UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
                                               :
                                               :
                                               :
IN RE: PLATINUM AND PALLADIUM                  :   Case No. 14-cv-9391 (GHW)
ANTITRUST LITIGATION                           :
                                               :   ECF CASE
                                               :
                                               :   ORAL ARGUMENT REQUESTED
                                               :
                                               :

---------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF
INDIVIDUAL MOTION OF UBS AG AND UBS SECURITIES LLC TO DISMISS
PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**



GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

555 Mission Street, Suite 3000
San Francisco, CA  94105
Phone:  (415) 393-8200

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 955-8500

*Attorneys for Defendants UBS AG and
UBS Securities LLC*


June 22, 2015

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     The Antitrust Claims Fail Because UBS Was Not A Platinum and
            Palladium Fixing Member And Plaintiffs Do Not Show That It Otherwise
            Conspired. ................................................................................................... 2

          A.    UBS Had No Role In Setting The Platinum and Palladium Fix
                 Price. ........................................................................................... 3

          B.    UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress
                 Platinum And Palladium Prices. .................................................. 4

    II.    The Commodities Manipulation Claims Fail Because UBS Did Not
            Intentionally Cause The Artificial Prices That Allegedly Caused Injury. ............ 10

CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

<u>Pages</u>

**CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................ 2, 9, 10, 11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................ 1, 3, 5, 6, 10

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991) ....................................................................... 5

*Fin. Acquisition Partners v. Blackwell,*
    440 F.3d 278 (5th Cir. 2006) ................................................................... 9

*Georgia Malone & Co., Inc. v. Rieder,*
    19 N.Y.3d 511, 973 N.E.2d 743 (N.Y. 2012) ....................................... 12

*In re Amaranth Natural Gas Commodities Litig.,*
    730 F.3d 170 (2d Cir. 2013) ............................................................... 11, 12

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
    560 F. App'x 84 (2d Cir. 2014) ...................................................... 6, 10, 12

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
    2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012),
    aff'd, 560 F. App'x 84 (2d Cir. 2014) ............................................ 10, 11

*In re Elevator Antitrust Litig.,*
    502 F.3d 47 (2d Cir. 2007) .............................................................. 6, 9, 10

*In re NYSE Specialists Sec. Litig.,*
    503 F.3d 89 (2d Cir. 2007) ....................................................................... 9

*In re Platinum & Palladium Commodities Litig.,*
    828 F. Supp. 2d 588 (S.D.N.Y. 2011) .................................................... 6

*Lipsky v. Commw. United Corp.,*
    551 F.2d 887 (2d Cir. 1976) ................................................................... 6

*Mayor of Balt. v. Citigroup,*
    709 F.3d 129 (2d Cir. 2013) ........................................................... 2, 3, 5, 9

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
    763 F.3d 198 (2d Cir. 2014) ................................................................... 5

TABLE OF AUTHORITIES
(cont'd)

Pages

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................. 5, 7

*Yak v. Bank Brussels Lambert*,
    252 F.3d 127 (2d Cir. 2001) ................................................................................... 5

**STATUTES**

15 U.S.C. § 1 ............................................................................................................... 2

7 U.S.C. § 1 ............................................................................................................... 10

7 U.S.C. § 13 ............................................................................................................. 11

**RULES**

Fed. R. Civ. P. 12(b)(6)............................................................................................ 2, 5

Fed. R. Civ. P. 8(a)(2) ................................................................................................ 2

Fed. R. Evid. 702 ....................................................................................................... 9

## INTRODUCTION

The Complaint in this purported class action alleges that the members of the Platinum and Palladium Fix panel—which determined a reference price for platinum and its "sister" metal, palladium, until October 2014—conspired to artificially suppress platinum and palladium prices for seven years by setting the Platinum and Palladium Fix price at unduly low levels.  The panel members (Defendants BASF Metals, Goldman Sachs, HSBC, and Standard Bank) allegedly engaged in this artificial-suppression and false-pricing scheme to benefit their investments in certain instruments whose value is derived from the price of physical platinum and palladium.

