UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                           :
                                           :
IN RE: PLATINUM AND PALLADIUM     :  Case No. 14-cv-9391 (GHW)
ANTITRUST LITIGATION                         :
                                           :  ECF CASE
                                           :
                                           :  ORAL ARGUMENT REQUESTED
                                           :
------------------------------------------------------------x


# MEMORANDUM OF LAW IN SUPPORT OF
# INDIVIDUAL MOTION OF UBS AG AND UBS SECURITIES LLC
# TO DISMISS PLAINTIFFS' SECOND
# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT


GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

555 Mission Street, Suite 3000
San Francisco, CA  94105
Phone:  (415) 393-8200

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 955-8500

*Attorneys for Defendants UBS AG and*
*UBS Securities LLC*

September 21, 2015

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

    I.      The Antitrust Claims Fail Because UBS Was Not A Platinum and Palladium Fixing Member And Plaintiffs Do Not Show That It Otherwise Conspired. ................................................................................................... 2

          A.     UBS Had No Role In Setting The Platinum and Palladium Fix Price. .................................................................................................. 3

          B.     UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress Platinum And Palladium Prices. ................................................................ 4

    II.     The Commodities Manipulation Claims Fail Because UBS Did Not Intentionally Cause The Artificial Prices That Allegedly Caused Injury. ............. 11

CONCLUSION ...................................................................................................................... 12

## TABLE OF AUTHORITIES

Pages

**CASES**

*Ashcroft v. Iqbal,*
　556 U.S. 662 (2009) ................................................................................................ 2, 10, 11

*Bell Atl. Corp. v. Twombly,*
　550 U.S. 544 (2007) ........................................................................................... 2, 3, 5, 6, 10

*Cortec Indus., Inc. v. Sum Holding L.P.,*
　949 F.2d 42 (2d Cir. 1991) ..................................................................................................... 5

*Fin. Acquisition Partners v. Blackwell,*
　440 F.3d 278 (5th Cir. 2006) .................................................................................................. 9

*Georgia Malone & Co., Inc. v. Rieder,*
　19 N.Y.3d 511, 973 N.E.2d 743 (N.Y. 2012) ....................................................................... 12

*In re Amaranth Natural Gas Commodities Litig.,*
　730 F.3d 170 (2d Cir. 2013) ............................................................................................ 11, 12

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
　560 F. App'x 84 (2d Cir. 2014) ....................................................................................... 6, 10, 12

*In re Commodity Exchange, Inc., Silver Futures & Options Trading Litig.,*
　2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012),
　aff'd, 560 F. App'x 84 (2d Cir. 2014) ............................................................................. 10, 11

*In re Elevator Antitrust Litig.,*
　502 F.3d 47 (2d Cir. 2007) .......................................................................................... 6, 9, 10

*In re NYSE Specialists Sec. Litig.,*
　503 F.3d 89 (2d Cir. 2007) ..................................................................................................... 9

*In re Platinum & Palladium Commodities Litig.,*
　828 F. Supp. 2d 588 (S.D.N.Y. 2011) ..................................................................................... 6

*Lipsky v. Commw. United Corp.,*
　551 F.2d 887 (2d Cir. 1976) ................................................................................................... 6

*Mayor of Balt. v. Citigroup,*
　709 F.3d 129 (2d Cir. 2013) .......................................................................................... 2, 3, 5, 9

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE,*
　763 F.3d 198 (2d Cir. 2014) ................................................................................................... 5

TABLE OF AUTHORITIES
(cont'd)

Pages

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................................. 5, 7

*Yak v. Bank Brussels Lambert*,
  252 F.3d 127 (2d Cir. 2001) ......................................................................................... 5

**STATUTES**

15 U.S.C. § 1 ...................................................................................................................... 2

7 U.S.C. § 1 ...................................................................................................................... 11

7 U.S.C. § 13 .................................................................................................................... 11

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 2, 5

Fed. R. Civ. P. 8(a)(2) ....................................................................................................... 2

Fed. R. Evid. 702 .............................................................................................................. 9

**INTRODUCTION**

The Second Amended Complaint ("SAC") in this purported class action alleges that the members of the Platinum and Palladium Fix panel—which determined a reference price for platinum and its "sister" metal, palladium, until October 2014—conspired to artificially suppress prices for seven years by setting the Platinum and Palladium Fix price at unduly low levels. The panel members (Defendants BASF Metals, Goldman Sachs, HSBC, and Standard Bank) allegedly engaged in this artificial-suppression and false-pricing scheme to benefit their investments in certain instruments whose value is derived from the price of physical platinum and palladium.

