**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | Lead Case No. 14-CV-9391 |
| ) | |
| ) | Hon. Gregory H. Woods |
IN RE PLATINUM AND PALLADIUM | ) | |
ANTITRUST LITIGATION | ) | Oral Argument Requested |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

**DEFENDANTS BASF CORPORATION, BASF METALS LIMITED, GOLDMAN**
**SACHS INTERNATIONAL, HSBC BANK USA, N.A., ICBC STANDARD BANK PLC**
**AND THE LONDON PLATINUM AND PALLADIUM FIXING COMPANY LTD.'S**
**JOINT MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**
**PURSUANT TO FED. R. CIV. P. 12(B)(6)**

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ................................................................................................ 4

ARGUMENT .................................................................................................... 10

    I.      Plaintiffs Fail To State A Claim For Violation Of The Sherman Act. ................ 10

          A.     The Complaint Does Not Allege the Existence of an
Anticompetitive Conspiracy. .................................................... 11

              1.     The Complaint Does Not Allege Direct Evidence of an
Agreement.................................................................... 11

              2.     The Complaint Does Not Plead Sufficient Circumstantial
Evidence from Which To Infer the Existence of an
Agreement.................................................................... 12

                    a.     The Complaint Does Not Plausibly Allege Parallel
Conduct.......................................................... 13

                    b.     The Complaint's Alleged 'Plus Factors' Do Not
Support a Plausible Inference of Conspiracy.................... 14

                         i.     There Is No Plausible Allegation of
Common Motive. .................................................. 14

                         ii.     Defendants Had No Plausible Opportunity
To Manipulate The Auctions. ................................. 18

          B.     The Views of Plaintiffs' Experts Are Insufficient to Establish a
Conspiracy to Fix Prices. ........................................................ 19

          C.     The Settlements and Investigations Mentioned in the Complaint
Are Irrelevant and Should Be Stricken. ..................................... 24

          D.     Plaintiffs Lack Antitrust Standing. ........................................... 25

              1.     Plaintiffs Do Not Adequately Allege Antitrust Injury.................. 25

              2.     Plaintiffs Are Not Efficient Enforcers. ......................................... 28

II.     The CEA Claims Must Be Dismissed...................................................... 30

        A.      The CEA Does Not Reach the Extraterritorial Conduct Alleged in
                the Complaint.................................................................................... 31

        B.      Plaintiffs Lack Standing Under the CEA Because They Do Not
                Allege Actual Damages. ................................................................... 34

        C.      The Complaint Fails To State A Claim For Violation Of The CEA. ....... 36

                1.      The Complaint Fails To Adequately Allege the Elements of
                        Market Manipulation. ........................................................... 37

                        a.      The Complaint Fails To Adequately Allege the
                                Existence of Artificial Prices. ................................... 37

                        b.      The Complaint Fails To Adequately Allege That
                                Defendants Caused Artificial Prices. .......................... 38

                        c.      The Complaint Fails To Adequately Allege That
                                Defendants Had the Ability To Influence Prices. ............ 40

                2.      The Complaint Does Not Adequately Allege Facts Giving
                        Rise to a Strong Inference of Scienter, Causing the CEA
                        Claims to Fail...................................................................... 41

                        a.      The Complaint Does Not Adequately Allege That
                                Defendants Had Motive To Commit Manipulation. ......... 42

                        b.      The Complaint Does Not Adequately Allege
                                Conscious Misbehavior or Recklessness. ...................... 45

                3.      The Complaint Does Not Allege A Manipulative Device
                        Claim With Particularity. ...................................................... 46

        D.      The Complaint Fails To Adequately Allege Principal-Agent Or
                Aiding-And-Abetting Liability. ......................................................... 47

III.    Plaintiffs Fail To State A Claim For Unjust Enrichment...................................... 48

CONCLUSION ............................................................................................... 50

## TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Allen v. Dairy Farmers of Am., Inc.*,
  No. 09-cv-230, 2014 WL 2610613 (D. Vt. June 11, 2014) ....................................................... 28

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987) ..................................................................................................... 40

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................................... 9-10, 44

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ......................................................................................................... 10, 28-29

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ................................................................................................................... 26

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ........................................................................................................ 36

*Bazak Int'l Corp. v. Tarrant Apparel Grp.*,
  347 F. Supp. 2d 1 (S.D.N.Y. 2004) .......................................................................................... 49

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................10-12, 14, 23, 39-40, 44

*Boyd v. AWB Ltd.*,
  544 F. Supp. 2d 236 (S.D.N.Y. 2008) ....................................................................................... 28

*Brothers v. Saag*,
  No. 13-466, 2014 WL 838890 (N.D. Ala. Mar. 4, 2014) .......................................................... 20

*Cancall PCS v. Omnipoint Corp.*,
  No. 99 CIV 3395 AGS, 2000 WL 272309 (S.D.N.Y. Mar. 10, 2000) ....................................... 16

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986) ................................................................................................................... 28

*CFTC v. Amaranth Advisors LLC*,
  554 F. Supp. 2d 523 (S.D.N.Y. 2008) ....................................................................................... 41

*CFTC v. Leighton*,
  No. 12-cv-4012, 2013 WL 4101874 (C.D. Cal. July 8, 2013) ................................................... 46

*CFTC v. Parnon Energy, Inc.*,
   875 F. Supp. 2d 233 (S.D.N.Y. 2012) ..................................................... 41

*City of Royal Oak Ret. Sys. v. Juniper Networks*, *Inc.*,
   No. 11-04003, 2013 WL 2156358 (N.D. Cal. May 17, 2013) ..................... 20

*Colliton v. Cravath, Swaine & Moore LLP*,
   No. 08-0400, 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ............... 20, 23

*Corsello v. Verizon N.Y., Inc.*,
   18 N.Y.3d 777 (2012) ............................................................................... 50

*DNAML Pty, Ltd. v. Apple Inc.*,
   25 F. Supp. 3d 422 (S.D.N.Y. 2014) ......................................................... 27

*Dobina v. Weatherford Int'l Ltd.*,
   909 F. Supp. 2d 228 (S.D.N.Y. 2012) ....................................................... 46

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................. 36

*Ga. Malone & Co. v. Rieder*,
   19 N.Y.3d 511 (2012) ............................................................................... 48

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
   711 F.3d 68 (2d Cir. 2013) ........................................................ 11, 24-25, 27

*Gross v. New Balance Athletic Shoe, Inc.*,
   955 F. Supp. 242 (S.D.N.Y. 1997) ............................................................ 28

*Guttman v. CFTC*,
   197 F.3d 33 (2d Cir 1999) ........................................................................ 47

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ................................................................................. 27

*In re Amaranth Nat. Gas Commodities Litig.* ("*In re Amaranth I*"),
   587 F. Supp. 2d 513 (S.D.N.Y. 2008) .......................................... 36, 41, 44, 47

*In re Amaranth Nat. Gas Commodities Litig.* ("*In re Amaranth II*"),
   612 F. Supp. 2d 376 (S.D.N.Y. 2009) .......................................... 40, 42, 45, 47

*In re Amaranth Nat. Gas Commodities Litig.* ("*In re Amaranth III*"),
   730 F.3d 170 (2d Cir. 2013) ........................................................ 35, 40, 46

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.* ("*In re Silver II*"),
   560 F. App'x 84 (2d Cir. 2014) .................................................... 15, 41, 47

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
   No. 14-MD-2548 (S.D.N.Y. Mar. 16, 2015) ........................................................................ 16

*In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*In re Silver I*"),
   No. 11 Md. 2213, 2012 WL 6700236 (S.D.N.Y. Dec. 21, 2012),
   *aff'd*, 560 F. App'x 84 .............................................................................. 15, 37-38, 41, 47

*In re Crude Oil Commodity Litig.*,
   2007 WL 1946553 (S.D.N.Y. June 28, 2007) .................................................................... 36, 45

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) (per curiam) .......................................................................... 13, 24

*In re Energy Transfer Partners Nat. Gas Litig.*,
   No. 07-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009),
   *aff'd sub nom. Hershey v. Energy Transfer Partners, L.P.*,
   610 F.3d 239 (5th Cir. 2010) .............................................................................................. 34

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR I*"),
   935 F. Supp. 2d 666 (S.D.N.Y. 2013) ...........................................................26-27, 31, 35-36, 48

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR II*"),
   962 F. Supp. 2d 606 (S.D.N.Y. 2013) ............................................................................ 34-35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR III*"),
   27 F. Supp. 3d 447 (S.D.N.Y. 2014) ....................................................................... 15, 41, 44, 49

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR IV*"),
   No. 11 MDL 2262, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) ........................................ 26, 48

*In re NYSE Specialists Sec. Litig.*,
   503 F.3d 89 (2d Cir. 2007) .............................................................................................. 20

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011) ............................................................................ 46-47

*Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*,
   686 F. Supp. 2d 259 (W.D.N.Y. 2010),
   *appeal dismissed*, 642 F.3d 121 (2d Cir. 2011) (per curiam) ...................................................... 36

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) .............................................................................................. 45

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S. Ct. 1659 (2013) .................................................................................................. 30-31

*Kolari v. N.Y.-Presbyterian Hosp.*,
   455 F.3d 118 (2d Cir. 2006) .............................................................................................. 50

*La. Mun. Police Emps.' Ret. Sys. v. JPMorgan Chase & Co.*,
  No. 12-cv-6659, 2013 WL 3357173 (S.D.N.Y. July 3, 2013) ................................................ 50

*Lawline v. Am. Bar Ass'n*,
  956 F.2d 1378 (7th Cir. 1992) ................................................................................ 26

*Laydon v. Mizuho Bank, Ltd.*,
  No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) .................... 10, 25-29, 41, 48-49

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ................................................................................ 24

*Liu Meng-Lin v. Siemens AG*,
  763 F.3d 175 (2d Cir. 2014) ................................................................................ 31

*Loginovskaya v. Batratchenko*,
  764 F.3d 266 (2d Cir. 2014) ................................................................................ 31

*Mahmud v. Kaufmann*,
  496 F. Supp. 2d 266 (S.D.N.Y. 2007) ...................................................................... 10

*Mason v. Am. Tobacco Co.*,
  346 F.3d 36 (2d Cir. 2003) ................................................................................ 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................................ 16

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013) ................................................................................ 11-14

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ................................................................................ 3, 30-33

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
  631 F.3d 29 (2d Cir. 2010) ................................................................................ 31

*Ocean View Capital, Inc. v. Sumitomo Corp. of Am.*,
  No. 98-cv-4067, 1999 WL 1201701 (S.D.N.Y. Dec. 15, 1999) .......................................... 28-29

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
  875 F.2d 365 (2d Cir. 1989) ................................................................................ 22

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
  763 F.3d 198 (2d Cir. 2014) ................................................................................ 32-33

*Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.*
  *Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ................................................................................ 10

*Ping He (Hai Nam) Co. v. Nonferrous Metals (U.S.A.) Inc.*,
22 F. Supp. 2d 94 (S.D.N.Y. 1998),
*vacated in part on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999) ........................................... 34

*Reading Indus., Inc. v. Kennecut Copper Corp.*,
631 F.2d 10 (2d Cir. 1980) ........................................................................................................... 29

*Ross v. Am. Express Co.*,
35 F. Supp. 3d 407 (S.D.N.Y. 2014) ............................................................................................ 14

*S&A Farms, Inc. v. Farms.com, Inc.*,
678 F.3d 949 (8th Cir. 2012) ........................................................................................................ 34

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
74 F. Supp. 3d 581 (S.D.N.Y. 2015) ............................................................................................ 24

*Starshinova v. Batratchenko*,
931 F. Supp. 2d 478 (S.D.N.Y. 2013) ........................................................................................... 31

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) ...................................................................................................................... 46

*Three Crown Ltd. P'ship v. Caxton Corp.*,
817 F. Supp. 1033 (S.D.N.Y. 1993) ............................................................................................. 46

*Twombly v. Bell Atl. Corp.*,
425 F.3d 99 (2d Cir. 2005),
*rev'd on other grounds*, 550 U.S. 544 ......................................................................................... 12

*Zinser v. Cont'l Grain Co.*,
660 F.2d 754 (10th Cir. 1981) ...................................................................................................... 28

**Regulations, Rules, and Statutes**

17 C.F.R. pt. 180 .............................................................................................................................. 36

7 U.S.C. § 2(i) .................................................................................................................................. 32

7 U.S.C. § 9(3) ................................................................................................................................. 30

7 U.S.C. § 13(a)(2) ........................................................................................................................... 30

28 U.S.C. § 1367(c) .......................................................................................................................... 50

76 Fed. Reg. 41,399 (July 14, 2011) ............................................................................................... 36

CEA Section 2(a)(1)(B), 7 U.S.C. § 2(a)(1)(B) ............................................................................... 30

CEA Section 6(c)(1), 7 U.S.C. § 9(1) .............................................................................................. 29

CEA Section 9(a)(2), 7 U.S.C. §13(a)(2) ...................................................................... 29

CEA Section 13, 7 U.S.C. § 13c(a) .............................................................................. 30

CEA Section 22(a)(1), 7 U.S.C. § 25(a)(1) .............................................................. 30-31

CFTC Rule 180.1, 17 C.F.R. § 180.1 ............................................................. 30, 36, 46

Fed. R. Civ. P. 9(b) ....................................................................................... 3, 36-37, 40

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 1, 4

Fed. R. Civ. P. 12(f) ..................................................................................................... 46

Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010) .......................................................... 32

**Other Authorities**

Bd. of Governors of the Fed. Res. System,
  *Selected Interest Rates (Daily)*,
  http://www.federalreserve.gov/releases/h15/data.htm (last visited September 21, 2015) ........ 44

CFTC Bank Participation Report Explanatory Notes (emphasis added),
  http://www.cftc.gov/MarketReports/BankParticipationReports/ExplanatoryNotes/index.htm
  (last visited September 17, 2015) ................................................................................. 9

