UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
                                            :

IN RE: PLATINUM AND PALLADIUM    :  Case No. 14-cv-9391 (GHW)
ANTITRUST LITIGATION                       :
                                            :  ECF CASE
                                            :
                                            :  ORAL ARGUMENT REQUESTED
                                            :

-----------------------------------------------------------x

**REPLY OF DEFENDANTS UBS AG AND UBS SECURITIES LLC
IN SUPPORT OF THEIR INDIVIDUAL MOTION TO DISMISS
PLAINTIFFS' SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Phone: (212) 351-4000

555 Mission Street, Suite 3000
San Francisco, CA  94105
Phone:  (415) 393-8200

1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 955-8500

*Attorneys for Defendants UBS AG
and UBS Securities LLC*

December 11, 2015

# CONTENTS

A.    The Conspiracy Allegations As To UBS Are Inadequate. ......................... 1

B.    The Manipulation Allegations As To UBS Also Are Implausible. ............ 5

According to Plaintiffs, the Platinum and Palladium Fix was the moving force behind the alleged conspiracy to achieve a "suppression of the platinum and palladium benchmarks" over "the entire Class Period." SAC ¶¶ 97, 195. But as UBS explained, UBS *never participated in the Platinum and Palladium Fix* with the panel members (Co-Defendants here), so UBS lacked the alleged "control" of the Platinum and Palladium Fix (SAC ¶ 196; SAC App. E, # 2(i), 4(e)) and "foreknowledge" of its level and direction (SAC ¶¶ 4, 12-14, 199) that Plaintiffs have depicted as the supposed engines driving the purported agreement. ECF No. 114 ("UBS Mem.") at 3-4.[1] While Plaintiffs strain to oppose dismissal (ECF No. 127 ("Opp'n")) by misreading their own Second Complaint and drawing inapt comparisons to unrelated conduct outside the Platinum and Palladium Fix setting, they offer nothing beyond "labels and conclusions" and facts showing at most "merely parallel conduct that could just as well be independent action" by UBS, which cannot state any plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009).[2]

A.   **The Conspiracy Allegations As To UBS Are Inadequate.**

The Second Complaint tries to allege UBS's participation in the Platinum and Palladium Fix conspiracy based on (1) the Swiss Financial Market Supervisory Authority's ("FINMA")'s regulatory investigation; (2) UBS's role as a market maker in the Platinum and Palladium spot

---

[1] UBS adopts all of the arguments in the Co-Defendants' Reply Memo, and nothing in this separate reply by UBS should be construed otherwise. Accordingly, UBS's reply addresses only issues unique to UBS, and not issues common to all Defendants, in conformance with this Court's order on page limits (ECF No. 75).

[2] Plaintiffs err (Opp'n 1) in pressing a legal standard at odds with *Twombly* and *Iqbal*. The guidance against "tightly compartmentalizing the various factual components" of the case-in-chief, which the Supreme Court tied to "the duty of *the jury* . . . to look at the whole picture and not merely at the individual figures in it," is inapposite here. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (internal quotation marks omitted; emphasis added). That observation about "the duty of the jury" does not mean that where, as here, a pleading is "utterly lacking" in "numerous critical respects," courts must give "synergistic effect" to the allegations "collectively" to save them from dismissal under Rule 12(b)(6). *See Ne. Tel. Co. v. AT&T*, 651 F.2d 76, 95 n.28 (2d Cir. 1981); *cf. Eatoni Ergonomics, Inc. v. Research in Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011). In any event, even when the deficient allegations here are viewed in combination, they lack "facial plausibility," *Iqbal*, 556 U.S. at 678, so Plaintiffs raise no tenable concern about "compartmentalizing."

(short-term) and related Platinum and Palladium derivatives markets; and (3) purported statistical disparities in prices quoted by UBS and other banks at intervals "around" the Platinum and Palladium Fix.  As we explained (UBS Mem. 4-10), alone or in tandem, those assertions fail to sustain the claims.  Nor do they show valid "'plus' factors" sufficient "to allow a fact-finder to infer a conspiracy." *Mayor of Balt. v. Citigroup*, 709 F.3d 129, 137-38 (2d Cir. 2013).

