UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                  :

IN RE PLATINUM AND PALLADIUM
ANTITRUST LITIGATION

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/28/2017

Lead Case 1:14-cv-9391-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................. 3

II.     BACKGROUND ................................................................................................................... 4

   A.  Facts ...................................................................................................................................... 4

     1.   The London Platinum and Palladium Market ........................................................... 4

     2.   Platinum and Palladium Fixing Process .................................................................... 6

     3.   The Impact of the Fixing on Other Platinum and Palladium Investments ............. 7

     4.   Defendants' Alleged Platinum and Palladium Price Manipulation ........................ 10

        a.   How Defendants Manipulated the Fix Price ..................................................... 11

        b.   Defendants' Alleged Price Manipulation Caused Price Distortions of Platinum and Palladium Investments Around the Fixing ................................................... 13

        c.   Defendants Profited from Manipulating the Fix Price .................................... 15

        d.   Related Regulatory Investigations .................................................................... 17

   B.  Procedural History ............................................................................................................ 19

III.    DISCUSSION .................................................................................................................... 20

   A.  Legal Standard ................................................................................................................... 20

   B.  Sherman Act Claim .......................................................................................................... 21

     1.   Sherman Act Violation ............................................................................................. 21

        a.   Parallel Conduct ............................................................................................... 23

        b.   Plus Factors ....................................................................................................... 25

     2.   Standing .................................................................................................................... 32

        a.   Constitutional Standing .................................................................................... 32

        b.   Antitrust Standing ............................................................................................. 35

|  | i. | Antitrust Injury | 36 |
|  | ii. | Efficient Enforcers | 39 |
| C. | Commodities Exchange Act ("CEA") Claims | | 51 |
| 1. | Extraterritoriality | | 51 |
| 2. | Standing Under the CEA | | 56 |
| 3. | CEA Violations | | 58 |
| a. | Legal Standard | | 58 |
| b. | Price Manipulation Claim | | 61 |
| c. | Manipulative Device Claims | | 67 |
| d. | Secondary Liability | | 71 |
| i. | Aiding and Abetting | | 71 |
| ii. | Principal-Agent Liability | | 73 |
| D. | Unjust Enrichment | | 75 |
| E. | Personal Jurisdiction Over Foreign Defendants | | 76 |
| 1. | Rule 12(b)(2) Legal Standard | | 77 |
| a. | Standard for Exercising Personal Jurisdiction | | 78 |
| 2. | Statutory Bases for Personal Jurisdiction | | 84 |
| a. | BASF Metals | | 86 |
| b. | ICBC | | 87 |
| c. | LPPFC | | 89 |
| i. | Alter Ego Theory of Personal Jurisdiction | | 90 |
| 3. | Conspiracy Jurisdiction | | 95 |
| 4. | Jurisdictional Discovery | | 97 |
| F. | UBS's Motion to Dismiss for Failure to State a Claim | | 99 |
| G. | BASF Corp.'s Motion to Dismiss for Failure to State a Claim | | 103 |
| H. | Leave to Amend | | 104 |
| IV. | CONCLUSION | | 105 |

## I.   INTRODUCTION

In this case, platinum and palladium join several of their fellow elements in the periodic table as the objects of an alleged massive price manipulation scheme.[1]  Plaintiffs, a group of entities and individuals who sold physical platinum and palladium or platinum and palladium futures, allege that defendants BASF Corporation ("BASF Corp."), BASF Metals Limited ("BASF Metals" and, together with BASF Corp., "BASF"), Goldman Sachs International ("Goldman Sachs"), HSBC Bank USA, N.A. ("HSBC"), ICBC Standard Bank Plc ("ICBC"), UBS AG, UBS Securities LLC ("UBS Securities" and, together with UBS AG, "UBS"), and the London Platinum and Palladium Fixing Company Ltd. ("LPPFC") (collectively, "Defendants") manipulated and artificially suppressed the price of physical platinum and palladium.  To recover financial losses incurred as a result of Defendants' alleged price manipulation, Plaintiffs brought this putative class action claiming violations of the Sherman Act, 15 U.S.C. § 1, and the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.*, and for unjust enrichment.

Because the Court finds that Plaintiffs are not efficient enforcers of the antitrust laws, Defendants' motion to dismiss Plaintiffs' Sherman Act claim is GRANTED.  Defendants' motion to dismiss Plaintiffs' CEA claims is GRANTED IN PART and DENIED IN PART.  The Court finds that the alleged conduct does not require an impermissible extraterritorial application of the CEA and that Plaintiffs have stated a CEA claim and have standing to sue under the Act.  However, because CFTC Rule 180.1 did not come into effect until August 15, 2011, Defendants' motion to dismiss is granted as to Plaintiffs' CEA manipulative device claims that are based on transactions

---

[1] *See, e.g.* (listed in the order of the corresponding elements appearance in the table, *see* Periodic Table of Elements: International Union of Pure and Applied Chemistry, *available at* https://iupac.org/what-we-do/periodic-table-of-elements/ (last accessed on March 28, 2017)), *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015); *In re Copper Antitrust Litig.*, No. 99-C-621-C, 2000 WL 34230131 (W.D. Wis. Jul. 12, 2000); *In re Zinc Antitrust Litig.*, No. 14-CV-3728 (KBF), 2016 WL 3167192 (S.D.N.Y. June 6, 2016); *In re London Silver Fixing, Ltd., Antitrust Litig.*, No. 14-MD-2573 (VEC), 2016 WL 5794777 (S.D.N.Y. Oct. 3, 2016); *In re Commodity Exch., Inc., Gold Futures and Options Trading Litig.*, No. 14-MD-2548 (VEC), 2016 WL 5794776 (S.D.N.Y. Oct. 3, 2016).

effected prior to that date.  Because Plaintiffs have not alleged that they had any direct dealings with

Defendants and that Defendants' were unjustly enriched at their expense, Defendants' motion to

dismiss Plaintiffs' unjust enrichment claim is GRANTED.

In addition, because Plaintiffs have failed to make a *prima facie* showing that Defendants

ICBC, BASF Metals, and the LPPFC have sufficient suit-related contacts in the United States, those

Defendants' motions to dismiss for lack of personal jurisdiction are GRANTED.  Finally, because

Plaintiffs have not alleged that UBS and BASF Corp. had any involvement in the alleged price

manipulation conspiracy, those defendants' motions to dismiss for failure to state a claim are

GRANTED.

## II.    BACKGROUND

### A.    Facts[2]

#### 1.    The London Platinum and Palladium Market

Platinum and palladium are precious metals.  SAC ¶ 99.  They are used decoratively in

jewelry, but also have significant commercial and industrial uses.  SAC ¶ 82.  We all breathe a little

easier thanks to the two metals.  As essential components of catalytic converters, platinum and its

"sister metal" palladium are responsible for reducing toxic air pollutants from vehicle exhaust

emissions.  SAC ¶ 73 & n.31.  In addition to the automobile industry, both metals are used in a

variety of industrial and commercial applications, including in electrical, laboratory, and dentistry

equipment.  SAC ¶ 73 & n.31.

Platinum and palladium have traditionally been traded internationally as precious metals, and

have been held primarily for their exchange value rather than their industrial use.  SAC ¶ 73 (internal

quotation marks and citations omitted).  Physical platinum and palladium trade in "opaque," "over-

---

[2] Unless otherwise noted, the facts are taken from the second consolidated amended class action complaint ("SAC"), Dkt. No. 102, and are accepted as true for the purposes of this Rule 12(b)(6) motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

the-counter" ("OTC") markets that operate "24-hours a day."  SAC ¶¶ 78-81.  Major players in the

global physical platinum and palladium markets include Defendants as well as platinum and

palladium producers (*e.g.*, miners and refiners), consumers (*e.g.*, jewelers and industrials), and

investors (*e.g.*, pension funds, hedge funds, and individuals).  SAC ¶¶ 81-82.  Since the 1970s,

London has been the center for physical platinum and palladium trading.  SAC ¶ 74.

London's physical platinum and palladium trading similarly takes place in an OTC market

and involves a number of activities by various market participants, including Defendants.  SAC ¶ 75.

The London Platinum and Palladium Market ("LPPM") is at the center of the London market for

those metals.  Established in 1987, the LPPM is a trade association that coordinates the activities

conducted on behalf of LPPM members and other participants in the platinum and palladium

market.  SAC ¶ 65.  Among other things, the LPPM sets standards for the "London Good

Delivery," a set of rules prescribing the physical characteristics and attributes of platinum and

palladium bars used in settlement in LPPM transactions.  SAC ¶ 65.  As of July 2015, the LPPM had

fifty-two members, including thirteen market-making full members, six ordinary full members, and

thirty-three associate members.  SAC ¶ 67.  The market-making members form the core of the

LPPM; they quote buying and selling prices for spot delivery and provide liquidity to the market.

SAC ¶ 71.

During the relevant time period, Defendants BASF Metals, Goldman Sachs, HSBC, ICBC,

and UBS were five of the thirteen LPPM market-making members.  SAC ¶¶ 31, 33, 35, 37, 44, 67.

Four out of the five LPPM market-making members—BASF Metals, Goldman Sachs, HSBC and

ICBC (the "Fixing Members")—were also members of the London Platinum and Palladium Fixing

Company Ltd. ("LPPFC"), a private company wholly owned and controlled by its four members.

SAC ¶ 45.  As the body responsible for setting global benchmark prices for platinum and palladium,

the LPPFC is "an integral part of the market for London platinum and palladium as well as global

markets—including U.S. markets—for platinum and palladium" and investments in securities based on physical platinum and palladium prices.  SAC ¶ 77; *see also* SAC ¶¶ 1, 22.

### 2.   Platinum and Palladium Fixing Process

Throughout the period between January 1, 2008 and November 30, 2014 (the "Class Period"), the Fixing Members participated in morning and afternoon conference calls to set the daily market prices of platinum and palladium (the "AM Fixing" and "PM Fixing," and, collectively, the "Fixing" or "Fixing Calls").  SAC ¶¶ 1, 62, 271.  The Fixing was conducted through a "Walrasian" auction among the Fixing Members.  SAC ¶ 51.  The LPPFC's Chair (selected annually from and by LPPFC members) announced a starting price (known as the "Opening Price").  SAC ¶¶ 50, 52.  The Opening Price typically reflected the "spot price"[3] for platinum and palladium, which, in turn, reflected the values of those metals at the time of the quote.  SAC ¶¶ 2, 52 & n.1.  The remaining Fixing Members would then declare themselves as "a net buyer or a net seller, or as having no interest at the starting price."  SAC ¶ 52.  Each Fixing Member's interest was based on its customers' orders, as well as proprietary orders from its trading desks.  SAC ¶ 51.  By combining those orders, the Fixing Members generated an aggregate buy or sell position for the auction.  *See* SAC ¶ 51.

In conducting the auction, the Chair's goal was to reach an equilibrium between platinum and palladium supply and demand orders.  SAC ¶¶ 52-53.  If the Opening Price did not generate any buying or selling, the Chair announced the Opening Price as the price as fixed (the "Fix" or the "Fix Price").  SAC ¶ 52.  If the Opening Price generated only selling or buying interest, however, the Chair solicited figures from the Fixing Members and then adjusted the Opening Price upward or downward until buying and selling reached an equilibrium or were within 4,000 troy ounces. SAC ¶¶ 53, 55.  If the Chair was unable to match supply and demand exactly, and had instead declared the price as fixed when the difference between buying and selling was 4,000 troy ounces or

---

[3] The "spot price" refers to the current market price of the underlying physical commodity.

less, the Chair pro-rated the difference between supply and demand between the participating firms.

SAC ¶ 59.  When the Chair reached an equilibrium between buy and sell orders, the Chair declared

the Fix Prices and stated the time at which they had been fixed and the final prices in U.S. dollars.

SAC ¶ 57.  Once the Chair declared the Fix Price, the Fixing Members were not able to alter or

withdraw buy and sell orders based on that price.  SAC ¶ 57.

Operating through the LPPFC, the Fixing Members conducted the Fixing throughout most

of the Class Period.  SAC ¶ 63.  On October 16, 2014, in response to the LPPFC's earlier

solicitation for an independent party to assume responsibility for administering the Fixing, the

LPPFC announced that, starting December 1, 2014, the London Metal Exchange ("LME") would

administer the Fixing.  SAC ¶ 63.  The LME replaced the LPPFC's Fixing process with the

LMEbullion, which relies on "a fully automated price-discovery process, holding two daily

auctions."  SAC ¶ 63.  The LMEbullion auctions allow authorized "traders [to] participate through a

secure web interface, where they can view the auction price and each submit their interest until a

final price is set."  SAC ¶ 63.

### 3.  The Impact of the Fixing on Other Platinum and Palladium Investments

As noted above, the Fixing was used to set global benchmark prices for platinum and

palladium, which were used in numerous transactions for platinum and palladium worldwide.

SAC ¶ 2.  Plaintiffs explain that "[t]he prices of palladium move the value of, and determine the cash

flow for, many different kinds of transactions."  SAC ¶ 12.  The effect of the Fixing was widespread.

For example, as alleged in the SAC, many physical supply contracts—such as contracts for the sale

of raw platinum or palladium—expressly incorporate prices from the Fixing.  SAC ¶ 91.

The relevance and impact of the Fixing extends beyond the markets for physical platinum

and palladium.  Many market participants trade in platinum and palladium derivatives, including

futures, forwards, and options.  SAC ¶ 91.  Such derivatives are financial instruments whose value is

derived from the underlying price of physical platinum and palladium on the spot market. SAC ¶ 84. The Fixing affects trades in such financial instruments because, as Plaintiffs explain, exchange prices closely track the price of spot platinum or palladium. SAC ¶ 91. Consequently, changes in the price of one will be almost immediately reflected in the other. As alleged in the SAC, "[t]he spot, Fix, and [New York Mercantile Exchange ("NYMEX")] settlement prices exhibit an almost perfect correlation." SAC ¶ 91; *see also* SAC ¶¶ 3-4. The relationship, Plaintiffs assert, is undeniable, and is thoroughly documented by studies conducted by independent academics and Plaintiffs. SAC ¶ 3. Many derivatives' cash flows are calculated by reference to the Fix benchmark prices on a given day. SAC ¶ 3. The SAC does not allege the total market size for platinum and palladium derivatives. But Plaintiffs assert that, since 2011, the markets for platinum and palladium futures alone have surpassed annual values of $100 billion and $40 billion, respectively. SAC ¶ 83. The alleged impact of the Fixing on the platinum and palladium market could therefore be immense.

A brief description of the financial instruments described above may be helpful to illustrate the relationship between the Fix Price for physical platinum and palladium and the value of the derivatives. A future "is a bilateral agreement for the purchase or sale of an agreed amount of" the underlying commodity at a specified time in the future. SAC ¶ 84. A futures contract buyer takes a "long" position on platinum or palladium, thereby agreeing to pay for a specified amount of the commodity at the expiry of the contract. SAC ¶ 85. A futures contract seller takes a "short" position, thereby agreeing to deliver and receive payment for the commodity at the specified amount and time. SAC ¶ 85. Most market participants do not settle their futures contracts at the expiry date; rather, instead of taking physical delivery of the commodity, traders generally offset their futures position prior to maturation. SAC ¶ 85.

Traders who hold a "long" position, and who are obligated to purchase the commodity at the agreed-upon price in the future, can profit when the price of the commodity increases by selling

an offsetting futures contract at the higher price. *See* SAC ¶ 86. By contrast, traders who hold a "short" position, and who are obligated to sell the underlying commodity at an agreed-upon price in the future, can profit when the price of the commodity decreases by selling an offsetting futures contract at the lower price. *See* SAC ¶ 86. Forwards are virtually identical to futures, but, unlike futures that are traded on an exchange, forwards are traded over the counter. SAC ¶ 84.

Like futures, platinum and palladium options contracts—"puts" or "calls"—can be traded over-the-counter or on an exchange. SAC ¶ 87. A put involves two parties: the put seller and the put buyer. SAC ¶ 87. By entering into a put, the put buyer obtains the right, but not the obligation, to force the put seller to buy the underlying futures contract, or the underlying metal itself, within an agreed-upon time frame at a specified, predetermined price —the "strike" price. SAC ¶ 87. In exchange for committing to buy, the put seller receives a fee—the premium. SAC ¶ 87. Conversely, a call gives the holder of the underlying platinum and palladium option the right, but not the obligation, to buy the underlying platinum or palladium futures contract, or the underlying metal itself, at a specified, predetermined price—the strike price—during a specified time period. SAC ¶ 87. The call seller is obligated to sell those futures contracts or the underlying metal to the call option buyer if the buyer exercises the right to do so before the expiry date. SAC ¶ 87. To retain the right to do so, the call buyer pays a premium to the call seller. SAC ¶ 87. As described in the SAC, "[a]n investor that buys a put option generally expects the price of platinum or palladium to fall . . . and an investor that buys a call option generally expects the price of the relevant metal to rise." SAC ¶ 87. If the price of the option contract falls below the strike price, the put buyer is likely to exercise the put option, and the put seller will likely have to purchase shares from the put buyer when the option is exercised. A call option buyer is more likely to exercise the right to "call in" the underlying futures contract if the price goes above the strike price. SAC ¶ 88. At that point,

the buyer can execute the purchase at the lower price and make a profit by selling the futures contract at the higher market price.  SAC ¶ 88.

Finally, platinum and palladium exchange-trade funds ("ETFs") invest only in those commodities and issue shares of stock that are directly linked to platinum and palladium spot prices. SAC ¶¶ 89-90.  Plaintiffs assert that the price of shares issued by such ETFs "correlates very closely to the spot price of platinum and palladium itself."  SAC ¶ 90.  The correlation between the spot price and the derivative is not unique to ETFs.  As alleged and illustrated in the SAC, the correlation coefficient of platinum and palladium spot prices and corresponding derivatives range between 0.96 to 1.00 (where a coefficient of 1 represents a perfect correlation).  SAC ¶ 95 & figs. on pp. 33-38. Plaintiffs maintain that the relationship "make[s] sense" because "the various instruments . . . have a common underlying economic good, be it platinum or palladium" and "[a]ny price changes in one instrument are very quickly transmitted and imputed in the others."  SAC ¶ 96.[4]

### 4.   Defendants' Alleged Platinum and Palladium Price Manipulation

The crux of Plaintiffs' allegations giving rise to this action is that Defendants took advantage of the Fixing Calls to set the Fix Price at lower levels than competitive market forces would otherwise have dictated.  SAC ¶ 97.  Put simply, Plaintiffs claim that the Fixing Members fixed the Fix.  Plaintiffs allege that the Fixing Calls provided Defendants with "a ready-made process for *daily* coordination of their activities," and that Defendants took advantage of that opportunity to move the Fix Price downward at their discretion and for their own benefit.  SAC ¶ 9; *see also* SAC ¶ 4. Because they move in lockstep with the price for physical platinum and palladium, Defendants' coordinated suppression of the Fix Price had the effect of artificially lowering the prices of platinum and palladium futures and options traded on NYMEX, platinum and palladium ETFs, and other

---

[4] As in the SAC, this opinion will refer to platinum and palladium bullion and platinum and palladium bullion coins, platinum and palladium futures traded on NYMEX and other U.S. exchanges, shares of platinum and palladium ETFs, OTC platinum and palladium, and platinum and palladium spot or forward transactions and options, or any of the foregoing, as "Platinum and Palladium Investments."  SAC ¶ 22 n.13.

Platinum and Palladium Investments.  SAC ¶ 97.  Consequently, in addition to creating numerous opportunities for Defendants to profit, Plaintiffs assert that during the Class Period, they, and other similarly situated members of the proposed class, were forced to sell their Platinum and Palladium Investments at artificially low prices as a result of Defendants' alleged price manipulation.  SAC ¶ 97.

### a.   How Defendants Manipulated the Fix Price

Plaintiffs allege that Defendants manipulated the Fix Price in at least two ways.  First, Defendants conspired to manipulate the Opening Price that the Chair announced at the beginning of the Fixing Calls.  SAC ¶ 253.  Second, Defendants misrepresented actual market supply and demand in order to move the AM and PM Fix Price to the level at which it was ultimately fixed.  SAC ¶ 253.  In advance of the AM and PM Fixing Calls, for example, Defendants allegedly compiled confidential client order information and then shared the information with the other Fixing Members in order to coordinate the execution of transactions immediately prior to and during the Fixing.  SAC ¶ 8.  To achieve "maximum effect," Defendants allegedly grouped and timed particularly large sell orders around the Fixing on the days when they intended to drive down the price of platinum or palladium.  SAC ¶ 8.  Plaintiffs allege that this practice was intended to, and in fact did, alter the Opening Price, inducing clients to change their interest in buying or selling at that price, and removing suspicion from an auction price that otherwise would have stood out.  SAC ¶¶ 8, 172-173.

The Fixing Calls, Plaintiffs allege, provided the perfect cloak of secrecy and veneer of legitimacy to Defendants' conduct, and enabled them to employ other price manipulation tactics.  For example, Defendants are alleged to have engaged in "front running," which Plaintiffs describe as "trading in their own positions in advance of customer orders to take advantage of the market's resulting move when the client's orders are placed."  SAC ¶ 8 n.2.  Defendants also allegedly placed large orders that were never executed (a practice known as "spoofing"), placed large orders that were

quickly executed but then reversed (a practice known as "wash sales"), placed orders that were subsequently cancelled to "give the illusion of activity" (a practice known as "painting the screen"), and used such techniques to "trigger a stop-loss order or to avoid a bank's having to pay on an option or similar contract" (generally referred to as "jamming"). SAC ¶¶ 8, 175 & n.2.[5]

As alleged in the SAC, Defendants' price manipulation continued into and during the Fixing itself. For example, Plaintiffs assert that to ensure that the auction produced their desired Fix Price, the Fixing Members placed auction bids and quotes irrespective of the actual aggregate demand reflected in their order books. SAC ¶ 177. By submitting aggregate auction bids that understated their clients' demand, the Fixing Members were able to suppress the Fix Price to benefit themselves, even if doing so was detrimental to their clients' interests. SAC ¶ 177.

While the Fixing Calls themselves furnished a convenient forum for sharing information, it was not the only one Defendants are alleged to have utilized. Plaintiffs claim that Defendants used chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and emails to coordinate among themselves to ensure members that attempts to move the market in one way or the other were not undermined by contrary efforts of other members or other large banks. SAC ¶ 171. By arming each other with pertinent information and deciding "to move in a particular direction, the colluding banks would equip each other with the tools to do so." SAC ¶ 172.

---

[5] Although the Court must accept all facts alleged in the SAC as true, *see infra* Part III.A, the Court observes that, in connection with their allegations that Defendants engaged in such practices, Plaintiffs point to statements in HSBC's and UBS's settlements with the U.S. Commodity Futures Trading Commission ("CFTC") and the U.K. Financial Conduct Authority ("FCA") to impute HSBC's and UBS's conduct leading up to the settlements to the Defendants in this action. While the Court accepts as true the allegations that these statements were made, as noted above, it does not accept as true the implicit suggestion that all Defendants engaged in such conduct. *Iqbal*, 556 U.S. at 678.

**b.   Defendants' Alleged Price Manipulation Caused Price Distortions of Platinum and Palladium Investments Around the Fixing**

In support of their price manipulation allegations, Plaintiffs point to economic data analyses, which they claim demonstrate large "anomalous" downward spikes in both spot prices and NYMEX prices around the time of the Fixing.  SAC ¶ 92; *see also* SAC ¶¶ 101-144.  Plaintiffs maintain that downward spikes are inconsistent with results driven entirely by market forces, which would have resulted in a random pattern exhibiting equal upward and downward shifts of the Fix Price. SAC ¶ 104.  According to Plaintiffs, the data are indicative of Defendants' collusion and price manipulation in a number of ways.  For example, Plaintiffs' allege that in every year during the Class Period, the platinum Fix Price moved downward around the AM and PM Fixing on approximately 60% to 70% of trading days.  SAC ¶ 106-107 & figs. on pp. 44-45.  Similarly, Plaintiffs allege that in every year during the Class Period, the palladium Fix Price moved downward around the AM Fixing on approximately 40% to 60% of trading days, although the corresponding PM Fixing does not exhibit the same trends.  SAC ¶ 106 & figs. on pp. 45-46.