But as Plaintiffs concede, *UBS AG and UBS Securities LLC ("UBS") never participated in the Platinum and Palladium Fix* with the panel members.  UBS fully concurs with the other Defendants that the Complaint should be dismissed in its entirety as to all Defendants.  The allegations as to UBS's conduct also suffer from additional, and even more glaringly fatal, flaws addressed in this separate motion.[1]

When the Complaint's labels and conclusory allegations are filtered out, as they must be, nothing remains to support an inference that UBS conspired with the Platinum and Palladium Fix panel members to suppress the price of platinum and palladium.  At most, the Complaint describes, in conclusory fashion, parallel conduct by UBS and panel members, which is inadequate under Section 1 of the Sherman Act:  "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

---

[1]  The Complaint—including Plaintiffs' claims for relief under the Sherman Act, the Commodity Exchange Act, and New York common law—should be dismissed as to all Defendants for all of the reasons set forth in Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Co-Defendants' Memo").  UBS adopts all of the arguments in the Co-Defendants' Memo, and nothing in this separate motion by UBS should be construed otherwise, such adoption being necessary for UBS to address in this motion only issues unique to UBS, and not issues common to all Defendants, in conformance with this Court's order (ECF No. 75) granting the parties' consent application for leave to file excess pages.  To further avoid redundancy, this Memorandum also adopts the Background section of the Co-Defendants' Memo.

The Complaint attempts to compensate for the lack of factual matter supporting a plausible inference of conspiracy by directing attention to three things:  **(1)** UBS's role as a market maker; **(2)** the November 2014 assertions by the Swiss financial regulatory agency about certain inappropriate conduct by UBS employees that has nothing to do with Plaintiffs' claims; and **(3)** UBS's purported price quotes on the short-term (spot) market for physical platinum and palladium.  But none of these things gives rise to a plausible inference that UBS conspired to exploit the Platinum and Palladium Fix.  Nor does the Complaint show that UBS intentionally caused the allegedly artificial prices to which Plaintiffs attribute their injuries.  Accordingly, in addition to the fatal insufficiency of the Complaint's allegations against all of the Defendants, the claims against UBS in particular are woefully inadequate and should be dismissed under Rule 12(b)(6).

## ARGUMENT

I.    **The Antitrust Claims Fail Because UBS Was Not A Platinum And Palladium Fixing Member And Plaintiffs Do Not Show That It Otherwise Conspired.**

The Complaint does not allege facts sufficient to show that Plaintiffs' antitrust claims against UBS have "facial plausibility."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 8(a)(2), 12(b)(6).  Plaintiffs allege that all Defendants engaged in a "combination and conspiracy" in violation of, *inter alia*, Section 1 of the Sherman Act, 15 U.S.C. § 1 (Complaint ("C."), ECF No. 45, ¶¶ 210, 242).  "[C]rucial" to such a claim is "whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'"  *Mayor of Balt. v. Citigroup*, 709 F.3d 129, 135 (2d Cir. 2013).  The "plaintiff's job … is to allege enough facts to support the inference that a conspiracy actually existed."  *Id.* at 135-36.

Direct allegations of a conspiracy "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  *Id.*  By contrast, "[c]ircumstantial facts" of a conspiracy require *more* than an allegation of "conscious parallelism."  *Id.* at 136;

*see Twombly*, 550 U.S. at 556.  The plaintiff must present "additional facts or circumstances," referred to as "plus factors," and those additional "facts must … lead to an inference of conspiracy." *Mayor*, 709 F.3d at 137.  That is, "parallel conduct" allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.  Here, the Complaint does not allege "enough facts to support the inference that a conspiracy actually existed" as to *any* of the Defendants, but it is even more deficient as to UBS, given that UBS was not even a Platinum and Palladium Fix panel member.  The Complaint does not present any facts, or any required "plus factor," sufficient to portray UBS as a participant in the purported conspiracy.