But as Plaintiffs concede, ***UBS AG and UBS Securities LLC ("UBS") never participated in the Platinum and Palladium Fix*** with the panel members. UBS fully concurs with the other Defendants that the SAC should be dismissed in its entirety as to all Defendants. The allegations as to UBS's conduct also suffer from additional, and even more glaringly fatal, flaws addressed in this separate motion.[1]

When the SAC's labels and conclusions are filtered out, as they must be, nothing remains to support an inference that UBS conspired with the Platinum and Palladium Fix panel members to suppress the price of platinum and palladium. At most, the SAC describes, in conclusory fashion, parallel conduct by UBS and panel members, which is inadequate under Section 1 of the Sherman Act: "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not

---

[1] The SAC—including Plaintiffs' claims for relief under the Sherman Act, the Commodity Exchange Act, and New York common law—should be dismissed as to all Defendants for all of the reasons set forth in Defendants' Memorandum of Law in Support of their Motion to Dismiss the Second Consolidated Amended Class Action Complaint ("Co-Defendants' Memo"). UBS joins the Co-Defendants' Memo in full. Nothing in this separate motion by UBS should be construed otherwise, such adoption being necessary for UBS to address in this motion only issues unique to UBS, and not issues common to all Defendants, in conformance with this Court's order (ECF No. 75) granting the parties leave to file excess pages. To further avoid redundancy, this Memorandum also adopts the Background section of the Co-Defendants' Memo.

suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

The SAC attempts to compensate for the lack of factual matter supporting a plausible inference of conspiracy by directing attention to three things: **(1)** UBS's role as a market maker; **(2)** the November 2014 assertions by the Swiss financial regulatory agency about certain inappropriate conduct by UBS employees that has nothing to do with Plaintiffs' claims; and **(3)** UBS's purported price quotes on the short-term (spot) market for physical platinum and palladium. But none of these things gives rise to a plausible inference that UBS conspired to exploit the Platinum and Palladium Fix. Nor does the SAC show that UBS intentionally caused the allegedly artificial prices to which Plaintiffs attribute their injuries. Accordingly, in addition to the fatal insufficiency of the SAC's allegations against all of the Defendants, the claims against UBS in particular remain woefully inadequate and should be dismissed under Rule 12(b)(6).

## ARGUMENT

**I.    The Antitrust Claims Fail Because UBS Was Not A Platinum And Palladium Fixing Member And Plaintiffs Do Not Show That It Otherwise Conspired.**

The SAC does not allege facts sufficient to show that Plaintiffs' antitrust claims against UBS have "facial plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 8(a)(2), 12(b)(6). Plaintiffs allege that all Defendants engaged in a "combination" or "conspiracy" in violation of, *inter alia*, Section 1 of the Sherman Act, 15 U.S.C. § 1. SAC, ECF No. 102, ¶ 280; *see* SAC ¶ 248. "[C]rucial" to such a claim is "whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'" *Mayor of Balt. v. Citigroup*, 709 F.3d 129, 135 (2d Cir. 2013). The "plaintiff's job … is to allege enough facts to support the inference that a conspiracy actually existed." *Id.* at 135-36.

Direct allegations of a conspiracy "would consist, for example, of a recorded phone call

2

in which two competitors agreed to fix prices at a certain level." *Id.* By contrast, "[c]ircumstantial facts" of a conspiracy require *more* than an allegation of "conscious parallelism." *Id.* at 136; *see Twombly*, 550 U.S. at 556. The plaintiff must present "additional facts or circumstances," referred to as "plus factors," and those additional "facts must … lead to an inference of conspiracy." *Mayor*, 709 F.3d at 137. That is, "parallel conduct" allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Here, the SAC does not allege "enough facts to support the inference that a conspiracy actually existed" as to *any* of the Defendants, but it is even more deficient as to UBS, given that UBS was not even a Platinum and Palladium Fix panel member. The SAC does not present any facts, or any required "plus factor," sufficient to portray UBS as a participant in the purported conspiracy.