Charles, Jeremy A.,
  *Commodities Futures Trading Commission: Examination of Futures and Options Trading in the
  Metals Markets* (Mar. 25, 2010) ................................................................................... 6

London Platinum & Palladium Market Members, http://www.lppm.com/lists.aspx?
  type=members
  (last visited September 17, 2015) ................................................................................. 5

NYMEX, *A Guide to Metals Hedging*,
  http://www.kisfutures.com/Metals-Hedge.pdf (last visited September 17, 2015) .................... 17

*Pricing and Statistics*,
  London Bullion Market Association, http://www.lbma.org.uk/pricing-and-statistics
  (last visited September 17, 2015) ............................................................................... 13

## PRELIMINARY STATEMENT

In response to Defendants' original motion to dismiss, which provided a road map of all the deficiencies in Plaintiffs' allegations, Plaintiffs filed the Second Consolidated Amended Class Action Complaint (the "Complaint"), but the Complaint cured *none* of the fatal issues that doomed the original complaint.[1]  Still, relying *entirely* on undisclosed "analyses" previously alleged to have been performed by anonymous "retained economic consulting experts" and news of unrelated regulatory settlements involving other markets and other products, Plaintiffs assert that Defendants secretly conspired to fix prices and manipulate the global platinum and palladium markets and somehow perpetuated that conspiracy of massive proportions for a seven-year period.  Based on this theory, the Complaint asserts seven claims for relief:  one under the Sherman Act (Claim One), five under the Commodity Exchange Act ("CEA") (Claims Two through Six), and one under the theory of unjust enrichment (Claim Seven).  Each claim fails to state a claim as a matter of law and thus should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

The Sherman Act claim fails first and foremost because the Complaint does not adequately allege a contract, combination, or conspiracy among Defendants in restraint of trade.  Despite proffering a 138-page, 310-paragraph Complaint, Plaintiffs offer no direct evidence of a conspiracy.  Critically, the Complaint does not point to a single contract, telephone call, e-mail, chat, or text message evidencing a conspiracy among any of the Defendants.  That is what makes this case so different from the other recent cases that have survived motions to dismiss, including those dealing with foreign exchange ("FX") markets, which Plaintiffs repeatedly invoke.  In the FX cases, the plaintiffs cited in their complaint direct evidence of conspiracy, including alleged

---

[1]   "Defendants" in this brief refers collectively to BASF Corporation ("BASF Corp."), BASF Metals Limited ("BASF Metals"), Goldman Sachs International ("GSI"), HSBC Bank USA, N.A. ("HSBC"), ICBC Standard Bank Plc ("ICBC Standard") and The London Platinum and Palladium Fixing Company Ltd. ("LPPFC"). Compl. ¶¶ 30, 31, 33, 35, 37, 45.

communications among defendants in chat rooms called "The Mafia," "The Cartel," and "The Bandits' Club."  And after the FX complaint was filed, numerous defendants settled FX matters with regulators around the world, agreeing to pay billions of dollars in fines.  Five defendants later pleaded guilty to criminal charges of collusion.  This Court need not confront the question whether such allegations and circumstances are sufficient to survive a motion to dismiss, because nothing comparable has happened, or is even alleged to have happened, here.

Without such direct evidence, rather than offering a plausible conspiracy theory supported by at least indirect evidence and/or circumstantial allegations, Plaintiffs present a theory that is completely implausible and economically irrational.  Plaintiffs baldly posit, without any attribution or evidence, that some but not all Defendants "had a significant net short platinum and palladium position during all or most of the Class Period," Compl. ¶ 193, and engaged in a years-long conspiracy to increase the value of those short positions by suppressing the price of platinum and palladium.  According to Plaintiffs, Defendants maintained these short positions for many years notwithstanding that platinum prices more than doubled between January 2009 and late 2011 (within the Class Period), and palladium prices more than doubled during the Class Period.  It would have been economically irrational for these sophisticated Defendants to sustain increasingly unprofitable short positions while prices continued to rise.  Nor is Plaintiffs' implausible theory supported by their putative empirical "analyses"—which remain attributable to anonymous "experts" and, thus, are entitled to no weight at the pleading stage despite the deletion of that attribution in the latest iteration of the Complaint.  Among other infirmities set forth below, Plaintiffs' analyses fail to dispel obvious non-culpable alternative explanations for the supposed price behaviors, and draw unwarranted negative inferences from expected and routine activity among market makers.

Claim One also fails for the independent reason that Plaintiffs lack antitrust standing.  To be granted antitrust standing, Plaintiffs must show both that they suffered an antitrust injury *and* that they are efficient enforcers of the antitrust laws.  The Complaint does neither.  Plaintiffs' claims—which are essentially that they sold platinum and palladium in a host of transactions around the world with myriad unnamed counterparties at prices adversely influenced by the allegedly manipulative conduct of certain Defendants during the twice-daily auctions in London— are too remote, indirect, and speculative to make Plaintiffs efficient enforcers of the antitrust laws.  And the Complaint does not allege an illegal restraint of trade or reduction in competition, much less an injury to Plaintiffs directly resulting from such conduct.

Next, the CEA claims fail for an assortment of reasons.  First, the language of the CEA itself and the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), establish that the CEA does not reach the allegedly manipulative transactions at the heart of the Complaint, which involve mostly *foreign* Defendants trading with one another during a *foreign* auction concerning a *foreign* physical commodity (*i.e.*, "loco" London or Zurich platinum or palladium).  Such extraterritorial conduct is beyond the scope of the CEA.

The CEA claims, which sound in fraud, also fail because the Complaint does not allege any of the elements of a CEA violation with the particularity required by Federal Rule of Civil Procedure 9(b).  Specifically, the Complaint fails to allege the existence of artificial prices, that Defendants caused any artificial price, that Defendants had the ability to influence prices, or that Defendants acted with scienter, thus dooming both the market manipulation and manipulative device claims.  The Complaint's derivative CEA claims for principal-agent and aiding-and-abetting liability fail both because (i) the Complaint fails to plead a primary CEA violation and (ii)

the Complaint does not allege the existence of any principal-agent relationship among Defendants, or that any Defendant knowingly aided or abetted any underlying violation of the CEA.

Finally, Plaintiffs' unjust enrichment claim fails because the Complaint does not allege any direct dealing or substantive relationship between any Plaintiff, on the one hand, and any Defendant, on the other.  It is thus no surprise that Plaintiffs plead no facts suggesting that any Defendant has been enriched at Plaintiffs' expense—an essential element of an unjust enrichment claim.

For all these reasons, and as set forth below, the Complaint should be dismissed with prejudice under Federal Rule of Civil Procedure 12(b)(6).

## BACKGROUND

### The Parties

Plaintiffs are individuals and entities who allegedly sold Platinum and Palladium Investments[2] in the worldwide spot markets and over the New York Mercantile Exchange ("NYMEX") from 2008 through 2014 (the "Class Period").  Compl. 13-14 ¶¶ (a)-(f)[3] & ¶ 271. Plaintiffs do not allege that they sold any Platinum and Palladium Investments directly to any Defendant during the Class Period or that they were any Defendant's customer.

Defendants BASF Metals, GSI, HSBC, ICBC Standard, and UBS are market makers for physical platinum and palladium and are but five of the 52 members of the London Platinum and Palladium Market ("LPPM")—a trade association whose members engage in trading and dealing in the two metals and "have an appropriate level of net assets and experience."  Compl. ¶¶ 65, 67-

---

[2]   The Complaint defines "Platinum and Palladium Investments" as "platinum and palladium bullion and platinum and palladium bullion coins, platinum and palladium futures on NYMEX and other U.S. exchanges, shares of Platinum or Palladium ETFs [ETFs that invest only in platinum or palladium and whose shares are linked directly to platinum or palladium prices], over-the-counter platinum and palladium spot or forward transactions and options on any of the foregoing."  Compl. ¶¶ 22 n.13, 90.  However, the named Plaintiffs only claim to have sold NYMEX platinum and palladium futures contracts and physical platinum and palladium.  *See id.* pp. 13-14.

[3]   The Complaint does not use numbered paragraphs when describing Plaintiffs.

71.  Defendant BASF Corp., which Plaintiffs added to the Complaint in implicit recognition of this Court's lack of personal jurisdiction over BASF Metals, is not now and has never been a member of the LPPM.[4]

BASF Metals, GSI, and ICBC Standard all have their principal places of business in London, England.  Compl. ¶¶ 31, 33, 37.  HSBC maintains a London branch and is an indirect subsidiary of HSBC Holdings plc, Compl. ¶ 35, which is headquartered in London (Declaration of Joseph Serino, Jr. [ECF No. 81] ("Serino Decl."), Ex. 1 (HSBC Holdings plc—Earnings Release (May 5, 2015).)  The newly added BASF Corp. has its principal place of business in Florham Park, New Jersey.  Compl. ¶ 30; *see also* Declaration of Dr. Vasileios Vergopoulos [ECF No. 83] ("Vergopoulos Decl.") ¶ 8.

During the Class Period, BASF Metals, GSI, HSBC, and ICBC Standard were members of the LPPFC, a private company "organized and existing under the laws of the United Kingdom" that has its principal place of business in London.  Compl. ¶ 45  Plaintiffs allege that LPPFC was owned and controlled by BASF Metals, GSI, HSBC, and ICBC Standard in London, and that these Defendants participated in twice-daily auctions in London for the discovery of platinum and palladium prices.  Compl. ¶¶ 45, 62.  Plaintiffs do not allege that BASF Corp. was a member of the LPPFC.[5]  *See* Compl. ¶ 45; *see also* Vergopoulos Decl. ¶ 8.

### The Platinum and Palladium Markets

Physical platinum and palladium trade in "opaque" over-the-counter ("OTC") markets.  Compl. ¶ 78.  These markets "operat[e] 24-hours a day" and are used by market makers, "platinum

---

[4]   Vergopoulos Decl. ¶ 8; s*ee also Members*, London Platinum & Palladium Market, http://www.lppm.com/lists.aspx?type=members (last visited September 17, 2015).

[5]   Defendants UBS AG and UBS Securities LLC (collectively "UBS"), who are not represented by any of the undersigned, also are not alleged to have been members of LPPFC.  *See* Compl. ¶ 45.

and palladium producers (*e.g.*, miners and refiners), consumers (*e.g.*, jewelers and industrials), and investors (*e.g.*, pension funds, hedge funds, and individuals)."  Compl. ¶¶ 81-82.

Some participants in the platinum and palladium markets also trade platinum and palladium derivatives, including futures, options, and forwards.  Compl. ¶¶ 83-84.  The Complaint purports to explain how these instruments work.  Compl. ¶¶ 85-88.  For example, holders of long positions through futures contracts benefit when the price of the underlying metal increases; holders of short positions benefit when that price decreases.  Compl. ¶ 88.  Transacting through futures contracts rarely requires an exchange of physical platinum or palladium, as investors usually offset by buying or selling an equal number of opposite positions, Compl. ¶ 85, thus allowing market participants to hedge their physical positions.  Banks with exposure to changes in the price of physical metals use futures or options transactions to hedge their positions and balance their cash-market risk.  Serino Decl. Ex. 2 (Jeremy A. Charles, *Commodities Futures Trading Commission: Examination of Futures and Options Trading in the Metals Markets* (Mar. 25, 2010)) at 3-4.

### The Price Auctions

Twice each day, a London-based representative from each of the four LPPFC members— Defendants BASF Metals, GSI, HSBC, and ICBC Standard—participated in a price discovery auction for platinum and palladium (the "Auctions"), which began at "9:45 a.m. GMT (the AM Fixing) and 2:00 p.m. GMT (the PM Fixing)."  Compl. ¶ 62.  During each Auction, the fixing members would first determine the price of platinum and then the price of palladium.  *Id*.  The Auctions began when the Chair announced an opening price for "loco" London or Zurich platinum or palladium.  Compl. ¶ 52.  After netting out its orders at the stated price, each LPPFC member would then declare itself as a buyer, a seller, or having no interest.  *Id*.  The price was then adjusted by the Chair upward or downward until there was a certain balance of buyers and sellers, and the

Chair would then ask for volume figures.  Compl. ¶ 53.  This process continued until there was two-way interest among the four LPPFC members within 4,000 troy ounces or the Chair otherwise declared the price "fixed" under the Auction rules, at which point the Chair declared the Auction closed and ensured that all orders were executed among the four members.  Compl. ¶¶ 53-58. Customers of the LPPFC members were free to follow the Auctions in real time, and "[a]t any time during the Fixing, a participating member or its customers could have increased or decreased an order, withdrawn a previously declared buying or selling order, or placed a new order." Compl. ¶ 56.

### Theory of Plaintiffs' Claims

The Complaint purports to assert seven claims for relief:  one count for violation of Section One of the Sherman Act (Claim One), five counts for violation of the CEA (Claims Two through Six), and a state law claim for unjust enrichment (Claim Seven).  Compl. ¶¶ 279-310. Underlying each of these claims is Plaintiffs' theory that Defendants conspired to manipulate *downward* the price of platinum and palladium through the twice-daily Auctions.  Compl. ¶¶ 4, 7- 8, 10, 12, 185, 195.  The Complaint does not identify a single conspiratorial communication among any of the Defendants or any act in furtherance of a conspiracy.  Instead, it substitutes two types of allegations for such evidence.

*First*, the Complaint adopts and heavily relies on the "studies" referenced in the Initial Complaint, which, according to that complaint, were performed by anonymous "expert consultants."  The Complaint claims that these studies observed allegedly anomalous downward price "spikes" occurring before or after the Auctions, which translated into lower prices throughout worldwide platinum and palladium markets.  Compl. ¶¶ 102, 195.  These downward spikes are purportedly "consistent with" manipulative conduct, Compl. ¶ 156, App. E, and supposedly

benefitted Defendants and harmed Plaintiffs when Plaintiffs sold Platinum and Palladium Investments to various non-parties around the world.  Compl. pp. 13-14.  For all its emphasis on these expert conclusions, the Complaint, like the Initial Complaint, declines to identify any expert by name and provides only scant details about their methodology—for instance, that they used unspecified "screens" to perform "economic analyses."  Compl. ¶ 101.