    **1. FINMA Assertions.**  Plaintiffs advance an account of the FINMA investigation (Opp'n 3-4, 8-10) that is irreconcilable with FINMA's report in at least two critical respects.  First, FINMA distinguished between allegations concerning (a) "foreign exchange ***benchmarks***" (FINMA Report §§ 3.3.1, 3.5, 4.3.1, 4.3.3, at 11-12, 13, 16, 17) (emphasis added), and (b) precious metals.  Second, in Section 3.3.3, the portion of the report addressing alleged events in precious metals markets, FINMA made specific assertions about "conduct against the interests of [the bank's] own clients."  FINMA Report § 3.3.3 at 12; *see id.* § 4.3.2 at 16 (asserting that § 3.3.3 depicts UBS "acting against client interests"); *id.* § 4.3.3 at 17 (asserting that § 3.3.3 depicts UBS departing from "internal policies" by "acting repeatedly against client interests").  Yet Plaintiffs do not allege that they were injured as UBS clients, or even that they were UBS clients at all.  Those distinctions preclude Plaintiffs' attempt to paint the FINMA Report as substantiating the Second Complaint's scattershot allegations.

    Crucially, while FINMA referred to "front running . . . of silver fix orders of one client" (§ 3.3.3 at 12), it ***nowhere*** discussed determination of the Platinum and Palladium Fix or indeed ***any*** precious metals ***benchmark***.  An allegation of unilateral "front running" as to a bank's own client trading orders has no tendency whatsoever to support an allegation of a horizontal price-fixing agreement with other banks that set a benchmark price.  Furthermore, since UBS is not a Fixing Member, information describing the Platinum and Palladium fix orders of UBS clients is

2

not the "intended or future price information" (SAC ¶¶ 170, 215) central to Plaintiffs' claim that the Fixing Members exploited their "foreknowledge" (SAC ¶¶ 4, 12-14, 199) of the direction and level of the Fix.  And contrary to Plaintiffs' contention (Opp'n 4, 8), it is FINMA's written report, not a Bloomberg News article's description of an agency official's purported oral overview, that defines the scope of FINMA's assertions.

Plaintiffs' deviation from the assertions in FINMA's report, and from the host of other investigations cited, including several not described in the Complaint (Opp'n 3-5 & nn.2-5), thus confirms the inapplicability of those proceedings—even if, contrary to law, "settlements, and government investigations in other cases" could satisfy pleading requirements.  *In re Platinum & Palladium Commods. Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011); *cf. Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) (absent sufficient "non-conclusory facts," complaint "that *merely* recites others' allegations may . . . be insufficient").

In that regard, Plaintiffs err in contending (Opp'n 8) that *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, No. 13 Civ. 7789, 2015 WL 363894 (S.D.N.Y. Jan. 28, 2015), licenses the Second Complaint's approach to unrelated regulatory resolutions.  The District Court in *In re FX Benchmark Rates* took "judicial notice of penalties and fines" from certain regulatory resolutions "for the **very conduct** alleged in the Complaint."  *Id.* at *6 (emphasis added).  In sharp contrast here, the Second Complaint does not track either the FINMA Report or any other regulatory resolution, none of which alleged, for example, that UBS or the Co-Defendants caused a "suppression of the platinum and palladium benchmarks."  SAC ¶ 97.  Plaintiffs' strained attempt to connect their Complaint to other regulatory resolutions involving UBS (Opp'n 3-5 & nn.2-5) would also dissolve the distinction between separate alleged "market[s] for antitrust purposes."  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per

curiam) (internal quotation marks omitted).  And it is incompatible with the Supreme Court's admonition that assessing plausibility is a "***context-specific*** task" requiring "the court to draw . . . reasonable inference[s]" from the well-pleaded factual allegations, because the allegation of "misconduct" in one market does "nothing more than" point to "the mere possibility of misconduct" in another market.  *Iqbal*, 556 U.S. at 678-79 (emphasis added).