Plaintiffs also examined intraday-minute tick figures, which demonstrate a minute-by-minute upward or downward movement in price.  SAC ¶ 116.  According to Plaintiffs, the data show significant downward price spikes just before the AM and PM Fixing and until the Fixing Calls ended.  SAC ¶ 117 & fig. on p. 53; *see also* SAC ¶ 118 & figs. on p. 54.  Plaintiffs also evaluated average price changes (referred to as "average returns") throughout the Class Period, examining the data in five- and fifteen-minute intervals throughout the trading day.  SAC ¶¶ 126-130.  As Plaintiffs explain, the data show consistent statistically significant downward price movements only around the AM and PM Fixing, with the largest negative returns taking place immediately before and after the Fixing Calls began.  SAC ¶ 130 & figs. on pp. 68-69; *see also* SAC ¶¶ 119-121 & figs. on pp. 56-57 (explaining that the greatest price drops for both platinum and palladium occurred around the PM Fixing window with far greater frequency than would be expected by normal statistical probability).

In addition to the frequency of the downward price spikes around the time of the Fixing, Plaintiffs assert that the downward price spikes were significantly more intense during those time windows than price spikes observed at any other time of the trading day.  SAC ¶ 117 & figs. on p. 53; *see also* SAC ¶¶ 135-137 & figs. on pp. 76-77 (pointing to data demonstrating that the Fix Prices were not only more likely to drop at the time of the Fixing as compared to any other time during the trading day, but also that the magnitude of the decrease is significantly larger than when prices increased during the Fixing).

In support of their allegations that Defendants were responsible for the anomalous downward price spikes, Plaintiffs compared Defendants' platinum and palladium price quotes immediately before the Fixing with simultaneous quotes from other market participants.  According to Plaintiffs, the resulting data show that, on the days when the market price declined shortly before the PM Fixing, other market participants were quoting significantly higher prices for the commodities as compared to the Fixing Members.  SAC ¶¶ 178-79 & fig. on p. 96.  Plaintiffs contend that the comparison demonstrates that on trading days when the prices of platinum and palladium decreased in the window leading up to and including the PM Fixing, the decrease was caused at least in part by the Fixing Members' offering lower quotes for the commodities than other market participants.  SAC ¶ 180.

Plaintiffs maintain that limited and incomplete data of the Fixing Members' specific quotes on specific trading days confirms that Defendants were "driving movements in prices before and around the Fixing window."  SAC ¶ 181.  For example, Plaintiffs allege that they have identified several days during the Class Period when Defendants' quotes appear to have caused, or at a minimum, correlated with, downward spikes in the PM Fixing.  SAC ¶¶ 182-185 & figs. on pp. 97-99.  Plaintiffs maintain that their analysis shows "numerous days throughout the Class Period on

which Defendants conspired to and did manipulate the Fixing, and thereby set the price of platinum and palladium at artificially low levels." SAC ¶ 141 & apps. A, B.

Plaintiffs allege that the downward spikes in the Fix Price caused a corresponding decline in platinum and palladium spot prices and futures markets. SAC ¶¶ 138-139. Pointing to three days during the Class Period, Plaintiffs contend that the downward movements coincide with the time period immediately preceding and including the Fixing. SAC ¶ 140 & figs. on pp. 79-80. According to Plaintiffs, the data show a consistent average downward bias in the price of platinum and palladium futures during the window immediately before and during the AM and PM Fixing. SAC ¶¶ 131-134 & figs. on pp. 70-75.

Plaintiffs claim that the frequency, magnitude, and timing of the downward price spikes represented in the data, coupled with the fact that (1) Defendants' own quotes correlate with those trends, and (2) platinum and palladium prices during the Class Period moved downward during the Fixing even against the upward trends, support an inference that Defendants manipulated those downward price movements using an intentional and coordinated scheme. SAC ¶¶ 101-104, 167-213.

### c.  Defendants Profited from Manipulating the Fix Price

According to Plaintiffs, Defendants were motivated to suppress the platinum and palladium Fix Price for two reasons. First, Plaintiffs generally allege that Defendants exploited their foreknowledge of downward swings in the platinum and palladium Fix Price to make advantageous transactions in a variety of Platinum and Palladium Investments. SAC ¶¶ 13-14, 61, 217. For example, as large participants in the market for physical platinum and palladium, the downward spikes in the Fix Price allowed Defendants to buy cheaper platinum and palladium than they would have been able to, creating opportunities for themselves to profit if and when platinum and palladium prices increased as the effects of suppression abated. SAC ¶ 200. During the Class

Period, Plaintiffs assert, Defendants were also large participants in the market for platinum and palladium Fix Price-denominated derivatives. SAC ¶ 201. Derivative contracts, like contracts for sale of physical platinum and palladium, directly incorporate the Fix Price in order to determine cash flows between the parties. SAC ¶ 201. Plaintiffs allege that Defendants profited from the price manipulation in this market because suppressing the Fix Price during the Fixing enabled Defendants to influence the volume of cash flows between respective parties and members of the Class in their favor. SAC ¶ 201.

Plaintiffs further allege Defendants' manipulation of the Fixing gave them an unfair advantage over counterparties that were not also members of the LPPFC by reducing their risk in "digital options" and other contracts with market-based triggers, such as "stop loss" orders and "margin" calls. SAC ¶ 202. As described in the SAC, "[t]hese contracts in various forms require the Defendants to act, or not act, based on whether the price of platinum and palladium crosses a specific threshold. By accepting these orders, the banks agreed to transact with the client at a specified price if the platinum and palladium benchmark reached that price." SAC ¶ 202. Through price manipulation of the Fix, Defendants frequently were able to trigger (or avoid triggering) such orders, avoiding much of the risk in such obligations. SAC ¶ 202.

Plaintiffs also maintain that Defendants were particularly motivated to suppress the Fix Price in order to profit from large net "short" positions that they allegedly held in the platinum and palladium futures market, including NYMEX, throughout the Class Period. SAC ¶¶ 12, 170. According to the SAC, since at least 2008 and until at least 2014—*i.e.*, for most of the Class Period—Defendants and their co-conspirators manipulated the AM and PM Fixing in order to profit from their short positions on the platinum and palladium futures market. SAC ¶¶ 185-203. As discussed above, holders of short positions (who are obligated to sell platinum and palladium at an agreed-upon price in the future), profit when the underlying commodity price goes *down* because

16

they are able to buy an offsetting contract for a lower price.  SAC ¶¶ 85-86.  Plaintiffs allege that

Defendants had an interest in suppressing the platinum and palladium Fix Price for that reason.

SAC ¶ 185-203.[6]  Plaintiffs assert that a comparison between Defendants' net positions and the

direction of the platinum and palladium Fixes shows that, to a statistically significant degree, the

direction of the Fix prices is much more strongly correlated with the Defendants' net position than

it is with the overall direction of the market on a given day.  SAC ¶ 196.

Plaintiffs assert that, even if Defendants were using their short positions in NYMEX futures

for hedging purposes—*i.e.*, to offset the risk of large long positions elsewhere—Defendants were

still primarily motivated to cause downward spikes in the price of platinum and palladium.  SAC

¶ 204-205.  That is because Defendants could profit from driving the commodities' prices down by

cashing in on margin payments since futures are marked to market on a daily basis, thus requiring

daily cash margin payments as a result of changes in the value prior to the settlement date for the

future.  SAC ¶ 205.  As Plaintiffs explain, that structure "generates daily cash flows for the holder of

the futures contract if the market moves in favor of the holder's position."  SAC ¶ 205.

### d.  Related Regulatory Investigations

To buttress their claim that Defendants engaged in the alleged collusion—and were, in fact,

able to profit from their the manipulation of the platinum and palladium Fixing process—Plaintiffs

note that many of the "world's leading banks have *admitted* to manipulating the key LIBOR financial

benchmark, including by way of collusion between their respective traders."  SAC ¶¶ 16, 203

(emphasis in original).  Plaintiffs also point out that, in the currency-exchange markets, many leading

banks, including several of the Defendants, "*admitted* that their traders would *collude* to move the

market in advance of setting key benchmarks."  SAC ¶ 203 (emphasis in original).  In addition, as set

---

[6] Although Plaintiffs are unable at this stage to quantify each individual Defendant's short position in the futures and OTC markets, they rely on publicly available data in support of this claim.  *See* SAC ¶ 192-193.

forth in the SAC, several investigations by various authorities around the world are currently underway.  SAC ¶ 223.  For example, Plaintiffs assert that the U.S. Department of Justice ("DOJ") and the CFTC have launched investigations into Defendants' manipulation of the price-setting mechanisms in precious metals, including in the platinum and palladium markets.  SAC ¶ 223. FINMA, the Swiss financial regulator, has recently reported that it has identified attempts to manipulate fixes in the precious metals market, including by at least one of the defendants in this action.  SAC ¶¶ 17, 168, 224-226.

According to the SAC, HSBC had recently entered into a settlement with the CFTC resulting from its manipulation of Forex benchmarks after the CFTC found that it and other banks used private chat rooms to communicate and plan their price manipulation.  SAC ¶ 243.  As alleged in the SAC, HSBC has also recently resolved charges by the U.K.'s FCA after the FCA found that HSBC attempted to manipulate foreign exchange rates through collusion with traders at other firms for HSBC's benefit and to the detriment of clients and other market participants.  SAC ¶ 244. Plaintiffs also allege that Barclays has recently settled with the FCA following an investigation into price manipulation in the precious metals context.  SAC ¶ 168.  Plaintiffs assert that the precious metals, which include platinum and palladium, and the Forex markets, their benchmarks, and the Defendants' respective trading desks "were closely related," particularly at UBS.  SAC ¶ 174.

In addition to DOJ's and CFTC's investigations of Defendants' price-setting mechanisms in precious metals markets generally, and the platinum and palladium markets specifically, the CFTC, FCA, and the German financial regulators have all launched probes into benchmark price manipulation in the context of other precious metals.  SAC ¶¶ 223-226.  Other regulators and legislative bodies, including the United States Senate, have noted concerns regarding potential "conflicts of interest" between banks and their clients with respect to platinum and palladium, as well as other precious metals.  SAC ¶¶ 19, 222, 228-231, 246.

### B. Procedural History

Plaintiffs commenced this action on November 25, 2014. Dkt. No. 1. Subsequently, plaintiffs in related actions (*see* 15-cv-0436-GHW, 15-cv-1036-GHW, 15-cv-1712-GHW, and 15-cv-1817-GHW) filed substantively similar complaints. On March 19, 2015, the parties filed a joint motion to consolidate all five actions and to appoint Labaton Sucharow LLP and Berger & Montague, P.C. as interim co-lead counsel for the proposed class, which the Court granted on March 20, 2015. Dkt. Nos. 22, 32. Also on March 19, 2015, the parties also filed a joint motion to stay discovery in the consolidated actions, which the Court granted on April 21, 2015. Dkt. Nos. 30, 48. On April 21, 2015, Plaintiffs filed a consolidated amended complaint, which Defendants moved to dismiss on June 22, 2015. Dkt. Nos. 45, 76, 79. On July 21, 2015, Plaintiffs filed their second consolidated class action complaint. Dkt. No. 102. Thereafter, Defendants moved to dismiss the SAC, challenging Plaintiffs' ability to bring Sherman Act, CEA, and unjust enrichment claims. Dkt. No. 115. BASF, ICBC, and LPPFC filed supplemental memoranda of law, arguing that the claims against them should be dismissed for lack of personal jurisdiction. Dkt. Nos. 117, 119-120. UBS filed a separate motion to dismiss for failure to state a claim, arguing that neither of the UBS entities named as defendants in the SAC had any role in the Fixing. Dkt. No. 113. Plaintiffs filed their oppositions to Defendants' motions on November 16, 2015. Dkt. Nos. 127-129. Defendants filed their respective replies on December 11, 2015. Dkt. Nos. 130-134. Since the motions were fully briefed, and in response to recent decisions issued by the Second Circuit and courts in this district, the parties filed a number of supplemental letters, advising the Court regarding those decisions' relevance to and impact on the pending motions in this action. *See, e.g.*, Dkt. Nos. 136-141, 146, 155-158, 161, 164-166.

III.   **DISCUSSION**[7]

   **A.  Legal Standard**[8]

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However, a complaint that offers "labels and conclusions" or "naked assertion[s]"

---

[7] Although UBS filed a separate motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), because UBS joined the remaining Defendants' motion, *see* Dkt. No. 113 at 1 n.1, references to "Defendants" in Parts III.B–III.D of this opinion include UBS. UBS's stand-alone motion is addressed separately below. *See* Part III.F.

[8] Unless otherwise noted, the legal standard set forth below governs the Court's analysis of Defendants' motion to dismiss.

without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

### B.  Sherman Act Claim

#### 1.  Sherman Act Violation

Plaintiffs claim that Defendants' alleged manipulation of the Fixing constitutes a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.  Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1; *see also Twombly,* 550 U.S. at 553-63.  "Notwithstanding its broad language, this provision prohibits 'only *unreasonable* restraints of trade.'" *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988) (emphasis added)).  To run afoul of § 1, the unreasonable restraint must result from an agreement between two or more entities.  *See Twombly*, 550 U.S. at 553-54.  A restraint of trade resulting from unilateral or independent action does not violate Section 1.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice.") (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)).  "The crucial question in a Section 1 case is therefore whether the challenged conduct 'stems from independent decision or from an agreement, tacit or express.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)) (alteration omitted).

To overcome a motion to dismiss, a plaintiff must allege "'enough factual matter (taken as true) to suggest that an agreement was made.'" *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016), *cert. denied*, No. 16-545, 137 S. Ct. 814 (2017).  A plaintiff can meet this pleading requirement in one of two ways.  "First, a plaintiff may, of course, assert direct evidence that the

defendants entered into an agreement in violation of the antitrust laws." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323-24 (3d Cir. 2010)); *see also In re Commodity Exch., Inc.* ("*In re Gold*"), No. 14-MD-2548 (VEC), --F. Supp. 3d--, 2016 WL 5794776, at *15 (S.D.N.Y. Oct. 3, 2016); *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*In re Silver*"), No. 14-MD-2573 (VEC), --F. Supp. 3d--, 2016 WL 5794777, at *14 (S.D.N.Y. Oct. 3, 2016). In many antitrust cases, however, "this type of 'smoking gun' can be hard to come by, especially at the pleading stage. Thus a complaint may, alternatively, present circumstantial facts supporting the inference that a conspiracy existed." *Mayor & City Council of Baltimore*, 709 F.3d at 136; *see also Gelboim*, 823 F.3d at 781 ("'[C]onspiracies are rarely evidenced by explicit agreements' and 'nearly always must be proven through 'inferences that may fairly be drawn from the behavior of the alleged conspirators.'") (quoting *Anderson News*, 680 F.3d at 183). Allegations of parallel conduct alone are insufficient to support an inference that a conspiracy existed. *Mayor & City Council of Baltimore*, 709 F.3d at 136; *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016) ("At the pleading stage, plaintiffs must allege sufficient facts to support (not 'prove' or even 'demonstrate') a plausible inference that defendants reached an agreement; a complaint merely alleging parallel conduct alone is not sustainable.") (citing *Twombly*, 550 U.S. at 556).

In the absence of direct evidence, therefore, courts can infer the existence of an agreement in restraint of trade "'on the basis of conscious parallelism when such independent conduct is accompanied by circumstantial evidence and plus factors.'" *Mayor & City Council of Baltimore*, 709 F.3d at 136 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)); *see also Twombly*, 550 U.S. at 557 (stating that allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement"); *Gelboim*, 823 F.3d at 781; *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987) ("Since mere parallel behavior can be consistent with independent conduct,

courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."). Such "plus factors" include "(1) 'a common motive to conspire'; (2) 'evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators'; and (3) 'evidence of a high level of interfirm communications.'" *Gelboim*, 823 F.3d at 781 (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136). The list of plus factors is "neither exhaustive nor exclusive, but rather illustrative of the type of circumstances which, when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Id.* (quoting *Mayor & City Council of Baltimore*, 709 F.3d at 136 n.6).

### a.  Parallel Conduct

Plaintiffs allege that Defendants' parallel conduct can be deduced from a comparison of Defendants' platinum and palladium quotes shortly before the Fixing with simultaneous quotes by other participants acting in the same market. SAC ¶¶ 178-194. According to Plaintiffs, the data show that on days when the price of platinum and palladium decreased in the window leading up to and during the PM Fixing, for example, the price drop was due at least in part to the Fixing Members' offering lower quotes for those metals than other participants in the platinum and palladium markets. SAC ¶¶ 179-180 & fig. on p. 96. Plaintiffs further allege that the Fixing Members' quotes were consistently lower than quotes of other market participants. SAC ¶ 181. Relying on several data plots from select days within the Class Period, Plaintiffs claim that their analysis of pricing behavior indicates that spot prices moved not only during the Fixing, but also before the Fixing process commenced. SAC ¶ 184 & figs. on pp. 97-99. The direction of the price movement, Plaintiffs contend, was often contrary to trends occurring during the rest of the day. SAC ¶ 184. Plaintiffs have also identified numerous days on which Defendants' alleged price manipulation generated downward movement of the PM Fixing for both platinum and palladium,

resulting in artificial suppression of the Fix Price of both metals.  *See* SAC apps. A & B.  Plaintiffs interpret these data as showing that Defendants quoted lower platinum and palladium prices in unison.  *See* Pls.' Opp'n to Defs.' Joint Mot. to Dismiss the Second Am. Class Action Compl., ("Pls.' Opp'n"), Dkt. No. 129, at 6.

Defendants maintain the SAC does not plausibly allege that they acted in parallel because, among other things, it includes allegations of aggregated spot-market activity and does not show any instances in which two Defendants simultaneously quoted similar artificially low prices.  Defs. BASF Corp. BASF Metals Ltd., Goldman Sachs, HSBC, ICBC, and the LPPFC's Joint Mem. of Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Defs.' Joint Br."), Dkt. No. 116, at 13-14.  Therefore, Defendants argue, the allegations in the SAC are entirely consistent with lawful independent action or with rational business behavior.  Defs. BASF Corp. BASF Metals Ltd., Goldman Sachs, HSBC, ICBC, and the LPPFC's Joint Reply Mem. of Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Defs.' Joint Reply"), Dkt. No. 132, at 3-4.  Defendants are correct that Plaintiffs' parallel conduct allegations, without more, do not support an inference of the existence of a conspiracy.  *See, e.g.*, *Twombly*, 550 U.S. at 553 ("While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense.'") (quoting *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-41 (1954)); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("[S]imilar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy.").  As described below, here there is more.  The Court is, therefore, satisfied that the SAC plausibly pleads conduct consistent with conscious parallelism.  *See, e.g.*, *In re Silver*, 2016 WL 5794777, at *14-15 (concluding that allegations that defendants "opportunistically caus[ed] 'reversions' in spot pricing in advance of"

the silver benchmarking calls supported an inferences that they acted in parallel); *In re Gold*, 2016 WL 5794776, at *16 (concluding that the complaint sufficiently pleaded parallel conduct where plaintiffs alleged that defendants offered spot quotes around the gold fixing calls that were clustered at prices that were lower than those of other market participants and where plaintiffs identified select days on which two more defendants appeared to have offered spot quotes that correlated with a downward trend in gold prices shortly before and after the publication of the gold benchmark price).

### b. Plus Factors

Plaintiffs point the Court to the following types of circumstantial evidence and plus factors alleged in the SAC: (1) Defendants engaged in direct exchange of pricing information during the Fixing Calls; (2) the information exchange occurred among a small group of dominant market players; (3) the communications between Defendants were private; (4) Defendants had a direct financial interest in the outcome of the Fixing and, thus, were strongly incentivized to influence the Fixing in their desired direction; (5) the semidiurnal Fixing Calls furnished ample opportunity for Defendants to police conspiracy participants who "broke rank;" (6) because of the Fixing Calls' private setting, there was a relatively low likelihood that the conspiracy would be exposed, thus encouraging collusion; and (7) numerous regulators in the U.S. and around the world were investigating and continue to investigate anticompetitive conduct and price manipulation in the precious metals markets. Pls.' Opp'n at 7-12. Defendants maintain that these plus factors are insufficient to salvage Plaintiffs' Section 1 claim. Defs.' Joint Reply at 4-6.

While the Court agrees with some of Defendants' critiques, on balance, the Court is satisfied that Plaintiffs have alleged sufficient circumstantial evidence and plus factors from which a conspiracy in restraint of trade may plausibly be inferred. First, Plaintiffs allege that the Fixing Calls furnished an ideal, recurrent setting for the Fixing Members to discretely exchange pricing information. Notwithstanding the negative connotation of the term "price fixing" in the legal

context, the Fixing Calls and the Fix Price were part of the platinum and palladium markets for several decades.  Absent manipulation, the process had been acknowledged and accepted by market participants as a legitimate and beneficial price-setting apparatus.  While it might be true that the Fixing Calls furnished a convenient forum and ample opportunities to conspire—and that the structure is not irrelevant—an "opportunity to collude does not translate into collusion."  *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 452 (S.D.N.Y. 2014), *aff'd sub nom. Ross v. Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015), *as corrected* (Nov. 24, 2015); *see also Venture Tech., Inc. v. Nat'l Fuel Gas Co.,* 685 F.2d 41, 47 (2d Cir. 1982) ("[O]ne who alleges that he is a victim of an antitrust conspiracy and seeks to impose the heavy sanctions of the Sherman Act upon the accused, must show more than the existence of a climate in which such a conspiracy may have been formed.").  Even at the pleading stage therefore, the Court finds that, in and of itself, the structure of the Fixing does not constitute a plus factor.  *See, e.g., In re Gold*, 2016 WL 5794776, at *16-17 (concluding that the "[t]he structure of the Fixing is not irrelevant because it provide a forum and opportunity for the Fixing Banks to conspire," but concluding that the structure alone did not constitute a plus factor).

That said, although the structure of the Fixing is not damning by itself, that the Fixing coincided with Defendants' alleged price manipulation constitutes sufficient circumstantial evidence of a conspiracy in restraint of trade.  Particularly important are Plaintiffs' allegations that the most significant platinum and palladium price drops were observed at the time of Fixing, during which Defendants allegedly shared confidential customer information and misrepresented their own and their customers' orders.  *See, e.g.*, SAC ¶¶ 117-118, 171 & figs. on pp. 53-54; *see also* SAC app. E, ¶¶ (a)-(k).  Coupled with Plaintiffs' allegations that the Fixing Members controlled the Fixing

process, and used various channels of communications to share information, the correlating price

drops support an inference that a conspiracy existed.  *See, e.g.*, *In re Gold*, 2016 WL 5794776, at \*17.[9]

Second, the Court is not persuaded that Plaintiffs' proffered circumstantial evidence

regarding investigations of price manipulation in precious commodities markets should be

considered as circumstantial evidence suggesting a conspiracy in the platinum and palladium market

in particular.  Again, while not entirely irrelevant, those allegations do not substantiate Plaintiffs'

allegations here.  Many of the investigations and settlements referenced in the SAC are in the

context of different markets or different market players (*i.e.*, not Defendants).  *See* SAC ¶¶ 223-262.

Accordingly, the Court finds that Plaintiffs' allegations concerning past, ongoing, or future

investigations do not constitute a plus factor.  *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (concluding

that allegations of antitrust wrongdoing abroad, "absent any evidence of linkage between such

foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened

there, it could have happened here'"); *In re Gold*, 2016 WL 5794776, at \*17 (concluding that ongoing

government investigations into possible manipulation of precious metals benchmarks and findings

---

[9] Defendants argue that Plaintiffs' conspiracy allegations rely almost exclusively on the opinions of unidentified experts, and that the Court may not consider those opinions at the motion to dismiss stage.  Defs.' Joint Br. at 19-24.  There is a difference between expert opinions, which the Court does not rely on, and allegations based on those opinions, which the Court may rely on—and has relied on—in analyzing whether Plaintiffs have stated a claim.  *See, e.g.*, *In re Silver*, 2016 WL 5794777, at \*17 ("The Court is not, however[,] relying on Plaintiffs' *opinions* (expert or otherwise) but rather on Plaintiffs' factual assertions regarding pricing and other economic data, which courts generally accept at the pleading stage.") (emphasis in original) (citations omitted).  The Second Circuit and district courts in this circuit routinely rely on expert and statistical analyses contained in pleadings.  *See, e.g.*, *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC.*, 750 F.3d 227, 234 n.8 (2d Cir. 2014) (relying on, among other things, plaintiff's expert economic analysis showing loss causation); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*") 935 F. Supp. 2d 666, 716-17 (S.D.N.Y. 2013) (accepting plaintiffs' proffered expert data analyses comparing LIBOR rates to other data), *vacated and remanded sub nom. on other grounds by, Gelboim*, 823 F.3d 759; *Dover v. British Airways, PLC (UK)*, No. 12-cv-5567, 2014 WL 317845, at \*2 (E.D.N.Y. Jan. 24, 2014) (noting that plaintiff's statistical analysis of prices "is a factual allegation that the Court must credit"); *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F. Supp.2d 306, 332 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) (addressing plaintiffs' internal review of a sampled subset of loan files and valuation models at the motion to dismiss stage).

of misconduct with respect to FX and LIBOR benchmarks do not constitute circumstantial evidence of a conspiracy in the defendants' market) (citations omitted).