**A.     UBS Had No Role In Setting The Platinum And Palladium Fix Price.**

The Platinum and Palladium Fix is at the heart of Plaintiffs' claims.  The Complaint's central contention is that Defendants "colluded to ensure there was coordinated manipulation and fixing of both the opening price" (C.¶ 215) at the start of the "auction process used in the Fixing" (C.¶ 213) and "the quoted buy/sell levels" (C.¶ 215) in the "auction that followed the Chair's announcement of the prevailing spot price" (C.¶ 214).  Using that exercise of "[d]irect and complete control of the Fixing values by a handful of competitors" (Complaint Appendix ("C. App.") E, No. 4(e)) and of "the direction of the Fixes, which the Fixing Bank Defendants controlled" (C.¶ 170), Defendants allegedly "sought to avoid the uncertainties and risks associated with platinum and palladium trading and the associated derivatives markets . . .  by collectively agreeing to manipulate the AM and PM Fixing through repeated conduct to suppress the price of platinum and palladium artificially" (C.¶ 160).  In this manner, the Complaint alleges, Defendants "held market participants hostage" (C.¶ 53), maintaining from 2008 through 2014 a "suppression of the platinum and palladium benchmarks" (C.¶ 89) to "profit from the purchase of platinum and palladium on the spot markets" (C.¶ 160) and, "on information and belief" (C.¶ 167), from Defend-

ants' purported "short positions on the platinum and palladium futures markets" (C.¶ 160).

But UBS concededly was not a "Fixing Bank Defendant[]" (C.¶ 1), nor one of the "four participants in the Fixing" (C.¶ 73), nor a co-owner of the entity that administered the Platinum and Palladium Fix until October 2014 (C.¶¶ 37-38, 55).  So even on Plaintiffs' baseless theory, UBS did not have "[d]irect and complete control of the Fixing values" (C. App. E, No. 4(e)) or of "the direction of the Fixes" (C.¶ 170), and UBS did not "directly control[]" the "collaboration" (C. App. E, No. 2(i)) that ran the auction.  UBS therefore was not poised to "subvert[]" (C.¶ 6) the process for determining the allegedly suppressed "platinum and palladium benchmarks" (C.¶ 89) or to hold investors "hostage" (C.¶ 53) by means of the Fix.  Nor does the Complaint describe communications between UBS and any Platinum and Palladium Fix panel member during the alleged "suppress[ion]" of "platinum and palladium prices around the AM and PM Fixing" (C.¶ 174), through which any supposed "information in order to know and control what was going to happen during the Fixing" was purportedly "shared" (C.¶ 15) with UBS.  Thus, even if the Platinum and Palladium Fix panel members could be treated as having acted in unlawful agreement, which they cannot be, nothing would connect UBS to that alleged agreement. The allegations as to the panel members thus cannot state an antitrust claim against UBS.

**B.    UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress Platinum And Palladium Prices.**

Failing to present facts showing UBS to be a conspirator is a fatal deficiency, and what Plaintiffs *do* allege about UBS does not compensate for that deficiency.  The Complaint presents three clusters of allegations as to UBS—that **(1)** UBS is a market maker in the platinum and palladium spot (short-term) markets (C.¶¶ 36, 63, 73);[2] **(2)** the Swiss Financial Market Supervisory

---

[2]    Market Making Members of the London Bullion Market Association ("LBMA") and Full Members of the London Platinum and Palladium Market ("LPPM") "provide continuous two-way bid and offer quotations in pre-

*(Cont'd on next page)*

Authority ("FINMA") made certain assertions about UBS's conduct as to its clients in precious metals trading in resolving a regulatory investigation (*e.g.*, C.¶¶ 147, 150, 153, 194-202);[3] and **(3)** UBS and the other Defendants allegedly quoted prices lower than market averages at intervals "before, during, and after the Fixing" (C.¶ 14) "for every year in the Class Period" (C.¶ 174(c)).  These allegations do not amount to any valid "plus factor," since they are not "facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Mayor*, 709 F.3d at 137.  That is, Plaintiffs have not described events showing that UBS engaged in, for example, "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4.