A.     **UBS Had No Role In Setting The Platinum And Palladium Fix Price.**

The Platinum and Palladium Fix is at the heart of Plaintiffs' claims. The SAC's central contention is that Defendants "colluded to ensure there was coordinated manipulation and fixing of both the opening price" (SAC ¶ 253) at the start of the "auction process used in the Fixing" (SAC ¶ 251) and of "the quoted buy/sell levels" (SAC ¶ 253) in the "auction that followed the Chair's announcement of the prevailing spot price" (SAC ¶ 252). Using that purported exercise of "[d]irect and complete control of the Fixing values by a handful of competitors" (SAC Appendix ("App.") E, # 4(e)) and of "the direction of the Fixes, which the Fixing Defendants controlled" (SAC ¶ 196), Defendants allegedly "sought to avoid the uncertainties and risks associated with platinum and palladium trading and the associated derivatives markets . . . by collectively agreeing to manipulate the AM and PM Fixing through repeated conduct to suppress the price of platinum and palladium artificially" (SAC ¶ 185). In this manner, the SAC alleges, Defendants "held market participants hostage" (SAC ¶ 61), maintaining from 2008

3

through 2014 a "suppression of the platinum and palladium benchmarks" (SAC ¶ 97) to "profit from the purchase of platinum and palladium on the spot markets" (SAC ¶ 185) and, "on information and belief" (SAC ¶ 193), from Defendants' purportedly "massive short positions" on "the platinum and palladium futures markets" (SAC ¶¶ 12, 185).

But UBS concededly was not a "Fixing Defendant[]" (SAC ¶ 1), nor one of the "four participants in the Fixing" (SAC ¶ 81), nor a co-owner of the entity that administered the Platinum and Palladium Fix until October 2014 (SAC ¶¶ 45-46, 63). So even on Plaintiffs' baseless theory, UBS did not have "[d]irect and complete control of the Fixing values" (SAC App. E, # 4(e)) or of "the direction of the Fixes" (SAC ¶ 196), and UBS did not "directly control[]" the "collaboration" (SAC App. E, # 2(i)) that ran the auction. UBS therefore was not poised to "manipulat[e]" (SAC ¶ 9) the process for determining the allegedly suppressed "platinum and palladium benchmarks" (SAC ¶ 97), or to hold investors "hostage" (SAC ¶ 61) by means of the Fix. Nor does the SAC describe particular communications between UBS and any Platinum and Palladium Fix panel member during the alleged "suppress[ion]" of "platinum and palladium prices around the AM and PM Fixing" (SAC ¶ 212), through which any supposed "foreknowledge" (SAC ¶¶ 4, 12-14, 199) of the Fix was conveyed to UBS. Thus, even if the Platinum and Palladium Fix panel members could be treated as having acted in unlawful agreement, which they cannot be, nothing would connect UBS to that alleged agreement. The allegations as to the panel members thus cannot state an antitrust claim against UBS.

**B.     UBS Did Not Otherwise Join The Alleged Conspiracy To Suppress Platinum And Palladium Prices.**

Failing to present facts showing UBS to be a conspirator is a fatal deficiency, and what Plaintiffs *do* allege about UBS does not compensate for that deficiency. The SAC presents three clusters of allegations as to UBS—that **(1)** UBS is a market maker in the platinum and palladium

4

spot (short-term) markets (SAC ¶¶ 44, 71, 81);[2] **(2)** the Swiss Financial Market Supervisory Authority ("FINMA") made certain assertions about UBS's conduct as to its clients in precious metals trading in resolving a regulatory investigation (*e.g.*, SAC ¶¶ 168, 171, 174, 232-40);[3] and **(3)** UBS and the other Defendants allegedly quoted prices lower than market averages at intervals "before and around the Fixing window" (SAC ¶ 181), "for every year in the Class Period" (SAC ¶ 212(c)). These allegations do not amount to any valid "plus factor," since they are not "facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Mayor*, 709 F.3d at 137. That is, Plaintiffs have not described events showing that UBS engaged in, for example, "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4.