*Second*, the Complaint implies that Defendants' precious metals traders engaged in improper conduct based on allegations and settlements involving different traders and different products.  While the Complaint alleges that Defendants "used chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and e-mails to coordinate among themselves," Compl. ¶ 171, it does not quote, refer to, or attach any such communication between or among any Defendants, let alone communications relating to the platinum or palladium markets.  Rather, Plaintiffs allege that government regulators have investigated and settled cases with financial institutions in connection with trading activity involving *other* markets, *other* products, and *different* reference rates.  Compl. ¶¶ 168-73, 223-46.  Aside from being about other markets, many of these allegations relate to entities that are not even defendants here.  *Id.*

Plaintiffs seek to compensate for the dearth of direct evidence with allegations of Defendants' supposed motive to suppress platinum and palladium prices.  The Initial Complaint alleged, "on information and belief," that BASF Metals, GSI, HSBC, ICBC Standard, and UBS (but not LPPFC) conspired to suppress prices because each of them "had a significant net short platinum and palladium position during all or most of the Class Period."  Initial Compl. ¶¶ 3, 167. The current Complaint, however, abandons that allegation with respect to BASF Metals, and it does not make it with respect to BASF Corp. and LPPFC.  *See* Compl. ¶ 193 & n.64.

Although the current Complaint still alleges "on information and belief" that the remaining Defendants maintained net short positions in platinum- and palladium-denominated investments during all or most of the Class Period, Plaintiffs admit they do not know whether, or to what extent, that is actually true for any Defendant. Compl. ¶ 193. Rather, the Complaint's "net short" allegation rests wholly on Plaintiffs' own analysis of monthly CFTC Bank Participation Reports, purporting to show that when the total outstanding NYMEX platinum and palladium futures positions of an unspecified number of unnamed banks are aggregated (typically representing somewhere between 20% and 50% of the respective markets), those unidentified banks were cumulatively "net short [in] platinum and palladium . . . or most of the Class Period." *Id.* & accompanying charts.[6] Without providing any methodology for the CFTC data on which it relies, the Complaint assumes what Plaintiffs acknowledge is "impossible . . . to quantify" at this stage: (i) that each of these Defendants must have been among the anonymous banks included in the aggregate CFTC Bank Participation Reports throughout the Class Period, and (ii) that since the cumulative total position of those unnamed banks was net short NYMEX platinum and palladium futures, each bank Defendant here must individually have been net short platinum and palladium futures. Compl. ¶ 193. The Complaint contains no other allegation about the supposed maintenance of a net short futures position by any Defendant at any time during the Class Period, let alone any potentially-offsetting positions in other platinum or palladium products.

---

[6]   More than half of the monthly Bank Participation Reports from the Class Period are incapable of being confirmed, since the CFTC only maintains Bank Participation Reports "for the rolling most recent *25 months*." *See* CFTC, Bank Participation Report Explanatory Notes (emphasis added), http://www.cftc.gov/MarketReports/BankParticipationReports/ExplanatoryNotes/index.htm (last visited September 17, 2015).

# ARGUMENT

To survive a motion to dismiss, a complaint must set forth "sufficient factual matter" to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In evaluating whether a pleading has met this burden, a court ignores "legal conclusions, deductions or opinions couched as factual allegations." *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (alteration omitted), as well as "'naked assertion[s]' devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)), and allegations couched in "vague" or "general" terms, *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464, at *3 (S.D.N.Y. Mar. 28, 2014) (citation omitted).

To avoid dismissal, well-pleaded factual allegations must "raise a reasonable expectation that discovery will reveal evidence" consistent with the claims alleged, *Twombly*, 550 U.S. at 556, such that it is not unfair to expose Defendants to the "enormous," *id.* at 559, and "asymmetric costs" of discovery, which can lead to "settlement extortion," *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). No claim asserted in the Complaint meets these requirements.

## I.    Plaintiffs Fail To State A Claim For Violation Of The Sherman Act.

To state a claim for relief under Section One of the Sherman Act, a plaintiff "must allege (1) concerted action; (2) by two or more persons; (3) that unreasonably restrains interstate or foreign trade or commerce." *Mahmud v. Kaufmann*, 496 F. Supp. 2d 266, 275 (S.D.N.Y. 2007) (quotation marks omitted). A complaint must therefore allege specific facts sufficient to demonstrate the existence of an unlawful "contract, combination[, or conspiracy" to restrain trade. *Twombly,* 550 U.S. at 556-57. The Complaint contains no such allegation. Moreover, to recover damages for a Section One violation, a plaintiff must also establish not only that it suffered an

injury sufficient to confer Article III standing, but also that it "is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). As the Second Circuit has recently re-emphasized, this type of standing—known "as antitrust standing"—requires a party to plead (and ultimately prove) both that (a) it has suffered antitrust injury and (b) it is an "efficient enforcer" of the antitrust laws. *See Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013). Plaintiffs have not satisfied either requirement.

### A. The Complaint Does Not Allege the Existence of an Anticompetitive Conspiracy.

#### 1. The Complaint Does Not Allege Direct Evidence of an Agreement.

A crucial question in any Section One case is "whether the challenged conduct stems from independent decision or from an agreement." *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). A "plaintiff's job at the pleading stage, in order to overcome a motion to dismiss, is to allege enough facts to support the inference that a conspiracy actually existed." *Id.* Conclusory allegations of an agreement, or facts that merely support a "suspicion" or "possibility" of agreement, will not do. *Twombly*, 550 U.S. at 555, 557. Rather, a complaint must offer either (i) direct evidence of an unlawful agreement among Defendants or (ii) sufficient circumstantial facts supporting the inference that a conspiracy existed. *Citigroup*, 709 F.3d at 136. Plaintiffs' Complaint does neither.

In contrast to the "independent allegation[s] of actual agreement" required by *Twombly*, 550 U.S. at 564, the Complaint offers only generic and unsupported allegations that "Defendants . . . agree[d] to manipulate the AM and PM Fixing through repeated conduct to suppress the price of platinum and palladium artificially," Compl. ¶ 185; that "Defendants repeatedly colluded to ensure there was coordinated manipulation and fixing of both the opening

price and the quoted buy/sell levels," Compl. ¶ 253; that Defendants "collusively shar[ed] and act[ed] on non-public information regarding client orders," Compl. ¶ 254; and that Defendants "us[ed] non-public proprietary trading platforms to directly coordinate intended price movements," Compl. ¶ 268.   Similarly, while the Complaint states that Defendants "used chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and e-mails" supposedly to facilitate conclusive conduct, Compl. ¶ 171, it does not identify a single specific communication, let alone one showing an anticompetitive conspiracy.   *See Citigroup*, 709 F.3d at 136.   The assertion is simply a guess, not a well-pleaded averment of fact, and thus there is no direct evidence of collusion in the Complaint sufficient to defeat a motion to dismiss.

> ### 2.   *The Complaint Does Not Plead Sufficient Circumstantial Evidence from Which To Infer the Existence of an Agreement.*

Just as the Complaint does not identify any direct evidence of conspiracy (even after an opportunity for plenary repleading), its meager circumstantial allegations likewise fail to show— even by inference—that a conspiracy existed.   The existence of a conspiracy "may be inferred on the basis of conscious parallelism, when . . . interdependent conduct is accompanied by circumstantial evidence and plus factors," *Citigroup*, 709 F.3d at 136, which "may include: a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications," *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 114 (2d Cir. 2005) (citations omitted), *rev'd on other grounds*, 550 U.S. 544 (2007).   Plaintiffs have alleged no plausible parallel behavior, much less the existence of any plus factors that would "nudge[] their claims across the line from conceivable to plausible."   *Twombly*, 550 U.S. at 570.

a.    <u>The Complaint Does Not Plausibly Allege Parallel Conduct.</u>

The Complaint's two attempts to allege parallel behavior both rest on aggregated spot-market activity.  Compl. ¶¶ 178-84.  Like the Initial Complaint, the current Complaint includes a chart purporting to show that on "days when the price of platinum and palladium declined shortly before the PM Fixing," Defendants quoted lower prices for those metals than did certain non-Defendants.  Compl. ¶ 179.  This allegation does not support an inference of conspiracy, or even parallelism.  Plaintiffs' chart purports to reflect only *average* prices quoted by Defendants, aggregated over a seven-year period; it does not show that any two Defendants ever acted in parallel by simultaneously quoting similar, artificially low prices and and completely ignores that it should be expected that dealers in any market would quote generally similar prices.  Indeed, it does not even show that any two Defendants ever provided similar quotes *in the same year*.

After Defendants highlighted these deficiencies in their motion to dismiss Plaintiffs' Initial Complaint (Dkt. No. 80 at pp. 9-11), Plaintiffs added allegations in the current Complaint that on five days, certain Defendants, together with certain non-defendants, quoted lower prices leading up to the PM Auction.  Compl. ¶¶ 181-84.  Putting aside that these new allegations account for only 0.002% of trading days during the Class Period,[7] they are flawed because, as Plaintiffs acknowledge, "[q]uotes from individual Defendants are only available sparsely, if at all, from public data."  Compl. ¶ 181 n.50.  The Complaint thus concedes that it provides only a tiny fraction of quotes from an equally tiny fraction of trading days during the Class Period.  This is not the total picture, and Plaintiffs' claim that Defendants "were driving the movement in prices before and around the Fixing window," Compl. ¶ 181, rather than reacting to the "[n]umerous other [market] participants," Compl. ¶ 82, is just a guess, unsupported by fact and insufficient to permit this action

---

[7]    The PM Fixing occurred on 1,736 days during the Class Period.  *See Pricing and Statistics*, London Bullion Market Association, http://www.lbma.org.uk/pricing-and-statistics (last visited September 17, 2015).

to go forward.  In any event, since such parallel pricing "could just as easily turn out to have been rational business behavior," *Citigroup*, 709 F.3d at 137, threadbare allegations of parallel price quotes do not plead an antitrust conspiracy.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (per curiam) ("[s]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").  Indeed, if anything, the new charts suggest that Defendants were reacting to non-defendants' quotes.  The chart from January 9, 2010, for instance, Compl. at 99, depicts non-defendant Credit Suisse consistently quoting spot prices lower than those quoted by UBS and Engelhard Metals.  So UBS's and Engelhard's decreasing quotes might well have been "independent responses to [a] common stimul[us]." *Twombly*, 550 U.S. at 557 n.4.

> b. The Complaint's Alleged 'Plus Factors' Do Not Support a Plausible Inference of Conspiracy.

Even if the Complaint sufficiently alleged that Defendants acted in parallel, "alleging parallel conduct alone is insufficient, even at the pleading stage."  *Citigroup*, 709 F.3d at 136 (citing *Twombly*, 550 U.S. at 551).  To plead conspiracy based on circumstantial evidence, a complaint must also identify "plus factors" showing that the alleged parallel activity was unlikely to result from "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 557 n.4.  Plaintiffs identify no such plus factors and try to obscure this fatal defect by offering suggestions of potential motive supported by nothing more than unrelated investigations and untested opinions of anonymous, self-styled experts.

> i. *There Is No Plausible Allegation of Common Motive.*

The Complaint asserts, "on information and belief," that each of "Defendants Goldman Sachs, HSBC, [ICBC] Standard Bank, and UBS had a significant net short platinum and palladium position during all or most of the Class Period," Compl. ¶ 193, and so benefited from the

suppression of prices for physical platinum and palladium.[8]  That assertion is both implausible and unsupported by any factual allegations.  On a motion to dismiss, "[c]ourts may not infer a conspiracy where the defendants have no rational economic motive to conspire."  *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014).  Here, the Complaint's own allegations show that a years-long conspiracy that could succeed only through price decreases would have been economically irrational because platinum and palladium prices rose for most of the Class Period: (1) palladium prices "have been in a general upward trend" since the start of the Class Period and were higher at the end of the Class Period than at its start, Compl. at 34 & ¶ 100; and (2) platinum prices *tripled* from January 2000 through December 2013, Compl. at 33-34, ¶ 125.[9]

Yet Plaintiffs argue that some Defendants maintained large, unhedged short positions in platinum- and palladium-denominated investments throughout the seven-year Class Period in an attempt to benefit from their alleged price *suppression* across the Auctions.  *See, e.g.*, Compl. ¶ 196 ("Defendants were motivated to engage in coordinated manipulation of the Fixing by the strong financial incentive created by their 'short' positions.").  Even if Plaintiffs' "always 'net short'" allegation were well-pleaded, it still would not establish motive.  To the contrary, an "inference of intent cannot be drawn from the mere fact that [defendant] had a strong short position" or from any other market position it naturally wished to advantage.  *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.* ("*In re Silver II*"), 560 F. App'x 84, 86 (2d Cir. 2014); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR III*"), 27 F. Supp. 3d 447, 468 (S.D.N.Y. 2014) ("A theory of scienter that consists of stating that defendants had a large presence in the

---

[8]    Plaintiffs make no allegation, not even on information and belief, that any of Defendants BASF Metals, BASF Corp., or LPPFC had a net short position on platinum or palladium during the Class Period.

[9]    Charts and graphical materials are referred to by the page on which they appear in the Complaint.