**2.  Price Quoting.**  Plaintiffs further err in contending (Opp'n 2-3) that the purported conclusions of their "economic consulting experts" (SAC ¶ 266) concerning alleged price quoting by UBS suffice to show plausibility.  Even if, contrary to law, anonymous expert opinions could be offered here, the particular opinions that Plaintiffs sketch do not establish plausibility.  The alleged UBS price-quoting activity is nothing more than "a bare allegation of parallel conduct" that is "not enough to survive a motion to dismiss" and does not "lead to an inference of conspiracy," because what Plaintiffs "assert fail[s] plausibly to suggest that this parallel conduct flowed from a preceding agreement rather than from [the banks'] own business priorities."  *Mayor*, 709 F.3d at 137-38.[3]

Plaintiffs are also mistaken in presupposing (Opp'n 2) that whenever there is an "existing upward price trend," a price quoted below that "price trend" must be improper.  Plaintiffs cite no authority in economics or in law for that presupposition, which radically oversimplifies the price-setting process, and ignores that firms in a dynamic market respond rationally to multiple legiti-

---

[3] Plaintiffs further err in contending (Opp'n 2-3) that "available pricing data" shows UBS participated in "mov[ing] . . . prices down" rather than engaging in legitimate behavior in a dynamic market.  Plaintiffs' fundamental position is that the "[t]he Fixing ***determined*** the prices of thousands of platinum and palladium spot, forward, futures, options and other derivatives contracts owned by Plaintiffs and the Class."  ECF No. 129 (Pls.' Opp'n to Co-Defs.' Joint Mot.) at 1 (emphasis added).  But if the Platinum and Palladium Fix "determined the prices," then the purported parallelism between UBS's quotes and those of the Fixing Defendants is simply a consequence of that determination, meaning that no plausible inference of any misconduct by UBS arises from these allegations.  *See also* SAC ¶¶ 61, 91, 196 (describing determinative effect of Fix price).  Moreover, Plaintiffs' inability to explain the origin of their purported price quotes, even after the Co-Defendants identified those quotes as not reflecting "actual trades" (ECF No. 116 (Co-Defs.' Mem.) at 21), confirms that the expert opinions recited undermine rather than bolster the plausibility of the asserted claim.

4

mate considerations, such that a price reduction may well be within the self-interest of the offeror—if, for example, the lower price reflects increased supply, or is expected to attract offerees. *Cf. Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 121 n.17 (1986) ("cutting prices in order to increase business often is the very essence of competition").

>    B.    **The Manipulation Allegations As To UBS Also Are Implausible.**

Because the Second Complaint relies on the same set of purported events centered on the Platinum and Palladium Fix to plead the commodities manipulation claims as well, UBS's lack of participation in the Platinum and Palladium Fix precludes plausibility on all fronts. UBS Mem. 10-12. Plaintiffs now strain to downplay the role of the Platinum and Palladium Fix with a new assertion that the Fix "itself was simply a tool" in the alleged manipulation. Opp'n 11. This new assertion is incompatible with, among other things, the Second Complaint's allegations that "the Fixing was designed in a manner that ***held market participants hostage*** to the dealings of four large and heavily self-interested participants in the platinum and palladium markets, . . . . [and] gave the Defendants the opportunity and motive to manipulate the prices reached by the Fixing to their advantage." SAC ¶ 61 (emphasis added); *see also* SAC ¶ 196 (stressing Fixing Defendant "control[]" over "the direction of the Fixes"); App. E, # 4(e) (spotlighting allegation of "[d]irect and complete control of the Fixing values by a handful of competitors"); Pls.' Opp'n to Co-Defs.' Joint Mot. 12 ("the Fixing Defendants controlled the prices set for platinum and palladium *as a result of* the Fixing") (emphasis added). Such allegations portray the Platinum and Palladium Fix as the crucial instrument in the agreement, not "simply a tool." Plaintiffs' conclusory assertions thus fall short of alleging facts giving rise to a plausible claim under the Commodity Exchange Act.

| | |
|---|---|
| DATE: December 11, 2015 | Respectfully submitted,<br><br>GIBSON, DUNN & CRUTCHER LLP |
| Thomas G. Hungar<br>D. Jarrett Arp<br>Melanie L. Katsur<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036<br>Telephone: (202) 955-8500<br><br>Peter Sullivan<br>Lawrence J. Zweifach<br>Indraneel Sur<br>200 Park Avenue<br>New York, NY 10166<br>Telephone: (212) 351-4000 | /s/ Joel S. Sanders<br>Joel S. Sanders<br>555 Mission Street, Suite 3000<br>San Francisco, CA 94105<br>Telephone: (415) 393-8200<br>JSanders@gibsondunn.com<br><br>*Attorneys for Defendant UBS AG and UBS Securities LLC* |