The Court observes, however, that in some circumstances, government and regulatory agencies' investigations, "when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, 175 F. Supp. 3d 44, 55 (S.D.N.Y. 2016) (internal quotation marks and citations omitted).  In *Alaska Electrical Pension Fund*, for example, plaintiffs "allege[d] not only that government investigations [were] pending, but also that those investigations *ha[d] actually turned up evidence of criminal behavior relating to the [defendants'] manipulation of*" a benchmark interest rate incorporated into a broad range of financial derivatives.  *Id.* (emphasis added) (internal quotation marks and citations omitted).  The plaintiffs further alleged that defendants "abruptly and simultaneously ceased engaging in parallel conduct when they were served with subpoenas in connection with" the investigations, "strengthening substantially the inference that a conspiracy existed."  *Id.*; *see also Starr v. Sony BMG*, 592 F.3d at 324 (acknowledging investigations by the New York State Attorney General and DOJ into the *defendants'* price fixing scheme in conjunction with other circumstantial evidence, as plausible grounds from which to infer an agreement in restraint of trade).  Such "strengthening" factors are absent here.

Third, while not expressly alleged, the SAC implies that the Fixing Members often acted against their own individual economic interests by, for example, quoting below-market prices leading up to the Fixing.  As noted above, the Second Circuit has recognized that actions against apparent individual and economic self-interest of the alleged conspirator are among the plus factors that courts must consider.  *Mayor & City of Baltimore*, 709 F.3d at 136.  The Fix Price dips alleged and illustrated in the SAC can only be explained, Plaintiffs maintain, if the Fixing Members held uniform trading positions and quoted in unison throughout the Class Period.  *See* SAC ¶¶ 178-203.  Thus, Plaintiffs allege, the data suggest that, at least on some days during this period, one or more of the

Fixing Members quoted prices that were contrary to their economic interest by, for example, agreeing to suppress the Fix Price irrespective of the fact that a given bank would have profited more from an increase in the price rather than a decrease.  On that basis, the Court finds that the SAC's allegations that Defendants acted against their own economic self-interest constitute circumstantial evidence of a conspiracy to manipulate the Fix Price.  *See, e.g.*, *In re Gold*, 2016 WL 5794776, at *20 (citations omitted); *In re Silver*, 2016 WL 5794777, at *17 (citations omitted); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 55 (recognizing allegations that banks conspired to manipulate ISDA benchmark rates by, among other things, trading against their own economic self-interest, sufficiently pleaded a plus factor in support of a Section 1 conspiracy claim); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 469 (S.D.N.Y. 2014) ("[I]t is implausible that all defendants would maintain parallel trading positions in the Eurodollar futures market across the Class Period and that those positions, in turn, motivated their daily LIBOR submissions.").

Fourth, Plaintiffs assert that Defendants acted with "common motive" to manipulate the platinum and palladium Fix Price.  Pls.' Opp'n at 8-11.  "Motive to conspire may be inferred where the parallel 'action taken [by defendants] had the effect of creating a likelihood of increased profits.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 123 F. Supp. 3d 478, 500 (S.D.N.Y. 2015) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 287 (1968)) (alteration in *Anderson*); *cf. Ross*, 35 F. Supp. 3d at 442 (reasoning that "[c]ourts may not infer a conspiracy where the defendants have no 'rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations'") (quoting *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233 (2d Cir. 1999)).

Plaintiffs maintain that Defendants had a "common motive" to suppress the platinum and palladium Fix Price for at least two related reasons:  (1) Defendants held net short platinum and

palladium positions on NYMEX, which allowed them to profit when the price of the underlying

metals dropped (*e.g.*, SAC ¶ 193); and (2) foreknowledge of the downward platinum and palladium

price swings enabled Defendants to profit from a variety of Platinum and Palladium Investments

(*e.g.*, SAC ¶¶ 12-14, 199-203).

In *In re Gold*, the plaintiffs pleaded the existence of a common motive with virtually identical

allegations.  Addressing the "net short" allegations, Judge Caproni found this theory "implausible,"

noting several internal inconsistencies within the complaint.  *In re Gold*, 2016 WL 5794776, at *18-19.

For example, Judge Caproni reasoned that, even if she "were to accept Plaintiffs' claim that the

Defendants (as opposed to other bullion banks) consistently held large net short positions in gold

futures throughout the Class Period, Plaintiffs fail to present a plausible theory as to how

Defendants profited from their short positions during a bull market in which the price of gold nearly

quadrupled." *Id.* at *18 (citations omitted).  This is because, as explained above, the holder of a

short position profits if the price of the underlying commodity falls, in which case the holder can

eliminate its delivery obligation before expiry by purchasing a lower-priced offsetting futures

contract and pocketing the difference in price.  SAC ¶¶ 85-86.  "[I]n a rising market," Judge Caproni

noted,

> short futures are a losing proposition.  Because the market price of
> gold rose steadily throughout the Class Period, Defendants would
> have had to hold massive long positions in physical gold, derivatives,
> and over-the-counter investments in order to counter losses on any
> short positions, including short futures.  Thus to the extent there
> were discrete periods when the price of gold fell, enabling
> Defendants to reap profits from their short futures, those profits
> would have been neutralized by Defendants other long holdings, thus
> negating Plaintiffs' alleged profit motive.

*In re Gold*, 2016 WL 5794776, at *18.  On that basis, Judge Caproni concluded that even accepting

the plaintiffs' allegations as true, the defendants in that case would still have lost money on their

alleged massive net short positions.  *Id.* at *19.

That conclusion applies with equal force to Plaintiffs' claims in this action, given that palladium prices "have been in a general upward trend" since the beginning of the Class Period and platinum prices *tripled* from January 2000 through December 2013. SAC ¶¶ 100, 125 & fig. on p. 41. In light of the substantial similarity between the allegations in *In re Gold* and the Plaintiffs' allegations here, the Court finds Judge Caproni's analysis of this plus factor persuasive and adopts her conclusions here. 2016 WL 5794776, at *18-19.

That said, while Plaintiffs' net short theory fails the plausibility test, their allegations that the Fixing Members were incentivized to profit from their foreknowledge of the Fix Price constitutes a "common motive" for antitrust purposes. *Id.* at *19. As large financial institutions with significant presence in various platinum and palladium markets, the SAC plausibly pleads that Defendants had an interest in the outcome of the Fixing. For example, as alleged in the SAC, the Fixing Members were positioned to cause platinum and palladium prices to increase or decrease: they had the ability to buy platinum and palladium at suppressed prices and sell at higher prices, an advantage not available to other market participants. SAC ¶ 206. The Fixing Members could also utilize their control of the Fixing to profit from platinum and palladium derivatives that directly incorporated the Fix Price. *See, e.g.*, SAC ¶ 201.

In sum, the Court finds that Plaintiffs have plausibly alleged conscious parallelism and sufficient circumstantial evidence and plus factors to support an inference that Defendants participated in a conspiracy in restraint of trade. In *Gelboim*, the Second Circuit found that "the complaints contain[ed] numerous allegations [of circumstantial evidence and plus factors] that clear the bar of plausibility" and noted that "[c]lose cases abound on this issue, but [that case was] not one of them." *Gelboim*, 823 F.3d at 781-82. As the analysis above shows, this case *is* one of them, but it still clears the bar.

## 2. Standing

Antitrust plaintiffs must establish both constitutional standing and antitrust standing.

*Gelboim*, 823 F.3d at 770.  "Antitrust standing is distinct from constitutional standing, in which a mere showing of harm will establish the necessary injury."  *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007).  As is true of constitutional standing, antitrust standing is a threshold question resolved at the pleading stage.  *Gelboim*, *823 F.3d* at 770 (citing *Gatt Commc'ns v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013)).

### a. Constitutional Standing[10]

Constitutional standing refers to the limitation on federal courts to hear a case or controversy within the meaning of Article III of the U.S. Constitution.  *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016).  "Constitutional standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'"  *Leibovitz v. New York City Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "'If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim,'" and the claim must be dismissed.  *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) (quoting

---

[10] Although Defendants do not appear to contest Plaintiffs' constitutional standing to bring a Sherman Act claim, their arguments concerning Plaintiffs' failure adequately to plead an antitrust injury is relevant to both constitutional standing and the antitrust standing inquires.  *See, e.g.*, Defs.' Joint Br. at 25 (arguing that Plaintiffs' allegations fall short of adequately pleading an antitrust injury because "Plaintiffs only assert that 'manipulation of the Fixing impacted . . . transactions and caused Plaintiffs and the Class to incur greater losses and/or realize lower prices than they would have realized in a free and open competitive market'") (quoting SAC ¶ 247); *see also id.* at 36. Accordingly, before proceeding to the parties' arguments concerning Plaintiffs' Sherman Act claim, the Court must first satisfy itself that Plaintiffs have constitutional standing to pursue this claim; the Court can raise the issue *sua sponte*. *E.g.*, *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*.") (citing *United States v. Quinones*, 313 F.3d 49, 57-58 (2d Cir. 2002)); *see also Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) (noting that because of the "Article III limitations on judicial power . . . the court can raise [an Article III issue] *sua sponte*"); *Schwartz v. HSBC Bank USA, N.A.*, No. 14 CIV. 9525 (KPF), 2017 WL 95118, at *4 (S.D.N.Y. Jan. 9, 2017) (reasoning that that the court has an "'independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte* . . . [including] whether a plaintiff has standing under Article III to pursue its claim'") (quoting *Jennifer Matthew Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 607 F.3d 951, 955 (2d Cir. 2010)).

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)).

"To satisfy the 'irreducible constitutional minimum' of Article III standing, a plaintiff must demonstrate (1) 'injury in fact,' (2) a 'causal connection' between that injury and the complained-of conduct, and (3) a likelihood 'that the injury will be redressed by a favorable decision.'" *Strubel v. Comenity Bank*, 842 F.3d 181, 187-88 (2d Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The injury-in-fact prong of the constitutional standing inquiry requires that the plaintiff's alleged injury be "'an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical.'" *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016) (quoting *Lujan*, 504 U.S. at 560) (alterations in *Montesa* omitted). In determining whether a plaintiff has standing, courts must "'accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.'" *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 191 (2d Cir. 2014) (quoting *Bigio v. CocaCola Co.,* 675 F.3d 163, 169 (2d Cir. 2012) (alterations omitted)); *see also Warth*, 422 U.S. at 501 ("For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.").

Defendants argue that allegations that they suffered "greater losses" or realized lower profits than they would have in a competitive market lack sufficient detail to show that Plaintiffs suffered any nonspeculative injuries as a result of the Fixing. Defs. Joint Br. at 25-26. Defendants also argue that, because Plaintiffs do not allege that they engaged in a transaction *at a time* that coincides with the AM or PM Fixing, when the prices were allegedly artificial, Plaintiffs have failed to allege that they suffered an injury-in-fact. Defs.' Joint Br. at 36 (emphasis in original) (citing *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 962 F. Supp. 2d 606, 622 (S.D.N.Y. 2013)). But

Plaintiffs allege that they sold Platinum and Palladium Investments on days when Defendants allegedly manipulated the Fix Price.  SAC apps. C & D.  In fact, Plaintiffs have amassed a list of dates on which, they allege, one or more of Plaintiffs' sales coincided with Defendants' manipulation of the PM platinum and palladium Fix Price.  SAC apps. A-D.

Moreover, Plaintiffs allege that the effect of the Fix price's downward spike lingered beyond the Fixing window, and through the time of day when the margin payment cash flows for the Defendants' large short futures positions would be calculated.  SAC ¶ 209.  In other words, even though Plaintiffs have not alleged that they sold futures within the Fixing window, they have alleged that they sold futures within the period during which Defendants' price manipulation had an effect on the Fix Price and the platinum and palladium derivatives markets.  SAC ¶ 209.  Because Plaintiffs have alleged that they suffered losses or reduced profits from sales at artificially lower prices as a result of Fixing, Plaintiffs have sufficiently pleaded that they suffered an injury as a result of Defendants' alleged price manipulation.  Accordingly, Plaintiffs have established that they have constitutional standing to sue.  *See Gelboim*, 823 F.3d at 770 (noting that the injury component of the constitutional standing inquiry was "uncontested, and easily satisfied by [plaintiffs'] pleading that they were harmed by receiving lower returns on LIBOR-denominated instruments as a result of defendants' manipulation of LIBOR"); *see also In re Gold*, 2016 WL 5794776, at *9 (finding that nearly identical allegations satisfied the constitutional standing inquiry); *In re Silver*, 2016 WL 5794777, at *7 (same); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 595 (S.D.N.Y. 2015), *appeal withdrawn*, (Apr. 27, 2015) (concluding that plaintiffs have satisfied the injury-in-fact prong because they "have demonstrated that they have a concrete stake in the present action.  Each named Plaintiff claims that it was injured by having to pay supra-competitive prices as a result of Defendants' manipulation of the Fix").

### b. Antitrust Standing

"Section 4 of the Clayton Act establishes a private right of action for violation of the federal antitrust laws." *Gatt*, 711 F.3d at 75.  Pursuant to Section 4,

> any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).  While "[i]t is a well-established principle that . . . the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'" *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005) (citing *Cargill, Inc. v. Monfort of Colo.,* 479 U.S. 104, 110 & nn.5-6 (1986).  "This standing requirement originates in the Supreme Court's recognition that, although Section 4 of the Clayton Act appears to confer a broad private right of action for antitrust damages, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Id.* at 436-37 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983)); *see also Gatt*, 711 F.3d at 75.

"The right to pursue private actions for treble damages under § 4 has thus developed limiting contours over the thirty years since [*AGC*] was handed down.  Those contours are embodied in the concept of 'antitrust standing.'" *Gatt*, 711 F.3d at 75 (citing *Daniel*, 428 F.3d at 436-38).  "'[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law.'" *Id.* at 75-76 (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)).[11]  This limiting contour

---

[11] Although the Second Circuit has not directly addressed this issue, it has cited with approval the D.C. Circuit's "holding that statutory standing under the antitrust laws is not a prerequisite to federal subject matter jurisdiction." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, 289

"'prevents private plaintiffs from recover[ing] damages under § 4 . . . merely by showing injury causally linked to an illegal presence in the market.'" *Id.* at 76 (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (alterations in original)). To satisfy the antitrust standing requirement, "a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations," *i.e.*, that plaintiff is "an 'efficient enforcer' of the antitrust laws." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157-58 (2d Cir. 2016) (citing *Gatt*, 711 F.3d at 76, *Daniel*, 428 F.3d at 438).

### i. Antitrust Injury

As noted above, the Supreme Court reasoned in *AGC* that "'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" 459 U.S. at 534 (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). Rather, "[a]n antitrust injury 'should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.'" *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury." *In re Aluminum Warehousing*, 833 F.3d at 158 (internal quotation marks and citations omitted).

The Second Circuit's decision in *Gelboim* provides the framework for this Court to analyze whether Plaintiffs have alleged an antitrust injury. In *Gelboim*, plaintiffs claimed that the defendant banks colluded to depress LIBOR rates through participation in the benchmarking process for LIBOR. 823 F.3d at 771. The plaintiffs maintained that they alleged an antitrust injury because they traded in LIBOR-dependent financial instruments and, consequently, incurred losses or reduced

---

F.3d 98, 107-08 (D.C. Cir. 2002) ("Unlike constitutional standing, this court's jurisdiction does not turn on antitrust standing."); *see also Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 468 (2d Cir. 2014) (reasoning that "statutory standing is not jurisdictional unless Congress says so").

profits. *Id.* at 772-75.  The Second Circuit held that the plaintiffs sufficiently alleged an antitrust injury because they "claim[ed] violation (and injury in the form of higher prices) flowing from the corruption of the rate-setting process, which (allegedly) turned a process in which the Banks jointly participated into conspiracy." *Id.* at 775.  Because the plaintiffs alleged that the defendant banks "warp[ed] market factors affecting the prices for LIBOR-based financial instruments," the Second Circuit held that "[n]o further showing of actual adverse effect in the market place is necessary.  This attribute separates evaluation of *per se* violations—which are presumed illegal—from rule of reason violations, which demand appraisal of the marketplace consequences that flow from a particular violation." *Id.* at 776.  By alleging a horizontal price-fixing scheme, "'perhaps the paradigm of an unreasonable restraint of trade'" and which, if proven, would be a *per se* violation of the antitrust laws, plaintiffs were not required to allege additional harm to competition writ large.  *Id.* at 771, 775 (quoting *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984)).  Adding that pleading requirement, the Second Circuit reasoned, "'comes dangerously close to transforming a *per se* violation into a case to be judged under the rule of reason.'"  *Id.* at 776 (quoting *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123-24 (3d Cir. 2000)).

Because "antitrust law is concerned with influences that corrupt market conditions, not bargaining power," that plaintiffs "remained free to negotiate the interest rates attached to particular financial instruments," was immaterial to the Second Circuit's conclusion in *Gelboim*.  *Id.* at 773.  In addition, although the defendant banks did not control the market, to the extent that they "raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces," and therefore engaging in an unlawful activity.  *Id.* (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940)).  By "alleging that they paid artificially higher prices" as a result of defendants' conduct, the Second Circuit held that the plaintiffs in *Gelboim* had sustained their burden of pleading an antitrust injury.  *Id.* at 777.

While, as a general rule, "only those that are participants in the defendants' market can be said to have suffered antitrust injury . . . [c]ourts have also recognized the antitrust claims of market participants other than consumers or competitors, *e.g.*, potential new market entrants, suppliers, and dealers." *In re Aluminum Warehousing*, 833 F.3d at 158 (internal quotation marks, citations, and alterations omitted). "The universe of potential [antitrust] plaintiffs is not strictly limited to participants in the defendants' market." *Id.* (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 465 (1982)). *Gelboim* observed that the injury prong of the antitrust standing requirement is satisfied when a plaintiff was injured through "'a purposefully anticompetitive scheme'" and the "'injury . . . was inextricably intertwined with the injury the conspirators sought to inflict.'" *Gelboim*, 823 F.3d at 774 (quoting *Brunswick* 429 U.S. at 483-84). Because plaintiffs claimed that they were in a "'worse position' as a consequence" of defendants' scheme to manipulate LIBOR rates, the Second Circuit held that plaintiffs' alleged injury was "one the antitrust laws were designed to prevent." *Id.* at 775 (quoting *Gatt*, 711 F.3d at 76).

Here, Plaintiffs allege that, as a result of Defendants' manipulation of the Fix Price, they were forced to sell platinum and palladium and Platinum and Palladium Investments at artificially low prices. SAC ¶¶ 260-262. Although, at the pleading stage, Plaintiffs are limited to publicly available information, they have preliminarily identified numerous dates on which one or more of Plaintiffs' sales coincided with Defendants' alleged manipulation of the platinum and palladium PM Fixing. SAC apps. C &D. Because Plaintiffs allege that their "loss[es] stem[ ] from a competition-*reducing* aspect of [D]efendants' behavior," they have sufficiently alleged an injury that the antitrust laws were designed to prevent and that flows from Defendants' allegedly unlawful conduct. *In re Gold*, 2016 WL 5794776, at *10 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990)); *see also In re Silver*, 2016 WL 5794777, at *8 (same); *In re Foreign Exch. Benchmark Rates*, 74 F. Supp. 3d at 596 (concluding that plaintiffs have sufficiently alleged  antitrust injury where plaintiffs

claimed to have paid supra-competitive prices as a result of defendants alleged horizontal price-fixing conspiracy); *Alaska Elec. Pension Fund*, 175 F. Supp. 3d at 59 ("Notably, this Court and the [*In re Foreign Exch. Benchmark*] Court are not alone in concluding that collusion in the setting of a benchmark rate (or its functional equivalent) that is then used as a component of price results in antitrust injury" and "courts have long held that such collusion gives rise to a claim under the Sherman Act by purchasers of the affected products."); *7 West 57th Street Realty Co. v. Citigroup, Inc.*, No. 13-CV-981 (PGG), 2015 WL 1514539, at *15-20 (S.D.N.Y. Mar. 31, 2015); *Laydon v. Mizuho Bank, Ltd.*, No. 12-CV-3419 (GBD), 2014 WL 1280464, at *7-8 (S.D.N.Y. Mar. 28, 2014).

### ii.   Efficient Enforcers

The second question the Court must address in determining whether Plaintiffs have antitrust standing is whether Plaintiffs are "efficient enforcers of the antitrust laws." *Gelboim*, 823 F.3d at 777-78 (citing *Daniel*, 428 F.3d at 443). The Second Circuit has identified four factors that bear on the efficient enforcers analysis: "(1) the 'directness or indirectness of the asserted injury'; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which [plaintiffs'] damages claim is 'highly speculative;' and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *Id.* at 778 (quoting *AGC*, 459 U.S. at 540-45).

> These factors are meant to guide a court in exploring the fundamental issue of "whether the putative plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." After all, "[i]t is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." Indeed, "[t]here is a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages." In both situations, the court must draw a line beyond which a defendant will not be held responsible for harm experienced by a plaintiff. And in both situations, no black-letter rule exists; *a*

> *court must "exercise [its] judgment in deciding whether the law affords a remedy*
> *in specific circumstances."*

*In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), No. 11 MDL 2262 (NRB), 2016 WL

7378980, at *15 (S.D.N.Y. Dec. 20, 2016) (citations omitted) (emphasis added) (alterations in

original).  The Court will address each factor in turn.

### (a)      Directness of Injury

The "'directness or indirectness of the asserted injury'" factor "requires evaluation of the

'chain of causation' linking [plaintiff's] asserted injury and the [defendants'] alleged price-fixing."

*Gelboim*, 823 F.3d at 778 (*quoting AGC*, 459 U.S. at 540).  "The antitrust laws do not require a

plaintiff to have purchased directly from a defendant in order to have antitrust standing."  *In re*

*Foreign Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), No. 13 CIV. 7789 (LGS), 2016 WL

5108131, at *9 (S.D.N.Y. Sept. 20, 2016) (citations omitted); *see also LIBOR VI*, 2016 WL 7378980,

at *16.  As the Supreme Court has recognized, the protection of the antitrust laws are not

"confine[d] . . . to consumers, or to purchasers, or to competitors, or to sellers. . . .  [They] are

comprehensive in . . . coverage [and] protect[ ] all who are made victims of the forbidden practices

by whomever they may be perpetrated."  *McCready*, 457 U.S. at 472 (quoting *Mandeville Island Farms,*

*Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948)).  A determination of standing in an individual

antitrust case is a fact-specific exercise involving a fact-intensive inquiry.  *AGC*, 459 U.S. at 536-37.

Plaintiffs bring their antitrust claim on behalf of a putative class of "[a]ll persons or entities

who," during the Class Period,

> (i) sold physical platinum or palladium; (ii) sold platinum or palladium
> futures contracts traded on NYMEX; (iii) sold shares in platinum or
> palladium ETFs; (iv) sold platinum or palladium call options traded
> on NYMEX; (v) bought platinum or palladium put options traded on
> NYMEX; (vi) sold over-the-counter platinum or palladium spot or
> forward contracts or platinum or palladium call options; or
> (vii) bought over-the-counter platinum or palladium put options.

SAC ¶ 271.  Thus, all contracts for physical platinum and palladium and all platinum and palladium futures, ETFs, options, forwards, and any other OTC or exchange-based platinum and palladium transactions could fall within the scope of this case.  In addition, because the proposed class is not limited to person who transacted directly with Defendants, this broad sweep exposes Defendants to potentially astronomical damages for transactions in which they played no direct role.

The scope and scale of Platinum and Palladium Investments that are the subject of this action "is relevant to the relationship between the defendants' actions and the 'concern of damages disproportionate to wrongdoing,' affecting 'myriad markets where derivative instruments have proliferated.'"  *Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *16 (S.D.N.Y. Feb. 21, 2017) (quoting *Gelboim*, 823 F.3d at 779) (emphasis added).  Accepting the SAC's allegations as true, the universe of Platinum and Palladium Investments allegedly affected by Defendants' conduct is extraordinarily large.  As noted earlier, by Plaintiffs' own estimation, subsets of the relevant market—those limited to platinum and palladium futures—have surpassed annual values of $100 billion and $40 billion, respectively.  SAC ¶ 83.  The Court expects that the quantities of affected physical platinum and palladium trades and ETFs are also significant in magnitude.