   1. **Market Making.**  UBS's activities as a market maker—"provid[ing] continuous two-way bid and offer quotations in precious metals for spot, outright and swap forwards" (note 2, *supra*)—do not plausibly suggest unlawful conduct in concert with the Platinum and Palladium Fix panelists.  The Complaint offers no basis whatsoever for inferring conspiracy from the mere fact of continuous active participation in a market.  As in the related commodities context, no

---

*(Cont'd from previous page)*

   cious metals for spot, outright and swap forwards and deposits or leases during the London business day."
   LBMA, *A Guide to the London Precious Metals Markets* 11 (2008) (Declaration of Joel S. Sanders, Ex. A).
   UBS respectfully requests that this Court take judicial notice of this LBMA publication.  Fed. R. Evid. 201.  At
   the Rule 12(b)(6) stage, the court examines the complaint "augmented by … 'documents incorporated into the
   complaint by reference, and matters of which a court may take judicial notice.'"  *Parkcentral Global Hub Ltd.
   v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues &
   Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130-31 (2d Cir. 2001)
   (court considers document "integral" to complaint even when pleading "[c]arefully avoid[s] all mention" of it
   when pleaded claims nonetheless depend on its contents) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949
   F.2d 42, 47-48 (2d Cir. 1991)).

[3]  UBS disagrees with the Complaint's characterization of the FINMA process, but for purposes of this motion it
   addresses the facts as pleaded.

"inference of intent" to engage in illicit conduct can be drawn from a firm's status as a major market participant. *In re Commodity Exchange, Inc.*, 560 F. App'x 84, 86 (2d Cir. 2014) ("*COMEX II*"). That is so even where the firm has market power, which is alleged here as to UBS (C.¶¶ 250, 255) only by impermissible "bald assertions." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (internal quotation marks omitted). If anything, UBS's market-making role undercuts the averment that UBS had a motive to participate in the alleged scheme, or that there is anything "suggestive," *Twombly*, 550 U.S. at 556, about UBS's "large short positions" in platinum and palladium derivatives (C.¶ 5). A "suppression of the platinum and palladium benchmarks" (C.¶ 89) over "the entire Class Period" (C.¶ 169) would not have benefitted UBS, given that, as an ordinary market maker, UBS was required to sell as well as to buy physical platinum and palladium to meet orders in the market, and UBS also held physical platinum and palladium (C.¶ 166).

   **2. FINMA Assertions.** FINMA's assertions announced on November 12, 2014 do not implicate UBS in the alleged conspiracy. To begin with, those assertions are "not an adjudication of the underlying issues" in Plaintiffs' case, and so Plaintiffs "are … prohibited from relying on the [FINMA statements] to plead the underlying facts of liability." *In re Platinum & Palladium Commods. Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011). Nonbinding assertions, including "pleadings, settlements, and government investigations in other cases," should be stricken as "immaterial" under Rule 12(f). *Id.* at 593 (citing *Lipsky v. Commw. United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976)).

   In any event, the FINMA assertions do not support Plaintiffs' claims. Plaintiffs here selectively refer to two documents that FINMA released on November 12, 2014: (1) a press release, *FINMA sanctions foreign exchange manipulation at UBS* 1 (Nov. 12, 2014) ("FINMA Re-

lease"), and (2) a report setting forth FINMA's allegations, *Foreign exchange trading at UBS AG: investigation conducted by FINMA* (Nov. 12, 2014) ("FINMA Report").[4] "Foreign exchange traders," the FINMA Release asserted, "acted unacceptably frequently against the interests of their clients and counterparties.  This conduct was partly coordinated with other banks.'" FINMA Release at 2.  "In the improper business conduct in foreign exchange and precious metals trading, electronic communication platforms played a key role," the FINMA Release added. *Id.*  The Complaint also refers (C.¶¶ 7, 147, 186, 200) to a Bloomberg News article that discussed the FINMA report and that quoted FINMA's chief executive officer, Mark Branson, as stating that "[t]he behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange," and that "[w]e have also seen clear attempts to manipulate fixes in the precious metals markets."[5]

But, of course, the FINMA Release selectively quoted in the Complaint, and the news coverage of the related FINMA Report, must be viewed in their proper context.  *See Tellabs*, 551 U.S. at 322; *supra* note 2.  The report—which focused mainly on conduct in the foreign exchange markets—briefly made assertions about events in precious metals markets in which UBS employees allegedly engaged in "*conduct against the interests of [the bank's] own clients*." FINMA Report § 3.3.3, at 12 (emphasis added).[6]  FINMA asserted that certain UBS employees

---

[4]   The release and report are at http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx.