**1. Market Making.** UBS's activities as a market maker—"quot[ing] buying *and* selling prices for spot delivery and provide liquidity to the market" (SAC ¶ 71) (emphasis added) on a "continuous basis" (note 2, *supra*)—do not plausibly suggest unlawful conduct in concert with

---

[2] "The OTC market trades on a 24-hour per day continuous basis and accounts for most global platinum trading. Market makers . . . trade with each other and with their clients on a principal-to-principal basis . . . . Fluctuations in liquidity are reflected in adjustments to dealing spreads—the differential between a dealer's 'buy' and 'sell' prices." ETF Securities, *ETFS Platinum Trust (ETFS Physical Platinum Shares) Prospectus* 21 (Mar. 6, 2015), *available at* http://www.etfsecurities.com/institutional/us/en-us/products/product/etfs-physical-platinum-shares-pplt-arca#14. UBS respectfully requests that this Court take judicial notice of this prospectus, required by law to be publicly filed. *See* Fed. R. Evid. 201; *cf.* SAC ¶ 90 & n.33 (appearing to quote version of this prospectus). At the Rule 12(b)(6) stage, the court examines the complaint "augmented by … 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 202 (2d Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *see Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130-31 (2d Cir. 2001) (court considers document "integral" to complaint even if pleading "[c]arefully avoid[s] all mention" of it when pleaded claims nonetheless depend on its contents) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

[3] UBS disagrees with the SAC's characterization of the FINMA process, but for purposes of this motion it addresses the facts as pleaded.

5

the Platinum and Palladium Fix panelists. The SAC offers no basis whatsoever for inferring conspiracy from the mere fact of continuous active participation in a market. As in the related commodities context, no "inference of intent" to engage in illicit conduct can be drawn from a firm's status as a major market participant. *In re Commodity Exchange, Inc.*, 560 F. App'x 84, 86 (2d Cir. 2014) ("*COMEX II*"). That is so even where the firm has market power, which is alleged here as to UBS (SAC ¶ 288) only by impermissible "bald assertions." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (internal quotation marks omitted). If anything, UBS's market-making role undercuts the averment that UBS had a motive to participate in the alleged scheme, or that there is anything "suggestive," *Twombly*, 550 U.S. at 556, about UBS's purportedly "massive short positions" in platinum and palladium derivatives (SAC ¶ 12; *see* SAC ¶ 218), an allegation made only on "information and belief" (SAC ¶ 193). The "suppression of the platinum and palladium benchmarks" (SAC ¶ 97) over "the entire Class Period" (SAC ¶ 195) that Plaintiffs posit would not have benefitted UBS, given that, as an ordinary market maker, UBS was required to sell as well as to buy physical platinum and palladium to meet orders in the market, and UBS also held physical platinum and palladium (SAC ¶ 191).

    **2. FINMA Assertions.** FINMA's assertions do not implicate UBS in the alleged conspiracy. Those assertions are "not an adjudication of the underlying issues" in Plaintiffs' case, so Plaintiffs "are … prohibited from relying on the [FINMA statements] to plead the underlying facts of liability." *In re Platinum & Palladium Commods. Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011). Such nonbinding assertions should be stricken as "immaterial" under Rule 12(f). *Id.* at 593; *see Lipsky v. Commw. United Corp.*, 551 F.2d 887, 894 (2d Cir. 1976).

    In any event, the FINMA assertions do not support Plaintiffs' claims. Plaintiffs here

selectively refer to two documents that FINMA released on November 12, 2014: (1) a press release, *FINMA sanctions foreign exchange manipulation at UBS* 1 (Nov. 12, 2014) ("FINMA Release"), and (2) a report setting forth FINMA's allegations, *Foreign exchange trading at UBS AG: investigation conducted by FINMA* (Nov. 12, 2014) ("FINMA Report").[4] "Foreign exchange traders," the FINMA Release asserted, "acted unacceptably frequently against the interests of their clients and counterparties. This conduct was partly coordinated with other banks.'" FINMA Release at 2. "In the improper business conduct in foreign exchange and precious metals trading, electronic communication platforms played a key role," the FINMA Release added. *Id.* The SAC also refers (SAC ¶¶ 17 & n.5, 168, 224) to a Bloomberg News article that discussed the FINMA report and that quoted FINMA's chief executive officer, Mark Branson, as stating that "[t]he behavior patterns in precious metals were somewhat similar to the behavior patterns in foreign exchange," and that "[w]e have also seen clear attempts to manipulate fixes in the precious metals markets."[5]