[relevant] market amounts to only a generalized motive . . . [which] is insufficient to show intent." (alterations in original)).[10]

Plaintiffs' theory can fairly be stated as:  Defendants conspired to hemorrhage money by holding large short futures positions that would lose value over a period of years when platinum and palladium prices were increasing, and that at no point did anyone think to "break the cartel" and take the opposing long position, which would benefit from prices going up.[11]  Equally telling is that while the Complaint acknowledges that there must have been "two-way interest" at the Auction—a willing net buyer and a willing net seller—or no new price would have been established during the AM or PM Auction, Compl. ¶¶ 52-53, it ignores the rational economic behavior implicit in its correct statement of the functioning of an auction.  In particular, it offers no explanation why any rational firm would join a conspiracy to manipulate a zero-sum auction that would require between 25-75% of its members to sell physical platinum or palladium at artificially low prices.  If Defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596-97 (1986); *see also Cancall PCS v. Omnipoint Corp.*, No. 99 CIV 3395 AGS, 2000 WL 272309, at *7 n.4 (S.D.N.Y. Mar. 10, 2000) (citing *Matsushita* and dismissing antitrust claim because it "would make no economic sense on the facts pleaded").

---

[10]  Though these cases analyze motive in the CEA context, the allegations there, as here, were that the defendants manipulated prices.  *See In re Commodity Exch., Inc., Silver Futures & Options Trading Litig.* ("*In re Silver I*"), No. 11 Md. 2213, 2012 WL 6700236, at *5 (S.D.N.Y. Dec. 21, 2012) (allegation that the defendants manipulated silver futures prices by acquiring "a concentrated short position"), *aff'd*, 560 F. App'x 84; *In re LIBOR III*, 27 F. Supp. 3d at 467 (allegation of "persistent suppression of LIBOR throughout the Class Period").

[11]  As explained *infra* at 43-44, the Complaint's new allegations do not cure this implausibility.  Moreover, these allegations are lifted nearly verbatim from the complaint in the *Gold* action.  *Compare* Compl. ¶¶ 199-211 *with* Second Consol. Am. Compl. ("*Gold* Compl.") ¶¶ 217-224, 229-233, *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, No. 14-MD-2548 (S.D.N.Y. Mar. 16, 2015), ECF No. 44.  This underscores that they are mere conjecture, and not the basis of any independent investigation or efforts by Plaintiffs to discern facts linking them to these Defendants or these metals.

Perhaps because Plaintiffs' theory of motive based on "net short" positions is illogical, they offer it without any factual support.  Instead, the Complaint points merely to what Plaintiffs claim is a compilation of monthly CFTC Bank Participation Reports as showing that—from one month to the next—a changing number of *unnamed* banks held an aggregated net short position in NYMEX platinum and palladium futures contracts, to claim "on information and belief" that each of the three bank Defendants (GSI, HSBC, and ICBC Standard) "w[as] net 'short' through the majority of the Class Period based on their positions in exchange-traded platinum and palladium futures and options."  Compl. ¶ 193.[12]  These Bank Participation Reports are incapable of supporting Plaintiffs' "net short" allegations as to any Defendant for several reasons.  First, as the Complaint concedes, the Reports are "not broken out by bank."  Instead, they compile the aggregate positions of a fluctuating number of unspecified banks in a given month.[13]  Thus, the reports do not necessarily include GSI, HSBC, ICBC Standard, or UBS, and do not include BASF Metals, BASF Corp., or LPPFC at all.  Compl. ¶ 193 & n.64.  Further, even if a Defendant was included in one or more of the CFTC Reports, those documents would not exclude the possibility that such a Defendant was net *long* platinum or palladium for the relevant month.  That is because, among other things, the CFTC Reports cited in the Complaint cover only NYMEX platinum or palladium futures.  *See* Compl. ¶ 194.  They do not account for the alleged "spot, forward, option and platinum and palladium ETF share transactions" that Plaintiffs claim Defendants traded during the Class Period, which, if long, would offset futures positions Plaintiffs claim the Defendants

---

[12]   The Complaint does not explain why the Bank Participation Reports—which allegedly provide "the banks' calls, puts, and net futures"—have anything to do with *options* contracts.

[13]   During some months in the Class Period for which Bank Participation Reports are available, as many as 19 banks are included in the Bank Participation Reports (though none are ever identified by name).  *See, e.g.*, Serino Decl. Ex. 3 (CFTC, Bank Participation in Futures Markets (May 2013)).

held.  *See, e.g.*, Compl. ¶¶ 34, 36, 38, 44.[14]  The Bank Participation Reports thus provide no basis

for concluding any entity's *net* (overall) long or short position in platinum or palladium.  Even if

holding a short futures position sufficed to establish motive (and it does not), the motive would not

be a common one if even one of the Defendants was net long platinum or palladium overall: that

Defendant would lack incentive to participate in the alleged conspiracy, thus negating any

inference that Defendants had a rational economic motive to manipulate the platinum and

palladium markets jointly.

ii.     *Defendants Had No Plausible Opportunity To Manipulate The Auctions.*

Plaintiffs likewise fail to adequately plead any "plus factors" indicating that Defendants

had a plausible opportunity to manipulate the Auctions and, in turn, the global platinum or

palladium markets.  The Complaint attempts to establish opportunity by portraying longstanding,

publicly known structural features of the twice-daily Auctions—in which only the so-called

"Fixing Defendants" (defined in the Complaint as "BASF Metals, Goldman Sachs, HSBC, and

Standard Bank," Compl. ¶ 1) participated—as nefarious "red flags" suggesting collusion.  *See, e.g.*,

Compl. ¶¶ 170, 214-22, App. E at 2-3.  But Plaintiffs' market descriptions neither establish a "plus

factor" nor support an inference of collusion among Defendants.[15]

Plaintiffs' characterization of the Auction process as a "private phone call" involving the

"direct exchange of intended or future price information among horizontal competitors," Compl.

¶ 170, does not support an inference of conspiracy.  No inference of unlawful behavior can be

---

[14]  Market participants, including banks, rely heavily on futures to hedge against their physical holdings.  *See* NYMEX, *A Guide to Metals Hedging* (describing "futures and options contracts" as "[t]he principal risk management instruments available to participants in the metals markets today), http://www.kisfutures.com/ Metals-Hedge.pdf (last visited September 17, 2015).

[15]  By conceding that Defendant BASF Corp. was not a member of the LPPFC or a participant in any of the Auctions, *see* Compl. ¶¶ 45-46 (referring only to the "Fixing Defendants"), Plaintiffs admit that Defendant BASF Corp. had no opportunity to manipulate the Auctions.

18

drawn from what Plaintiffs, by their own allegations, describe as an arm's-length auction process. Compl. ¶¶ 1-2. Defendants' buying or selling interests in those Auctions took into account the orders placed by their customers, who had the opportunity to follow the Auction process in real time and were free to place, change, or withdraw their orders during the Auction. Compl. ¶ 56. Similarly, although the Complaint invokes supposed "market power" as an indicator of the potential for collusion during the Auction, *see* Compl. App. E at 3, it offers no facts to support the bare assertion that Defendants had the kind of power in the various physical or derivatives markets that would make allegations of an anticompetitive cartel plausible. Compl. ¶ 288. Indeed, the Complaint's assertion that Defendants had "large market shares in the markets for platinum and palladium," Compl. ¶ 216, is belied by other allegations that "[n]umerous other participants enter the platinum and palladium markets," Compl. ¶ 82, including not only financial institutions, such as the unnamed banks included in the CFTC reports, *supra* at 17-18, but also a host of industrial and jewelry buyers, Compl. ¶ 82, and mines that produce the metals, *id.*

**B.    The Views of Plaintiffs' Experts Are Insufficient to Establish a Conspiracy to Fix Prices.**

In the absence of (i) any direct evidence of a conspiracy, (ii) any consciously parallel behavior by Defendants, and (iii) any "plus factors," Plaintiffs rely almost exclusively on the opinions previously attributed to unnamed "expert consultants," rather than actual facts. Although Plaintiffs have deleted all references to their unnamed experts from the current Complaint—tacitly admitting that untested expert opinion cannot be considered at the pleading stage—they still rely on the same untestable, unexplained, and anonymous "analyses" to assert that:

- "[A]bsent collusion," "the prices during each day's Fixing windows [should] move up equally as often as down," should "move up or down largely in sync with the price movement of the market as a whole," and should increase or decrease in "roughly even magnitudes." Compl. ¶¶ 104, 107, 109-10, 137.

- The pricing patterns for platinum and palladium are "anomalous" and suggest manipulation.  Compl. ¶¶ 92, 109, 113, 122-23, 132.
- Allegedly lower price quotes leading up to and during the Auction window suggest that Defendants colluded.  Compl. ¶¶ 178-84.
- The observed pricing patterns are inconsistent with various "innocent explanation[s]."  Compl. ¶¶ 145-67.
- On certain days, the market movements around the PM Auction were inconsistent with market movements at other times during those days.  Compl. ¶¶ 139, 141-44.

These unverifiable "conclu[sions]" and "observ[ations]," Compl. ¶¶ 92, 134—now claimed to be the handiwork of Plaintiffs themselves—are both improper at this stage and insufficient to salvage the Complaint.

As an initial matter, Plaintiffs are bound by factual admissions in their Initial Complaint and thus cannot escape their reliance on expert studies at the pleading stage, especially when the current Complaint still presents the same work product previously ascribed to those experts.  *See Colliton v. Cravath, Swaine & Moore LLP*, No. 08-0400, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) ("Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint, a court is authorized to accept the facts described in the original complaint as true.").  Thus, Plaintiffs are bound by factual admissions in the Initial Complaint and cannot undo their reliance on experts by deleting all references to them.

Regardless of to whom Plaintiffs now attribute the work product previously attributed to their experts, neither the analyses—nor the vague allegations of pending investigations and unrelated regulatory settlements—can establish a Sherman Act claim.  First, when deciding a motion to dismiss, a court cannot rely on mere "opinions couched as factual allegations."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007); *see also Brothers v. Saag*, No. 13-466, 2014 WL 838890, at *6 (N.D. Ala. Mar. 4, 2014) ("considering expert opinions at the

pleading stage" is "inappropriate"); *City of Royal Oak Ret. Sys. v. Juniper Networks*, *Inc.*, No. 11-04003, 2013 WL 2156358, at *7 (N.D. Cal. May 17, 2013) (holding that "[expert] opinions cannot substitute for facts" and dismissing complaint for failure to state a claim).   Moreover, the Complaint's own description of the studies originally attributed to (and presumably performed by) Plaintiffs' unnamed experts underscores why such material should not be credited at the motion to dismiss stage.   As an initial matter, Plaintiffs offer only vague generalities—for example, that they (or their "expert consultants" as originally alleged) developed "screens" and conducted "event studies," Compl. ¶¶ 102, 128.   Those phrases, however, are merely jargon; they do not describe the nature, source, or quality of the data analyzed, or the specific assumptions underlying the consultants' analysis.   Perhaps these omissions are not accidental, as there are sound reasons to question the reliability of the data cited in the Complaint.

Even without the benefit of a proper *Daubert* process, the flaws in Plaintiffs' "expert" work product are obvious and further highlight why allegations based on this work product cannot be considered.   *First*, the "screens" and "event studies" are based on unreliable data.   As the Complaint concedes, spot platinum and palladium are traded over the counter between private parties in "opaque" markets, Compl. ¶¶ 75, 78, so there is no reliable, publicly available data about actual trades.   In the absence of the actual trade data, Plaintiffs (or more likely their now-forgotten experts) substitute other data but provide no facts to support a conclusion that their sources reflect actual prices.   Indeed, there is substantial reason to believe that the data employed by Plaintiffs are *not* a reliable proxy for transaction prices.   For instance, although subscription services like Bloomberg or Reuters allow market participants to post "informational" price quotes to advertise prices that they are offering, the posted quotes are merely one-sided offers (or bids) that do not reflect actual trades.   And because trading takes place over the telephone, the quotes are not

necessarily updated at regular intervals, putting the accuracy of the data in further doubt.[16] Additionally, the average quote of non-defendant market participants could comprise several quotes that are the same as Defendants' quotes and one higher outlier, which would slightly raise the average.[17]

*Second*, the allegations in the Complaint are not consistent over the entire Class Period or between the twice-daily Auctions. The Complaint asserts that price spikes occurred most often around the time of the platinum and palladium Auctions, a result described as "anomalous" and "abnormally." *See, e.g.*, Compl. ¶¶ 92, 103. But it also concedes—without explanation—that the price trends observed did *not* occur in every year of the Class Period.[18] The Complaint does not explain why the conspiracy was "turned off" or failed in the years that Plaintiffs could not make the data fit their desired conclusion.[19]

*Third*, Plaintiffs' claim that Defendants quoted lower spot prices around the PM Auction, Compl. ¶ 179, likewise suffers from several flaws. To begin, Plaintiffs do not explain why the supposed trend was not observed during the AM Auction, which Defendants allegedly manipulated in the same fashion. Also, while the Complaint claims that Non-Defendants quoted "significantly

---

[16] Plaintiffs' misuse of these data is apparent in many places, including the Complaint's discussion of "price impact per quote." Compl. ¶¶ 153-56. Attempting to divine the average "impact" of each quote at different times of day is not meaningful when the quotes are non-binding and when there is no alleged correlation between the number of quotes per minute and the actual volume traded.

[17] To illustrate, assume that (i) there are eight market participants in total; (ii) four Defendants quote a price at $1,000; (iii) three non-defendant market participants quote the price at $1,000; and (iv) one non-defendant market participant quotes the price at $1,005. The average non-Defendant quote would be $1,001.25, *i.e.*, .125% higher than the Defendant average quote of $1,000, even though three out of four non-Defendant market participants quoted exactly the same price as Defendants.

[18] *See* Compl. at 39 (trend observed did not occur for Palladium PM Auction in 2010, 2011, 2012, and 2014), 51 (trend not observed for Palladium PM Auction in 2011 and 2012), 76 (trend observed neither for Palladium AM Auction in 2008 nor for Palladium PM Auction in 2001 and 2014).