The named Plaintiffs are a group of entities and individuals who sold physical platinum and palladium or platinum and palladium futures during the Class Period.  SAC at pp. 13-14, ¶¶ (a)-(f). The SAC is silent with respect to whether those Plaintiffs had any direct sales to or purchases from Defendants.  Plaintiffs only allege that, as a result of Defendants' price manipulation, they were forced to sell the physical platinum and palladium and platinum and palladium futures at artificial prices, and that those artificial prices were caused by Defendants' unlawful manipulation.  SAC at pp. 13-14, ¶¶ (a)-(f).  Two appendices to the SAC identify dates on which one or more of Plaintiffs' sales coincided with Defendants' alleged manipulation of the PM Platinum and Palladium Fixing. SAC apps. C & D.

Defendants argue that, because Plaintiffs are, at most, indirect sellers, their injury is too attenuated from the alleged unlawful conduct to satisfy the directness prong.  Defs.' Joint Br. at 28-29.  Plaintiffs who do not have direct dealings with the defendants, but purchased products allegedly affected by defendants' price fixing, are referred to as "umbrella purchasers."  *LIBOR VI*, 2016 WL 7378980, at *15; *Sullivan v. Barclays*, 2017 WL 685570, at *17.  "Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole."  *Gelboim*, 823 F.3d at 778 (citations omitted).  "In the typical umbrella liability case, plaintiffs' injuries arise from transactions with non-conspiring retailers who are able, but not required, to charge supra-competitive prices as the result of defendants' conspiracy to create a pricing 'umbrella.'"  *In re Gold*, 2016 WL 5794776, at *13 (citations omitted).

Some courts have found that umbrella purchasers do not have antitrust standing because "'significant intervening causative factors,' most notably, the 'independent pricing decisions of non-conspiring retailers,' attenuate the causal connection between the violation and the injury."  *LIBOR VI*, 2016 WL 7378980, at *15 (quoting *In re Gold*, 2016 WL 5794776, at *13); *see also Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242, 245-47 (S.D.N.Y. 1997) (finding that plaintiffs injury was too remote to satisfy the directness prong of the efficient enforcers inquiry, and rejecting umbrella purchasers' standing because "the causal connection between the alleged injury and the conspiracy is attenuated by significant intervening causative factors," including "independent pricing decisions of non-conspiring retailers").  Under such circumstances, because the defendants did not secure an illegal benefit at the plaintiffs' expense, "permitting recovery . . . 'could subject antitrust violators to potentially ruinous liabilities, well in excess of their illegally earned profits.'"  *LIBOR VI*, 2016 WL 7378980, at *15 (quoting *Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 583, 586 (3d Cir. 1979)).  Although *Gelboim* observed that the question of antitrust standing of umbrella purchasers

has produced a split among the circuit courts, the Second Circuit did not adopt a clear position on the issue. 823 F.3d at 778-79. Accordingly, as Judge Caproni observed in *In re Gold*, here too, "[d]ue to the uncertainty surrounding the viability of the theory [of] umbrella liability, and the unique facts of this case, analyzing Plaintiffs' claims under an umbrella theory of liability leads to no dispositive conclusions." *In re Gold*, 2016 WL 5794776, at *12; *see also In re Silver*, 2016 WL 5794777, at *11.

In remanding *Gelboim* to the district court to consider the efficient enforcers analysis, the Second Circuit observed that "there are features of this case that are like no other" and, "[a]t first glance . . . there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks." *Gelboim*, 823 F.3d at 778-79. The court cautioned, however, that "[r]equiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of a[ ] [relevant transaction] would, if [plaintiffs'] allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated." *Id.* at 779.

Mindful of the Second Circuit's concern regarding a vast extension of the potential scope of antitrust liability, and recognizing that antitrust standing determinations are fact-specific, on remand the district court "dr[ew] a line between plaintiffs who transacted directly with defendants and those who did not." *LIBOR VI*, 2016 WL 7378980, at *16. The court was able to draw that line in part by acknowledging that "plaintiffs who did not purchase directly from defendants continue to face the same hurdle: they made their own decisions to incorporate LIBOR into their transactions, over which defendants had no control, in which defendants had no input, and from which defendants did not profit." *Id.* "To hold defendants trebly responsible for these decisions would result in 'damages disproportionate to wrongdoing . . . .'" *Id.* (quoting *Gelboim*, 823 F.3d at 779). Since the Second Circuit's decision in *Gelboim* and the district court's application its instruction, at least one other

43

court in this district has adopted the same approach when faced with damages that could accrue in the trillions if non-direct plaintiffs were allowed to proceed. *Sullivan v. Barclays*, 2017 WL 685570, at *17-18 (concluding that plaintiffs who did not have direct dealings with defendants were not efficient enforcers of the antitrust laws).

Analyzing substantially similar allegations as those alleged here, brought by similarly situated plaintiffs as those named in the SAC, Judge Caproni determined that at least a subset of the plaintiffs in the proposed class had cleared the causation hurdle. *In re Gold*, 2016 WL 5794776, at *13; *In re Silver*, 2016 WL 5794777, at *12. Judge Caproni expressed skepticism, however, regarding whether "*all* market participants who sold gold [or sliver] or gold [or silver] instruments on alleged manipulation days will ultimately be able to move forward with their claims," but concluded that the question could be deferred to the class certification stage. *In re Gold*, 2016 WL 5794776, at *13; *see also In re Silver*, 2016 WL 5794777, at *12. The Court shares Judge Caproni's skepticism. But unlike Judge Caproni, the Court does not believe that this issue should be deferred to class certification with respect Plaintiffs' Sherman Act claim. As discussed above, satisfaction of the efficient enforcer requirement is a condition to antitrust standing, which is appropriately considered on the pleadings.[12] Examining the remaining efficient enforcers factors lends additional support to the Court's ultimate conclusion that, as in *LIBOR VI*, it is appropriate to draw a line between persons who transacted directly with Defendants and those who did not.

---

[12] Since *Gelboim*, at least one other court has found non-direct plaintiffs to be efficient enforcers. *See Merced Irrigation Dist. v. Barclays Bank PLC*, No. 15 CIV. 4878 (VM), 2016 WL 6820738, at *4 (S.D.N.Y. Nov. 10, 2016). In *Merced*, the plaintiff did not deal directly with Barclays, but instead "ended up on the wrong side of an independent" contract, the terms of which referenced the indexes allegedly manipulated by Barclays. *Id.* (citations omitted). The court recognized that it was "unclear how many entities are parties to contracts that reference the indexes at issue" and that, "if Barclays were to be held responsible for all of them, it would greatly expand Barclay's potential liability." *Id.* Nevertheless, the court concluded that "this factor is unlikely to have as much weight as it did in *Gelboim*, where innumerable financial instruments all over the world relied upon LIBOR to determine rates of return, because the scope of Merced's action i*s limited to contracts which settled against the indexes at four Western United States based trading hubs*." *Id.* (internal quotation marks and citations omitted) (emphasis added). The limited scope of the plaintiffs' transactions in *Merced* is not present here.

### (b)    Existence of More Direct Victims

Whether there is a more direct victim of Defendants' alleged antitrust violation turns "chiefly on whether the plaintiff is a consumer or a competitor." *Gelboim*, 823 F.3d at 779.  The plaintiff's status, however, "is not the end of the inquiry; the efficient enforcer criteria must be established irrespective of whether the plaintiff is a consumer or a competitor." *Id.* (citing *Sunbeam Television Corp. v. Nielsen Media Research, Inc.,* 711 F.3d 1264, 1273 (11th Cir. 2013)).  "'Inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009).  "Implicit in the inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779.

In *Gelboim*, the Second Circuit recognized that "one peculiar feature of [that] case [was] that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks." *Id.*  Accordingly, the Second Circuit concluded that this factor "may have diminished weight." *Id.*; *see generally Daniel*, 428 F.3d at 443 (2d Cir. 2005) ("[T]he weight to be given the various [efficient enforcer] factors will necessarily vary with the circumstances of particular cases."). *Gelboim*'s "peculiar feature" is also present here.  Those who transacted in Platinum and Palladium Investments with other market participants would be injured to the same extent and in the same way as Defendants' direct customers.  Therefore, this factor carries diminished weight in this case. *See Sullivan v. Barclays*, 2017 WL 685570, at *17 (concluding that plaintiffs "who engaged in a . . . transaction as counterparty to a defendant employing the price-fixers were in the immediate impact zone of the defendant's unlawful conduct" and are sufficiently direct victims; "plaintiffs who had no such dealings with a defendant would not"); *see also LIBOR VI*, 2016 WL 7378980, at *17.

(c)     **Speculative Damages**

"[H]ighly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement." *Gelboim*, 823 F.3d at 779.  Whether damages calculations will be too speculative and, therefore, unreliable, depends on "the nature and complexity of the alleged antitrust violation." *Id.* "The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); *see also Gelboim*, 823 F.3d at 780 ("Impediments to reaching a reliable damages estimate often flow from the nature and complexity of the alleged antitrust violation.") (citing *DDAVP,* 585 F.3d at 689).  "At the same time, some degree of uncertainty stems from the nature of antitrust law." *Gelboim*, 823 F.3d at 779.

To prove their claim, Plaintiffs will carry the burden of coming forward with "'a just and reasonable estimate' of damages." *Id.* (quoting *Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988)).  As with most antitrust cases, to establish damages, Plaintiffs will have to offer a reliable "but-for" world.  IIA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law:  An Analysis of Antitrust Principles & Their Application § 395d (3d ed. 2007) (explaining that, in seeking antitrust damages, the plaintiff must "prov[e] the price that is actually paid . . . [and] the price that it would have paid 'but for' the conspiracy"); *see also Sullivan v. Barclays*, 2017 WL 685570, at *18 (stating that, "[t]o prove damages in this case, plaintiffs will have to offer a reliable 'but for' [interest rate benchmark] calculation"); *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293 DLC, 2014 WL 1282293, at *16 (S.D.N.Y. Mar. 28, 2014) ("In this [antitrust] case . . . the damages will be calculated by subtracting the but-for prices of e-books from the prices paid by class members.").  At a minimum, that "but-for" world will require Plaintiffs to establish (1) what an alternative Fix Price would have been absent collusion, and (2) the behavior of Platinum and Palladium Investments absent a Fix Price affected by collusion.  As alleged in the SAC, the effect of the Fixing reverberated

worldwide, affecting numerous market participants and various OTC markets and exchanges where physical platinum and palladium and Platinum and Palladium Investments are traded.  Thus, the Court would have to assess the ripple effects of the Fixing and determine whether and how numerous market participants, many of whom had no relationship with Defendants, reacted to the allegedly artificial Fix Price.

Plaintiffs argue that computing damages in this case would be relatively straightforward because "[h]ere, there is only one benchmark, the Fixing, which affects all derivatives."  Pls.' Opp'n at 31.  That argument is far too simplistic.  First, although the Fix Price is the only "benchmark," it is not the only variable in Plaintiffs' "but-for" world.  Plaintiffs do not dispute that the platinum and palladium prices are subject to other market forces, irrespective of any alleged collusion or manipulation.  As alleged in the SAC, the platinum and palladium Fix Prices were "the globally accepted benchmark prices . . . used in a plethora of transactions for platinum and palladium worldwide."  SAC ¶ 2.  Once the Fixing Calls concluded and the Fix Price was set, that price did not remain static.  Market forces unrelated to the alleged manipulation—present and at play both before and after the Fixing—resulted in price fluctuations across each day.  *See, e.g.*, SAC, figs. on pp. 35, 53, 54, 59-65.  Although Plaintiffs allege that the effect of the Fixing "lingered far longer than economists would expect to see if a price movement was caused" by market forces not subject to manipulation, SAC ¶ 163, Plaintiffs do not dispute that the price varied throughout each day and across all days within the Class Period.  Moreover, even on days allegedly affected by the Fixing, prices varied considerably; Plaintiffs' statistical analyses show significant rebounds in the price shortly after the Fixing, suggesting that damages may be affected not only by the trade date, but also by the specific trade time.

Plaintiffs further allege that the spot, Fix Price, and NYMEX settlement prices "exhibit an almost perfect correlation," *e.g.*, SAC ¶ 91, and that there is a "correlation between the prices

47

reached at the Fixing and in the markets for Platinum and Palladium Investments," SAC ¶ 92.  Even

when statistically significant, however, correlation does not necessarily imply causation.  Thus, while

Plaintiffs maintain that the price behavior throughout the Class Period exhibited a pattern consistent

with artificial price suppression, given the sheer number of market participants and exchanges that

rely on the Fixing, it is not clear to the Court how Plaintiffs will be able to control for any single

variable when calculating damages in the "but-for" world.  The presence of intervening factors

further supports the finding that the chain of causation between Defendants' alleged price

manipulation scheme and any injury Plaintiffs may prove too attenuated.  *See Laydon* 2014 WL

1280464, at *10 ("Analysis of Plaintiff's injury would require the reconstruction of hypothetical 'but-

for' Euroyen TIBOR and Yen-LIBOR benchmark rates during the period Plaintiff held his

positions.  The Court cannot hypothesize the impact of these 'but-for' benchmark rates on the

perceptions of the market participants whose activities would have influenced the prices of Euroyen

TIBOR futures contracts."); *see also Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13-14 (2d

Cir. 1980) (finding damages too speculative where numerous intervening factors could have affected

the market such that the "court's task of tracing [those variables] would be difficult, if not

impossible"); *Sullivan v. Barclays*, 2017 WL 685570, at *19.

Second, Plaintiffs' damages theory is that, as a result of Defendants' artificial price

suppression, they were forced to sell derivatives at lower prices than those that would have resulted

from market forces not subject to manipulation, and that those prices were artificially low as a result

of Defendants' manipulation of the Fix Price.  Plaintiffs maintain that as result of being forced to

sell derivatives at lower prices, they suffered losses and reduced profits.  That theory only accounts

for one side of the equation.  Simply put, profit is the difference between a purchase price and a sale

price.  Plaintiffs allege that their sale prices were depressed, but they do not account for the impact

of the Fix on their purchase price.  If the effect of the Fix was constant, there may be no impact on

their profit, since both purchase and sale prices were similarly suppressed.  To prove damages, therefore, Plaintiffs will have to establish not only the price at which they sold their derivatives during the Class Period, but also the price at which they first acquired the derivatives.  Furthermore, they will have to show that their purchase price was somehow less affected by the Fixing than their sale price.

As pleaded, Plaintiffs will have to determine not only the sale price for those derivatives, but also the purchase price from a vast—and yet undetermined—number of market participants who are not defendants in this case.  This type of speculative undertaking might be mitigated if Plaintiffs had had direct dealings with Defendants, but none of the named Plaintiffs had such a relationship. *See, e.g.*, *Sullivan v. Barclays*, 2017 WL 685570, at *19 (finding that determining damages for plaintiffs who had direct dealings with the defendants "would still require the calculation of the hypothetical unaffected Euribor rate at multiple points in time.  But [those plaintiffs] ought to be able to identify specific transactions in which a remaining named defendant was a counterparty and that defendant, based upon its own records, ought to be able to intelligently respond.").

The Court does not purport to question Plaintiffs' or their experts' ability to construct some model to estimate damages despite these many complications.  But, as noted above, any damages estimate would necessarily require Plaintiffs to put forth evidence to support a just and reasonable estimate of their damages. *Gelboim*, 823 F.3d at 779 (citing *Nat'l Football League*, 842 F.2d at 1378).  Given Plaintiffs' definition of the proposed class, "it is difficult to see how [Plaintiffs] would arrive at such an estimate, even with the aid of expert testimony." *Gelboim*, 823 F.3d at 779.  "[T]o find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of an alleged conspiracy in [a] market . . . where countless other market variables could have intervened to affect those pricing decisions." *Reading*, 631 F.2d at 13-14.  These concerns reinforce the appropriateness of drawing a line between persons who transacted directly with Defendants and

those who did not.  The task of computing damages for persons who, for example, had direct dealings with Defendants would not be a simple undertaking.  But at the very least, those who had direct dealings with Defendants would be able to identify specific transactions to which Defendants were counterparties.  Under those circumstances, damages computation would require plausible computations rather than financial models so attenuated as to approach hopeless speculation.

### (d)     Duplicative Recovery & Complex Damages Apportionment

The Court need not discuss the risks of duplicative recovery and complex damages apportionment at length.  *Gelboim* observed that "[t]he transactions that are the subject of investigation and suit are countless and the ramified consequences are beyond conception."  823 F.3d at 780.  That characterization is equally applicable to the facts of this case.  Here, Defendants represent a subset of the fifty-two LPPM members and a subset of the LPPM market-making members.  SAC ¶¶ 31, 33, 35, 37, 44-45, 67.  But the SAC asserts claims on behalf of all market participants, including persons who have not transacted with Defendants.  Plaintiffs ask that these few Defendants be held liable for the conduct of all other market participants:  The extent of their potential liability is enormous, and the allocation of responsibility for the claimed damages will be extremely challenging.  "In certain of these transactions, it may not even be apparent which party profited and which party was injured by the [alleged price] manipulation; given the nature of these transactions, there would surely be instances in which both sides would claim to have suffered injury."  *Sullivan v. Barclays*, 2017 WL 685570, at *19.  That concern may well dissipate—at least to some extent—if the plaintiff group is limited to those who transacted directly with Defendants.  Those plaintiffs would be better able to ascertain profits and losses in transactions to which Defendants were counterparties.  *See id.*  The risks of duplicative recovery and complex apportionment of damages will not be eliminated by limiting the claims in that way, but they will be considerably mitigated.

\*      \*      \*

Although Plaintiffs have sufficiently alleged antitrust injury for the purpose of establishing antitrust standing, the Court concludes that Plaintiffs are not efficient enforcers of the antitrust laws and, therefore, are not the "proper party 'to perform the office of a private attorney general' and . . . 'vindicate the public interest in antitrust enforcement.'" *Gelboim*, 823 F.3d at 780 (quoting *Gatt*, 711 F.3d at 80). Accordingly, Defendants' motion with respect to this count is granted and Plaintiffs' Sherman Act claim is dismissed. As the Second Circuit observed, and as noted above, "not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Id.* at 779.

### C.   Commodities Exchange Act ("CEA") Claims

Plaintiffs' CEA claims include: (1) market manipulation in violation of 7 U.S.C. §§ 1 *et seq.* and CFTC Rule 180.2; (2) employment of a manipulative or deceptive device and delivery of false reports in violation of 7 U.S.C. §§ 1 *et seq.* and CFTC Rule 180.1; (3) principal-agent liability in violation of 7 U.S.C. §§ 1 *et seq.*; and (4) aiding and abetting manipulation in violation of 7 U.S.C. §§ 1 *et seq.* Defendants move to dismiss all claims, arguing that (1) the CEA does not extend to the alleged foreign transactions and conduct; (2) Plaintiffs lack standing to assert CEA claims because they have not alleged actual damages; and (3) the SAC does not adequately plead a claim under the CEA. Defs.' Joint Br. at 30.

#### 1.   Extraterritoriality

Defendants argue that the CEA does not reach the alleged price manipulation here because the Fixing Calls took place abroad and the CEA does not apply to extraterritorial conduct concerning a foreign commodity. Defs.' Joint Br. at 31-34. The parties agree that *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010), governs the question of whether Plaintiffs' CEA claims require an impermissible extraterritorial application of the CEA. Defs.' Joint Br. at 31; Pls.'

Opp'n at 32.  Although *Morrison* analyzed the extraterritorial reach of §§ 10(b) and 20(a) of the

Securities Exchange Act of 1934, the Second Circuit has since endorsed the application of the

*Morrison* framework to claims brought under the CEA.  *See, e.g.*, *Loginovskaya v. Batratchenko*, 936 F.

Supp. 2d 357 (S.D.N.Y. 2013), *aff'd*, 764 F.3d 266 (2d Cir. 2014) (reviewing and affirming the district

court's application of the *Morrison* framework to CEA claims); *see also Chan Ah Wah v. HSBC N. Am.*

*Holdings Inc.*, No. 15 CIV. 8974 (LGS), 2016 WL 4367976, at *3 (S.D.N.Y. Aug. 11, 2016); *Starshinova*

*v. Batratchenko*, 931 F. Supp. 2d 478, 486 (S.D.N.Y. 2013).

  *Morrison* reaffirmed the "longstanding principle of American law 'that legislation of

Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of

the United States.'"  561 U.S. at 255 (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248

(1991)).  The Supreme Court observed that "[t]his principle represents a canon of construction, or a

presumption about a statute's meaning, rather than a limit upon Congress's power to legislate," and

"rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign

matters."  *Id.* (citing *Blackmer v. United States*, 284 U.S. 421, 437 (1932), *Smith v. United States*, 507 U.S.

197, 204 n.5 (1993)).

  *Morrison* established the following framework for deciding questions regarding the

extraterritorial application of federal statutes.  First, unless Congress's intention to give a statute

extraterritorial effect is "clearly expressed," courts "must presume it is primarily concerned with

domestic conditions."  *Id.* (citations omitted).  In other words, "[w]hen a statute gives no clear

indication of an extraterritorial application, it has none."  *Id.*  Second, if a statute applies only

domestically, a court must determine which domestic conduct it regulates.  *Id.* at 266-67.  This is

because "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the

territory of the United States.  But the presumption against extraterritorial application would be a

craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Id.* at 266 (emphasis in original).

Addressing those questions, the Supreme Court held that § 10(b) only applies to "transactions in securities listed on domestic exchanges[ ] and domestic transactions in other securities." *Morrison*, 561 U.S. at 267. "'With regard to securities *not* registered on domestic exchanges, the exclusive focus [is] on *domestic* purchases and sales . . . .'" *Morrison*, 561 U.S. at 268 (emphasis in original); *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012). Although *Morrison* did not further define a domestic transaction, the Second Circuit addressed that issue in *Absolute Activist*. There, the Second Circuit held that "transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States." *Absolute Activist*, 677 F.3d at 67.

The Second Circuit has evaluated the first *Morrison* prong in the context of a CEA claim. In *Loginovskaya*, the Second Circuit held that, because "[t]he CEA as a whole . . . is silent as to extraterritorial reach," courts must "'presume it is primarily concerned with domestic conditions.'" 764 F.3d at 271-72 (quoting *Morrison*, 561 U.S. at 255). Interpreting § 22 of the CEA, which creates a private right of action under the Act, the court reasoned that "the focus of § 22 . . . [is] domestic conduct, domestic transactions, or some other phenomenon localized to the United States." *Id.* at 272. The focus of Congress's concern, therefore, was "clearly transactional." *Id.* at 272. The court concluded that "the CEA creates a private right of action for persons anywhere in the world who transact business in the United States, and does not open our courts to people who choose to do business elsewhere." *Id.* at 273. Addressing the second prong of *Morrison*, the Second Circuit stated that "there is no reason why *Absolute Activist's* formulation should not apply" to CEA claims, and, therefore, that plaintiffs asserting CEA claims must "demonstrate that the transfer of title or the point of irrevocable liability for such an interest occurred in the United States." *Id.* at 274. Thus,

the Court must determine whether the transactions at issue here are "domestic" within the meaning of *Morrison* and *Absolute Activist*.

Plaintiffs assert that the "vast majority" of the derivatives contracts at issue in this action were traded on NYMEX. Pls.' Opp'n at 37. Because NYMEX is a domestic exchange, they maintain, trades on NYMEX—including platinum and palladium derivatives contracts—do not require an impermissible extraterritorial reach of their CEA claims. *Id.* at 34. With respect to OTC transactions, Plaintiffs maintain their allegations are limited to those OTC derivatives contracts where "incurrence of liability and/or the passing of an interest equivalent to 'title' happened within the U.S." *Id.* Defendants do not appear to dispute that NYMEX is a domestic exchange; in fact, Defendants described it as a "U.S.-based derivatives exchange[ ]." Defs.' Joint Br. at 33. Defendants also do not appear to take issue with the assertion that Plaintiffs' OTC transactions are limited to those that incurred liability in the U.S. or those where title passed within the U.S.

The crux of Defendants' argument is that Plaintiffs' CEA claims do not apply to "bids, asks, and trades made by *foreign* employees of mostly *foreign* corporations in a *foreign* auction for a *foreign* physical commodity." Defs.' Joint Br. at 31. That argument lacks merit. The Second Circuit's conclusion in *Absolute Activist* could not have been clearer: for the purpose of determining whether a transaction is "domestic" within the meaning of *Morrison*, "a party's residency or citizenship is irrelevant." 677 F.3d at 70. "While it may be more likely for domestic transactions to involve parties residing in the United States, '[a] purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States.'" *Id.* (quoting *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010)).[13] "Rather

---

[13] Defendants' reliance on *Parkcentral Global Hub, Ltd. V. Porsche Automobile Holdings SE* is unavailing. In *Parkcentral*, the Second Circuit applied the *Morrison* and *Absolute Activist* tests to claims under § 10(b) against foreign defendants for securities transactions relating to securities-based swap agreements pegged to the foreign defendants' stock

than looking to the identity of the parties, the type of security at issue, or whether each individual

defendant *engaged in conduct within the United States*," the Second Circuit held "that a securities

transaction is domestic when the parties incur irrevocable liability to carry out the transaction within

the United States or when title is passed within the United States." *Absolute Activist*, 677 F.3d at 69.