[5]   Nicholas Larkin & Elena Logutenkova, *UBS Precious Metals Misconduct Found by Finma in FX Probe*, Bloomberg News, Nov. 12, 2014, *at* http://www.bloomberg.com/news/articles/2014-11-12/finma-s-ubs-foreign-exchange-settlement-includes-precious-metals.

[6]   Plaintiffs' allegations and characterizations of the FINMA report are based almost entirely on two sentences from the report.  The first sentence reads:  "The conduct and techniques inadmissible from a regulatory perspective were also applied at least in part to PM spot trading—for instance, the following conduct against the interests of [UBS's] own clients: (i) sharing information on order books with third parties (e.g. stop loss orders), (ii) sharing so-called 'flow information' with third parties on large current or imminent orders, (iii) sharing client names with third parties, (iv) front running and (v) triggering stop loss orders."  FINMA Report § 3.3.3, at 12.  The second sentence reads:  "A substantial element of the conspicuous conduct in PM trading was the repeated front running (especially in the back book) of silver fix orders of one client."  *Id.*

had shared the confidential order information of UBS's precious metals trading customers with unnamed "third parties," and also engaged in impermissible "front running"—that is, capitalizing on confidential customer order information to trade on UBS's behalf—including as to "silver fix orders of one client." *Id.* But FINMA's report did not allege that the conduct had anything to do with the Platinum and Palladium Fix or that the "third parties" were Platinum and Palladium Fix panel members, and Plaintiffs do not allege they are UBS customers whose confidential order information potentially was said to have been misused. Plaintiffs' claims hinge on purported "shar[ing of] information [among the Fixing Bank Defendants] in order to know and control what was going to happen during the Fixing" (C.¶ 15) of particular platinum and palladium benchmarks, not knowledge about customer orders from a bank lacking "control" over the Platinum and Palladium Fix (C. App. E, Nos. 2(i), 4(e)).

Departing from the FINMA release and report, which lend no support to the conspiracy allegations, the Complaint refers to a news article describing an alleged assertion of FINMA's Mr. Branson regarding "clear attempts to manipulate fixes in the precious metals markets." C.¶¶ 7, 147, 186, 200. But the quotation attributed to Mr. Branson does not even mention platinum or palladium or name UBS or any alleged co-participants in the supposed "attempts." In any event, nothing in the Complaint shows Mr. Branson used "manipulate" to assert that any specific company (let alone UBS in particular) participated in a conspiracy to "suppress" platinum and palladium prices via "control" of the Platinum and Palladium Fix as alleged in the Complaint. C.¶¶ 15, 155, 170, C. App. E, Nos. 2(i), 4(e). Moreover, any such assertion would be inconsistent with FINMA's report, which contains no suggestion that UBS had any role in any conspiracy using advance "know[ledge]" and "control" of the Platinum and Palladium Fix price and direction. C.¶¶ 15, 155. Mr. Branson's quoted remark thus does not "lead to an inference of

conspiracy" as alleged.  *Mayor*, 709 F.3d at 137.

Plaintiffs strain to recast FINMA's assertions about two categories of inappropriate conduct as to clients in precious metals markets—in which certain UBS staff improperly shared client "stop loss order[]" data and "trigger[ed]" such stop loss orders, and also improperly shared "flow information" concerning "large current or imminent orders" (FINMA Report § 3.3.3, at 12)—as pertaining to the Platinum and Palladium Fix.  C.¶¶ 9, 149, 171, 179, 216.  Again, however, FINMA's assertions did not connect UBS's alleged conduct towards certain of its clients to the Platinum and Palladium Fix, much less to an alleged effort to "control" or exploit advance "know[ledge]" of the Platinum and Palladium Fix in concert with the Fixing Members, and Plaintiffs' "mere conclusory statements" about the existence of such a connection are inadequate.  *Iqbal*, 556 U.S. at 678.[7]