But, of course, the selectively quoted FINMA Release and the news coverage of the related FINMA Report must be viewed in their proper context. *Tellabs*, 551 U.S. at 322; *supra* note 2. The report—which focused mainly on conduct as to benchmarks in the foreign exchange markets—briefly made assertions about conduct by UBS employees in precious metals

---

[4] The release and report, cited at SAC ¶ 17 & nn.6-7, are available at http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx. Plaintiffs rely almost entirely on two sentences from the report. The first sentence reads: "The conduct and techniques inadmissible from a regulatory perspective were also applied at least in part to PM spot trading—for instance, the following conduct against the interests of [UBS's] own clients: (i) sharing information on order books with third parties (e.g. stop loss orders), (ii) sharing so-called 'flow information' with third parties on large current or imminent orders, (iii) sharing client names with third parties, (iv) front running and (v) triggering stop loss orders." FINMA Report § 3.3.3, at 12. The second sentence reads: "A substantial element of the conspicuous conduct in PM trading was the repeated front running (especially in the back book) of silver fix orders of one client." *Id.*

[5] Nicholas Larkin & Elena Logutenkova, *UBS Precious Metals Misconduct Found by Finma in FX Probe*, Bloomberg News, Nov. 12, 2014, *at* http://www.bloomberg.com/news/articles/2014-11-12/finma-s-ubs-foreign-exchange-settlement-includes-precious-metals.

7

markets that was allegedly "*against the interests of [the bank's] own clients*." FINMA Report § 3.3.3, at 12 (emphasis added). FINMA asserted that certain UBS employees had shared confidential order information of UBS's precious metals trading customers with unnamed "third parties," and also engaged in impermissible "front running"—that is, capitalizing on confidential customer order information to trade on UBS's behalf—including as to "silver fix orders of one client." *Id.* But FINMA's report did not allege that the conduct had anything to do with the Platinum and Palladium Fix (or any other precious metals benchmark), or that the "third parties" were Platinum and Palladium Fix panel members, and Plaintiffs do not allege they are UBS customers whose confidential order information potentially was said to have been misused. Plaintiffs' claims hinge on purported "foreknowledge that the Fix price . . . was going to go down on a given day, at a given time" (SAC ¶ 13), not knowledge about individual customer orders possessed by a bank lacking "control" over the Platinum and Palladium Fix (SAC App. E, # 2(i), 4(e)).

Departing from the FINMA release and report, which lend no support to the conspiracy allegations, the SAC refers to a news article describing an alleged assertion of FINMA's Mr. Branson regarding "clear attempts to manipulate fixes in the precious metals markets." SAC ¶¶ 17 & n.5, 168, 224. But the quotation attributed to Mr. Branson does not even mention platinum or palladium or name UBS or any alleged co-participants in the supposed "attempts." In any event, nothing in the SAC shows Mr. Branson used "manipulate" to assert that any specific company (let alone UBS in particular) participated in a conspiracy to "suppress" platinum and palladium prices via "control" of the Platinum and Palladium Fix as alleged. SAC ¶¶ 12, 176, 193, 196; SAC App. E, # 2(i), 4(e). Moreover, any such assertion would be inconsistent with FINMA's report, which contains no suggestion that UBS had any role in any

conspiracy using "foreknowledge" and "control" of the Platinum and Palladium Fix price and direction. SAC ¶¶ 4, 12, 176, 199. Mr. Branson's quoted remark thus does not "lead to an inference of conspiracy" as alleged. *Mayor*, 709 F.3d at 137.