[19] Likewise, at times the Complaint refers to the Plaintiffs' (previously "expert") findings for only one of the two metals or one of the AM Auction and PM Auction. *See, e.g.*, Compl. ¶ 151 & accompanying chart (referring only to the Platinum PM Auction), ¶¶ 157-59 (referring only to the PM Auctions). Plaintiffs offer no hint as to why they have limited their allegations, leaving the reader to assume that the Complaint has conveniently avoided any unhelpful "findings."

higher prices" than Defendants, *id.*—even though those quotes allegedly differed, on average, by a mere 0.12% for platinum and 0.16% for palladium, Compl. at 96—it does not allege, much less demonstrate, that the difference was *statistically* significant. *Cf. Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989) ("Because random deviations from the norm can always occur, statisticians do not consider slight disparities between predicted and actual results to be statistically significant." (citations omitted)).[20]   Finally, the notion that Defendants systematically quoted prices that were lower than those quoted by other "members of the LPPM," Compl. ¶ 179—which were other major platinum and palladium dealers, Compl. ¶¶ 65-69—contradicts the Complaint's allegation that "other major platinum and palladium banks and institutions[] participated as co-conspirators," Compl. ¶ 48.  If the Complaint is to be believed, then those co-conspirators' quotes should resemble Defendants'.

*Fourth*, the Complaint fails to dispel "obvious alternative explanation[s]" for the alleged pricing anomalies in the data.  *See Twombly*, 550 U.S. at 567.  That Plaintiffs (or their experts) found price decreases around the Auctions is hardly surprising:  Plaintiffs themselves concede that "an especially liquid time of day would be during the AM and PM Fixing because large volumes are traded then."  Compl. ¶ 153.  One would expect the biggest price movements of the day to be clustered around the times when the market is most active.  Plaintiffs, in repleading the Initial Complaint, try to walk back this concession by alleging that, "while the platinum and palladium markets were liquid around the Fixing, they were not uniquely so," and that "the effects of a liquidity-driven spike [were not] short-lived."  Compl. ¶¶ 162-63.  Not only are these allegations almost identical to those in the *Gold* Complaint,[21] they lack plausibility.  The Complaint does not

---

[20]   Defendants point out the lack of a claim to statistical significance not because adding the allegation would make this sort of impermissible pleading proper, but because Plaintiffs do make such claims in other parts of the Complaint, and the absence here highlights the particular weakness of this "average quote" approach.

[21]   *See Gold* Compl. ¶¶ 175, 177.

allege that any other time of day offered sellers more liquidity than the Auctions.  And Plaintiffs previously conceded that "[l]arge price drops around the Fixing are followed by price recovery," Initial Compl., App. E at 1, thereby contradicting their contention that the observed "spikes" were not "short-lived."  Deleting this language does not make it any less a binding admission.  *See Colliton*, 2008 WL 4386764, at *6.

### C.   The Settlements and Investigations Mentioned in the Complaint Are Irrelevant and Should Be Stricken.

Rather than providing factual support for their claims, Plaintiffs' tired digressions about settlements for *unrelated* misconduct highlight the inadequacy of their Complaint.  *See* Compl. ¶¶ 16, 168-69, 171-74, 203, 211, 221.  The Complaint's references to settlements should be stricken, or simply ignored, because regulatory settlements are "not the result of an actual adjudication of any of the issues."  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *see supra* at 8.

The "precious metals" investigations identified by Plaintiffs are similarly irrelevant. Neither of the two regulatory resolutions mentioned in the Complaint, Compl. ¶¶ 168, 221, involved platinum or palladium.  *See In re Elevator*, 502 F.3d at 52 (rejecting argument that "if it happened there, it could have happened here").  What is more, neither involved allegations of price-fixing, but rather alleged conflicts of interest in the banks' unilateral client transactions.  *See, e.g.*, Compl. ¶ 222.  No Plaintiff claims that it was a client of any Defendant or that it was harmed by any conflict of interest.  And because the allegations about ongoing investigations, Compl. ¶¶ 223-26, do not state that "the scope and outcome of [those investigations] is known," they offer

only "pure speculation." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 592 (S.D.N.Y. 2015).[22]

### D.      Plaintiffs Lack Antitrust Standing.

"[A]ntitrust standing is a threshold, pleading-stage inquiry[;] when a complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of law." *Gatt*, 711 F.3d at 75 (first alteration in original).  To show that it has antitrust standing, a plaintiff must show both that it has "a special kind of 'antitrust injury,'" and that it is an "efficient enforcer" of the antitrust laws. *Id.* at 76.  Plaintiffs fail on both fronts.

### *1.      Plaintiffs Do Not Adequately Allege Antitrust Injury.*

In the Second Circuit, courts use a three-step analysis to determine whether a putative plaintiff has suffered an antitrust injury: *first*, the plaintiff must identify the conduct complained of and why that conduct might be anticompetitive; *second*, the plaintiff must identify the actual injury it suffered; and *third*, the court must compare the allegedly anticompetitive aspects of the  alleged conduct with the actual injury experienced by the plaintiff to determine whether that injury is of the kind the antitrust laws were designed to address.  *See Gatt*, 711 F.3d at 76.

Here, Plaintiffs fail to identify any injury-in-fact.  Plaintiffs only assert that "manipulation of the Fixing . . . impacted [platinum- and palladium-related] transactions and caused Plaintiffs and the Class to incur greater losses and/or realize lower prices than they would have realized in a free and open competitive market," Compl. ¶ 247, and that Plaintiffs transacted "at artificial prices

---

[22]   The Complaint's guilt-by-association allegations, which try to tie certain Defendants' alleged misconduct in FX to their precious metals operations by labeling "Defendants' respective trading desks" "closely related[,]" Compl.¶ 174, contradict not only the FX settlements themselves, *see* UK Fin. Conduct Auth., Final Notice to HSBC Bank plc ¶ 2.11 (Nov. 11, 2014) ("This Notice relates *solely* to HSBC's conduct in its G10 spot FX trading business in London." (emphasis added)), but also other allegations in the Complaint, *see* Compl. ¶ 189 ("Defendant HSBC has a *specialized team* that *only deals in precious metals* . . . ." (emphases added)).  And the efforts to draw parallels between banks' precious metals and FX desks are especially misplaced as to the BASF entities because the Complaint nowhere alleges that BASF Metals, BASF Corp., or any other BASF entity even had an FX trading desk during the Class Period.

proximately caused by Defendants' unlawful manipulation," Compl. at 13-14, ¶¶ (a)-(f).  But these generalized allegations lack sufficient detail to show that Plaintiffs sustained *any* nonspeculative injury, let alone an antitrust injury.

Judge Daniels's decision in *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-3419, 2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014), is instructive.  There, as here, the plaintiff claimed to have sustained losses on his positions in a financial market that had allegedly been distorted by attempts to influence a particular financial benchmark.  The court held that the plaintiff had failed to plead a cognizable injury because the *Laydon* complaint, like the Complaint here, was silent on the particulars of the underlying transactions, "such as when [the plaintiff's positions] were initiated, how long they were held, and whether he exited those positions by entering into offsetting transactions or held them until their settlement dates." *Id.*

Even if Plaintiffs allege *an* injury, they fail to allege an injury of the kind the antitrust laws were designed to address.  While misrepresentations about price *might* cause certain types of injuries, unless those injuries can be viewed as an anticompetitive consequence of an alleged antitrust violation, they are not antitrust injuries.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig. ("In re LIBOR IV")*, No. 11 MDL 2262, 2015 WL 4634541, at *79 (S.D.N.Y. Aug. 4, 2015) (no antitrust injury if "plaintiff's injury flowed . . . more directly from intervening causes, including other tortious aspects of defendant's conduct"); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337-38 (1990) (defining "antitrust injury").  Here, the Complaint merely alleges (without support) that certain Defendants intentionally submitted Auction bids that "understated demand," Compl. ¶ 177, and "depriv[ed] [Plaintiffs] of the benefit of accurate platinum and palladium benchmark prices reflecting true market conditions," Compl. ¶ 282.  Such allegations do not establish anticompetitive conduct and the requisite injury.  Indeed, when

confronted with similar allegations, the *Laydon* court held that even if the plaintiff had transacted at artificial prices and sustained losses as a result, he had nonetheless failed to establish a "reduction in competition." 2014 WL 1280464, at *8 ("'[I]t is not sufficient that the plaintiffs paid higher prices because of defendants' collusion; that collusion must have been anticompetitive, involving a failure of defendants' to compete where they otherwise would have.'" (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig. ("In re LIBOR I")*, 935 F. Supp. 2d 666, 688–89 (S.D.N.Y. 2013)).

Moreover, injecting false information into a marketplace, as Plaintiffs allege, cannot violate the antitrust laws unless Defendants have constrained others to follow those inaccurate prices. *Cf. Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1383 (7th Cir. 1992). Here, no market participant was required to reference the Auction price in its platinum- or palladium-related contracts, and Plaintiffs, like all market participants, "were free to take various positions in the market, including long and short." *Laydon,* 2014 WL 1280464, at *9; *see also In re LIBOR I*, 935 F. Supp. at 686. Plaintiffs do not even claim that their Platinum and Palladium Investments expressly incorporated the platinum or palladium Auctions as a component of price, making their claims even more attenuated than those that were dismissed in *Laydon*. For instance, the Complaint states only that "the Fix prices are used as global benchmarks" and that "[m]any physical supply contracts . . . incorporate prices from the Fixing." Compl. ¶ 91. But it never asserts that the named Plaintiffs' physical platinum or palladium contracts did so. As to the NYMEX platinum- and palladium futures contracts the named Plaintiffs claim to have sold, the Complaint alleges even less—that those products "closely track[] the price of spot platinum or palladium," *id.*, not that the Auction is incorporated into those products as a component of price.

## 2.        *Plaintiffs Are Not Efficient Enforcers.*

Four factors determine whether a plaintiff is an efficient enforcer, a mandatory requirement

for it to be a proper party to seek damages under the Sherman Act:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an
> identifiable class of persons whose self-interest would normally motivate them to
> vindicate the public interest in antitrust enforcement; (3) the speculativeness of the
> alleged injury; and (4) the difficulty of identifying damages and apportioning them
> among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78.  This analysis is not a balancing test; rather, the directness of the asserted

injury must be demonstrated in every case.  *DNAML Pty, Ltd. v. Apple Inc.*, 25 F. Supp. 3d 422,

430 (S.D.N.Y. 2014).  Plaintiffs fail this test for multiple reasons.

*First*, and most fundamentally, Plaintiffs are (at best) indirect sellers who cannot satisfy the

"directness" requirement under *Gatt* and its progeny:  the Complaint nowhere alleges that *any*

Plaintiff bought platinum or palladium from, or sold platinum or palladium to, any Defendant.

Since the Supreme Court decided *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the law has

been clear that there can be no "antitrust action by a seller who alleges price-fixing by a defendant

with whom he has not dealt directly."  *Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 761 (10th Cir.

1981).  Plaintiffs do not claim to be direct sellers; they claim merely to have sold "at artificial

prices proximately caused by Defendants' unlawful manipulation."  Compl. at 13-14, ¶¶ (a)-(f).

This damages theory, known as an "umbrella theory" of liability—that a plaintiff was injured when

it sold a good to non-conspirators who lowered their prices under the price umbrella of the alleged

conspirators—has been rejected by the courts in this Circuit, and sensibly so.  *Allen v. Dairy

Farmers of Am., Inc.*, No. 09-cv-230, 2014 WL 2610613, at *27 (D. Vt. June 11, 2014); *Ocean

View Capital, Inc. v. Sumitomo Corp. of Am.*, No. 98-cv-4067, 1999 WL 1201701, at *7 (S.D.N.Y.

Dec. 15, 1999); *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 246-47 (S.D.N.Y.

1997) (rejecting umbrella theory of liability because "the causal connection between the alleged

injury and the conspiracy is attenuated by significant intervening causative factors," most notably, the independent pricing decisions of non-conspiring retailers).[23]

*Second*, in determining whether a plaintiff is not just *an* efficient enforcer but *the* efficient enforcer on whom standing should be conferred, a key consideration is the existence of other parties that have been more directly harmed. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986); *Associated Gen. Contractors*, 459 U.S. at 541-42, 545-46. Assuming there is any merit to Plaintiffs' allegations (and there is none), there exists a group of potentially better-situated entities to vindicate the public interest in antitrust enforcement:  Defendants' direct customers, whose Auction orders were transacted in an allegedly manipulated process.  This is fatal to Plaintiffs' assertion of antitrust standing.  *See Associated Gen. Contractors*, 459 U.S. at 541-42; *Ocean View*, 1999 WL 1201701, at *7 ("there are more direct victims than plaintiff"— who purchased only from non-conspirators—"such as those who purchased . . .  directly from the defendants").

*Third*, because Plaintiffs never transacted during the allegedly manipulated Auctions or at the only price alleged to have been manipulated (the Auction price), their claim is one of alleged general price suppression and thus is too speculative to confer antitrust standing.  *See Associated Gen. Contractors*, 459 U.S. at 542.  To allow a plaintiff to ground standing by alleging that manipulation of a remote price (like the Auction price here) affected a different price at which the plaintiff transacted (like the multiple prices for the various instruments that Plaintiffs claim to have sold) would force the Court to engage in "hopeless speculation" about a complicated series of market interactions among countless market players, *Reading Indus., Inc. v. Kennecut Copper*

---

[23]  Although *Ocean View* was later transferred to a district court in the Seventh Circuit—which applied that Circuit's more lenient precedents and reached a different conclusion on standing—it is cited here as persuasive authority, and indeed it continues to be cited favorably in this District for its holding on standing.  *See Laydon*, 2014 WL 1280464, at *9; *Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 250 (S.D.N.Y. 2008).