　　With respect to the "vast majority" of transactions at issue in this action, the Court

concludes that, as derivatives contracts traded on NYMEX, they are "transactions in securities listed

on [a] domestic exchange[ ]." *Morrison*, 561 U.S. at 267.  With respect to any OTC platinum and

palladium derivatives, which Plaintiffs acknowledged in their opposition as limited to those where

liability was incurred or title transferred in the United States, the Court concludes that those are

domestic as defined in *Absolute Activist*.[14]  Accordingly, Plaintiffs' CEA claims do not implicate an

impermissible extraterritorial application of the statute.  *See, e.g.*, *LIBOR I*, 935 F. Supp. 2d at 696

(concluding that a claim is within the "CEA's domestic application if it involves (1) commodities in

interstate commerce or (2) futures contracts traded on domestic exchanges" and concluding that

---

value.  763 F.3d 198, 201 (2d Cir. 2014) (per curiam) (emphasis added).  The court held that allowing the claims to
proceed "would constitute an impermissibly extraterritorial application of the statute."  *Id.*  In so holding, the court
expressly stated that its "ultimate conclusion that this suit seeks impermissibly to extend § 10(b) extraterritorially
*depends in some part on the particular character of the unusual security at issue.*"  *Id.* at 201-02.  The court "express[ed] no
view whether [it] would have reached the same result if the suit were based on different transactions."  *Id.*  Courts
in this district have declined to extend the *Parkcentral* analysis on that basis.  *See, e.g.*, *In re Poseidon Concepts Sec. Litig.*,
No. 13-CV-1213 (DLC), 2016 WL 3017395, at *12-13 (S.D.N.Y. May 24, 2016) (concluding that purchases of
OTC stock in the U.S. is a "domestic transaction in other securities" within the meaning of *Morrison* and holding
that *Parkcentral* was inapposite); *Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-CV-5790 JMF, 2015 WL 144165,
at *8 (S.D.N.Y. Jan. 12, 2015) ("Given the differences in the nature of the securities involved in *Parkcentral* from
the Subordinated Notes at issue here, that case does not alter the Court's conclusion that Plaintiffs have adequately
pled that the Exchange Act applies.").  For those reasons, the Court similarly declines to extend the *Parkcentral*
holding to the transactions at issue in this action.

[14] The Court notes that, although Plaintiffs cite several paragraphs in the SAC as support for their assertion that
the OTC transactions at issue are limited to transactions where liability was incurred or title was transferred in the
United States, the allegations in the SAC are not so limited.  In light of the Court's conclusion, and the Second
Circuit's holding in *Absolute Activist*, however, any OTC transactions that fall outside those limitations will
necessarily require an impermissible extraterritorial application of the CEA.  To the extent that the SAC seeks to
assert claims regarding OTC contracts where irrevocable liability to carry out the transaction occurred or where
title was transferred outside the United States, such claims must be, and are, dismissed.

"plaintiffs' claims involve manipulation of the price of domestically traded futures contracts" and therefore do not implicate an impermissibly extraterritorial application of the CEA).

### 2. Standing Under the CEA

Section 22 of the CEA creates a private right of action for any person "who purchased or sold a [futures contract] or swap if the violation constitutes . . . (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap." 7 U.S.C. § 25(a)(1)(D). To have standing to sue under the Act, the plaintiff must show that he or she suffered "actual damages" as a result of the manipulation. 7 U.S.C. § 25(a)(1); *see also In re Silver*, 2016 WL 5794777, at *18 (citations omitted). To establish "actual damages" a plaintiff must show an "'actual injury caused by the violation.'" *In re Silver*, 2016 WL 5794777, at *18 (quoting *LIBOR II*, 962 F. Supp. 2d at 620); *see also In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 379 (S.D.N.Y. 2010) (finding that plaintiffs had standing to sue under the CEA because they established that they "suffered net losses . . . caused by the [defendants'] alleged [price] manipulation"). When "CEA claims are based on discrete, episodic instances of manipulation, plaintiffs must allege that they 'engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged . . . manipulative conduct, and that the artificiality was adverse to their position.'" *In re Silver*, 2016 WL 5794777, at *18 (quoting *LIBOR II*, 962 F. Supp. 2d at 622).

Defendants argue that Plaintiffs do not have standing under the CEA because Plaintiffs have not alleged that they sold Platinum and Palladium Investments during time periods when prices were allegedly suppressed. Defs.' Joint Br. at 35. If Plaintiffs purchased derivatives at artificially low prices, Defendants argue, they could have potentially benefited from the alleged price manipulation by selling them at slightly higher prices. *Id.*

As several courts in this district have held, however, where plaintiffs allege that they transacted "at artificial prices, injury may be presumed." *In re Amaranth*, 269 F.R.D. at 380; *see also In*

*re Silver*, 2016 WL 5794777, at *18; *In re Gold*, 2016 WL 5794776, at *21.  Unlike federal securities

cases, "courts have observed that loss causation is not a statutory element of proof under the CEA."

*In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 60 (S.D.N.Y. 2012) (collecting cases).  In

securities fraud actions, which require a showing of loss causation,

> a securities fraud plaintiff purchasing or selling stock before a
> corrective disclosure occurs cannot plausibly allege injury from the
> fraud.  Thus, a loss causation requirement can dispose of such a
> securities fraud claim at the pleading stage.  However, in the context
> of a CEA manipulation claim, there is no similar bright line indicating
> when losses begin or cease to accrue.  And the period during which
> the manipulative activity occurs is not necessarily a proxy for the
> period when losses attributable to artificial prices occur. . . . The issue
> of "actual damages" thus becomes a complex factual inquiry.

*Id.* (citing *Initial Public Offering Securities Litig.*, 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003)); *see also*

*Sullivan v. Barclays*, 2017 WL 685570, at *31.

Defendants point to *LIBOR II* in support of their argument that Plaintiffs lack standing

under the CEA because they fail to allege that they "'engaged in a transaction *at a time* during which

prices were artificial.'"  Defs.' Joint Br. at 36 (quoting *LIBOR II*, 962 F. Supp. 2d at 622 (emphasis in

Defs.' Joint Br.).  But the reference to "time" in *LIBOR II* was to *days*, not hours or minutes.  In

addition, the district court expressly distinguished the "persistent suppression theory," where it did

not require plaintiffs to allege specific days on which they traded, from the "trader-based

manipulation theory," where it did impose that requirement.  *Id.*  For the group of plaintiffs alleging

persistent suppression, the court reasoned that because "LIBOR, and consequently Eurodollar

futures prices, was allegedly artificial throughout the Class Period," plaintiffs need not match specific

trades with days on which they alleged LIBOR manipulation.  *Id.*  For the trader-based allegations,

however, the court reasoned that the claims "would entail only that LIBOR was artificial for certain

discrete days during the Class Period, and thus the allegation that plaintiffs traded during the Class

Period is insufficient to show that plaintiffs suffered actual damages."  *Id.*

The *LIBOR II* "persistent suppression theory" reasoning applies here. Plaintiffs allege that they sold platinum and palladium derivatives on dates when Defendants allegedly artificially suppressed the Fix Price for those commodities. *See, e.g.*, SAC apps. A-D. Plaintiffs also allege that the platinum and palladium Fix Prices were artificially low throughout the Class Period as a result of Defendants' ongoing manipulation scheme. *See, e.g.*, SAC ¶ 215. As set forth in four appendices attached to the SAC, to the extent that Plaintiffs were able to cross-reference sale dates with artificial suppressions dates, the lists they generated are "preliminary." *Id.* At the pleading stage, those allegations and preliminary lists are sufficient. Accordingly, Plaintiffs have adequately alleged that they suffered actual damages as a result of Defendants' price manipulation. *See, e.g.*, *Sullivan v. Barclays*, 2017 WL 685570, at \*31 (concluding that plaintiffs have sufficiently alleged actual damages to establish standing under the CEA and stating that "plaintiffs' allegations do not purport to be the exclusive universe of defendants' alleged manipulation. It ultimately remains plaintiffs' burden to prove through reliable evidence that they suffered actual loss based on defendants' manipulation of the [interest rate benchmark], but at the pleading stage, they have adequately alleged that they were damaged by the [benchmark's] manipulation.").

### 3. CEA Violations

#### a. Legal Standard

The parties disagree regarding the pleading standard applicable to Plaintiffs' CEA claims. Defendants argue that, although Plaintiffs allege price manipulation, their allegations sound in fraud and are therefore subject to the heightened pleading standard dictated by Federal Rule of Civil Procedure 9(b). Defs.' Joint Br. at 36. Plaintiffs argue that Defendants mischaracterize their claims; they maintain that the SAC only alleges that Defendants took advantage of their control of the market in order to collude and suppress prices. Pls.' Opp'n at 39. Plaintiffs maintain that, based on those allegations, Rule 8(a) is the applicable pleading standard to their CEA allegations. *Id.* at 37-38.

Pursuant to Federal Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* In this district, "[m]ost courts . . . apply [a] case-by-case approach to determine whether Rule 9(b) applies to claims of manipulation under the CEA." *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 244 (S.D.N.Y. 2012); *see also Myun-Uk Choi v. Tower Research Capital LLC*, 165 F. Supp. 3d 42, 47 (S.D.N.Y. 2016); *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 531 (S.D.N.Y. 2008); *In re Crude Oil Commodity Litig.*, No. 06 CIV. 6677 (NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007). Other courts have held that Rule 9(b) applies generally in CEA manipulation cases because "market manipulation is inherently deceptive." *In re Amaranth Nat. Gas Commodities Litig.* ("*Amaranth I*"), 587 F. Supp. 2d 513, 535 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 ("*Amaranth III*") (2d Cir. 2013).

Notwithstanding Plaintiffs' attempt to cast their claims as Defendants' abuse of market power, the allegations in the SAC plainly sound in fraud. For example, Plaintiffs allege that Defendants submitted "false, misleading, or inaccurate reports of the Fixing, *i.e.*, false reports concerning market information or conditions that affected or tended to affect both prices of platinum and palladium and prices of platinum and palladium futures and options." SAC ¶ 298; *see also id.* ("Defendants and co-conspirators did so either knowingly, intentionally, or with reckless disregard of the fact that such reports were false, misleading, or inaccurate."). Plaintiffs elsewhere allege that Defendants operated a secret cartel and utilized chat rooms, instant messages, phone calls, and proprietary trading venues and platforms with the intent to mislead market participants and profit at others' expense. *See, e.g.*, SAC ¶¶ 171, 248. Thus, Rule 9(b) is the appropriate pleading standard with which to evaluate Plaintiffs CEA allegations. *See, e.g.*, *FOREX*, 2016 WL 5108131, at *19 (concluding that Rule 9(b) applies to plaintiffs' CEA claims where they alleged collusive acts

committed in secret and where traders acted with the intent to mislead defendants' customers); *see also LIBOR I*, 935 F. Supp. 2d at 713-14 (applying Rule 9(b) to plaintiffs' market manipulation claims where the allegations "sound[ed] in fraud and thus must be pled with particularity" and where "the claim [was] that defendants, by submitting artificial LIBOR quotes, misled the market with regard to future levels of LIBOR, and by extension future prices of Eurodollar contracts, and thus caused Eurodollar contracts to trade at artificial prices").

Despite the generally rigid requirement that fraud be pleaded with particularity, the Second Circuit has recognized that "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (citing *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 486 (S.D.N.Y. 2002)). As a result, the heightened pleading standard under 9(b) "is generally relaxed in the context of manipulation-based claims, where the complaint must simply specify 'what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *In re Silver*, 2016 WL 5794777, at *19 (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007), quoting *In re Nat. Gas Commodity Litig.*, 358 F. Supp. 2d 336, 343 (S.D.N.Y. 2005)); *see also Sullivan v. Barclays*, 2017 WL 685570, at *30. Here, in addition to price manipulation, Plaintiffs also allege that Defendants engaged in manipulative trading practices. The pleading standard applicable to those claims remains an open issue in this Circuit. *See In re Gold*, 2016 WL 5794776, at *22 (citations omitted). The Court need not address this issue, however, because it concludes that the SAC meets the more stringent 9(b) standard.

### b. Price Manipulation Claim

Plaintiffs bring a CEA price manipulation claim under Sections 6(c)(3) and 9(a)(2) and CFTC Rule 180.2, which make it unlawful for "any person to manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or of any swap . . ." and for any person to "directly or indirectly . . . manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. §§ 9(3), 13(a)(2); *see also* 17 C.F.R. § 180.2 ("It shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to [CFTC rules and regulations]."). "The CEA is a 'remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived.'" *Loginovskaya*, 764 F.3d at 270 (quoting *Commodity Futures Trading Comm'n v. R.J. Fitzgerald & Co.,* 310 F.3d 1321, 1329 (11th Cir. 2002)).

To state a claim for market manipulation under the CEA, Plaintiffs must allege that: (1) the defendant "possessed an ability to influence market prices;" (2) "an artificial price existed;" (3) the defendant "caused the artificial price; and" (4) the defendant "specifically intended to cause the artificial price." *Amaranth III*, 730 F.3d at 173 (quoting *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 246-47 (5th Cir. 2010) (internal quotation marks omitted)); *see also In re Crude Oil Commodity Litig.*, No. 06 CIV. 6677 (NRB), 2007 WL 1946553, at *3 (S.D.N.Y. June 28, 2007); *In re Nat. Gas Commodity Litig.* ("*In re Natural Gas I*"), 337 F. Supp. 2d 498, 507 (S.D.N.Y. 2004)). "There is thus no manipulation without intent to cause artificial prices." *In re Amaranth III*, 730 F.3d at 183.

The SAC adequately pleads a manipulation claim under Rule 9(b). First, Plaintiffs plausibly allege Defendants' ability to influence market prices. "[T]he ability to influence prices can manifest

itself in various ways, including the exercise of market power." *Parnon Energy*, 875 F. Supp. 2d at

245; *see also In re Amaranth*, 269 F.R.D. at 383 (concluding that the ability to influence prices can be

evaluated by determining whether defendant held a dominant market position and whether such a

market position would allow it to manipulate prices).

Defendants' sole basis for disputing the contention that they had the ability to influence

market prices is that, although the SAC alleges a price manipulation claim by collective action,

Plaintiffs have not adequately pleaded the existence of a conspiracy necessary to show that

Defendant had the ability to influence prices. Defs.' Joint Br. at 40. Because the Court already

found that the SAC adequately pleads a conspiracy, *see supra*, Part III.B(1), it need not repeat that

analysis here. It is worth reiterating, however, that, according to the SAC, Defendants are five of

thirteen market making-members that form "the heart of the LPPM." SAC ¶¶ 67, 71. Moreover,

the four Fixing Members form and exclusively control the LPPFC, the vehicle for the alleged price

manipulation. SAC ¶¶ 1, 47. Through their control of the Fixing process and their role as LPPM

market makers, the Court finds that the first element of Plaintiffs' CEA manipulation claim is met.

With respect to the second element, an artificial price is "a price that 'does not reflect basic

forces of supply and demand.'" *In re Term Commodities Cotton Futures Litig.*, No. 12 CIV. 5126 ALC

KNF, 2013 WL 9815198, at *17 (S.D.N.Y. Dec. 20, 2013) (quoting *Parnon Energy Inc.*, 875 F. Supp.

2d at 246), *on reconsideration in part on other grounds*, No. 12 CIV. 5126, 2014 WL 5014235 (S.D.N.Y.

Sept. 30, 2014). "When determining if artificial prices exist, a court may consider the underlying

commodity's normal market forces, historical prices, supply and demand factors, price spreads, and

also the cash market for the commodity at issue." *In re Commodity Exch., Inc., Silver Futures and Options

Trading Litig.,* No. 11 Md. 2213(RPP), 2012 WL 6700236, at *12 (S.D.N.Y. Dec. 21, 2012) (citing *In

re Sumitomo Copper Litig.*, 182 F.R.D. 85, 90 n.6 (S.D.N.Y. 1998)). The allegations in the SAC

sufficiently plead the existence of artificial platinum and palladium prices throughout the Class

Period.  For example, Plaintiffs alleged a pattern of downward spikes at and around the Fixing. SAC ¶¶ 115-118 & figs. on pp. 53-54.  Plaintiffs also allege that the AM and PM Fixing's downward spikes stand out as against movement at any other time of day.  SAC ¶¶ 115-134 & figs. on pp. 53-54, 56-57, 59-65, 68-75.

Relying on *In re Commodity Exch., Inc., Silver Futures*, Defendants argue that the SAC does not adequately plead this element because Plaintiffs have not alleged that the platinum and palladium prices during the Class Period "did not . . . comport with contemporaneous prices in comparable markets."  Defs.' Joint Br. at 38.  Because the SAC alleges a near-perfect to perfect correlation between the spot prices and the futures platinum and palladium prices, Defendants' maintain, Plaintiffs have in fact demonstrated that price movement in the comparable the futures market was entirely consistent with the commodities' price movement.  *Id.*  Defendants' argument fails for at least three reasons.

First, Defendants misread *In re Commodity Exch., Inc., Silver Futures*.  The court's reference to other markets comparable to silver was with respect to markets for other commodities, not the markets for silver derivatives.  2012 WL 6700236, at *13.  Second, the Court is not aware of any cases suggesting that a "comparable market" allegation is required in order to successfully plead a CEA manipulation claim.  In fact, *In re Commodity Exch., Inc., Silver Futures* described artificial prices as "those prices that do not reflect the forces of supply and demand in the market *or* do not otherwise comport with contemporaneous prices in comparable markets."  *Id.* at *12 (emphasis added).  Third, Defendants' argument that the correlation between the spot and futures and spot and ETF prices during the Class Period shows that the Fix Prices were not artificial misses the mark. Plaintiffs allege that the Fixing set the global benchmark for platinum and palladium and that exchange prices closely track the platinum and palladium spot price.  That is the essence of Plaintiffs' claims.  Defendants have not explained why platinum and palladium spot, Fix, and

derivatives would exhibit a different correlation in the absence of the alleged price manipulation than they would if the Fix Price was artificially suppressed.

Plaintiffs also adequately plead that Defendants' conduct was the "proximate cause of the price artificiality." *In re Commodity Exch., Inc., Silver Futures*, 2012 WL 6700236, at *16.  Plaintiffs have identified multiple days on which atypical downward pricing spikes occurred distinctly around the Fixing Calls and have provided ample examples showing predictable price movements in the platinum and palladium derivatives market. *See, e.g.*, SAC ¶¶ 131-134 & figs. on pp. 70-75.  While Plaintiffs acknowledge that Defendants were not operating in a vacuum, and that other market participants and forces were present, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Anderson News*, 680 F.3d at 185.  At the pleading stage, "[i]t is enough, for purposes of a finding of manipulation in violation of . . . the [CEA] that [the defendants'] action *contributed* to the price [movement]." *Parnon Energy*, 875 F. Supp. 2d at 248 (emphasis added) (internal quotation marks and citations omitted) (alterations in original).  Thus, the Court finds that the SAC sufficiently pleads that Defendants' alleged price manipulation was at least one cause of the artificial pricing during the Class Period.

Finally, to adequately plead the specific intent element, Plaintiffs must allege that Defendants "'acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand.'" *U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 532 (S.D.N.Y. 2014) (quoting *Parnon*, 875 F. Supp. 2d at 249).  "A generalized intent to obtain trading profits 'which could be imputed to any corporation with a large market presence in any commodity market, is insufficient to show intent.'" *Id.* at 532-33 (quoting *In re Crude Oil Commodity*, 2007 WL 1946553, at *8).  "The specific intent to cause a market distortion, scienter, can be pled by 'alleging facts (1) showing that the defendants had

both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Amaranth I*, 587 F. Supp. 2d at 530 (quoting *ATSI*, 493 F.3d at 99).

The SAC adequately pleads scienter. First, as discussed above, Plaintiffs allege that the Fixing Members were motivated to manipulate the Fix Price for platinum and palladium because doing so provided them with arbitrage opportunities in both the physical and derivatives platinum and palladium markets. *See, e.g.*, SAC ¶¶ 185-186. Plaintiffs further allege that foreknowledge of the Fixing allowed Defendants to capitalize on their price manipulation by strategically buying and selling physical platinum and palladium and platinum and palladium futures at opportune times during or around the Fixing window. *See, e.g.*, SAC ¶¶ 200-201. Such allegations are sufficient to establish motive because they "'entail concrete benefits that could be realized by'" Defendants' price manipulation. *Amaranth I*, 587 F. Supp. 2d at 530 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)); *see also LIBOR I*, 935 F. Supp. 2d at 715 (concluding that plaintiffs plausibly pleaded scienter by alleging that "defendants specifically intended to manipulate the price of Eurodollar futures contracts" and identified "concrete benefits that defendants stood to gain from manipulating Eurodollar futures contract prices"). In addition, because the Fixing Members were in complete control of the Fixing Process, they were able to implement the alleged price manipulation in an ideal setting—and with the veneer of legitimacy—during the Fixing Calls and via communications between the LPPFC members. Thus, Defendants were perfectly situated to implement and execute the alleged price manipulation scheme. *See Laydon*, 2014 WL 1280464, at *5 (reasoning that defendants' positions in the market furnished an opportunity to engage in price manipulation); *see also In re Silver*, 2016 WL 5794777, at *21; *In re Gold*, 2016 WL 5794776, at *24.[15]

---

[15] Defendants argue that Plaintiffs' "net 'short' position" theory is insufficient to establish motive. Defs.' Joint Br. at 43-45. As discussed above, *see supra* Part III.B(1)(b), the Court agrees. Regardless, even if Plaintiffs are able to establish that Defendants held large net short positions during the Class Period and profited from holding those

Plaintiffs have also alleged sufficient facts to show that Defendants engaged in conscious misbehavior or, at least, acted with recklessness in artificially suppressing the Fix Price.  The four Fixing Members were the *only* members of the LPPFC.  As such, the Fixing Member were in complete control over the Fixing process and fully aware of their ability to influence it.  Based on the facts alleged, it is improbable that Defendants somehow managed to artificially lower the platinum and palladium Fix Price over the course of seven years by sheer happenstance or chance.  Rather, Plaintiffs allegations support the inference that the Fixing Members acted with conscious misbehavior or recklessness.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR III*"), 27 F. Supp. 3d 447, 470 (S.D.N.Y. 2014) (concluding that plaintiffs have adequately pleaded scienter based on a conscious misbehavior or recklessness theory where they alleged that defendants had submitted artificial LIBOR quotes and, given their positions and involvement in the markets, the danger of doing so was either known or so obvious that they must have been aware).[16]  Accordingly, because Plaintiffs have adequately alleged the elements of a price manipulation claim under the CEA, Defendants' motion to dismiss this claim is denied.

---

positions, such generalized motive allegations "could be imputed to any corporation with a large market presence in any commodity market," and are insufficient to show intent."  *In re Crude Oil Commodity*, 2007 WL 1946553, at *8.

[16] Defendants argue that Plaintiffs have not alleged "any particular communications supposedly evidencing Defendants' manipulative intent," and instead rely on references to "regulatory investigations into *other* entities that are not defendants here, into *other* financial benchmarks, and to articles describing alleged investigations into precious metals markets," all of which Defendants describe as an insufficient "hearsay" substitute for factual allegations.  Defs.' Joint Br. at 45-46.  In a footnote, Defendants invite the Court, if it is so "inclined[,] to strike the offending allegations" and ask the Court to treat their motion as a motion to strike pursuant Federal Rule of Civil Procedure 12(f).  *Id.* at 46 n.32.  The Court is not so inclined.  First, those allegations do not form the basis of the Court's conclusions in this case.  Second, "'motions to strike under Rule 12(f) are rarely successful.'"  *Hidalgo v. Johnson & Johnson Consumer Companies, Inc.*, 148 F. Supp. 3d 285, 292 (S.D.N.Y. 2015).  Unless there "is a strong reason for doing so . . . courts should not tamper with the pleadings."  *Restis v. Am. Coalition Against Nuclear Iran, Inc.*, 530 F. Supp. 3d 705, 731 (S.D.N.Y. 2014).  "'To prevail on a [Rule 12(f)] motion to strike, a party must demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant.'"  *Landesbank Baden-Württemberg v. RBS Holdings USA Inc.*, 14 F. Supp. 3d 488, 497 (S.D.N.Y. 2014) (quoting *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (alteration in original).  Defendants have not met this standard, let alone attempted to meet it in their footnote.