**3.  Purported Price Quotes.**  Plaintiffs' threadbare assertions about UBS's price-quoting activity likewise fail to present a plausible claim.  No facts connect Plaintiffs' alleged statistical disparities in platinum and palladium pricing (C.¶¶ 99-145, 158), said to have been revealed by Plaintiffs' unidentified "expert consultants" (C.¶¶ 90, 93, 106, 112, 128-32, 135, 144, 170), to unlawful activity by UBS.[8]  Plaintiffs instead point to "spot prices" purportedly quoted by UBS and other Defendants that "were consistently lower than quoted prices by other market partici-

---

[7]  Also unavailing are allegations concerning November 2014 UBS settlements with the Commodities Futures Trading Commission ("CFTC") and the U.K. Financial Conduct Authority ("FCA") (C.¶¶ 148, 150, 152), and CFTC and Department of Justice inquiries said to be pending now (C.¶¶ 7, 185).  These unadjudicated assertions should be stricken under Rule 12(f).  At any rate, the settled CFTC and FCA matters are inapposite here because they addressed conduct relating to foreign exchange, not the Platinum and Palladium Fix, and do not support Plaintiffs' effort (C.¶ 153) to dissolve the distinction between those separate alleged "market[s] for antitrust purposes."  *Elevator Antitrust Litig.*, 502 F.3d at 52 (internal quotation marks omitted).

[8]  Plaintiffs err in reciting opinions contained in expert reports at the pleading stage, where "[l]egal conclusions, deductions or opinions couched as factual allegations" are not given "a presumption of truthfulness."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  *See generally* Fed. R. Evid. 702.  For example, "allowing plaintiffs to rely on an expert's opinion in order to state securities claims requires a court to confront a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage."  *Fin. Acquisition Partners v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006) (internal quotation marks omitted).

pants" (C.¶ 14) in periods "around the AM and PM Fixing" (C.¶ 174), when the spot markets

were "especially liquid" (C.¶ 140).  But beyond "labels and conclusions," *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 550 U.S. at 555), Plaintiffs again provide no facts showing that any price

quotations by UBS raise a plausible inference of conspiracy.  The price-quoting contention as to

UBS is especially incongruous given Plaintiffs' allegations of disparities distinguishing spot

market prices quoted by the Fixing Bank Defendants from those of other traders.  C.¶¶ 158-59.

These allegations carry no weight, of course, because the bare submission of purportedly

parallel or correlated price quotes in a dynamic market cannot support an inference of conspira-

cy, without additional facts showing that such quotes "would *probably not* result from chance,

coincidence, independent responses to common stimuli, or mere interdependence unaided by *an*

*advance understanding* among the parties." *Twombly*, 550 U.S. at 556 n.4 (emphases added);

*see also id.* at 557.  Here, Plaintiffs offer no non-conclusory grounds for inferring that UBS's

price quotes resulted from "an advance understanding" between UBS and any other Defendant.

"[S]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive

conspiracy." *Elevator Antitrust Litig.*, 502 F.3d at 51.  The Complaint's "paragraphs de-

scrib[ing] … market price fluctuations," coupled with "bald assertions" that the fluctuations are

the result of unlawful conduct, thus fall well short of the minimum demanded by Rules 8 and 12.

*In re Commodity Exchange, Inc.*, 2012 WL 6700236, *20 (S.D.N.Y. Dec. 21, 2012)

("*COMEX I*"), *aff'd, COMEX II*, 560 F. App'x at 86-87.

## II.   The Commodities Manipulation Claims Fail Because UBS Did Not Intentionally Cause The Artificial Prices That Allegedly Caused Injury.

The Complaint does not allege facts sufficient to show that Plaintiffs' manipulation

claims against UBS have "facial plausibility" under the Commodity Exchange Act ("CEA"), 7

U.S.C. § 1 *et seq.*—whether based on UBS's primary conduct as a principal (Claim Four) or sec-

ondary conduct as an alleged aider and abettor (Claim Five).  *Iqbal*, 556 U.S. at 678.  Because

the pleading fails to meet Rule 8, it also fails to meet Rule 9.