Plaintiffs strain to recast FINMA's assertions about two categories of inappropriate conduct as to clients in precious metals markets—in which certain UBS staff improperly shared client "stop loss order[]" data and "trigger[ed]" such stop loss orders, and also improperly shared "flow information" concerning "large current or imminent orders" (FINMA Report § 3.3.3, at 12)—as pertaining to the Platinum and Palladium Fix. SAC ¶¶ 197, 202, 238. Again, however, FINMA's assertions did not connect UBS's alleged conduct towards certain of its clients to the Platinum and Palladium Fix, much less to an alleged effort to "control" or exploit "foreknowledge" of the Platinum and Palladium Fix in concert with the Fixing Members.[6]

**3. Purported Price Quotes.** Plaintiffs' threadbare assertions about UBS's price-quoting activity likewise fail to present a plausible claim. No facts connect Plaintiffs' alleged statistical disparities in platinum and palladium pricing (SAC ¶¶ 108-66, 179-93) to unlawful activity by UBS.[7] Plaintiffs instead point to "spot prices" purportedly quoted by UBS and other Defendants that were "consistently lower than [those of] other market participants" (SAC ¶ 181) in periods

---

[6] Also unavailing are allegations concerning November 2014 UBS settlements with the Commodities Futures Trading Commission ("CFTC") and the U.K. Financial Conduct Authority ("FCA") (SAC ¶¶ 8 n.2, 169 & n.43, 171 & n.45, 173 & n.48); CFTC and Department of Justice ("DOJ") inquiries described in news reports in 2015 (SAC ¶¶ 18 & n.9, 223); and UBS's May 2015 resolution of a DOJ foreign exchange investigation (SAC ¶¶ 18, 168). Even if these unadjudicated assertions could be considered, they addressed conduct relating to certain interest rate and foreign exchange benchmarks, not the Platinum and Palladium Fix, and do not support Plaintiffs' effort to dissolve the distinctions between those separate alleged "market[s] for antitrust purposes." *Elevator Antitrust Litig.*, 502 F.3d at 52 (internal quotation marks omitted).

[7] Plaintiffs err in reciting opinions contained in expert reports at the pleading stage, where "[l]egal conclusions, deductions or opinions couched as factual allegations" are not given "a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). *See* Fed. R. Evid. 702; *Fin. Acquisition Partners v. Blackwell*, 440 F.3d 278, 285-86 (5th Cir. 2006). Although Plaintiffs have now deleted the many references to their "expert consultants" that adorned their prior complaint, that stylistic revision does not change the impermissible nature of these assertions. *Cf.* Compl., ECF No. 45, ¶¶ 90, 93, 106, 112, 128-32, 135, 144, 170.

9

"around the AM and PM Fixing" (SAC ¶ 6-7, 9-10), when the spot markets were "especially liquid" (SAC ¶ 153). But beyond "labels and conclusions," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), Plaintiffs again provide no facts showing that any price quotations by UBS raise a plausible inference of conspiracy. The price-quoting contention as to UBS is especially incongruous given (a) Plaintiffs' acknowledgment that *actual* price data is "only available sparsely" (SAC ¶ 181 & n.50); (b) Plaintiffs' concession that their charts exaggerate UBS's role regarding the movement of prices, in that "UBS's quotes are identified *far more often* than other institutions" (*id.*) (emphasis added); and (c) Plaintiffs' allegations of disparities distinguishing spot market prices quoted by the Fixing Defendants from those of other traders (SAC ¶¶ 179-81).

In all, Plaintiffs' price-quoting allegations carry no weight, because the bare submission of purportedly parallel or correlated price quotes in a dynamic market cannot support an inference of conspiracy without additional facts showing that such quotes "would *probably not* result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by *an advance understanding* among the parties." *Twombly*, 550 U.S. at 556 n.4 (emphases added); *see also id.* at 557. Here, Plaintiffs offer no non-conclusory grounds for inferring that UBS's price quotes resulted from "an advance understanding" between UBS and any other Defendant. "[S]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy." *Elevator Antitrust Litig.*, 502 F.3d at 51. The SAC's "paragraphs describ[ing] … market price fluctuations," coupled with "bald assertions" that the fluctuations are the result of unlawful conduct, thus fall well short of the minimum demanded by Rules 8 and 12. *In re Commodity Exchange, Inc.*, 2012 WL 6700236, *20 (S.D.N.Y. Dec. 21, 2012) ("*COMEX I*"), *aff'd*, *COMEX II*, 560 F. App'x at 86-87.

## II. The Commodities Manipulation Claims Fail Because UBS Did Not Intentionally Cause The Artificial Prices That Allegedly Caused Injury.