*Corp.*, 631 F.2d 10, 13 (2d Cir. 1980), an analysis further complicated by "many independent factors that could influence perceptions in the market, and pricing decisions." *Laydon*, 2014 WL 1280464, at *10. The Complaint seeks just such an analysis. It posits that conspiratorial conduct in London reverberated worldwide and caused other market participants, with no relationship with Defendants, to change the prices at which they were willing to buy platinum and palladium. Even if such conduct occurred, remote market participants—like Plaintiffs here—would not be the proper parties to redress it.[24]

## II. The CEA Claims Must Be Dismissed.

Plaintiffs assert three primary-liability claims under the CEA: a market manipulation claim under CEA Section 9(a)(2), 7 U.S.C. §13(a)(2), Compl. ¶¶ 286-90 (Claim Two), and two manipulative device claims under CEA Section 6(c)(1), 7 U.S.C. § 9(1), and CFTC Rule 180.1, 17 C.F.R. § 180.1, Compl. ¶¶ 291-99 (Claims Three and Four). Plaintiffs also assert two derivative-liability claims under the CEA: a principal-agent claim under CEA Section 2(a)(1)(B), 7 U.S.C. § 2(a)(1)(B), Compl. ¶¶ 300-02 (Claim Five), and an aiding-and-abetting claim under CEA Sections 13 and 22(a)(1), 7 U.S.C. §§ 13c(a), 25(a)(1), Compl. ¶¶ 303-05 (Claim Six).

Plaintiffs' CEA claims fail for three independent reasons. *First*, the CEA does not extend to the alleged foreign transactions and conduct that are the gravamen of the Complaint. *Second*, Plaintiffs lack standing to assert any CEA claim because they have not alleged any cognizable damages. And *third*, the Complaint does not adequately allege the elements necessary to state a claim for relief under the CEA's anti-manipulation rules.

---

[24] Defendants do not address the fourth factor—the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries—because Plaintiffs have not identified any direct victims, making this factor moot.

### A.    The CEA Does Not Reach the Extraterritorial Conduct Alleged in the Complaint.

Claims Two through Six rest on the assumption that the anti-manipulation provisions of the CEA apply to bids, asks, and trades made by *foreign* employees of mostly *foreign* corporations in a *foreign* auction for a *foreign* physical commodity.  This argument is foreclosed because the CEA anti-manipulation provisions invoked by the Complaint do not reach the conduct alleged in the Complaint.  *See* 7 U.S.C. §§ 9(3), 13(a)(2).

The Supreme Court has declared that federal statutes do not apply to foreign conduct unless Congress has given a "clear indication" otherwise.  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013).  "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010).  The presumption that a statute does not reach beyond U.S. borders can be overcome only if Congress has "clearly expressed" an "affirmative intention" to give the law "extraterritorial effect."  *Id.*  Courts have repeatedly held that the extraterritorial application of a federal statute is the exception, not the rule.  *See, e.g.*, *Kiobel*, 133 S. Ct. at 1669 (Alien Tort Statute does not apply extraterritorially); *Morrison*, 561 U.S. at 265 (same for Section 10(b) of the Securities Exchange Act); *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 33 (2d Cir. 2010) (same for a provision of RICO); *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 183 (2d Cir. 2014) (same for the anti-retaliation provision of the Dodd-Frank Act).

Indeed, the Second Circuit recently determined that the presumption against extraterritoriality applies to the private right of action afforded by CEA Section 22, 7 U.S.C. § 25(a)(1), limiting that right of action to claims alleging commodities transactions within the United States.  *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014).  Congress

likewise did not manifest any intent to apply the anti-manipulation provisions of the CEA to foreign transactions.  As the Supreme Court recognized in *Morrison*, it is a "traditional principle that silence means no extraterritorial application."  561 U.S. at 261.  Applying that "traditional principle" to the CEA's anti-manipulation provisions, which are silent on extraterritoriality, compels the conclusion that those provisions do not apply abroad.  *See id.* (noting that courts "apply the presumption [against extraterritoriality] in all cases, preserving a stable background against which Congress can legislate with predictable effects"); *see also Loginovskaya*, 764 F.3d at 271 (concluding that before the Dodd-Frank Act, the "[CEA] as a whole . . . [was] silent as to extraterritorial reach"); *Starshinova v. Batratchenko*, 931 F. Supp. 2d 478, 485–86 (S.D.N.Y. 2013) (compiling pre-*Morrison*, pre-Dodd-Frank case law and holding there is no basis to conclude that the CEA applies abroad); *In re LIBOR I*, 935 F. Supp. 2d at 696 (no indication of extraterritorial effect in either the text or the legislative history of the pre-Dodd-Frank CEA).

The Dodd-Frank amendments to the CEA further reinforce the conclusion that the anti-manipulation provisions invoked in the Complaint do not apply extraterritorially.  The Supreme Court has emphasized that "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."  *Morrison*, 561 U.S. at 265.  That is the case here.  In 2010, Congress amended the CEA to add coverage for swaps.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act §§ 711-814, Pub. L. 111-203, 124 Stat. 1376 (July 21, 2010).  In making those amendments, Congress also provided for express extraterritorial application of the CEA to certain swap transactions.  *Id.* § 722 (amending 7 U.S.C. § 2(i) to expressly apply the CEA to certain swap activities "outside the United States").  Congress's decision to provide explicitly for an extraterritorial application of the CEA, but only in relation to certain swaps activity, is limited to its terms, and underscores that Congress did not alter

the purely domestic reach of the CEA in all other respects.  *See Morrison*, 561 U.S. at 265.  The Complaint alleges no swap activity here.  Rather, it alleges only conduct in a foreign auction market for a foreign physical commodity (*i.e.*, "loco" London or Zurich platinum or palladium) beyond the reach of the CEA's anti-manipulation provisions.

Plaintiffs attempt to evade this result by alleging that the activities in London during the AM and PM Auctions had secondary domestic effects on transactions executed on U.S.-based derivative exchanges, such as the NYMEX.  The Second Circuit has rejected this expansive theory of extraterritorial application of federal anti-manipulation law.  In *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014), the court considered the application of *Morrison* to domestic transactions in derivative securities whose values were tied to the prices of foreign securities.  It affirmed the dismissal of the plaintiffs' securities fraud claims, concluding that the allegation of a domestic securities transaction was necessary, but not sufficient, to overcome *Morrison*'s prohibition on extraterritorial application of Section 10(b).  In so doing, the Second Circuit recognized two critical facts.  *First*, "[a]lthough the securities-based swap agreements in [*Parkcentral*] may have been concluded domestically, the VW shares they referenced appear to trade only on foreign exchanges."  *Id*. at 207.  And *second*, the defendants' "allegedly deceptive conduct occurred primarily in Germany."  *Id*.  The Second Circuit concluded that "subject[ing] to U.S. securities laws conduct that occurred in a foreign country, concerning securities in a foreign company, traded entirely on foreign exchanges, in the absence of any congressional provision addressing the incompatibility of U.S. and foreign law nearly certain to arise," would undermine the presumption against extraterritoriality.  *Id*. at 215-16.

The facts here require the same result.  As in *Parkcentral*, Plaintiffs attempt to apply the CEA to purely foreign activity (here, the Auctions conducted in London) solely on the basis that

the foreign activity "impacts prices" of purportedly domestic financial instruments.  Compl. at 29; *see also id.* ¶ 3 ("Because of the Fixing's importance as a benchmark, as the Fix prices go, so too go the spot and futures markets for platinum and palladium.").  Here, as in *Parkcentral*, alleging that Plaintiffs conducted transactions domestically is insufficient to overcome *Morrison*'s presumption against extraterritorial application of American law, because Plaintiffs' claims are based on the alleged foreign manipulation of a foreign auction for foreign physical commodities.  *See Parkcentral*, 763 F.3d at 215 (noting that "a rule making the statute applicable whenever the plaintiff's suit is predicated on a domestic transaction, regardless of the foreignness of the facts constituting the defendant's alleged violation, would seriously undermine" the principles set forth in *Morrison*).

Because the anti-manipulation provisions of the CEA do not reach Defendants' alleged actions in this case, Plaintiffs' CEA claims should be dismissed with prejudice.

### B.      Plaintiffs Lack Standing Under the CEA Because They Do Not Allege Actual Damages.

Plaintiffs also lack standing to assert claims under the CEA because they do not allege actual damages.  "Under section 22(a) of the CEA, a plaintiff has standing to bring a commodities manipulation action only if he has suffered 'actual damages' as a result of defendant's manipulation."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR II*"), 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) (quoting 7 U.S.C. § 25(a)(1)); *Ping He (Hai Nam) Co. v. Nonferrous Metals (U.S.A.) Inc.*, 22 F. Supp. 2d 94, 107 (S.D.N.Y. 1998) (Sotomayor, J.) ("[Plaintiff] is only authorized to bring suit, and can only recover, for those violations that caused [plaintiff] to suffer 'actual damages.'" (quoting 7 U.S.C. § 25(a)(1))), *vacated in part on other grounds*, 187 F.R.D. 121 (S.D.N.Y. 1999); *S&A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949, 954 (8th Cir. 2012) (same).  To plead actual damages where, as here, Plaintiffs' claim is that

Defendants engaged in "isolated (though repeated) manipulative activity," Plaintiffs must allege both (1) "that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged . . . manipulative conduct" and (2) "that the artificiality was adverse to their position." *In re LIBOR II*, 962 F. Supp. 2d at 622; *cf. In re Energy Transfer Partners Nat. Gas Litig.*, No. 07-3349, 2009 WL 2633781, at *9-11 (S.D. Tex. Aug. 26, 2009) (plaintiffs must show that they transacted when the prices were artificial due to the manipulation), *aff'd sub nom. Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239 (5th Cir. 2010).

The Complaint alleges no such facts.  Although it asserts (based on the opinions of Plaintiffs' retained "experts") that "the price impact [of the Auction prices] for both metals can be seen to last for several hours," Compl. ¶ 134, it does not allege that Plaintiffs sold their Platinum and Palladium Investments during the periods when prices were suppressed.  Plaintiffs claim only that they sold Platinum and Palladium Investments on certain days, but provide no details about when those trades occurred, at what price they occurred, or how the transaction price related to the price that they would have obtained but for the alleged manipulation.  *See* Compl. ¶ 98, Apps. C & D.[25]  The Complaint likewise fails to allege the times at which Plaintiffs purchased their Platinum and Palladium Investments.  If they bought when prices were artificially low, Plaintiffs could have actually benefitted from the alleged manipulation—which would preclude them from alleging, as they must to plead actual injury, that the "artificiality was adverse to their position." *In re LIBOR II*, 962 F. Supp. 2d at 622.  Recognizing these inherent weaknesses, the Complaint alleges, in conclusory fashion, that "Defendants—and [unnamed] co-conspirators who were not members of the Fixing—colluded to manipulate the market for Platinum and Palladium Investments . . . at times of the day other than around the AM and PM Fixing."  Compl. ¶ 256.

---

[25]   Of course, if Plaintiffs *did* sell during the Auction time periods, they would be contributing to the market pressure causing the Auction price to be lower than the spot price before the Auction.  This would directly undercut their theory that Defendants' manipulation is the sole cause of the alleged downward price movement.

Such allegations, without any factual support, are insufficient.  Plaintiffs do not allege that they

ever "engaged in a transaction *at a time* during which prices were artificial."  *In re LIBOR II*, 962

F. Supp. 2d at 622 (emphasis added); *see also In re LIBOR I*, 935 F. Supp. 2d at 718 ("the mere

fact that plaintiffs purchased their Eurodollar contracts at an inflated price does not show that they

suffered a loss on those contracts").

### C.   The Complaint Fails To State A Claim For Violation Of The CEA.

A market manipulation claim under the CEA (like Claim Two) requires proof that: (1) the

defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) the

defendant caused the artificial price; and (4) scienter—that is, the defendants specifically intended

to cause the artificial price.  *See In re Amaranth Nat. Gas Commodities Litig.* ("*In re Amaranth

III*"), 730 F.3d 170, 183 (2d Cir. 2013).  Here, the CEA market manipulation claims "sound in

fraud" because the Plaintiffs allege that Defendants intentionally created a false impression about

supply and demand for platinum and palladium.[26]  The CEA claims are thus subject to the higher

pleading standards imposed by Federal Rule of Civil Procedure 9(b), which dictate that each of

these elements "must be pled with particularity."  *In re LIBOR I*, 935 F. Supp. 2d at 714; *In re

Crude Oil Commodity Litig.*, 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007); *cf. In re

Amaranth Nat. Gas Commodities Litig.* ("*In re Amaranth I*"), 587 F. Supp. 2d 513, 535 (S.D.N.Y.

2008) (any "complaint that alleges manipulation of commodities prices must satisfy Rule 9(b)[]").

This heightened pleading rule is designed to deter weak claims and to prevent plaintiffs from using

the "long and expensive discovery process" as a "fishing expedition[]" or a means of extorting an

---

[26]   For example, the Complaint alleges that Defendants "colluded to manipulate . . . by falsely representing the net supply or demand on their order books," Compl. ¶ 255, took "affirmative steps to conceal their improper conduct," Compl. ¶ 270, and "caused to be delivered for transmission false or misleading, or inaccurate reports of the Fixing," Compl. ¶ 298.

unwarranted settlement.  *Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 267 (W.D.N.Y. 2010), *appeal dismissed*, 642 F.3d 121 (2d Cir. 2011) (per curiam).

The elements of a manipulative device claim under the CEA (like Claims Three and Four) mirror claims under the SEC's antifraud Rule 10b-5[27]: (1) a manipulative act, (2) performed in connection with a swap, or contract of sale of a commodity, (3) scienter, (4) reliance, (5) economic loss, and (6) loss causation.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *ATSI Commc'ns*, *Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).  For the same reason, Rule 180.1 claims must be pleaded with the same heightened degree of particularity required of Rule 10b-5.  *See* Prohibition, 76 Fed. Reg. at 41,399; *see also Dura*, 544 U.S. at 341-42 (requiring plaintiffs to plead claims under Rule 10b-5 with particularity).