### c. Manipulative Device Claims

Plaintiffs bring two manipulative device claims under CEA Sections 6(c)(1), 9(a)(2), and

CFTC Rule 180.1.  Sections 6(c)(1) renders it unlawful for any person

> directly or indirectly, to use or employ, or attempt to use or employ,
> in connection with any swap, or a contract of sale of any
> commodity . . . or for future delivery on or subject to the rules of any
> registered entity, any manipulative or deceptive device or contrivance,
> in contravention [of CFTC rules and regulations].

7 U.S.C. § 9(1).  Section and 9(a)(2) renders it unlawful

> to manipulate or attempt to manipulate the price of any commodity
> in interstate commerce, or for future delivery on or subject to the
> rules of any registered entity, or of any swap . . . or knowingly
> deliver or cause to be delivered for transmission through the mails or
> interstate commerce by telegraph, telephone, wireless, or other means
> of communication false or misleading or knowingly inaccurate
> reports concerning crop or market information or conditions that
> affect or tend to affect the price of any commodity . . . .

7 U.S.C. § 13(a)(2).  CFTC Rule 180.1 prohibits

> any person . . . in connection with any swap, or contract of sale of
> any commodity in interstate commerce, or contract for future
> delivery . . . to intentionally or recklessly:  (1) Use or employ, or
> attempt to use or employ, any manipulative device, scheme, or
> artifice to defraud; (2) Make, or attempt to make, any untrue or
> misleading statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made not untrue or
> misleading; (3) Engage, or attempt to engage, in any act, practice, or
> course of business, which operates or would operate as a fraud or
> deceit upon any person; or, (4) Deliver or cause to be delivered . . . a
> false or misleading or inaccurate report concerning crop or market
> information or conditions that affect or tend to affect the price of
> any commodity in interstate commerce, knowing, or acting in
> reckless disregard of the fact that such report is false, misleading or
> inaccurate.

17 C.F.R. § 180.1(a).

Although the CEA does not define the terms "manipulate device" or "contrivance," the

CFTC has provide the following guidance with respect to those terms:

> The language of CEA section 6(c)(1), particularly the operative
> phrase 'manipulative or deceptive device or contrivance,' is virtually
> identical to the terms used in section 10(b) of the Securities Exchange
> Act of 1934. . . .  Indeed, when the Commission promulgated Rule
> 180.1, the Commission observed that given the similarities between
> CEA section 6(c)(1) and Exchange Act section 10(b), the
> Commission deems it appropriate and in the public interest to model
> final Rule 180.1 on SEC Rule 10b-5.  Accordingly, case law
> developed under Section 10(b) of the Exchange Act and SEC Rule
> 10b-5 is instructive in construing CEA Section 6(c)(1) and
> Commission Regulation 180.1(a).

*In re Total Gas & Power N. Am., Inc.*, CFTC Dkt. No. 16-03, 2015 WL 8296610, at *8 (Dec. 7, 2015)

(internal quotation marks and citations omitted).  Nevertheless, the CFTC explained, because of

"the differences between the securities markets and the derivatives markets, the Commission will be

*guided, but not controlled*, by the substantial body of judicial precedent applying the comparable

language of SEC Rule 10b-5."  *Id.* (quoting 76 Fed. Reg. at 41,399) (emphasis added).

Defendants first argue that, because Rule 180.1 did not take effect until August 15, 2011,

Plaintiffs' manipulative device claims that predate August 15, 2011 must be dismissed.  Defs.' Joint

Br. at 47; Defs.' Joint Reply at 23.  Plaintiffs maintain that the statute's prohibition on "false

reporting" existed before Rule 180.1 came into effect and, therefore, their "false reporting" claims

are actionable even with respect to transactions effected prior to August 15, 2011.  Pls.' Opp'n at 46-

47.  The Court need not decided this issue, however, because it concludes that, to the extent that the

SAC alleges that Defendants delivered any false reports, those are not "reports" within the meaning

of the CEA.

Although case law on this issue is scarce, as one court in this district observed, "'[t]he term

'report' is not defined in the CEA or any CFTC regulations.'"  *FOREX*, 2016 WL 5108131, at *23

(quoting *United States v. Brooks*, 681 F.3d 678, 691 (5th Cir. 2012)).  Interpreting the meaning of the

term within the CEA, the Fifth Circuit noted that "report," is a "detailed statement of fact."  *Brooks*,

681 F.3d at 691.  In contrast to "expression of opinion, or casual conversation," the Fifth Circuit

reasoned, "the lengthy documents outlining detailed information about natural gas trades, sent to established industry publications with the intent to inform those publications about the state of natural gas markets," were within the CEA's meaning of that term. *Id.*; *see also FOREX*, 2016 WL 5108131, at *23. Adopting the Fifth Circuit's reasoning, the *FOREX* court rejected plaintiffs' argument that, by "furtively coordinating the prices they showed to customers," Defendants submitted "reports" within the meaning of the statute, despite the fact that the prices may ultimately have affected the prices of foreign exchange instruments, because "[t]hey are not lengthy written accounts describing historical fact that courts have found to be within the plain meaning of the term 'report.'" *Id.*; *see also U.S. Commodity Futures Trading Comm'n v. Atha*, 420 F. Supp. 2d 1373, 1376 (N.D. Ga. 2006) (concluding that oral conversations or information submitted by defendants to indexes fell within the meaning of "reports" under the CEA).

The Court finds the Fifth Circuit's analysis and the *FOREX* court's application of that analysis persuasive. The Court finds that the same conclusion is warranted here. The SAC contains a single reference to "false reports" allegedly submitted by Defendants. That reference appears under the manipulative device claim, where Plaintiffs allege that "Defendants and co-conspirators caused to be delivered for transmission false, misleading, or inaccurate reports of the Fixing, *i.e.*, false reports concerning market information or conditions that affected or tended to affect both prices of platinum and palladium and prices of platinum and palladium futures and options in interstate commerce." SAC ¶ 298. Beyond a recitation of the statutory language, the SAC's 136 pages, 310 paragraphs, and five appendices contain no other reference to or illustration of any false reports associated with Defendants' conduct. Plaintiffs cannot shoehorn Defendants' alleged false or misleading price quotes and orders during the Fixing into claims under the CEA provisions prohibiting the delivery of false or misleading "reports." Therefore, while the allegations plausibly

plead a price manipulation claim, they do not support a manipulative device claim based on false

reports.  *See FOREX*, 2016 WL 5108131, at *23.

Since Plaintiffs do not dispute that Rule 180.1 came into effect on August 15, 2011, any

claims based on transactions that predate August 15, 2011 must be dismissed.  *See, e.g.*, *In re Silver*,

2016 WL 5794777, at *22 (dismissing pre-August 15, 2011 manipulative device claims alleging

violations of Rule 180.1); *In re Gold*, 2016 WL 5794776, at *25 (same); *see also Amaranth III*, 730 F.3d

at 173 n.1 (noting that Rule 180.1 "does not impact the present appeal . . . given the regulation's

effective date of August 15, 2011" (citations omitted)); *In re Barclays PLC, Barclays Bank PLC, and

Barclays Capital Inc.*, CFTC Dkt. No. 15-25, 2015 WL 2445060, at *14 (CFTC May 20, 2015)

(differentiating between conduct occurring pre- and post-August 15, 2011 for purposes of

Rule 180.1).

Regarding the remaining claims based on transactions that post-date August 15, 2011,

Defendants argue that Plaintiffs have not sufficiently alleged scienter, loss causation, or actual

reliance, and that Plaintiffs failed to identify any public misstatement that could support a fraud-on-

the market presumption of reliance.  Defs.' Joint Br. at 46.  The Court already found that Plaintiffs

have adequately alleged scienter, including through circumstantial misbehavior or recklessness, and

need not address that argument again.  *See supra*, Part III.C(3)(b).

With respect to reliance and loss causation, the case law addressing whether those elements

must be pleaded in CEA manipulative device claims is scarce.  *See In re Gold*, 2016 WL 5794776,

at *26.  In *In re Gold*, Judge Caproni noted that "'at least in the context of manipulation-based claims,

as to which the effects of the alleged manipulation presumably dissipate over time, loss causation is

not required.'"  *Id.* (quoting *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 60-61

(S.D.N.Y. 2012)); *see also In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 600-01

(S.D.N.Y. 2011) (concluding that loss causation principles were not applicable to a CEA claim

involving a manipulative "bang the close" trading strategy). Here, as in *In re Gold*, Plaintiffs allege

both that Defendants misrepresented bids and quotes during the Fixing and that Defendants

engaged in price manipulation of the Fix Price leading up to and during the Fixing. Accordingly,

given the absence of Second Circuit authority directly addressing this issue, and in light of Judge

Caproni's persuasive analysis in *In re Gold* and *In re Silver*, the Court concludes that Plaintiffs have

plausibly pleaded a CEA manipulative device claim "by alleging with particularity 'the nature,

purpose, and effect of the fraudulent conduct and the roles of the defendants.'" *In re Gold*, 2016 WL

5794776, at *26 (quoting *ATSI*, 493 F.3d at 101); *see also In re Silver*, 2016 WL 5794777, at *22 (same);

*In re Platinum and Palladium Commodities Litig.*, 828 F. Supp. 2d at 600-001 (distinguishing CEA claims

based on allegations that information was hidden from the market, which require a showing of loss

causation at the pleading stage, from claims based on market manipulation, which do not) (citing *In*

*re Initial Public Offering Sec. Litig.*, 297 F. Supp. 2d 668, 674-75 (S.D.N.Y. 2003)); *cf. Laydon*, 2014 WL

1280464, at *5-6 (denying defendants' motion to dismiss plaintiff's CEA claims based on alleged

Euroyen TIBOR and Yen-LIBOR manipulation without separately addressing reliance and loss

causation).

Accordingly, Defendants' motion to dismiss Plaintiffs' CEA manipulative device claims is

granted with respect to Plaintiffs' claims based on false reports and transactions that precede the

effective date of Rule 180.1, but denied with respect to any remaining manipulative device claims in

connection with transactions that post-date August 15, 2011.

### d.  Secondary Liability

#### i.  Aiding and Abetting

Pursuant to Section 22 of the CEA, "[a]ny person . . . who violates this chapter or who

willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall

be liable for actual damages resulting from [relevant transactions] . . . and caused by such violation"

of the statute. 7 U.S.C. § 25(a)(1). The Second Circuit has interpreted "aiding and abetting" in this context as "'requir[ing] the defendant to 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *Amaranth III*, 730 F.3d at 182 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). Consistent with the Second Circuit's holding, courts in this district have required plaintiffs alleging aiding and abetting under the CEA to plead sufficient facts showing that "the Defendant (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." *Laydon*, 2014 WL 1280464, at *4 (citing *In re Platinum and Palladium*, 828 F. Supp. 2d at 600-01); *see also FOREX*, 2016 WL 5108131, at *25.

The SAC adequately pleads those elements. As discussed above, the SAC is replete with allegations that the Fixing Members colluded to manipulate the platinum and palladium Fix Price during the Fixing Calls. Therefore, and as discussed more fully above, Plaintiffs plead sufficient facts showing that Defendants knowingly assisted each other and participated in the Fixing with the intent to artificially suppress the prices of platinum and palladium. *See, e.g.*, *FOREX*, 2016 WL 5108131, at *25 (denying a motion to dismiss CEA aiding and abetting claims when plaintiffs alleged defendants knowingly associated in a venture to manipulate prices with the intent that that the venture would succeed); *see also In re Silver*, 2016 WL 5794777, at *23; *In re Gold*, 2016 WL 5794776, at *27; *Laydon*, 2014 WL 1280464, at *6 (denying defendants' motion to dismiss a CEA aiding and abetting claim based on "numerous allegations giving rise to an inference that Defendants knew of the other Defendants' unlawful and manipulative conduct and assisted each other in the furtherance of the violation"). Accordingly, Defendants' motion to dismiss Plaintiffs' aiding and abetting claim under the CEA is denied.

### ii.    Principal-Agent Liability

The SAC also asserts a claim for principal-agent liability under Section 2 of the CEA, pursuant to which, "[t]he act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."  7 U.S.C. § 2(a)(1)(B).  This section is "'a variant of the common law principle of *respondeat superior*,' which holds an employer 'strictly liable—that is to say, regardless of the presence or absence of fault on the employer's part— for torts committed by [its] employees in the furtherance of [its] business.'"  *U.S. Commodity Futures Trading Comm'n v. Byrnes*, 58 F. Supp. 3d 319, 326 (S.D.N.Y. 2014) (quoting *In re Natural Gas I*, 337 F. Supp. 2d at 515 (S.D.N.Y. 2004)).

To state a claim for principal-agent liability under the CEA, a plaintiff must plead "that the agent was acting in the capacity of an agent when he or she committed the unlawful acts and that the agent's actions were within the scope of his or her employment."  *In re Gold*, 2016 WL 5794776, at *27 (citing *Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999)); *see also FOREX*, 2016 WL 5108131, at *24 ("'Such liability may be imposed where (1) the agent participated in the alleged unlawful activity and (2) his actions were within the scope of his employment or office.'") (quoting *In re Platinum and Palladium*, 828 F. Supp. 2d at 599.  "[I]t is enough if [the agent] was 'acting for' [the principal] in executing the illegal trades."  *Guttman v. Commodity Futures Trading Comm'n*, 197 F.3d 33, 39 (2d Cir. 1999).

Plaintiffs adequately plead principal-agent liability under the CEA.  The SAC expressly states that whenever it refers to an "any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or *through its officers, directors, agents, employees, or representatives while they were engaged in the management, direction, control, or transaction of the entity's*

*business or affairs.*" SAC ¶ 28 (emphasis added).  Elsewhere Plaintiffs allege that, around the time of

the AM and PM Fixing, Defendants quoted platinum and palladium prices that were significantly

lower than those other market participants.  *See, e.g.*, SAC ¶ 212(c).  Plaintiffs also allege that

Defendants shared customer and confidential proprietary information necessary to execute the

alleged price manipulation scheme through chat rooms, instant messages, phone calls, emails, and

other proprietary trading platforms.  SAC ¶ 171.  Those allegations necessarily implicate the

involvement of Defendants' officers, directors, agents, employees, or representatives.  As several

courts in this district have concluded based on similar allegations, in the absence of any indication

that these yet-to-be identified employees acted outside the scope of their employment, CEA

principal-agent liability claims will be allowed to proceed.  *See, e.g.*, *FOREX*, 2016 WL 5108131,

at *25 ("Nothing in the [complaint] suggests that any trader was operating outside the scope of his

employment when engaging in the alleged conduct.  To the contrary, the [complaint] alleges conduct

by traders 'acting for' the benefit of their respective employers.  Nothing more is required to plead a

claim for principal-agent liability."); *In re Platinum & Palladium*, 828 F. Supp. 2d at 599-600

(concluding that allegations that the "head of the execution desk . . . entered into entered the

manipulative orders" for defendants sufficiently pleaded a CEA principal-agent claim); *see also In re*

*Silver*, 2016 WL 5794777, at *23 ("There is no indication, at this stage, that these employees acted on

a lark or in any way outside the scope of their employment."); *In re Gold*, 2016 WL 5794776, at *27

(same).  To the extent the evidence shows that certain rogue employees were responsible for the

entire alleged scheme, Defendants will have the opportunity to introduce that evidence at the

summary judgement stage or at trial.

### D.  Unjust Enrichment

"The theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (N.Y. 2009) (citation omitted). To state a claim for unjust enrichment under New York law, a plaintiff must allege "'that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (N.Y. 2012) (quoting *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 182 (N.Y. 2011)).  The "essence" of an unjust enrichment claim "is that one party has received money or a benefit at the expense of another." *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citing *City of Syracuse v. R.A.C. Holding, Inc.,* 685 N.Y.S.2d 381, 381 (4th Dep't 1999)).  "A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff." *Chevron Corp. v. Donziger,* 871 F. Supp. 2d 229, 260 (S.D.N.Y. 2012).  The benefit must be both "specific" and "direct." *Kaye,* 202 F.3d at 616.

There is no requirement that the aggrieved party be in privity with the party enriched at his or her expense. *See Sperry v. Crompton Corp.,* 8 N.Y.3d 204, 215 (N.Y. 2007).  "An unjust enrichment claim, however, 'requires some type of direct dealing or actual, substantive relationship with a Defendant.'" *Laydon*, 2014 WL 1280464, at *13 (quoting *Reading Int'l, Inc. v. Oaktree Capital Mgmt.,* 317 F. Supp.2d 301, 334 (S.D.N.Y. 2003)).  Nevertheless, if the relationship between the parties is too attenuated, the unjust enrichment claim must be dismissed. *Sperry,* 8 N.Y.3d at 215.

Defendants argue that the unjust enrichment claim must be dismissed because Plaintiffs have not alleged that they had any direct dealings with Defendants. Defs.' Joint Br. at 48-50. Defendants are correct.  That Plaintiffs "relied on the Fix as a *bona fide* benchmark in conducting their transactions," as they argue in response, Pls.' Opp'n at 49-50, says nothing about whether the

relationship between the parties was not too attenuated.  It says nothing about the relationship at all.

Moreover, because Plaintiffs do not allege that they transacted directly with Defendants, they have

not adequately pleaded that Defendants were enriched at their expense.  *See, e.g.*, *In re LIBOR-Based*

*Fin. Instruments Antitrust Litig.* ("*LIBOR II*"), 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) ("[I]t makes

little sense to conclude that a particular defendant bank somehow improperly obtained profits

intended for a certain plaintiff when those two parties never transacted or otherwise maintained a

business relationship at all.").  Accordingly, Plaintiffs have failed adequately to plead an unjust

enrichment claim, and Defendants' motion to dismiss that claim is granted.  *See, e.g.*, *Laydon*, 2014

WL 1280464, at *13 (dismissing an unjust enrichment claim where plaintiff's conclusory assertions

that defendants financially benefited from the unlawful manipulation and that the unlawful acts

caused plaintiff injury were insufficient to meet the pleading requirement for that claim); *Amaranth I*,

587 F. Supp. 2d at 547 (dismissing an unjust enrichment claim based on alleged market manipulation

that impacted prices of natural gas futures contracts because plaintiffs did not "allege[ ] any direct

relationship, trading or otherwise, between themselves and any [defendant]"); *see also In re Silver*, 2016

WL 5794777, at *26 (dismissing plaintiffs' unjust enrichment claim because "[t]he connection

between the named Plaintiffs and Defendants is 'too attenuated'"); *In re Gold*, 2016 WL 5794776,

at *29 (same).

### E.  Personal Jurisdiction Over Foreign Defendants

BASF Metals, ICBC, and LPPFC (the "Foreign Defendants") filed supplemental

memoranda of law arguing that they should be dismissed from this action pursuant to Federal Rule

of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  *See* BASF Metals Ltd. And BASF

Corp.'s Mem. of Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. of Civ. P. 12(b)(2) and

12(b)(6) ("BASF JDX Br."), Dkt. No. 117; LPPFC Supp. Mem. of Law in Supp. of Mot. to Dismiss

Pursuant to Rule 12(b)(2) ("LPPFC JDX Br."), Dkt. No. 119; ICBC Standard Bank Plc's Mem. of

Law in Supp. of Mot. to Dismiss Pursuant to Fed. R. 12(b)(2) and 12(b)(6) ("ICBC JDX Br."), Dkt. No. 120.

### 1.  Rule 12(b)(2) Legal Standard

It is well established that, on a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant.") (citations omitted).  To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "'varies depending on the procedural posture of the litigation.'"  *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  At the pleading stage—and prior to discovery—a plaintiff need only make a *prima facie* showing that jurisdiction exists.  *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("'In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.'") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

If the court considers only pleadings and affidavits, the plaintiff's *prima facie* showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (internal quotation marks omitted)).  Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction.  *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81,

84 (2d Cir. 2001).  "'The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits.'"  *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993)).  If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."  *Seetransport Wiking*, 702 F.3d at 727 (citations omitted).

### a.  Standard for Exercising Personal Jurisdiction

Federal courts must satisfy three requirements in order to exercise personal jurisdiction over an entity:  (1) the entity must have been properly served, (2) the court must have a statutory basis for exercising personal jurisdiction, and (3) the exercise of personal jurisdiction must comport with constitutional due process.  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 673 F.3d 50, 59-60 (2d Cir. 2012).  In a federal question case, the manner in which district courts assess whether the exercise of personal jurisdiction comports with constitutional due process varies depending on the asserted statutory basis.

"The constitutional analysis under the Due Process Clause consists of two separate components:  the 'minimum contacts' inquiry and the 'reasonableness' inquiry.  The 'minimum contacts' inquiry requires [the court] to consider whether the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction."  *Id.* at 60.  Although the Second Circuit has not "has not yet decided" whether to adopt this approach, other circuits have held that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole."  *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (collecting cases).  Courts in this district have followed this approach, including in cases arising

under the federal statutes at issue in this case. *See, e.g.*, *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013) ("When the jurisdictional issue flows from a federal statutory grant that authorizes suit under federal-question jurisdiction and nationwide service of process, however, the Fifth Amendment applies, and the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state.") (internal quotation marks and citations omitted); *Estate of Ungar v. Palestinian Auth.*, 400 F. Supp. 2d 541, 548 (S.D.N.Y. 2005), *aff'd*, 332 F. App'x 643 (2d Cir. 2009) ("If a federal statute provides for nationwide service of process, the jurisdictional reach of an enforcing court is at its fullest—its analysis is limited only by the requirements of due process, and it may consider a party's contacts with the United States as a whole, rather than with the forum state."); *see also Sullivan v. Barclays PLC*, 2017 WL 685570, at *42 (examining nationwide contacts in an action alleging CEA and Sherman Act violations); *LIBOR IV*, 2015 WL 4634541, at *18 (examining nationwide contacts in an action alleging CEA violations); *Amaranth I*, 587 F. Supp. 2d at 526; *Grosser v. Commodity Exch., Inc.*, 639 F. Supp. 1293, 1312 (S.D.N.Y. 1986) ("Section 12 [of the Clayton Act] is construed as conferring nationwide personal jurisdiction over corporate antitrust defendants."), *aff'd*, 859 F.2d 148 (2d Cir. 1988).  "The rationale underlying this national contacts approach is that when the national sovereign is applying national law, the relevant contacts are the contacts between the defendant and the sovereign's nation." *In re Libor-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), No. 11 MDL 2262 NRB, 2015 WL 4634541, at *18 (S.D.N.Y. Aug. 4, 2015), *amended on other grounds*, No. 11 MDL 2262 (NRB), 2015 WL 13122396 (S.D.N.Y. Oct. 19, 2015) (internal quotation marks, citations, and alternations omitted).

If the federal statute at issue does not provide for nationwide service, or if the claim does not arise under federal law, the personal jurisdiction analysis begins by applying the forum state's long-arm statute. *See PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) ("In a federal

question case where a defendant resides outside the forum state, a federal court applies the forum

state's personal jurisdiction rules 'if the federal statute does not specifically provide for national

service of process.'") (quoting *Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir. 1990)).  If the long-arm

statute is satisfied, the due process inquiry examines whether the foreign defendant has sufficient

minimum contacts with the forum state.  *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 126 F.3d 365, 370

(2d Cir. 1997).

>   A third means of establishing personal jurisdiction over a foreign defendant is found in

Federal Rule of Civil Procedure 4(k)(2).  Rule 4(k)(2) states:

>> For a claim that arises under federal law, serving a summons or filing
>> a waiver of service establishes personal jurisdiction over a defendant
>> if:  (A) the defendant is not subject to jurisdiction in any state's courts
>> of general jurisdiction; and (B) exercising jurisdiction is consistent
>> with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).  The Second Circuit has interpreted this rule as "'extend[ing] the reach of

federal courts to impose jurisdiction over the person of all defendants against whom federal law

claims are made and who can be constitutionally subjected to the jurisdiction of the courts of the

United States.'"  *Chew v. Dietrich*, 143 F.3d 24, 27 (2d Cir. 1998) (quoting Fed. R. Civ. P. 4, 1993

advisory committee's note to 1993 amendment).

>   Rule 4(k)(2) allows courts to exercise personal jurisdiction over a defendant on condition:

"(1) that plaintiff's cause of action arise[s] under the federal law; (2) that the defendant is not subject

to the jurisdiction of the courts of general jurisdiction of any one State; and (3) that the defendant's

total contacts with the *United States* as a whole are sufficient to confer the court with personal

jurisdiction without offending due process."  *Hartford Fire Ins. v. Co.*, No. 03 CIV. 2196 (SAS), 2003

WL 22990090, at *3 (S.D.N.Y. Dec. 18, 2003) (quoting *Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.*,

956 F. Supp. 427, 434 (S.D.N.Y. 1996)).  As the Second Circuit observed:

>> Rule 4(k)(2) was specifically designed to "correct[ ] a gap" in the
>> enforcement of federal law in international cases.  The gap arose

> from the general rule that a federal district court's personal
> jurisdiction extends only as far as that of a state court in the state
> where the federal court sits. . . . The pre-1993 Rules, the Advisory
> Committee noted, left a significant lacuna "when the defendant was a
> non-resident of the United States having contacts with the United
> States sufficient to justify the application of United States law and to
> satisfy federal standards of forum selection, but having insufficient
> contact with any single state to support jurisdiction under state long-
> arm legislation or meet the requirements of the Fourteenth
> Amendment limitation on state court territorial jurisdiction."