      The CEA "prohibits any person from 'manipulat[ing] or attempt[ing] to manipulate the

price of any commodity.'"  *COMEX I*, 2012 WL 6700236, *10 (quoting 7 U.S.C. § 13).  Ma-

nipulation is found "where (1) Defendants possessed an ability to influence market prices; (2) an

artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically

intended to cause the artificial price."  *In re Amaranth Natural Gas Commods. Litig.*, 730 F.3d

170, 173 (2d Cir. 2013) (internal quotation marks omitted); *COMEX II*, 560 F. App'x. at 86-87.

In addition to the reasons Plaintiffs' CEA theory fails as to all of the Defendants, it also fails as

to UBS for the same reasons that the antitrust conspiracy theory fails.  The Platinum and Palladi-

um Fix is the moving force behind the alleged manipulation.  C.¶¶ 6, 15, 53, 89, 160, 170, 174,

213-15; C. App. E. Nos. 2(i), 4(e).  But no facts alleged support a plausible inference that UBS

had any role in that purported scheme.

      Plaintiffs thus fail to satisfy at least three of the elements of a CEA manipulation claim as

to UBS.  UBS lacked "ability to influence" the Platinum and Palladium Fix outcome even under

Plaintiffs' theory, given that UBS did not participate in the Platinum and Palladium Fix.  C.¶¶ 1,

37-38, 55, 73; *see Amaranth*, 730 F.3d at 173.  The Complaint also fails to show that UBS

"[c]aused the artificial prices" alleged or that UBS "specifically intended to cause" any such

prices.  *Id.*  Importantly, the "inference of intent" to manipulate "cannot be drawn from the mere

fact that" a trader has "a strong short position" in particular instruments, because the trader

"may . . . acquire a large position in the belief that the price of the future will, for reasons other

than the traders' own activity, move in a favorable direction."  *COMEX II*, 560 F. App'x at 86

(quoting *Amaranth*, 730 F.3d at 184) (internal quotation marks omitted).

Moreover, UBS's role as a market maker further undercuts the plausibility of the allegation that it had a motive to suppress prices over a seven-year period. *Supra*, Point I.B.1. And Plaintiffs' attempt to plead CEA claims premised on "false or misleading or inaccurate reports of the Fixing" (C.¶ 256) fails as to UBS for all the reasons set forth in the Co-Defendants' Memo and also because UBS was not a Platinum and Palladium Fix panel member.

Furthermore, "[a]s plaintiffs fail[] to allege a CEA violation, their aiding and abetting claim [is] properly dismissed as well." *COMEX II*, 560 F. App'x. at 87. Aiding and abetting "requires knowledge of the primary violation and an intent to assist it," *Amaranth*, 730 F.3d at 183, but no alleged facts support those inferences. And for the reasons discussed as to the antitrust claim, none of the clusters of allegations concerning UBS's conduct compensates for these deficiencies. *See COMEX II*, 560 F. App'x. at 86-87 (quoting *Amaranth*, 730 F.3d at 183).[9]

## CONCLUSION

For the foregoing reasons, and the reasons stated in the Co-Defendants' Memo, all claims in the Complaint should be dismissed as to UBS.

DATE:  June 22, 2015

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

Joel S. Sanders
555 Mission Street, Suite 3000
San Francisco, CA  94105
Telephone: (415) 393-8200

Peter Sullivan
Lawrence J. Zweifach
Indraneel Sur
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000

/s/  Thomas G. Hungar
Thomas G. Hungar
D. Jarrett Arp
Melanie L. Katsur
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 955-8500
thungar@gibsondunn.com

*Attorneys for Defendants UBS AG
and UBS Securities LLC*

---

[9]  Claim Six, for unjust enrichment, also fails, as Plaintiffs do not allege a relationship with UBS supporting quasi-contractual relief. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516-18, 973 N.E.2d 743, 746-48 (2012).