The SAC does not allege facts sufficient to show that Plaintiffs' manipulation claims against UBS have "facial plausibility" under the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*—whether based on UBS's primary conduct as a principal (Claim Five) or secondary conduct as an alleged aider and abettor (Claim Six). *Iqbal*, 556 U.S. at 678. Because the pleading fails to meet Rule 8, it necessarily fails to meet Rule 9.

The CEA "prohibits any person from 'manipulat[ing] or attempt[ing] to manipulate the price of any commodity.'" *COMEX I*, 2012 WL 6700236, *10 (quoting 7 U.S.C. § 13). Manipulation is found "where (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commods. Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (internal quotation marks omitted); *COMEX II*, 560 F. App'x. at 86-87. In addition to the reasons Plaintiffs' CEA theory fails as to all of the Defendants, it also fails as to UBS for the same reasons that the antitrust conspiracy theory fails. The Platinum and Palladium Fix is the moving force behind the alleged manipulation. *See, e.g.*, SAC ¶¶ 6, 97, 185, 196, 212, 251-53; SAC App. E. # 2(i), 4(e). But no facts alleged support a plausible inference that UBS had any role in that purported scheme.

Plaintiffs thus fail to satisfy at least three of the elements of a CEA manipulation claim as to UBS. UBS lacked "ability to influence" the Platinum and Palladium Fix outcome even under Plaintiffs' theory, given that UBS did not participate in the Platinum and Palladium Fix. SAC ¶¶ 1, 45-46, 63, 81; *see Amaranth*, 730 F.3d at 173. The SAC also fails to show that UBS "[c]aused the artificial prices" alleged or that UBS "specifically intended to cause" any such prices. *Id.* Importantly, the "inference of intent" to manipulate "cannot be drawn from the mere

11

fact that" a trader has "a strong short position" in particular instruments, because the trader "may . . . acquire a large position in the belief that the price of the future will, for reasons other than the traders' own activity, move in a favorable direction." *COMEX II*, 560 F. App'x at 86 (quoting *Amaranth*, 730 F.3d at 184) (internal quotation marks omitted).

Moreover, UBS's role as a market maker further undercuts the plausibility of the allegation that it had a motive to suppress prices over a seven-year period. *Supra*, Point I.B.1. And Plaintiffs' attempt to plead CEA claims premised on "false, misleading, or inaccurate reports of the Fixing" (SAC ¶ 298) fails as to UBS for all the reasons set forth in the Co-Defendants' Memo and also because UBS was not a Platinum and Palladium Fix panel member.

Furthermore, "[a]s plaintiffs fail[] to allege a CEA violation, their aiding and abetting claim [is] properly dismissed as well." *COMEX II*, 560 F. App'x. at 87. Aiding and abetting "requires knowledge of the primary violation and an intent to assist it," *Amaranth*, 730 F.3d at 183, but no alleged facts support those inferences. And for the reasons discussed as to the antitrust claim, none of the clusters of allegations concerning UBS's conduct compensates for these deficiencies. *See COMEX II*, 560 F. App'x. at 86-87 (quoting *Amaranth*, 730 F.3d at 183).[8]

## CONCLUSION

All claims in the SAC should be dismissed as to UBS.

/ / /

/ / /

/ / /

---

[8] Claim Seven, for unjust enrichment, also fails, as Plaintiffs do not allege a relationship with UBS supporting quasi-contractual relief. *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516-18, 973 N.E.2d 743, 746-48 (2012).

| | |
|---|---|
| DATE:  September 21, 2015 | Respectfully submitted,<br><br>GIBSON, DUNN & CRUTCHER LLP |
| Joel S. Sanders<br>555 Mission Street, Suite 3000<br>San Francisco, CA  94105<br>Telephone: (415) 393-8200<br><br>Peter Sullivan<br>Lawrence J. Zweifach<br>Indraneel Sur<br>200 Park Avenue<br>New York, NY 10166<br>Telephone: (212) 351-4000 | /s/  Thomas G. Hungar<br>Thomas G. Hungar<br>D. Jarrett Arp<br>Melanie L. Katsur<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C.  20036<br>Telephone: (202) 955-8500<br>thungar@gibsondunn.com<br><br>*Attorneys for Defendants UBS AG and UBS Securities LLC* |