Accordingly, even were there no issues of extraterritoriality or standing, Plaintiffs would still fail to state a claim for relief under the CEA.  The Complaint does not adequately allege the elements of a CEA claim, much less with the particularity required by Rule 9(b) and Rule 10b-5.

> ### 1.   *The Complaint Fails To Adequately Allege the Elements of Market Manipulation.*

Plaintiffs' market manipulation claim (Claim Two) also fails for the independent reason that the Complaint does not adequately allege the elements required to state a claim for relief.

> #### a.   The Complaint Fails To Adequately Allege the Existence of Artificial Prices.

The Complaint alleges no facts showing that platinum and palladium prices were artificial.  "Artificial prices are those prices that do not reflect the forces of supply and demand in the market or do not otherwise comport with contemporaneous prices in comparable markets."  *In re Silver I*,

---

[27]  *See* CFTC, Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) (to be codified at 17 C.F.R. pt. 180) ("Prohibition") ("the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5.")

2012 WL 6700236, at *12.  "When determining if artificial prices exist, a court may consider the underlying commodity's normal market forces, historical prices, supply and demand factors, price spreads, and also the cash market for the commodity at issue."  *Id.*

The Complaint does not allege that platinum and palladium prices did "not . . . comport with contemporaneous prices in comparable markets."  *In re Silver I*, 2012 WL 6700236, at *12. In fact, it alleges the opposite—that the correlation between spot and futures and spot and ETF prices during the Class Period ranged between 96% and 100%, respectively, Compl. ¶ 95, that "downwards spike[s] around the time of the Fixing" appeared in both spot and NYMEX prices, Compl. ¶ 92, and that the ETF prices also "move[d] in unison" with the Auction price, Compl. ¶ 93.

### b.   The Complaint Fails To Adequately Allege That Defendants Caused Artificial Prices.

Plaintiffs also do not allege any facts showing that defendants were "the proximate cause of [any] price artificiality."  *In re Silver I*, 2012 WL 6700236, at *16.  Plaintiffs make much of the fact that the analyses that they previously attributed to anonymous "experts" allegedly show that prices declined just before the start of the PM Auction, *see*, *e.g.*, Compl. ¶¶ 8, 20, 103, 117-24, 130, 136, 140, 145, 178-84, leaping to the conclusion that the decline must be a result of Defendants' collusion, because other unnamed market participants quoted prices, on average, about 0.12% or 0.16% higher than the ultimate fixing price on those few days, *see* Compl. ¶ 179.

*First*, for the reasons stated above at Section I.B, these "analyses" fail to state a plausible claim.  They cannot be considered on a motion to dismiss, and in any event, the average of an untold number of bids quoted by unnamed non-defendant market participants says nothing about how many other market participants actually made higher or lower spot bids than Defendants supposedly did.  Plaintiffs attempt to bolster this allegation with what they concede is "very limited

and incomplete data" concerning just five trading days during the nearly 7 year Class Period that supposedly shows "that prices . . . began to move down—often, contrary to trends occurring during the rest of the day—*before the Fixing process even began*" and supposedly "confirms that Defendants . . . were driving the movement in prices before and around the Fixing window." Compl. ¶¶ 181-84.  But the data Plaintiffs cite do not support that allegation.  Two of the graphs Plaintiffs provide show an *upward* price trend prior to the Fixing period.  *See* Compl. ¶¶ 182-83. And even the graphs that supposedly show a downward trend before the Fixing purport to show only "incomplete public data" about Defendants' "large quotes" and contain virtually no data about non-defendants, making it impossible to draw any conclusion about the causes of any alleged trend.  *See id.*[28]

Second, even if prices dropped before the PM Auction, that would not show that Defendants caused that drop.  Plaintiffs ignore the "obvious alternative explanation," *Twombly*, 550 U.S. at 567, supported by their own allegations.  The Complaint claims  that "prices often began to move *before* the Fixing began" and that "[t]he Defendants (and their co-conspirators) were the only market participants that could accurately predict, and thus confidently trade as to profit off of, the Fix prices before the Fixing even began."  Compl. ¶ 145.  But Plaintiffs' own allegations show that the supposedly "new information" impacting the price was in fact well known to the market.  The Complaint alleges that these downward price spikes were repeated and

---

[28]   The data is woefully deficient for more fundamental reasons that should remove it from the Court's consideration.  First, the Complaint does not identify the source of the material (saying only that it is "public data," Compl. 181 n.50).  Further, it acknowledges the data reflects only "large quotes" but does not explain what constitutes a "large" quote.  The Complaint likewise does not explain whether Plaintiffs selectively identified "large quotes" from the "public data," or included all publicly available "large quotes" for each Defendant for each trading day depicted.  Indeed, it does not even identify whether the cited "quotes" are *bids to buy or offers to sell*, or both.  In so doing, Plaintiffs do not foreclose the possibility that their data compares Defendants' bids to buy against non-Defendants' offers to sell (or compares offers to sell in the pre-Fixing window to bids to buy *during* the Fixing window).  And of course, it is unremarkable that Defendants' bids to buy would be lower than the average market price at any given time, as purchasers always want to pay as little as possible.

predictable, *see* Compl. ¶ 183, and that other market participants can and do observe market behavior, *see* Compl. ¶ 96.   Non-defendant market participants thus would have observed such "repeated and predictable" downward price movements around the time of the Auctions and would have sought to sell before those declines began.   Plaintiffs ignore this explanation, alleging that "there is no reason to expect that sellers *and only sellers* would . . . *disproportionately* flock to transaction . . . around the Fixing window" and that sellers would come to the market only at liquid times.   Compl. ¶ 160.   Unable to rebut this plausible alternative explanation, the current Complaint takes down a straw-man argument about liquidity-dependent sellers.   Although Plaintiffs choose to ignore it, such pre-Auction selling provides a more obvious and plausible explanation for the alleged pre-Auction price drop than the alleged manipulation claimed by Plaintiffs.   *See Twombly*, 550 U.S. at 567-68.[29]

> c.     The Complaint Fails To Adequately Allege That Defendants Had the Ability To Influence Prices.

The Complaint's failure to adequately plead the existence of a conspiracy precludes any showing that Defendants had the ability to influence prices.   Where, as here "the complaint alleges [a price manipulation claim by] collective action," Plaintiffs must establish a conspiracy in order to demonstrate Defendants' ability to influence prices.   *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 261 (2d Cir. 1987).   As discussed above in Section I.A.1, the Complaint does not allege any facts showing the existence of a conspiracy beyond conclusory allegations that Defendants

---

[29]   The Complaint also offers nonsensical and unsupported theories as to why benign liquidity characteristics supposedly do not explain the allegedly observed price movements.   *First*, it alleges that "while platinum and palladium markets were liquid around the Fixing, they were not uniquely so."   Compl. ¶ 162.   *Second*, it alleges that "the effect of the downward movement lingered far longer than economists would expect to see if a price movement was caused by a singular, inexplicable, repeat patterns of sellers . . . rushing to the market at a point of time during the day."   Compl. ¶ 163.   The Complaint offers no support for either allegation—both of which contradict allegations in the Initial Complaint, *supra* at 13, 23—and Plaintiffs' *ipse dixit* does not meet their heightened pleading burden.

communicated with one another, and thus does not show that Defendants had the requisite collective ability to influence prices.  Compl. ¶ 171.

### 2.  The Complaint Does Not Adequately Allege Facts Giving Rise to a Strong Inference of Scienter, Causing the CEA Claims to Fail.

As noted above, scienter is a required element of *both* Plaintiffs' market manipulation (Claim Two) and manipulative device (Claims Three and Four) claims.  *In re Amaranth III*, 730 F.3d at 183 ("There is . . . no manipulation without intent to cause artificial prices"); *see also supra* 35-36.  "[I]n relation to commodities fraud . . . Rule 9(b) imposes a significant burden on allegations of scienter."  *In re Amaranth Nat. Gas Commodities Litig. ("In re Amaranth II")*, 612 F. Supp. 2d 376, 383 (S.D.N.Y. 2009).  "[P]laintiffs must . . . allege facts that give rise to a *strong inference* of scienter," *In re LIBOR III*, 27 F. Supp. 3d at 468,[30] one that is "at least as compelling as any opposing inference one could draw from the facts alleged," *In re Amaranth I*, 587 F. Supp. 2d at 535-36.  To meet this burden, Plaintiffs must allege particularized facts either (a) showing that Defendants had a motive and opportunity to manipulate or (b) constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *See*, *e.g.*, *In re LIBOR III*, 27 F. Supp. 3d at 468.

In other, unrelated commodities litigations, plaintiffs have attempted to show manipulative intent through emails, instant messages, and other similar direct evidence.  *See*, *e.g.*, *CFTC v. Amaranth Advisors LLC*, 554 F. Supp. 2d 523, 533 (S.D.N.Y. 2008) (scienter sufficiently pleaded by quoting from "numerous instant message conversations"); *see also Laydon*, 2014 WL 1280464, at *6 (denying motion to dismiss because complaint included "overwhelming factual content," including "direct evidence [of scienter] from certain Defendants' communications."); *CFTC v.*

---

[30]   Though Judge Buchwald sustained the plaintiffs' CEA claims in *In re LIBOR III*, she did so on the theory that the submitting banks were motivated by reputational concerns and the desire to appear financially stable during the financial crisis and a time of perceived liquidity challenges.  27 F. Supp. 3d at 468-70.  That theory is not alleged here.

*Parnon Energy*, *Inc*., 875 F. Supp. 2d 233, 250 (S.D.N.Y. 2012) (complaint set forth "multiple communications" evidencing defendants' intentions); *In re LIBOR III*, 27 F. Supp. 3d at 462-63. "The Complaint here, by contrast, includes no reference to specific communications between the Defendants about any specific plan to cause artificial prices or an artificial price trend in the [platinum and palladium] futures market."  *In re Silver I*, 2012 WL 6700236, at *11 (dismissing CEA claims for, among other reasons, failure to plead scienter); *In re Silver II*, 560 F.App'x at 87 (affirming dismissal for failure to plead scienter of CEA and noting that "plaintiffs [did not] allege any specific facts indicative of an intent to affect prices similar to those that have been found sufficient in comparable CEA actions").

As noted above at Section I.A.1, Plaintiffs here allege no direct evidence, offering instead only conclusory allegations that Defendants colluded through "chat rooms, instant messages, phone calls . . . and e-mails."  Compl. ¶ 171.  Without *any* direct evidence, Plaintiffs must identify other *particularized* facts showing Defendants' motive and opportunity to manipulate the market or allege strong circumstantial evidence of Defendants' conscious misbehavior.  *See In re Amaranth II*, 612 F. Supp. 2d at 383.  Plaintiffs do neither.

a.  The Complaint Does Not Adequately Allege That Defendants Had Motive To Commit Manipulation.

Plaintiffs attempt to allege motive by asserting that "the [Bank] Defendants (and co-conspirators) jointly manipulated the AM and PM Fixing in order to profit from the purchase of platinum and palladium on the spot markets and their short positions on the platinum and palladium futures markets."  Compl. ¶ 185.  This theory is insufficient to support a CEA claim for several reasons.

*First*, as noted above, the Second Circuit and other courts in this District have repeatedly held that a defendant's market position is insufficient to establish manipulative intent, because such

an intent could otherwise be attributed to *any* market participant.  *See* Section II.C.1.  Plaintiffs cannot establish that Defendants acted with the requisite manipulative intent by invoking allegations that could be made against *any* market participant.

*Second*, even if a "short" position in platinum or palladium were sufficient to demonstrate scienter—which it is not—Plaintiffs have not alleged facts showing that any Defendant was net short in platinum or palladium overall.  As discussed above at Section I.A.2.b.i, the only factual allegation in the Complaint is the inferential leap, made "on information and belief," that because the *aggregate* position of a group of *unnamed* banks was more short than long on NYMEX platinum and palladium futures, each of the three bank Defendants (GSI, HSBC, and ICBC Standard) was net short platinum and palladium futures contracts over "the majority of the Class Period." Compl. ¶ 193.  Yet even assuming the truth of this conclusory and inaccurate assumption, it fails to take into account any Defendant's other, potentially-offsetting platinum or palladium investments, leaving Plaintiffs unable to even plead any Bank's overall (net) market position *at all*.  The Complaint thus cannot support any inference of scienter, let alone a strong one.

Recognizing that Defendants' physical holdings of platinum and palladium would suffer as a result of the alleged price suppression of Auction prices, Plaintiffs offer a variety of inconsistent and implausible speculations as to how Defendants "*could* have profited" from the supposed suppression without actually alleging that Defendants *did* profit by any of these means.  *See* Compl. ¶ 199 (emphasis added).  The Complaint first alleges that Defendants had "an opportunity to profit" from the suppression by purchasing metals more cheaply on the spot markets.  Compl. ¶ 200.  But if the spot prices fall, Defendants not only lose when they are sellers in the spot markets, but also suffer losses on the value of Defendants' physical holdings.  Plaintiffs next offer an "example" illustrating that suppression could allow Defendants to control margin calls and stop-

loss orders, "creat[ing] real-world value for Defendants even if the physical platinum and palladium on their books had become theoretically worth less."  Compl. ¶ 205.  But as Plaintiffs concede, the alleged suppression would not actually generate cash flows "because [platinum and palladium] prices were overall going up."  Compl. ¶ 208 n.70.  Therefore, the best Plaintiffs can offer is the implausible and unsubstantiated theory that Defendants manipulated prices against their own physical holdings in order to "lose less cash to [unquantified, hypothetical] margin payments than they otherwise would have."  *Id.*[31]  Finally, Plaintiffs allege that while Defendants may not be motivated to manipulate the spot price given their physical holdings, certain departments and individual traders "would still be motivated" to maximize their returns, regardless of the bank's overall position.  Compl. ¶ 211.  This possibility, of course, directly contradicts Plaintiffs' theory that "Defendants colluded around the AM and PM Fixings . . . to ensure prices moved in the direction that was financially beneficial to the *Defendants' collective and individual interests*."  Compl. ¶ 6 (emphasis added); *see also* Compl. ¶ 103 ("Prices around the Fixing . . . acted in a way that is most plausibly explained by the joint manipulative conduct of the *entities in charge* of the Fixing and their co-conspirators." (emphasis added)).   "Put simply, plaintiffs' dual motive assertions . . . are implausible."  *In re LIBOR III*, 27 F. Supp. 3d at 469.