*Porina v. Marward Shipping Co.*, 521 F.3d 122, 126-27 (2d Cir. 2008) (citing Fed R. Civ. P. 4 advisory

committee's note, 1993 Amendments) (alterations in original).  As amended, Rule 4(k)(2) closes that

gap.

Whether personal jurisdiction is based on a statute containing nationwide service, a state-

long arm statute, or Rule 4(k)(2), the court must also determine that the exercise of personal

jurisdiction comports with the Due Process Clause.[17]  "[D]ue process requires a plaintiff to allege

(1) that a defendant has 'certain minimum contacts' with the relevant forum, and (2) that the

exercise of jurisdiction is reasonable in the circumstances."  *In re Terrorist Attacks*, 714 F.3d at 673

(citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  As discussed above, the "relevant

forum" for the purpose of the contacts analysis may be the forum state (here, New York) or the

United States as a whole.

"To determine whether a defendant has the necessary 'minimum contacts,' a distinction is

made between 'specific' and 'general' personal jurisdiction."  *Id.* (citing *Metro. Life Ins. Co. v.*

*Robertson-Ceco Corp.,* 84 F.3d 560, 567-68 (2d Cir. 1996)).  "A court may assert general jurisdiction

---

[17] Depending on the basis for personal jurisdiction, due process under either the Fifth or Fourteenth Amendment
applies.  "[T]he due process analysis is basically the same under both the Fifth and Fourteenth Amendments.  The
principal difference is that under the Fifth Amendment the court can consider the defendant's contacts throughout
the United States, while under the Fourteenth Amendment only the contacts with the forum state may be
considered." *Chew v. Dietrich*, 143 F.3d 24, 28 n. 4 (2d Cir. 1998); *see also Straub*, 921 F. Supp. 2d at 253 ("[B]ecause
the language of the Fifth Amendment's due process clause is identical to that of the Fourteenth Amendment's due
process clause, the same general principles guide the minimum contacts analysis.").

over a foreign defendant to hear any and all claims against that defendant only when the defendant's affiliations with the State in which the suit is brought 'are so constant and pervasive so as to render it essentially at home in the forum State.'" *Waldman v. Palestinian Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014)). "'Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and therefore subject to the State's regulation.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)); *see also Licci,* 732 F.3d at 170 ("'Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction [is asserted]—minimum contacts [necessary to support such jurisdiction] exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there.'") (quoting *Brussels Lambert,* 305 F.3d at 127).

Specific personal jurisdiction is predicated on "an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks and alteration omitted). "In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* A plaintiff must plead personal jurisdiction with respect to each claim asserted. *Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 24 (2d Cir. 2004) (citing *SAS Group, Inc. v. Worldwide Inventions, Inc.,* 245 F. Supp.2d 543, 548 (S.D.N.Y. 2003)). "[T]he relationship must arise out of contacts that the 'defendant *himself*' creates with the forum . . . ." *Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (emphasis in *Walden*). "The activities of plaintiffs or third parties alone will not confer jurisdiction, and the court's analysis is directed to the defendant's contacts with the forum itself and 'not the defendant's contacts with

persons who reside there.'" *Sullivan v. Barclays*, 2017 WL 685570, at *43 (quoting *Walden*, 134 S. Ct. at 1122).

Specific jurisdiction over a foreign defendant may also exist even if the relevant conduct took place entirely outside the forum.  Under the so-called "effects test," personal jurisdiction is "typically invoked where . . . the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Licci*, 732 F.3d at 173; *see also Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (describing "independent, if conceptually overlapping, methods of demonstrating minimum contacts," including where on the basis of "in-state effects of out-of-state activity").  For such claims, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant *expressly aimed its conduct at the forum*." *Licci*, 732 F.3d at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983) (emphasis added).  Harmful effects alone will not establish jurisdiction: "'[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant.'" *Waldman*, 835 F.3d at 339 (quoting *In re Terrorist Attacks*, 714 F.3d at 674).  "[T]he defendant must expressly aim his conduct at the United States." *Id.* at 337 (citing *Licci*, 732 F.3d at 173) (alterations omitted)); *see also LIBOR IV*, 2015 WL 4634541, at *27 (concluding that effects in forum did not support personal jurisdiction over a foreign defendant when "there [wa]s no suggestion, and it [did] not stand to reason, that foreign defendants aimed their manipulative conduct at the United States or any particular forum state").

In addition, the underlying "suit-related conduct must create a substantial connection with the forum State." *Walden*, 134 S. Ct. at 1121.  "[I]t is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.* at 1122.  Therefore, the analysis necessarily includes consideration of the claims' elements and where the conduct occurred.  *See generally Waldman*, 835 F.3d at 335-39.  The forum must be the "focal point"

or "nucleus" of plaintiff's alleged harm. *Id.* at 340. Continuous presence in the forum does not confer specific jurisdiction unless that presence involves "suit-related conduct." *Id.* at 335; *see also 7 W. 57th Realty Co.*, 2015 WL 1514539, at *10 ("Plaintiff must demonstrate that the Foreign Banks' *suit*-related conduct creates minimum contacts with New York, however, not simply that the Foreign Banks have a presence here or conduct business activities here in general.") (citations omitted).

If the contacts are not sufficient, the due process inquiry ends. *See Metro. Life Ins.*, 84 F.3d at 568-69. If the court has either general or specific jurisdiction, it must turn to the second step of the due process inquiry, and determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Licci*, 673 F.3d at 60 (citing *Chloe*, 616 F.3d at 164). The "reasonableness" analysis requires district courts to evaluate the following five factors: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Chloe*, 616 F.3d at 164-65 (citing *Asahi Metal Indus., Co., Ltd. v. Superior Court of Cal.,* 480 U.S. 102, 109 (1987)).

### 2. Statutory Bases for Personal Jurisdiction

Plaintiffs have asserted three statutory bases for the Court's exercise of specific personal jurisdiction over the Foreign Defendants. First, Plaintiffs point to nationwide service provisions embedded in the CEA and the Clayton Act. Pls.' Consol. Opp'n to Defs.' Mot. ("Pls.' JDX Opp'n"), Dkt. No. 128, at 19-20. Under the CEA, "[p]rocess . . . may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found." 7 U.S.C. § 25(c). Under the Clayton Act,

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.[18]

Second, Plaintiffs assert personal jurisdiction over the Foreign Defendants is proper pursuant to New York's long-arm statute. Pls.' JDX Opp'n at 20. Under Section 302 of the C.P.L.R., "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:

> (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . ; (3) commits a tortious act without the state causing injury to person or property within the state . . . .[19]

N.Y. C.P.L.R. 302(a). Finally, Plaintiffs have asserted Rule 4(k)(2) as another statutory basis for exercising personal jurisdiction over the Foreign Defendants. Pls.' JDX Opp'n at 4-5.

Here, Plaintiffs have implicitly disclaimed that the Foreign Defendants are subject to general personal jurisdiction. *See* Pls.' JDX Opp'n at 2 (stating that ICBC and BASF are "subject to *specific* personal jurisdiction in this District"). As alleged in the SAC:

> This Court has personal jurisdiction over each Defendant, because each Defendant: transacted business throughout the U.S., including in this District; had substantial contacts with the U.S., including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the U.S. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the U.S.,

---

[18] "Because the service of process provision applies only to 'such cases' described in the preceding clause, the Second Circuit has concluded that nationwide service of process is permissible "only in cases in which its venue provision is satisfied."" *Sullivan v. Barclays*, 2017 WL 685570, at *42 (quoting *Daniel*, 428 F.3d at 423). Neither party has addressed the relationship between the venue provision and the service of process provision, nor have the Foreign Defendants contested that venue is proper in this district.

[19] Plaintiffs have not asserted any other subsections of C.P.L.R. § 302 as statutory bases for personal jurisdiction over the Foreign Defendants.

including in this District, and Plaintiffs' claims arise out of
Defendants' conduct.

SAC ¶ 26.  The SAC does not distinguish between the Foreign Defendants' and the remaining

domestic Defendants' contacts with New York or the United States.

Because Plaintiffs have alleged Sherman Act and CEA claims against all Defendants in this

case, including the Foreign Defendants, the Court will first analyze whether those Defendants have

sufficient minimum contacts in the United States to satisfy the first prong of the due process

requirement.  Because the Court concludes that Plaintiffs have not made a *prima facie* showing that

the Foreign Defendants have sufficient contacts with the United States as a whole, it follows that the

Foreign Defendants do not have sufficient contacts in this forum.  Thus, the Court need not

separately analyze specific personal jurisdiction under the New York long-arm statute and whether

the Foreign Defendants have sufficient minimum contacts with New York.

### a.  BASF Metals

As alleged in the SAC, BASF Metals is "organized . . . under the laws of the United

Kingdom with its principal place of business in London, England."  SAC ¶ 31.  Plaintiffs allege that

BASF Metals is "organizationally part of and subordinate to BASF Corp," and that, during the Class

Period, BASF Metals was a Fixing Member and a market-making LPPM member.  *E.g.*, SAC ¶¶ 31,

45, 62, 271.  Plaintiffs further argue that "[v]arious BASF subsidiaries also held memberships in the

NYMEX and CME and engaged in trading on NYMEX."  Pls.' JDX Opp'n at 7.  The SAC alleges

generally that the Fixing Members used chat rooms, instant messages, phone calls, proprietary

trading venues and platforms, and emails to coordinate the alleged price manipulation.  SAC ¶ 171.

Plaintiffs do not allege sufficient minimum contacts between BASF Metals and the United

States to confer specific personal jurisdiction over this defendant.  BASF Corp.'s presence in the

U.S. is irrelevant because continuous presence in the forum does not confer specific jurisdiction

unless its presence involves "suit related conduct."  *Waldman*, 835 F.3d at 335; *7 W. 57th Realty Co.*,

2015 WL 1514539, at *10.  Plaintiffs have not alleged any such conduct with respect to BASF Corp. The SAC's vague references to the Fixing Members' use of chat rooms and emails is also unavailing. Indeed, even allegations that such communications "passed through and/or were stored within the United States are [generally] insufficient" for the purpose of establishing specific jurisdiction over a foreign defendant.  *Laydon*, 2015 WL 1515358, at *3; *see also Sullivan v. Barclays*, 2017 WL 685570, at *44; *LIBOR VI*, 2016 WL 7378980, at *10.

Finally, the SAC does not allege that BASF Metals' conduct was aimed at the United States. That Defendants' alleged manipulation of the Fix Price had harmful effects on U.S.-based exchanges is insufficient.  *Waldman*, 835 F.3d at 339.  Even if the harm was foreseeable, it "is insufficient for the purpose of establishing specific personal jurisdiction."  *Id.*  Rather, the allegations must make a *prima facie* showing that the defendant expressly aimed its conduct at the U.S.  Plaintiffs' allegations pertaining to BASF Metals do not.  Accordingly, the Court concludes that the SAC does not allege sufficient minimum contacts between BASF Metals and the U.S. for the Court to exercise specific personal jurisdiction over this defendant with respect to Plaintiffs' CEA and Sherman Act claims. Because SAC's allegations fall far short of showing that BASF Metals had the requisite suit-related minimum contacts with the U.S. as a whole, it necessarily follows that BASF Metals does not have the requisite minimum contacts with New York.

### b.  ICBC

As alleged in the SAC, ICBC is "organized . . . under the laws of the United Kingdom," and "maintains its principal place of business in London, England."  SAC ¶ 37.  Plaintiffs allege that during the Class Period, ICBC was a Fixing Member and a market-making LPPM member. SAC ¶ 37.  Plaintiffs further allege that ICBC is a "a member of NYMEX (COMEX)" and "executes client trades in the physical platinum and palladium markets, on NYMEX, in platinum and palladium derivatives, and in shares of platinum and palladium ETFs."  SAC ¶¶ 38-39.  Throughout

the Class Period, ICBC "entered directly into platinum and palladium spot, forward, option and platinum and palladium ETF share transactions with members of the Class." SAC ¶ 38. As alleged in the SAC, on at least one occasion, "the COMEX Business Conduct Committee initiated disciplinary proceedings against [ICBC] because it had violated exchange rules." SAC ¶ 39. Plaintiffs further allege that ICBC's "website holds itself out as having a substantial presence worldwide including in New York," and ICBC has "four U.S. subsidiaries . . . [e]ach . . . registered in Delaware with corporate offices located in this District." SAC ¶ 40.

Despite the arguably more detailed allegations against ICBC as compared to BASF Metals, the same deficiencies described above apply to Plaintiffs' jurisdictional allegations against ICBC. That ICBC has subsidiaries in the U.S. and that its website advertises its presence in the United States "is only relevant insofar as it has a nexus to the misconduct underlying plaintiffs' claims." *Sullivan v. Barclays*, 2017 WL 685570, at *44 (citing *Waldman*, 835 F.3d at 340 (jurisdictional requirement)). Here it does not: Plaintiffs have not alleged that ICBC's U.S. subsidiaries played any role in the Fixing or alleged manipulation.

In addition, ICBC's membership in COMEX and trades on NYMEX fall short of establishing that it expressly aimed its conduct at the U.S. The alleged unlawful conduct in this case is the manipulation of the Fix Price that took place during the Fixing Calls, not manipulations of particular transactions on NYMEX. That the effect of the alleged manipulation of the Fix Price had a foreseeable impact on platinum and palladium derivatives traded on NYMEX is insufficient for the purpose of establishing personal jurisdiction over a foreign defendant. *Waldman*, 835 F.3d at 339. And courts in this district have held that general allegations of price manipulation abroad alone do not establish that a foreign defendant expressly aimed its conduct at the U.S. *See Laydon v. Mizuho Bank, Ltd.*, No. 12 CIV. 3419 GBD, 2015 WL 1515358, at *6 (S.D.N.Y. Mar. 31, 2015); *see also LIBOR IV*, 2015 WL 6243526, at *10 ("It is bedrock law that merely foreseeable effects of

defendants' [manipulation of the LIBOR rate] do not support personal jurisdiction."); *7 West 57th St. Realty*, 2015 WL 1514539, at *11 ("Because the Amended Complaint does not plead facts demonstrating that the LIBOR manipulation was done with the express aim of causing an effect in New York, the 'effects test' is not satisfied."). Accordingly, and for the reasons discussed above with respect to BASF Metals, the Court concludes that the SAC does not allege sufficient minimum contacts between ICBC and the U.S. for the Court to exercise personal jurisdiction over this defendant.

### c. LPPFC

As alleged in the SAC, the LPPFC "is a private company organized and existing under the laws of the United Kingdom with its principal place of business in London, England." SAC ¶ 45. The LPPFC is "100% owned and controlled by" the Fixing Members and, "is indistinguishable from the Fixing [Members] for jurisdictional purposes." SAC ¶ 46. "The LPPFC's only function is to take and continue the promotion, administration and conduct of the [LPPM] Fixing" and, "[a]s such," Plaintiffs allege that "at all times LPPFC was an instrumentality in Defendants' conspiracy alleged in" the SAC. SAC ¶ 47. Plaintiffs further allege that the LPPFC served as a vehicle for the alleged conspiracy, and "was targeted and had substantial depressive effects on the platinum and palladium Fixing price and Platinum and Palladium Investments traded in the U.S., including platinum and palladium derivatives traded on the NYMEX in this District." SAC ¶ 47. In addition, Plaintiffs allege that "[a]t all times, LPPFC and its members and directors knew that the Fixing—and the Fix prices reached thereby—had a substantial effect on Platinum and Palladium Investments traded in the U.S., including platinum and palladium derivatives traded on the NYMEX in this District." SAC ¶ 47.

Plaintiffs' jurisdictional allegations concerning the LPPFC suffer from the same defects as their jurisdictional allegations concerning BASF Metals and ICBC. The Court need not restate that

analysis here, but notes that the LPPFC's presence on NYMEX, or any other domestic OTC market or exchanges, fails to establish that it expressly aimed its conduct at the U.S.  Absent allegations that the LPPFC—or the other Foreign Defendants—manipulated Platinum and Palladium Investments traded on NYMEX, such allegations do not rise to the level of minimum contacts necessary for personal jurisdiction.  *Compare In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR V*"), No. 11 MDL 2262 NRB, 2015 WL 6696407, at *19 (S.D.N.Y. Nov. 3, 2015) (declining to exercise personal jurisdiction over foreign defendants based on allegations that they manipulated LIBOR in London, which plaintiffs argued had a foreseeable effect on futures contract prices in the United States) *with Amaranth I*, 587 F. Supp. 2d at 536 (concluding that plaintiffs made a *prima facie* showing that personal jurisdiction existed over a foreign defendant based on allegations that defendant who manipulated NYMEX futures prices with the knowledge that "trades would affect the price of natural gas futures within the United States," thus "constitut[ing] purposeful availment of the United States") (citations omitted).[20]

### i.   Alter Ego Theory of Personal Jurisdiction

Plaintiffs argue that the Court may nevertheless exercise personal jurisdiction over the LPPFC because the LPPFC was the Fixing Members' alter ego.  Pls.' JDX Opp'n at 11-12.  The Second Circuit has recognized that, under certain conditions, "it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation . . . when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009) (internal quotation marks and citations omitted); *cf. Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 142-43 (2d Cir. 1991) (stating that, in general, "alter egos are

---

[20] Plaintiffs' assertion that the LPPFC "is indistinguishable from the Fixing [Members] for jurisdictional purposes" SAC ¶ 46, is a legal conclusion that the Court need not—and does not—accept as true.  *Iqbal*, 556 U.S. at 678.

treated as one entity" for jurisdictional purposes).  While the parties agree that courts may exercise personal jurisdiction over foreign defendants pursuant to this theory, they disagree whether English law, federal common law, or a less stringent variant of federal common law governs the analysis. Because the Court concludes that the SAC's allegations fail to establish that the LPPFC was the Fixing Member's alter ego even under the most forgiving standard, the Court need not resolve the dispute regarding which law applies.[21]

The LPPFC argues that, under New York choice of law rules, "[w]hen courts are asked to pierce the corporate veil against a defendant's alter ego, they look to the state where the defendant is incorporated."  LPPFC JDX Br. at 9 & n.6 (citations omitted).  Because the LPPFC is incorporated under the laws of the United Kingdom, the LPPFC asserts that English law governs the alter ego analysis.  *Id.* at 10.  As the LPPFC explains, under English law, "a plaintiff must allege that the defendant has sought deliberately to evade or frustrate an obligation or liability by interposing an alter ego."  *Id.*  Pointing to a tome of English law appended to its brief, the LPPFC argues that courts in the United Kingdom have "articulated this concept by reference to a temporal element, namely whether the defendant had 'placed the [alleged alter ego] between himself and his victim *after* incurring liability."  *Id.* (citations omitted) (emphasis in LPPFC JDX Br.).  And because, as Plaintiffs allege, the LPPFC was formed in 2004—at least four years prior to the beginning of the Class Period—the LPPFC argues that Plaintiffs cannot meet "this critical element."  *Id.*; *see also* SAC ¶ 1.

---

[21] At least two courts in this district observed that the question whether the same standard that governs the alter ego analysis for liability purposes controls for jurisdictional purpose has not yet been addressed by the Second Circuit and that courts have taken a variety of approaches when confronted with this question.  *See, e.g., Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007) (declining to decide whether "the choice of law for alter ego analysis for personal jurisdiction purposes is different than for liability"); *In re Lyondell Chem. Co.*, 543 B.R. 127, 139 n.38 (Bankr. S.D.N.Y. 2016) ("Some federal courts have engaged in a choice of law analysis to decide which law to apply to an alter ego analysis of *jurisdiction,* usually finding that the law of the corporation's state of incorporation governs.  Other courts have disagreed, distinguishing the analysis for 'alter ego' *liability* and for 'alter ego' *jurisdiction,* and finding that because 'alter ego' jurisdiction is either a construction of the statute providing jurisdiction or is part of due process (or both), for a *jurisdictional* veil piercing analysis, courts should apply either the law governing the interpretation of the jurisdictional statute or federal due process jurisprudence, or both.") (collecting cases) (citations omitted).

Plaintiffs disagree.  Because this action "arises under federal question jurisdiction and implicates antitrust law and commodities manipulation, which are governed by federal statutes and backed by strong federal interest," Plaintiffs maintain that federal common law governs the alter-ego analysis.  Pls.' JDX Opp'n at 12.  Plaintiffs argue that the "federal common law standard for alter ego requires the party seeking to attach alter-ego based jurisdiction to demonstrate only that 'it would be unfair under the circumstances not to disregard the corporate form."  *Id.* at 15 (citations omitted).  According to Plaintiffs, this standard is further relaxed when the alter ego theory is "used . . . to establish jurisdiction," and requires only that they allege that the "controlled entity was a shell for the allegedly controlling entity."  *Id.* at 15 (citations omitted).  Plaintiffs maintain that the allegations in the SAC satisfy this standard.  *Id.* at 15-18.

"Federal common law allows piercing of the corporate veil where (1) a corporation uses its alter ego to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own."  *Status Int'l S.A. v. M & D Mar. Ltd.*, 994 F. Supp. 182, 186 (S.D.N.Y. 1998) (citing *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 342 (2d Cir. 1986); *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 984-85 (2d Cir. 1980)); *see also Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014) (citing *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 63 (2d Cir. 2001)).  However, several courts in this district have held that "this standard is relaxed where the *alter ego* theory is used not to impose liability, but merely to establish jurisdiction."  *Int'l Equity Investments*, 475 F. Supp. 2d at 459 (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981)); *see also D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196 (2d Cir. 2005) (summary order) (reasoning that "the exercise of personal jurisdiction over an alleged alter ego requires application of a 'less onerous standard' than that necessary for equity to pierce the corporate veil for liability purposes under New York law") (citations omitted); *Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 CIV.

13157 GEL, 2006 WL 3735657, at *13 (S.D.N.Y. Dec. 15, 2006) (citing *Marine Midland*, 664 F.2d at

904) ("Establishing the exercise of personal jurisdiction over an alleged alter ego requires application

of a less stringent standard than that necessary to pierce the corporate veil for purposes of

liability."); *Miramax Film Corp. v. Abraham*, No. 01 CV 5202 (GBD), 2003 WL 22832384, at *7

(S.D.N.Y. Nov. 25, 2003) ("The standard for piercing the corporate veil for liability purposes is not,

however, the same standard to be used when piercing for jurisdictional purposes.  The standard for

piercing the corporate veil for purposes of obtain jurisdiction is a less stringent one.") (citations

omitted); *In re Gold*, 2016 WL 5794776, at *32 (citing *Int'l Equity Invest.*, 475 F. Supp. 2d at 459).[22, 23]

"In such an instance, the question is only whether the allegedly controlled entity 'was a shell' for the

allegedly controlling party; it is not necessary to show also 'that the shell was used to commit a

fraud.'"  *Int'l Equity Invs.*, 475 F. Supp. 2d at 459 (quoting *Marine Midland*, 664 F.2d at 904); *see also*

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (same)

(citations omitted); *Miramax*, 2003 WL 22832384, at *7 ("If a corporation is merely a shell, the

corporate veil may be pierced to impute jurisdiction even without a showing that the shell was used

to perpetrate a fraud.") (citations omitted).

---

[22] The cases cited in this paragraph address the alter ego analysis under New York law, but "Second Circuit's common law standard is taken directly from New York law." *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014).  Accordingly, the standard is the same. *See Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 285 (S.D.N.Y. 2006) (reasoning that federal common law and New York law of veil-piercing are not "meaningfully distinct").

[23] The Court recognizes that most district courts in this circuit—and the Second Circuit itself—point to *Marine Midland* as support for the proposition the alter ego standard applicable to personal jurisdiction questions is different from the standard applicable to liability questions.  The Court disagrees with that reading of the case.  In *Marine Midland*, the Second Circuit analyzed the fiduciary shield doctrine, under which "it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer."  664 F.2d at 902.  The court held that, when determining whether it is fair to pierce the fiduciary shield, a "less onerous standard" applies, and "it is sufficient to inquire whether the corporation is a real or shell entity."  *Id.* at 903-904.  The Court does not read *Marine Midland* as establishing a less onerous standard applicable in all cases involving an alter ego analysis in the personal jurisdiction context.  However, because Plaintiffs' allegations do not show that the LPPFC was merely a shell of the Fixing Members, the Court need not determine the scope of *Marine Midland* here.