*Third*, even if Plaintiffs had sufficiently pleaded that Defendants were net short, and even if such allegations were sufficient to show scienter, Plaintiffs' theory would still fail to satisfy the plausibility requirement of *Iqbal* and *Twombly*.  The Complaint does not explain how Defendants could have successfully and persistently suppressed prices in a precious metals spot market to

---

[31]  This margin-payment theory rests on the premise that Defendants preferred the "real-world value" of immediate cash payments, presumably because of the time value of money.  Compl. ¶¶ 205-07.  But interest rates were at historic lows, so that banks could borrow as much money as they wanted at rates below 0.2%.  *See* Bd. of Governors of the Fed. Res. System, *Selected Interest Rates (Daily)*, http://www.federalreserve.gov/releases/h15/ data.htm (choose Federal Funds, Annual) (last visited September 21, 2015).  The earned interest on the cash in hand thus would not plausibly motivate a massive, seven-year price-manipulation conspiracy.

which access was unrestricted and in which many knowledgeable traders with large appetites for risk participated (traders who, if given the opportunity, would have readily bought any precious metal offered at artificially low prices, thereby causing prices to rise quickly).  Because Plaintiffs have failed to meet their burden to plead "facts that give rise to an inference of scienter at least as strong as any competing inference," and their CEA claims must therefore be dismissed.  *In re Amaranth I*, 587 F. Supp. 2d at 530.

b.    The Complaint Does Not Adequately Allege Conscious<br/>Misbehavior or Recklessness.

Plaintiffs make no serious attempt to allege particularized facts constituting circumstantial evidence of Defendants' conscious misbehavior or recklessness.  This deficiency likely exists because "[u]nder this theory of scienter, a plaintiff must allege facts showing that the defendant's conduct is 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *In re Amaranth II*, 612 F. Supp. 2d at 383 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  Although Plaintiffs can attempt to "plead scienter by identifying circumstances indicating conscious behavior by the defendant, . . . the strength of the circumstantial allegations must be correspondingly greater."  *Id*. (quoting same).

Here, the Court need not consider the strength of the circumstantial allegations, because there are none.  The Complaint does not allege, in contrast to other benchmark-manipulation cases, any particularized facts or identify any particular communications supposedly evidencing Defendants' manipulative intent.  Rather, it points to regulatory investigations into *other* entities that are not defendants here, into *other* financial benchmarks, and to articles describing an alleged investigation into precious metals markets as supposed evidence that "the tools of the

(manipulation) trade are well known to Defendants."  Compl. ¶¶ 16-19, 168-74, 197, 203, 221, 223-46.  "The hearsay nature of these recitals underscores why they are an insufficient substitute for factual allegations, for '[P]laintiffs cannot be permitted to free-ride off the press or the complaints of other parties filing similar lawsuits,' but instead 'must prove to the court that their complaint is backed by specific facts supporting a strong inference of fraud.'"  *Crude Oil*, 2007 WL 1946553, at *8 (quoting *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1040 n.11 (S.D.N.Y. 1993)); *see also In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594, 598 (S.D.N.Y. 2011) (striking references to a CFTC order because it was "not an adjudication of the underlying issues" and refusing to use CFTC order to find scienter); *cf. Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 258 (S.D.N.Y. 2012) ("there is no basis to conclude that a DOJ investigation initiated over a year after the events in question is probative of anything").[32]

### 3. The Complaint Does Not Allege A Manipulative Device Claim With Particularity.

The Complaint also fails to plead the elements of a manipulative device claim under the CFTC Rule 180.1.  Compl. ¶¶ 291-99 (Claims Three and Four).  In addition to failing to plead scienter (*supra* Section II.C.1), the Complaint fails to allege any manipulative conduct (*supra* Section I.A.1), economic loss (*supra* Section I.D.1), or loss causation (*supra* Section I.D.2).  Nor does it allege actual reliance or identify any public misstatements that could support a fraud-on-the-market presumption of reliance.  *See Stoneridge Inv. Partners*, *LLC v. Scientific-Atlanta*, *Inc.*, 552 U.S. 148, 159 (2008).  Thus, Plaintiffs' manipulative device claims must be dismissed.

---

[32]   If the Court is inclined to strike the offending allegations, Defendants respectfully ask the Court to treat this motion, in relevant part, as a motion to strike in accordance with Federal Rule of Civil Procedure 12(f).

Claims Three and Four also must be dismissed insofar as they are based on pre-August 15, 2011 conduct.  Rule 180.1—which did not become effective until August 15, 2011—has no retroactive effect.  *In re Amaranth III*, 730 F.3d at 173 n.1; *CFTC v. Leighton*, No. 12-cv-4012, 2013 WL 4101874, at *5-6 (C.D. Cal. July 8, 2013).

### D.  The Complaint Fails To Adequately Allege Principal-Agent Or Aiding-And-Abetting Liability.

Claims Five and Six, for principal-agent and aiding-and-abetting liability, both depend on a viable primary-liability claim for violation of the CEA.  Comp. ¶¶ 301, 304; *see also In re Silver II*, 560 F.App'x at 87; *In re Platinum*, 828 F. Supp. 2d at 599-600.  Because, as noted above, there is no such underlying violation, these derivative claims must likewise be dismissed.

In addition, a principal-agent claim under the CEA requires Plaintiffs to demonstrate the existence of an agency relationship and that the agent violated the CEA while acting within the scope of its employment or office.  *See Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir 1999).  The Complaint does not allege that any Defendant had a principal-agent relationship with any other Defendant such "that [any] principal manifested an intent to grant [an] agent authority, the agent agreed, and the principal maintained control over key aspects of the undertaking."  *In re Amaranth I*, 587 F. Supp. 2d at 546 (alteration in original).  To the contrary, it alleges that Defendants traded against one another.  *See* Compl. ¶¶ 49-58.

Finally, an aiding-and-abetting claim under the CEA requires that the defendant "(1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective."  *In re Amaranth  II*, 612 F. Supp. 2d at 385; *In re Silver I*, 2012 WL 6700236 at *19.  Plaintiffs' aiding-and-abetting claim fails for the independent reason that the "only allegations in the . . . Complaint that relate directly to [P]laintiffs' claims for aiding and abetting against these entities are conclusory and insufficient.

In each of these allegations, [P]laintiffs have pleaded that [each Defendant] '[knowingly] aided, abetted, counseled, induced, or procured the commission of violations of the [CEA] by the [other] Defendants.'" *In re Amaranth II*, 612 F. Supp. 2d at 390 (some alterations in original); *see* Compl. ¶ 304 (alleging only that "Defendants and their co-conspirators knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein").

## III.   Plaintiffs Fail To State A Claim For Unjust Enrichment.

Plaintiffs fail to plead a cognizable unjust enrichment claim.  *See* Compl. ¶¶ 306-10 (Claim Seven).  A claim for unjust enrichment requires a plaintiff to have "some type of direct dealing or actual, substantive relationship with a Defendant." *See Laydon*, 2014 WL 1280464, at *13.  It also requires a plaintiff to plead facts showing that (1) the defendant received a benefit, (2) at the plaintiff's expense, and that (3) "equity and good conscience" require restitution. *See Ga. Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012).  Plaintiffs satisfy none of these elements.

Despite two opportunities to amend their Complaint, Plaintiffs still do not allege that any named Plaintiff had any "substantive relationship with a Defendant." *See Laydon*, 2014 WL 1280464, at *13; *see also supra* Section I.D.2.  While the named Plaintiffs claim to have been injured when they sold Platinum and Palladium Investments at allegedly suppressed prices, Compl. at 13-14, none alleges that he sold Platinum and Palladium Investments directly to any Defendant at any time at any price, let alone during the Class Period at an artificially low one.

Instead, Plaintiffs claim only that the "direct and foreseeable consequence" of Defendants' alleged manipulation of the Fixings in London was to cause Plaintiffs to sell Platinum and Palladium Investments at artificial prices to non-defendants in transactions around the world. Compl. ¶¶ 308-10.  Multiple courts in this District have held, however, that similar allegations of a defendant's improper influence over a marketplace in which a plaintiff traded with non-defendants do not "establish a relationship, of *any* sort between plaintiffs and defendants," let alone the

"substantive relationship" necessary to establish a claim for unjust enrichment.  *In re LIBOR I*, 935 F. Supp. 2d at 737 (emphasis added) (dismissing unjust enrichment claim because futures contract purchasers did not allege that they had bought futures contracts from—"or that they had any other relationship with"—defendants accused of manipulating price of contracts); *see also In re LIBOR IV*, 2015 WL 4634541, at *68 (holding that in market manipulation cases, "unjust enrichment claims may only be alleged against a counterparty").  Plaintiffs' unjust enrichment claim fails for this reason alone.[33]

Nor can Plaintiffs show that any Defendant has been enriched at any Plaintiff's expense.  *See Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) ("A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value *which belongs to the plaintiff*." (emphasis added)).  Indeed, because the Complaint does not allege that any Defendant purchased any Platinum and Palladium Investment from any Plaintiff, no Defendant could have been "unjustly enriched" at any Plaintiff's expense.  *See In re LIBOR III*, 27 F. Supp. 3d at 479 ("[I]t makes little sense to conclude that a particular defendant bank somehow improperly obtained profits intended for a certain plaintiff when those two parties never transacted or otherwise maintained a business relationship at all.").  The conclusory allegation that Defendants "reap[ed] millions of dollars in profits at the expense of Plaintiffs," Compl. ¶¶ 308-10, does not establish a plausible claim.  *See Laydon*, 2014 WL 1280464, at *13 ("conclusory assertions that Bank Defendants 'financially benefitted'" from alleged misconduct "fail to satisfy Plaintiff's pleading burden").

---

[33]   The Complaint alleges that some Defendants "entered directly into platinum and palladium spot, forward, option and platinum and palladium ETF share transactions with *members of the Class*."  Compl. ¶¶ 34, 36, 38, 44 (emphasis added).  But because they do not establish a transactional relationship with any Defendant, named Plaintiffs lack Article III standing to assert their unjust enrichment claims, and thus lack "class standing" to pursue those claims on behalf of any purported class members who *did* transact with Defendants. *See, e.g., In re LIBOR III*, 27 F. Supp. 3d at 480-82 (plaintiffs lacked class standing to pursue unjust enrichment claims against defendants with whom they did not claim to have transacted themselves).

Plaintiffs' unjust enrichment claim must be dismissed for the independent reason that it is duplicative of Plaintiffs' Sherman Act and CEA claims.  It is well settled under New York law that "[u]njust enrichment is not a catchall cause of action to be used when others fail," and it is "not available where it simply duplicates, or replaces, a conventional [legal] claim."  *La. Mun. Police Emps.' Ret. Sys. v. JPMorgan Chase & Co.*, No. 12-cv-6659, 2013 WL 3357173, at *16 (S.D.N.Y. July 3, 2013) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012)).  Plaintiffs' unjust enrichment claim derives entirely from, and relies on the same alleged facts, circumstances, and wrongdoing as, their Sherman Act and CEA claims.  Thus, Plaintiffs' unjust enrichment theory adds nothing to the Complaint; it only duplicates other claims and, accordingly, fails as a matter of law.[34]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice as to BASF Corporation, BASF Metals Limited, Goldman Sachs International, HSBC Bank USA, N.A., ICBC Standard Bank Plc, and the London Platinum and Palladium Fixing Company Limited.

---

[34]  Moreover, if this Court dismisses the only claims over which it has original federal jurisdiction—the Sherman Act and CEA claims—it should decline to exercise supplemental subject matter jurisdiction over Plaintiffs' state law claim for unjust enrichment.  28 U.S.C. § 1367(c); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

Dated: September 21, 2015
        New York, New York

Respectfully submitted,

*/s/ Joseph Serino Jr.*
Joseph Serino, Jr., P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4913
Fax: (212) 446-6460
jserino@kirkland.com

*Attorneys for Defendant*
*BASF Corporation and*
*BASF Metals Limited*

*/s/ Stephen Ehrenberg*
Stephen Ehrenberg
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10005
Tel: (212) 558-4000
Fax: (212) 558-3588
ehrenbergs@sullcrom.com

*Attorneys for Defendant*
*Goldman Sachs International*

*/s/ Michael Lacovara*
Michael Lacovara
FRESHFIELDS BRUCKHAUS
DERINGER US LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 277-4000
Fax: (212) 277-4001
michael.lacovara@freshfields.com

*Attorneys for Defendant*
*HSBC Bank USA, N.A.*

 */s/ Robert G. Houck*
Robert G. Houck
John D. Friel
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, NY 10019
Tel: (212)-878-8000
Fax: (212)-878-8375
robert.houck@cliffordchance.com
john.friel@cliffordchance.com

*Attorneys for Defendant*
*ICBC Standard Bank Plc*


 */s/ Ethan E. Litwin*
Ethan E. Litwin
Malik Havalic
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Tel: (212) 837-6540
Fax: (212) 299-6540
ethan.litwin@hugheshubbard.com
malik.havalic@hugheshubbard.com

*Attorneys for Defendant*
*The London Platinum and Palladium Fixing*
*Company Ltd.*