Courts applying this "less onerous standard" have considered various factors in determining whether a corporation is a "shell," such that the corporate form should be disregarded, including, *inter alia*, "'the failure to observe corporate formality; inadequate capitalization; intermingling of personal and corporate funds; the sharing of common office space, address and telephone numbers of the alleged dominating entity and the subject corporation; an overlap of ownership, directors, officers or personnel; the use of the corporation as a means to perpetrate the wrongful act against the plaintiff.'" *In re Gold*, 2016 WL 5794776, at *33 (quoting *Miramax*, 2003 WL 22832384, at *8 (citing *Wm. Passalacqua Builders, Inc.,* 933 F.2d at 138)). "These factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative. Rather, a finding that a corporation is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Miramax*, 2003 WL 22832384, at *8 (quoting *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 601 (2d Cir. 1989)).

Plaintiffs' allegations regarding the LPPFC do not warrant disregarding its corporate form. As noted above, Plaintiffs allege that the LPPFC is "100% owned and controlled by" the Fixing Members and, "is indistinguishable from the Fixing [Members] for jurisdictional purposes." SAC ¶ 46. Plaintiffs also allege that "the LPPFC's only function is 'to take and continue the promotion, administration and conduct of the" Fixing and, "[a]s such, at all times LPPFC was an instrumentality in Defendants' conspiracy alleged in" the SAC. SAC ¶ 47. Plaintiffs further allege that the LPPFC served as a vehicle for the alleged conspiracy, and "was targeted and had substantial depressing effects on the platinum and palladium Fixing price and Platinum and Palladium Investments traded in the U.S., including platinum and palladium derivatives traded on the NYMEX in this District." SAC ¶ 47. The SAC does not address whether the LPPFC observed corporate formalities, whether the LPPFC's funds were intermingled with those of the Fixing Members, and whether the Fixing Members shared any office space or addresses with the LPPFC. Although no

single factor is determinative, Plaintiffs' scant allegations regarding the LPPFC's membership and role in the alleged price manipulation do not show that the LPPFC was the Fixing Members' shell, such that the Court may disregard its corporate form. Plaintiffs have, therefore, failed to make a *prima facie* showing that the Court may exercise personal jurisdiction over the LPPFC under the alter ego theory.

### 3. Conspiracy Jurisdiction

Plaintiffs also assert conspiracy-based jurisdiction pursuant to New York's long arm statute. Pls.' JDX Opp'n at 20-21. "The elements of conspiracy jurisdiction are that '(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant.'" *Tarsavage v. Citic Trust Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014) (quoting *Maersk, Inc. v. Neewra, Inc.,* 554 F. Supp. 2d 424, 442-43 (S.D.N.Y. 2008)); *see also In re Terrorist Attacks on Sept. 11, 2001,* 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005), *on reconsideration in part on other grounds,* 392 F. Supp. 2d 539 (S.D.N.Y. 2005), and *aff'd*, 538 F.3d 71 (2d Cir. 2008), and *aff'd*, 714 F.3d 118 (2d Cir. 2013) ("To establish personal jurisdiction on a conspiracy theory, Plaintiffs must make a prima facie showing of conspiracy, allege specific facts warranting the inference that the defendant was a member of the conspiracy, and show that the defendant's co-conspirator committed a tort in New York."). "While '[t]he acts of a co-conspirator may . . . be attributed to a defendant for the purpose of obtaining personal jurisdiction over that defendant, the bland assertion of conspiracy . . . is insufficient to establish jurisdiction for the purposes of § 302(a)(2).'" *Accurate Grading Quality Assur., Inc. v. Thorpe*, No. 12 CIV. 1343 ALC, 2013 WL 1234836, at *3 (S.D.N.Y. Mar. 26, 2013) (quoting *Drucker Cornell v. Assicurazioni Generali S.p.A. Consolidated,* No. 97 CIV. 2262 (MBM), 98 CIV. 9186

(MBM), 2000 WL 284222, 5 (S.D.N.Y. Mar. 16, 2000)); *see also Universal Trading & Inv. Co. v. Tymoshenko*, No. 11 CIV. 7877 PAC, 2012 WL 6186471, at *2 n.3 (S.D.N.Y. Dec. 12, 2012) (same).

"Courts have been increasingly reluctant to extend this theory of jurisdiction beyond the context of New York's long-arm statute." *Laydon*, 2015 WL 1515358, at *3 (citations omitted); *see also In re Aluminum Warehousing Antitrust Litig* ., 13-md-2481 (KBF), 2015 WL 892255, at *5 (S.D.N.Y. Mar. 3, 2015) (rejecting the plaintiffs' argument "that Rule 4(k)(2) permits courts to exercise personal jurisdiction over a defendant on the basis of a conspiracy," and holding that "[t]he rules and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine"); *Tymoshenko v. Firtash,* 11-CV-2794 (KMW), 2013 WL 1234943, at *2-4 (S.D.N.Y. Mar. 27, 2013) (recognizing that conspiracy jurisdiction "has been widely criticized by courts and scholars" and declining to consider co-conspirators' contacts for the purpose of establishing personal jurisdiction over a foreign defendant).

Even if the Court were to find that exercising personal jurisdiction over the Foreign Defendants based on this theory was proper, Plaintiffs have not alleged sufficient facts to support the elements of conspiracy jurisdiction.  Plaintiffs argue that the allegations in the SAC sufficiently plead the elements of a conspiracy jurisdiction because it includes allegations that (1) the Fixing process was "the central tool used to implement the conspiracy;" (2) Defendants' "involvement and knowledge that the conspiracy had effects in New York;" and (3) the Foreign Defendants' "co-conspirators . . . committed torts in New York by implementing the conspiracy via trades made at artificially deflated prices for NYMEX derivatives and futures."  Pls.' JDX Opp'n at 21-22. Plaintiffs mischaracterize their own allegations.  The allegations Plaintiffs' point to address (1) the domestic Defendants' businesses and involvement in various platinum and palladium markets and transactions (SAC ¶¶ 33-36); (2) the relationship between the Fix Price and the price of platinum and palladium derivatives (SAC ¶ 12); (3) the Defendants' alleged motive in manipulating the Fix

Price (SAC ¶¶ 15, 170, 193-195); and (4) general allegations about governmental investigations that do not identify any specific defendant, market, or conduct.  Nowhere in the SAC do Plaintiffs allege that any Defendant—foreign or domestic—engaged in any activity related to the Fixing process or the Fixing Calls while present in New York.  Accordingly, because Plaintiffs failed to allege that any conduct relevant to the alleged price manipulation took place in New York, they have failed to allege sufficient facts to establish personal jurisdiction on that basis.

*     *     *

For the foregoing reasons, and because Plaintiffs have failed to make a *prima facie* showing that the Court has personal jurisdiction over the Foreign Defendants, the Foreign Defendants' motions to dismiss for lack of personal jurisdiction are granted and Plaintiffs' claims against those defendants are dismissed.[24, 25]

### 4.   Jurisdictional Discovery

In the alternative, Plaintiffs argue that they are entitled to jurisdictional discovery if the Court grants the Foreign Defendants' motions to dismiss.  Pls.' JDX Opp'n at 25-26.  "It is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff

---

[24] Plaintiffs point to "[a] variety of other facts," which they assert indicate that Defendants' scheme targeted the U.S.," and which they argue demonstrate that the Court may exercise personal jurisdiction over the Foreign Defendants.  Those factors include, *inter alia,* that "[p]rices were 'fixed' at 2:00 p.m. London time each day to coordinate with the start of the U.S. trading day" and that the Fix Prices were "stated in U.S. dollars."  Pls.' JDX Opp'n at 1.  As Defendants point out, however, "[t]he U.S. dollar is the standard unit of currency in international commodities markets, including for the London and leading European markets that trade in platinum and palladium."  Def. LPPFC Reply to Pls.' Consol. Opp'n in Supp. of Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) ("LPPFC JDX Reply"), Dkt. No. 131, at 3.  In addition, Plaintiffs have not alleged that the Fixing was conducted in a different currency prior to the beginning of the Class Period, or that the Fixing Members changed the currency in order to facilitate the alleged price manipulation.  As to the timing of the Fixing Calls, Plaintiffs do not allege that the Fixing Members changed the Fixing Calls' schedule to orchestrate their alleged scheme; in fact, as the LPPFC notes, Plaintiffs' assertion "is contradicted by [their] more specific allegation that '[f]or various reasons, such as changing daylight savings times, the Fix occurred at different times during the New York trading day, and sometime did not occur at all.'"  LPPFC JDX Reply at 3 (quoting SAC ¶ 10 n.3).

[25] In addition to its motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), ICBC also moves to dismiss the SAC against it for failure to state a claim.  *See* ICBC JDX Br. at 11-12.  Because the Court concludes that it does not have personal jurisdiction over ICBC, ICBC's Rule 12(b)(6) motion is denied as moot.

may be able to establish jurisdiction if given the opportunity to develop a full factual record." *Ikeda v. J. Sisters 57, Inc.*, No. 14-CV-3570 ER, 2015 WL 4096255, at *8 (S.D.N.Y. July 6, 2015) (citing *Leon v. Shmukler,* 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014)); *see also In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d at 208. Where a plaintiff does not make a *prima facie* showing that personal jurisdiction exists, a district court is "well within its discretion in declining to permit [jurisdictional] discovery." *Best Van Lines,* 490 F.3d at 255 (citations omitted); *see also Jazini v. Nissan Motor Co.,* 148 F.3d 181, 186 (2d Cir. 1998) (finding that the district court did not err in denying jurisdictional discovery where the plaintiffs did not establish a *prima facie* case that the district court had jurisdiction over the defendant). And "'[d]istrict courts in this [C]ircuit routinely reject requests for jurisdictional discovery where a plaintiff's allegations are insufficient to make out a prima facie case of jurisdiction.'" *Laydon*, 2015 WL 1515358, at *7 (quoting *Stutts v. De Dietrich Grp.,* 465 F. Supp. 2d 156, 169 (E.D.N.Y. 2006) (collecting cases)) (second alteration in *Laydon*).

The Court has not identified any persuasive reason to allow jurisdictional discovery at this stage, and Plaintiffs have pointed to none. The allegations in the SAC are insufficient to support Plaintiffs' application. Among other cases, Plaintiffs cite *In re Magnetic Audiotape* in support of their application for jurisdictional discovery. Pls.' JDX Opp'n at 26 n.25. That case is distinguishable. There, the complaint included an allegation which specifically cited the minutes of a meeting— which was not mentioned in the opinion denying jurisdictional discovery—that an executive of the dismissed parent company had been present at an in-person meeting at which a price-fixing conspiracy was allegedly discussed. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 208. The defendant asserted that this was simply a courtesy meeting and that no price-fixing discussion in fact took place. *Id.* The Second Circuit vacated the district court's dismissal of that defendant, holding that the plaintiffs should at the very least have been allowed to further develop this point through discovery. *Id.*

Those facts are a far cry from the facts alleged in the SAC.  The only allegations that link any of the Foreign Defendants to New York are that they transacted in Platinum and Palladium Investments traded on NYNEX and other U.S.-based exchanges and markets.  Such allegations are too generalized, too devoid of meaningful context, and too remote from the unlawful conduct alleged in the SAC—*i.e.*, the Fixing—to allow Plaintiffs to embark on a jurisdictional mining expedition.  *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 240 (S.D.N.Y. 2015) (declining application for jurisdiction discovery); *Laydon*, 2015 WL 1515358, at *7 (same).  Accordingly, Plaintiffs' application for jurisdictional discovery is denied.

### F.  UBS's Motion to Dismiss for Failure to State a Claim

UBS moves to dismiss all claims against it pursuant to Rule 12(b)(6).  UBS argues that it did not participate in the Fixing, was not a member of the Fixing, and played no role in the alleged price manipulation underlying Plaintiffs' Sherman Act, CEA, and unjust enrichment claims.  Mem. of Law in Supp. of Individual Mot. of UBS AG and UBS Securities LLC to Dismiss Pls.' Second Consol. Amend. Class Action Compl. ("UBS Br."), Dkt. No. 114, at 1.

The SAC does not allege that UBS participated in the Fixing and contains sparse allegations regarding UBS's presence in the platinum and palladium market.  Plaintiffs allege that UBS AG is a Swiss corporation with its principal place of business in Zurich, Switzerland.  SAC ¶ 41.  Plaintiffs allege that UBS Securities LLC is a Delaware company, a wholly owned subsidiary of UBS AG, with its principal place of business in Stamford, Connecticut.  SAC ¶ 42.  As alleged in the SAC, "since its inception UBS has operated a large precious metals business;" UBS "holds itself out as 'a leading provider of physical and derivative precious metal products to a broad range of customers around the globe."  SAC ¶ 43 (internal quotation marks and citations omitted).  Plaintiffs also allege that "UBS executes client trades in physical platinum and palladium markets, on NYMEX, in platinum and palladium derivatives, and in shares of platinum and palladium ETFs."  SAC ¶ 44.  In addition,

Plaintiffs allege that "UBS operates electronic platforms for trading platinum and palladium products" and "conducts proprietary trading in the platinum and palladium markets." SAC ¶ 44. Throughout the Class Period, Plaintiffs allege, "UBS was a market-making member of the LPPM, cleared platinum and palladium transactions, and entered directly into platinum and palladium spot, forward, option, and platinum and palladium ETF share transactions with members of the Class." SAC ¶ 44.

The SAC's allegations concerning UBS fail to state a claim for violation of § 1 of the Sherman Act. As discussed above, *supra* Part III.B(1), to overcome a motion to dismiss for failure to state a claim under § 1, a plaintiff must plead facts from which the court can infer the existence of an agreement in restraint of trade. In the absence of direct evidence of an agreement, Plaintiffs must plead sufficient facts showing parallel conduct as well as circumstantial evidence and plus factors from which the Court can infer the existence of a conspiracy. *Mayor & City Council of Baltimore*, 709 F.3d at 136 *see also Twombly*, 550 U.S. at 557; *Gelboim*, 823 F.3d at 781. The allegations against UBS fall far short of meeting this standard. UBS is not alleged to have been a member of the Fixing during the Class Period, or to have participated in the Fixing, either directly or indirectly. That it is an LPPM market maker does not constitute circumstantial evidence of UBS's misconduct. If it did, the remaining forty-seven LPPM members, which Plaintiffs did not name as defendants in the SAC could have been brought into this action.

In addition, Plaintiffs' assertion that UBS, along with the Fixing Members, allegedly offered below-market platinum and palladium spot quotes during the Class Period, suggests nothing more than parallel conduct. SAC ¶ 182. "While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establish[ing] agreement or itself constitut[ing] a Sherman Act offense.'" *Twombly*, 550 U.S. at 553 (internal quotation marks and citations omitted); *see also In re Elevator Antitrust Litig.*, 502 F.3d at 51

("Similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy.").

   In opposition to UBS's motion, Plaintiffs argue that they have alleged sufficient plus factors and circumstantial evidence from which the Court can infer an agreement in restraint of trade. *See* Pls.' Opp'n to UBS's Mot. to Dismiss ("Pls.' UBS Opp'n"), Dkt. No. 127, at 1-5. Plaintiffs allege that FINMA found "serious misconduct" by UBS in precious metal trading," that "UBS has recently agreed to cooperate with the U.S. DOJ and CFTC's precious metals investigation in exchange for immunity from criminal charges, that the CFTC found that UBS "actively colluded to manipulate the price of Forex benchmarks," and that the CFTC imposed hefty fines on UBS and other market-participating banks for "actively collud[ing] to manipulate the price of Forex benchmarks." SAC ¶ 168. As already noted above, however, *see supra* Part III.B(1)(b), allegations that regulators have been investigating price manipulation in the precious commodities markets do not constitute circumstantial evidence of a conspiracy in the platinum and palladium market in particular. *See In re Gold*, 2016 WL 5794776, at *17 (concluding that ongoing government investigations into possible manipulation of precious metals benchmarks and findings of misconduct with respect to FX and LIBOR benchmarks do not constitute circumstantial evidence of a conspiracy in the defendants' market) (citations omitted); *In re Elevator Antitrust Litig.*, 502 F.3d at 52 (concluding that allegations of antitrust wrongdoing abroad, "absent any evidence of linkage between such foreign conduct and conduct here—is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here'"). In the absence of additional circumstantial evidence or plus factors, Plaintiffs' allegations do not plausibly support an inference that UBS was part of the alleged conspiracy. *See In re Gold*, 2016 WL 5794776, at *30 (dismissing Sherman Act claim against UBS where plaintiffs failed to allege that UBS participated in the gold benchmark price setting and the allegations in the

complaint did not plausibly support an inference that a conspiracy existed); *see also In re Silver*, 2016 WL 5794777, at *26 (same).[26]

Plaintiffs' CEA claims against UBS fail for substantially the same reasons. Both CEA price manipulation and manipulative device claims require that Plaintiffs plausibly plead that (1) UBS "possessed an ability to influence market prices;" (2) "an artificial price existed;" (3) UBS "caused the artificial price; and" (4) UBS "specifically intended to cause the artificial price." *Amaranth III*, 730 F.3d at 173 (internal quotation marks and citations omitted). Here, Plaintiffs did not allege that UBS played a role in the conspiracy to manipulate and suppress the platinum and palladium Fix Prices. Therefore, Plaintiffs fail adequately to plead that UBS caused the artificial price, that it had the ability to suppress the platinum and palladium Fix Prices, or that UBS intended to cause the alleged price manipulation during the Class Period. Plaintiffs' conclusory allegations also fail to show that, beyond its status as an LPPM market maker, UBS played any role in the Fixing or associated itself with the Fixing Members. Therefore, Plaintiffs have also failed adequately to plead CEA aiding and abetting and principal-agent liability claims. *See, e.g., id.* (stating that proof of unlawful intent is required for aiding and abetting liability under the CEA). Plaintiffs' unjust enrichment claim against UBS is likewise dismissed for the same reasons articulated above with respect to the Fixing Members. *See supra* Part III.D; *see also In re Gold*, 2016 WL 5794776, at *30 (dismissing CEA claim against UBS where Plaintiffs failed to allege that UBS caused the alleged

---

[26] Plaintiffs cite *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015) and *In re Foreign Exch. Benchmark Rates*, 74 F. Supp. at 588-89, in support of their argument that the Court may rely on allegations concerning regulatory investigations as showing that UBS participated in the alleged manipulation of the platinum and palladium Fix Prices. *See* Pls.' UBS Opp'n at 7-8. Those cases are inapposite. For example, in *In re Foreign Exch. Benchmark Rates*, the court took "judicial notice of penalties and fines levied by regulators in three countries against six Defendants as a result of some of the investigations detailed in the U.S. Complaint and *for the very conduct alleged in the Complaint*." 74 F. Supp. 3d at 592 (emphasis added). On that basis, the court found that "[t]he penalties provide[d] non-speculative support for the inference of a conspiracy." *Id.* Plaintiffs' references to foreign and domestic investigations and settlements do not involve "the very same conduct conducted alleged in the" SAC. Plaintiffs' reliance on *Anderson News* is similarly unavailing. Pls.' UBS Opp'n at 9 (citing *Anderson News*, 680 F.3d at 184 ("The choice between . . . plausible inferences . . . is one for the factfinder.")). While Plaintiffs are correct that it is the factfinder's role to choose between plausible inferences, it nevertheless remains the Court's role to distinguish between plausible and conclusory allegations.

price manipulation or participated in the gold benchmark price setting, and the allegations in the complaint did not plausibly support an inference that UBS was a member of the alleged conspiracy); *In re Silver*, 2016 WL 5794777, at *26 (same). Accordingly, UBS's motion to dismiss the SAC is granted, and Plaintiffs' claims against UBS are dismissed.

### G. BASF Corp.'s Motion to Dismiss for Failure to State a Claim

In addition to moving to dismiss BASF Metals for lack of personal jurisdiction, BASF moves to dismiss all claims against BASF Corp. pursuant to Rule 12(b)(6). *See* BASF JDX Br. at 11-12.

Plaintiffs allege that BASF Corp. "is a Delaware-registered company," which is the "parent of BASF Catalysts LLC," and that BASF Catalysts LLC "holds itself out as the global leader in catalysts." SAC ¶ 30. Plaintiffs also allege that "BASF Precious Metals Services," an entity not named as a defendant in the SAC, "is a full service provider of precious metals and products and services that leverages BASF's unparalleled market insight and decades of precious metals sourcing, trading, and hedging expertise to create a tangible competitive advantage for BASF and BASF's industrial customers." SAC ¶ 30 (internal quotation marks, alterations, and citations omitted). In addition, according to Plaintiffs, "BASF Corp. serves as approved carrier, assayer, and refiner of platinum and palladium for CME Group in the U.S." and "provides CME Group approved platinum and palladium brands." SAC ¶ 30. "This branded physical platinum and palladium," Plaintiffs explain, "is deliverable against NYMEX platinum and palladium futures contracts." SAC ¶ 30. Plaintiffs further allege that BASF Metals, a defendant and one of the Fixing Members, "is organizationally part of and subordinate to BASF Corp." SAC ¶ 31.

Much like Plaintiffs' allegations against UBS, the SAC's exiguous allegations against BASF Corp. do not meet even the most liberal pleading standard, let alone the heightened pleading standard applicable to their CEA claims. In response to BASF's motion to dismiss, Plaintiffs maintain that they "provided a meaningful connection between BASF Metals, the Fixing [M]ember,

and BASF Corp.," and claim that "[i]t is immaterial that Plaintiffs do not allege that BASF Corp. (i) participated in the daily Fixing calls; (ii) served as a member of the LPPFC; or (iii) maintained a net short position during the Class Period."  Pls.' JDX Opp'n at 26-27.  According to Plaintiffs, their allegations that "BASF Corp. engaged in acts in furtherance of the conspiracy and shared common interest with BASF Metals and the other Defendants in achieving the conspiracy's aims" are "sufficient to defeat a Rule 12(b)(6) motion."  They are not.  Other than educating the Court about the BASF corporate structure, the SAC says nothing about BASF Corp.'s involvement—direct or indirect—in the alleged price manipulation, BASF Corp.'s role in executing the scheme, or BASF Corp.'s motive in artificially suppressing the Fix Price.  Plaintiffs' vacuous claims to the contrary cannot salvage their failure adequately to plead any claim against BASF Corp.  Accordingly, BASF's motion to dismiss the SAC against BASF Corp. is granted, and Plaintiffs' claims against BASF Corp. are dismissed.

### H.  Leave to Amend

Although Plaintiffs have already once amended their complaint in response to Defendants' motion to dismiss, in this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'"  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  The Court will, therefore, grant Plaintiffs leave to amend once again.  However, Plaintiffs should not expect any additional opportunities to amend their complaint.  *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003) ("[W]here pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough.") (citations omitted).

Any amended complaint must be filed no later than **May 2, 2017**.  If Plaintiffs file an amended complaint, Defendants must answer or otherwise respond to the amended complaint no later than **June 5, 2017**.  If Plaintiffs choose not to amend the SAC, the remaining Defendants must file an answer with respect to claims not dismissed in this opinion and order no later than **June 5, 2017**.

As noted above, *see supra* II.B, discovery in this action is stayed pursuant to the Court's April 21, 2015, order.  Dkt. No. 48.  Discovery in this action will remain stayed until the deadline for Defendants to answer or otherwise respond.  If Plaintiffs amend the SAC, and Defendants move to dismiss Plaintiffs' amended complaint, the parties may file a new motion for a stay of discovery no later than **June 5, 2017**.

If Plaintiffs do not amend the SAC, or if Defendants do not file a motion to stay by the deadlines specified above, the Court will schedule a Rule 16 conference promptly thereafter.

## IV.   CONCLUSION

For the foregoing reasons:

Defendants' motion to dismiss Plaintiffs' Sherman Act claim is GRANTED.

Defendants' motion to dismiss Plaintiffs' Commodities Exchange Act claims is GRANTED IN PART AND DENIED IN PART.

Defendants' motion to dismiss Plaintiffs' unjust enrichment claim is GRANTED.

Defendants' motion to strike portions of the SAC is DENIED.

ICBC's, BASF Metals', and the LPPFC's motions to dismiss for lack of personal jurisdiction are GRANTED.

ICBC's motion to dismiss for failure to state a claim is DENIED as moot.

Plaintiffs' application for jurisdictional discovery is DENIED.

BASF Corp.'s and UBS's motions to dismiss for failure to state a claim are GRANTED.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 113 and 115.

SO ORDERED.

Dated:  March 28, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge