**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PLATINUM AND PALLADIUM ANTITRUST LITIGATION | Lead Case No. 14-cv-9391<br><br>Hon. Gregory H. Woods |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO
MOTIONS TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) BY:**

- **BASF METALS LIMITED ("BASF Metals")**

- **ICBC STANDARD BANK PLC ("ICBC Standard")**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

    1.    As to BASF Metals: .............................................................................................. 1

    2.    Similarly, as to ICBC Standard: .......................................................................... 2

ARGUMENT ........................................................................................................................ 4

    I.    THIS COURT HAS PERSONAL JURISDICTION OVER BASF
        METALS AND ICBC STANDARD. ........................................................... 5

        A.    Rule 4(k)(2) Authorizes the Court to Exercise Jurisdiction ..................... 5

            i.    BASF Metals and ICBC Standard Performed Acts in the
                U.S. From Which Plaintiffs' Claims Arise. ................................... 6

            ii.    BASF Metals and ICBC Standard Expressly Aimed Their
                Conduct at the U.S., and Their Conduct Had Significant
                Effects in the U.S. ........................................................................ 14

            iii.    Exercising Jurisdiction Comports with Due Process. .................. 18

        B.    Personal Jurisdiction Exists Under the Worldwide Service of
            Process Provisions of the Clayton Act and the CEA .............................. 20

        C.    The N.Y. C.P.L.R. Also Establishes Personal Jurisdiction Over
            BASF Metals and ICBC Standard .......................................................... 22

    II.    JURISDICTIONAL DISCOVERY—NOT DISMISSAL—IS
        APPROPRIATE ........................................................................................... 25

CONCLUSION ................................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Allstate Life Ins. Co. v. Linter Grp. Ltd.*,
  782 F. Supp. 215 (S.D.N.Y. 1992), *dismissed on other grounds*, 1992 WL
  136849 (S.D.N.Y. 1992), *aff'd* 994 F.2d 996 (2d Cir. 1993) .................................23

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
  2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ......................................................21

*In re Aluminum Warehousing Antitrust Litig.*,
  90 F. Supp. 3d 219, 222 (S.D.N.Y. 2015) ..............................................16, 24, 25

*In re Aluminum Warehousing Antitrust Litig.*,
  2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) .......................................16, 17, 25

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp*,
  456 U.S. 556 (1982)..............................................................................................10

*In re Amaranth Nat. Gas Commodities Litig.*,
  269 F.R.D. 366 (S.D.N.Y. 2010) ..........................................................................15

*In re Amaranth Natural Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008)...................................................................21

*In re Angeln GmbH & Co. KG*,
  510 F. App'x 90 (2d Cir. 2013) .............................................................................5

*Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*,
  480 U.S. 102 (1987) (O'Connor, J.) .....................................................................11

*Atlantica Holdings, Inc. v. BTA Bank JSC*,
  2015 WL 144165 (S.D.N.Y. Jan. 12, 2015) ....................................................16, 19

*Banker v. Esperanza Health Sys., Ltd.*,
  201 F. App'x 13 (2d Cir. 2006) .............................................................................4

*Bristol-Myers Squibb Co. v. Superior Court of California*,
  137 S. Ct. 1773 (2017).............................................................................................8

*Calder v. Jones*,
  465 U.S. 783 (1984).............................................................................................14

*Carrier Corp v. Outokumpu Oyj*,
  673 F.3d 430 (6th Cir. 2012) .............................................................................18, 19

*CFTC v. Wilson*,
    27 F. Supp. 3d 517, 528-30 (S.D.N.Y. 2014) ........................................................22

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) ...............................................................................11, 20

*Davis v. Bemis*,
    1 Hand 453, 1869 WL 6521, at *1, *3 (N.Y. Mar. 19, 1869)................................11

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
    722 F.3d 81 (2d Cir. 2013)..........................................................................4, 25, 26

*Emerald Asset Advisors LLC v. Schaffer*,
    895 F. Supp. 2d 418 (E.D.N.Y. 2012) .......................................................13, 24

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ..........................................7, 15

*GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*,
    667 F. Supp. 2d 308 (S.D.N.Y. 2009).......................................................13

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915, 131 S. Ct. 2846 2857 (2011) ............................................20

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014).......................................................................20

*Harte v. Ocwen Fin. Corp.*,
    2016 WL 1275045 (E.D.N.Y. Mar. 31, 2016) .........................................13

*Int'l Shoe Co. v. Wash.*,
    326 U.S. 310 (1945).................................................................................11

*LaChapelle v. Torres*,
    1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014) ................................................25

*Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
    2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) ...................................16, 25

*Leist v. Simplot*,
    638 F.2d 283 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner &
    Smith, Inc. v. Curan*, 456 U.S. 353 (1982)...............................................8

*Leon v. Shmukler*,
    992 F. Supp. 2d 179 (E.D.N.Y. 2014) ...................................................26

*In re LIBOR-Based Fin. Instruments Antitrust Litig. (LIBOR VI)*,
    2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) .................................17, 18

*In re LIBOR-Based Financial Instruments Antitrust Litigation*,
    2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016)........................................................17

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)....................................................................................4, 18

*In re M/V MSC Flaminia*,
    107 F. Supp. 3d 313 (S.D.N.Y. 2015)........................................................................20

*In re Magnetic Audiotape Antitrust Litig.*,
    334 F.3d 204 (2d Cir. 2005)........................................................................................26

*Martin v. Eide Bailly LLP*,
    2016 WL 4496570 (S.D. Ind. Aug. 26, 2016) ............................................................25

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)........................................................................................13

*In re N. Sea Brent Crude Oil Futures Litig.*,
    2017 WL 2535731 (S.D.N.Y. June 8, 2017) ............................................19, 26, 27

*In re N. Sea Brent Crude Oil Futures Litig.*,
    No. 13-md-2475, ECF No. 389 (S.D.N.Y. Mar. 17, 2016) ......................................26

*In re Natural Gas Commodity Litig.*,
    337 F. Supp. 2d 498 (S.D.N.Y. 2004)........................................................................22

*New York v. Mountain Tobacco Co.*,
    55 F. Supp. 3d 301, 308 (E.D.N.Y. 2014) ............................................................4, 26

*Parke-Bernet Galleries v. Frankyln*,
    26 N.Y.2d 13 (1970) ..................................................................................................11

*Peterson v. Iran*,
    2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir.
    2014), *aff'd on other grounds sub nom. Bank Markazi v. Peterson*, 136 S. Ct.
    1310 (2016)................................................................................................................5, 6

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 20 ............................................................1, 23

*Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*,
    2014 WL 2610608 (S.D.N.Y. June 10, 2014) ..........................................................20

*Regenlab USA LLC v. Estar Techs. Ltd.*,
    2017 WL 3601304 (S.D.N.Y. Aug. 17, 2017)............................................................26

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
    48 F. Supp. 3d 675 (S.D.N.Y. 2014)...............................................................11

*Simon v. Philip Morris, Inc.*,
    86 F. Supp. 2d 95 (E.D.N.Y. 2000) ...........................................................16, 19

*Sullivan v. Barclays PLC*,
    2017 WL 685570 (S.D.N.Y. Feb. 21, 2017)................................................16, 18

*In re Sumitomo Copper Litig.*,
    120 F. Supp. 2d 328 (S.D.N.Y. 2000)..................................................14, 15, 22, 23

*In re Term Commodities Cotton Futures Litigation*,
    2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) ..............................................19, 21

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005), *on reconsideration*, 392 F. Supp. 2d
    539 (S.D.N.Y. 2005) ..............................................................................23, 24

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 659 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2870 (2014) .......................17

*In re Terrorist Attacks on Sept. 11, 2001*,
    718 F. Supp. 2d 456 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 109 (2d Cir. 2013) ......................14, 17

*United States v. Scophony Corp. of Am.*,
    333 U.S. 795 (1948)....................................................................................21

*Vizant Techs., LLC v. Whitchurch*,
    97 F. Supp. 3d 618, 629 (E.D. Pa. 2015) .................................................18

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)............................................................................8

**Statutes**

7 U.S.C. § 25(c) ...........................................................................................21

15 U.S.C. § 22 .............................................................................................20

**Rules**

Fed. R. Civ. P. 4(k)(1)...................................................................................22

Fed. R. Civ. P. 4(k)(2)...................................................................................5, 6

Federal Rule 4(k)(2).......................................................................................24

N.Y. C.P.L.R. 302(a)(1)-(3)............................................................................22

N.Y. C.P.L.R. 302(a)(2)...........................................................................................................24

N.Y. C.P.L.R. 302(a)(3)(ii)......................................................................................................22

**Other Authorities**

Restatement (Third) of Agency, intro. (2006) ..........................................................................11

## PRELIMINARY STATEMENT

The Moving Defendants—BASF Metals and ICBC Standard—together with Defendants Goldman Sachs International and HSBC Bank USA, N.A.—manipulated the prices of physical platinum and palladium and NYMEX platinum and palladium futures and options. Defendants held twice-a-day conference calls to set the prices for physical platinum and palladium—a collective process that the Defendants themselves dubbed the "Fixing." For years, the Fixing was the global benchmark for the products involved in this case—physical platinum and palladium and identified futures and options traded on NYMEX ("physical and NYMEX platinum and palladium").

Previously, this Court upheld Plaintiffs' conspiracy allegations. However, the Court declined jurisdiction over the Moving Defendants, holding that Plaintiffs had failed sufficiently to plead: (1) minimum contacts between the Moving Defendants and the United States, and (2) that the Moving Defendants' conduct was specifically directed at the U.S. *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *44-45 (S.D.N.Y. Mar. 28, 2017) ("*Platinum*").

Plaintiffs' Third Amended Complaint ("TAC") cures these insufficiencies. The TAC alleges that BASF Metals and ICBC Standard each used employees or agents in the U.S. to execute trades on their behalf and to provide order flow information during the Fixing itself—all in furtherance of the conspiracy. More specifically:

1. **As to BASF Metals:**

- "BASF [Metals] executes client trades in Physical and NYMEX Platinum and Palladium" and "conducts a large amount of proprietary trading in Physical and NYMEX Platinum and Palladium." TAC ¶38.

- "[D]uring the Fixing, BASF [Metals] and BASF Corporation's New Jersey-based precious metals traders were in constant communication with BASF's participant in the Fixing."

1

*Id.* These "New Jersey-based precious metals traders would update order information during the Fixing and provide this updated order information to BASF [Metals's] participant in the Fixing as the Fixing was conducted." *Id.*

- "The New Jersey-based precious metals traders would make trades in Physical and NYMEX Platinum and Palladium as the Fixing progressed based on information received from the Fixing (including proprietary trading such as trading in futures and options on NYMEX for profit and for hedging purposes)." *Id.* They also "would provide commentary on the Fixing to BASF [Metal's] clients and other BASF SE entities." *Id.*

- BASF Metals advertised for precious metals trading positions in New Jersey— which it filled. TAC ¶37; Himes Decl. at Ex. 1.

2.    **Similarly, as to ICBC Standard:**

- "Standard Bank executes client trades in Physical and NYMEX Platinum and Palladium" and "conducts a large amount of proprietary trading in Physical and NYMEX Platinum and Palladium." TAC ¶44.

- "[D]uring the Fixing, [ICBC Standard's] New York-based precious metals traders were in constant communication with Standard Bank's participant in the Fixing." *Id.* These "New York-based precious metals traders would update order information during the Fixing and provide this updated order information to Standard Bank's participant in the Fixing as the Fixing was conducted." *Id.*

- "The New York-based precious metals traders also made trades in Physical and NYMEX Platinum and Palladium as the Fixing progressed based on information received from the Fixing (including proprietary trading such as trading NYMEX futures and options for profit)." *Id.* They also "provided commentary on the Fixing to Standard Bank clients." *Id.*

2

Despite these specific factual allegations and the reasonable inferences that may be drawn from them, the Moving Defendants again argue that they are not subject to the Court's jurisdiction. The Court, however, has specific jurisdiction over each Moving Defendant. Their motions to dismiss should be denied.

*First*, both Moving Defendants have significant contacts in the U.S. and in this District—the location of NYMEX, "where much of the affected trading takes place and whose prices were manipulated"—and Plaintiffs' claims arise from these contacts. *See, e.g.*, TAC ¶25 (NYMEX "is located in the Southern District of New York."); ¶45 (ICBC Standard is a member of NYMEX). As noted above, the Moving Defendants were in "constant communication" with their U.S.-based traders, who not only executed physical and NYMEX platinum and palladium trades on behalf of the Moving Defendants, but also provided order flow information—all in the U.S. and in furtherance of Defendants' scheme to manipulate the Fixing and the market more generally. This conduct in the U.S. gives rise to the antitrust and commodities injuries that Plaintiffs allege.

*Second*, Defendants' conspiracy—and the Moving Defendants' conduct specifically—targeted the NYMEX, which is the pre-eminent exchange for trading platinum and palladium futures and options. *See* TAC ¶89 and Chart 3 & 4. Thus, the success of Defendants' conspiracy to manipulate the Fixing for their own benefit necessarily contemplated and required trading on NYMEX. Trading on NYMEX was as necessary to the Moving Defendants' scheme as cracking an egg is to a chef making an omelet.

*Third*, exercising jurisdiction comports with the fairness and reasonableness considerations underlying due process. The Moving Defendants are each members of a corporate family that publicly showcases its global reach and ability to deal, on a 24/7 basis, in commodities, including physical and NYMEX platinum and palladium. *See, e.g.*, TAC ¶¶34-38

(BASF); ¶¶43-46 (ICBC Standard). Trading on NYMEX is integral to each Moving Defendant's global activity. New York City is familiar territory for each of them, and Iselin, New Jersey, where BASF maintains a "key bullion centre," is a stone's throw away. Due process is not offended by this Court's exercise of jurisdiction.

*Finally*, if the Court has any lingering doubt on jurisdiction, then discovery on the issue is warranted. This class action will proceed against the two non-moving Defendants, Goldman Sachs and HSBC, in all events. Accordingly, limited discovery against the two Moving Defendants, BASF Metals and ICBC Standard, is preferable to an outright dismissal on jurisdictional grounds at this point.

## ARGUMENT

To establish jurisdiction over BASF Metals and ICBS Standard: (1) statutory authority for jurisdiction must exist; and (2) jurisdiction must comport with due process. *See Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013); *New York v. Mountain Tobacco Co.*, 55 F. Supp. 3d 301, 308 (E.D.N.Y. 2014).[1] Where jurisdiction is tested on a motion to dismiss, the plaintiff may prevail by "'pleading in good faith, legally sufficient allegations of jurisdiction . . . [and this] *prima facie* showing may be established solely by allegations.'"); *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84–85 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Moreover, on a motion to dismiss, the court construes the complaint "'in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor.'" *Banker v. Esperanza Health Sys., Ltd.*, 201 F.

---

[1] Service of process also must be proper. However, the Moving Defendants do not challenge service.

App'x 13, 15 (2d Cir. 2006) (quoting *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 80 (2d

Cir. 1993)).

The TAC satisfies these requirements for jurisdiction.

I.     **THIS COURT HAS PERSONAL JURISDICTION OVER BASF METALS AND ICBC STANDARD.**

   A.     **Rule 4(k)(2) Authorizes the Court to Exercise Jurisdiction.**

Federal Rule of Civil Procedure 4(k)(2) grants jurisdiction over a defendant "in a case (1)

'aris[ing] under federal law,' (2) where a defendant is not subject to the general jurisdiction of

any one state, and (3) where 'exercising jurisdiction [would be] consistent with the United States

Constitution and laws.'" *In re Angeln GmbH & Co. KG*, 510 F. App'x 90, 91–92 (2d Cir. 2013)

(quoting Rule 4(k)(2); citing *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir.

2008)). "[P]laintiff need only raise a *prima facie* case that 4(k)(2) jurisdiction is proper[.]"

*Peterson v. Iran*, 2013 WL 1155576, at *14 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d

Cir. 2014), *aff'd on other grounds sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).

All three elements are met here. The first element is satisfied because Plaintiffs' claims

arise under federal law—the antitrust laws and the CEA. TAC ¶¶273-95. The second element is

satisfied because BASF Metals and ICBC Standard each argue that they are "at home" only in

the United Kingdom. ICBC Standard Br. at 1-2; BASF Metals Br. at 2. "By arguing that it has no

presence in the United States . . . [each Moving Defendant] has in fact established the necessary

predicate for personal jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2)." *Peterson*, 2013 WL

1155576, at *17.

To satisfy the third element, Plaintiffs must show only that the Moving Defendants have

"sufficient contacts" with the United States to justify the Court's exercise of personal

jurisdiction. *Angeln GmbH*, 510 F. App'x at 92. Here, there are ample contacts.

i.    **BASF Metals and ICBC Standard Performed Acts in the U.S. From Which Plaintiffs' Claims Arise.**

Federal Rule of Civil Procedure 4(k)(2) authorizes personal jurisdiction when the defendant's contacts include, among other things, "transacting business" or "doing an act" in the U.S. *See, e.g., Peterson*, 2013 WL 1155576, at \*15 (quotation marks omitted; citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir. 1972)). The TAC pleads both types of contacts:

*First*, U.S.-based precious metals traders acting for each Moving Defendant "were in constant communication" with the Moving Defendants' participants in the Fixing. TAC ¶¶38, 44. Through these communications, these U.S.-based traders provided "order information during the Fixing and provide[d] this updated order information to [the Moving Defendants'] participant[s] in the Fixing as the Fixing was conducted." *Id.*

*Second*, as the TAC alleges, the Fixing itself is determined using order flow information (including size and direction). *See* TAC ¶¶58-66 (describing the operation of the Fixing); ¶38 (describing trading by BASF Metals and traders at its U.S.-based affiliates during the Fixing), ¶44 (same for ICBC Standard). Accordingly, contrary to Defendants' assertions, these U.S.-based traders participated in the Fixing for the benefit of the Moving Defendants.

The TAC allegations—demonstrating that the Moving Defendants' U.S.-based traders traded in physical and NYMEX platinum and palladium for purposes of carrying out and profiting from Defendants' scheme to manipulate the Fixing—are well-pleaded.

ICBC Standard, however, calls "implausible" communications between ICBC Standard's New York traders and its London participants during the daily AM Fixing, which occurred during the early morning hours in New York. ICBC Standard Br. at 11 n.10. Not so at all: NYMEX platinum and palladium futures and options can be traded virtually nonstop on Globex,

an electronic trading platform. ICBC Standard itself touts its "24 hour service around the globe," which includes "seamless connectivity between the systems in Beijing, London and New York running round the clock . . . to provide real-time prices to worldwide buyers and sellers of precious metals." TAC ¶46; CME Group, Trading Hours: Futures & Options http://www.cmegroup.com/trading-hours.html#metals (NYMEX platinum and palladium instruments trade 23 hours a day). *See also* Himes Decl. at Ex. 9 (ICBC webpage)[2]

BASF Metals and ICBC Standard also argue that Plaintiffs' allegations do not plead that their claims arise out of their forum contacts. ICBC Standard Br. at 5-6; BASF Metals Br. at 5-6. But this argument fails because Plaintiffs have sufficiently pleaded a direct connection between ICBC Standard's and BASF Metals' U.S.-based affiliates and the Moving Defendants during the Fixing and in furtherance of the conspiracy. Moreover, there is a causal nexus arising from (1) the coordination between the Moving Defendants' U.S.-based employees or agents and their London-based Fixing participants, and (2) the domestic harm that Plaintiffs and members of the proposed class suffered. Specifically:

*First*, NYMEX, the exchange on which both the Moving Defendants and the Plaintiffs and class members traded, is located in this District. TAC ¶79.

*Second*, there is an indisputable correlation between the Fixing (*i.e.*, spot) prices and physical and NYMEX platinum and palladium prices. Movement in one price is almost perfectly replicated in the other. TAC ¶¶91-103 (alleging a near 1-to-1 correlation).

---

[2] In a similar vein, ICBC Standard urges the Court to disregard Plaintiffs' allegations as conclusory. ICBC Standard Br. at 6. However, this contention "amounts to a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267, at *6 (S.D.N.Y. Mar. 31, 2016) ("*FX*") (rejecting defendants' jurisdictional argument) (quotation marks and citation omitted).

*Third*, trading on NYMEX is a "zero-sum game," so that when one trader makes money, another loses money. *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curan*, 456 U.S. 353 (1982). Thus, when the Moving Defendants' U.S.-based traders profited from their physical and NYMEX platinum and palladium transactions in furtherance of Defendants' manipulative scheme to rig the Fixing, Plaintiffs and other traders of physical and NYMEX platinum and palladium necessarily lost money on their transactions. And because the trading of physical and NYMEX platinum and palladium was central to the Defendants' scheme—a means by which Defendants profited—Plaintiffs' claims arise from the business that Moving Defendants' transacted in the U.S. and specifically, in this District. *See, e.g.*, TAC ¶13 ("By manipulating the price around the Fixing, the Defendants were creating opportunities to profit in, among other places, Physical and NYMEX Platinum and Palladium."); ¶14 (describing various ways that Defendants profited), ¶¶38, 44, 190 (describing BASF Metals and ICBC Standard's substantial market share and proprietary trading in physical and NYMEX platinum and palladium, and their traders' trading before, during, and after the Fixing).[3]

Although each Moving Defendant has submitted a declaration in support of its motion, neither denies that it has U.S.-based agents who traded physical and NYMEX platinum and

___

[3] Plaintiffs' allegations are unlike those in *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773 (2017) ("*BMS*"), and *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016), on which ICBC Standard relies. In *BMS*, out-of-state plaintiffs, prescription drug users, sued BMS in California. The Supreme Court held there was no specific jurisdiction over BMS because plaintiffs' use of BMS's drug, and resulting injury, occurred outside the state, and was unrelated to BMS's California-based conduct. And in *Waldman*, terrorist attacks in Israel killed or injured U.S. citizens traveling abroad. The trial evidence failed to show that "defendants participated in these acts in the United States or that their liability for these acts resulted from their actions that did occur in the United States." *Waldman*, 835 F.3d at 337.

palladium around or during the Fixing. To the contrary, BASF Metals acknowledges that its U.S. affiliates "employ[] metals traders who are based in Iselin, New Jersey." Dr. Vergopoulos Decl., ECF No. 209-1 at ¶8. BASF Metals also advertised for precious metals trading positions in New Jersey. The job posting noted:

> BASF Metals Ltd., is a full service provider of precious metals product and services. . . . . As a Trader / Dealer, you will [be] responsible for managing and hedging all price risk (outright and forward) inherent in BASF Metals Ltd's precious metals business unit  - Precious and Base Metals Services (CCM).

*See* Himes Decl. at Ex. 1 (job posting for BASF Metals; .xml back-slash characters (\) omitted).

This job posting is noteworthy. It states that the "Precious and Base Metals Service (CCM)" is "a precious metals business unit" of BASF Metals Ltd., the Defendant here. Yet, BASF Metals now asserts that "CCM is not BASF Metals . . . . Rather CCM is an organizational and marketing term that describes all of BASF SE's and its subsidiaries' global business operations relating to precious metals, including operations from many separate and legally distinct BASF SE subsidiaries." BASF Metals Br. at 7 n.6.

Among the individuals who traded precious metals for BASF's U.S.-based affiliates during the class period are:

- **Matthew Gidicsin**, Senior Dealer of Platinum Group Metals (*i.e.*, platinum and palladium) for BASF Corporation (May 2008-present), and a silver and platinum group metals dealer for ICBC Standard.

- **Thomas Fallon**, PGM (Platinum Group Metals) Dealer for Engelhard Metals Ltd. (the predecessor to BASF Metals Ltd., *see* TAC ¶34) (July 2010-September 2012), and currently a precious metals trader at HSBC.

*See* Himes Decl. at Exs. 2-3 (LinkedIn profiles for Messrs. Gidicsin & Fallon).

Likewise, ICBC Standard had (and still has) employees or agents who traded precious metals in the U.S., including physical and NYMEX platinum and palladium, such as:

- ***Ludmila Fabianova***, Senior Vice President, Precious Metals Sales at ICBC Standard Bank Plc (March 2010-present), and a "USA"-based delegate for Standard Bank plc for The LBMA/LPPM 2013 Precious Metals Conference" held Rome, Italy. Himes Decl. at Exs. 4 (Ms. Fabianova's LinkedIn Profile), 5, at 5 (LBMA/LPPM delegate list).

- ***Mike Villagomez***, Senior Vice President, Commodity Sales and Trading at ICBC Standard Bank (February 2015-present); Senior Vice President Commodity Sales and Trading, Standard Bank Group (July 2009-January 2015). *Id.* at Ex. 6 (Mr. Villagomez's LinkedIn profile).

- ***Gary Domenico***, former Director of Precious Metals Options at ICBC Standard Resources (March 2009-May 2016), and who "[q]uoted and managed the Precious metals option book for the bank." *Id.* at Ex. 7 (Mr. Domenico's LinkedIn profile).

- ***Thomas O'Keeffe***, former Precious Metals Trader at ICBC Standard Resources (September 1997-June 2016), and who managed "risk for spot and forwards in Gold, Silver, and PGM [Platinum-Palladium] markets," "quoting both markets to a customer base which included physical clients, producers, funds, institutional clients and market competitors." *Id.* Ex. 8 (Mr. O'Keffee's LinkedIn profile).

Regardless of whether or not these individuals were employees of BASF Metals or ICBC Standard, a time-honored principle of agency law is *qui facit per alium facit per se*—he who acts through another acts himself. Thus, acts performed in furtherance of an agent's authority and for the benefit of the principal are those of the principal as a matter of law. *See, e.g., Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp,* 456 U.S. 556, 565-66 (1982) (principal was liable for

antitrust violations committed by its agent: "under general rules of agency, principals are liable when their agents act with apparent authority and commit torts analogous to the antitrust violation"); *Davis v. Bemis*, 1 Hand 453, 1869 WL 6521, at *1, *3 (N.Y. Mar. 19, 1869) (principal, whose agents submitted false bills of lading, was liable for overcharges: "the principal is held liable to the public, or third persons in a civil action for the frauds, deceits, concealments, misrepresentations, torts, negligence and other malfeasances in the course of his [agent's] employment"); Restatement (Third) of Agency, intro. at 4 (2006) (agency law makes the principal "vicariously liable for torts committed by an . . . agent while acting within the scope of employment or other engagement.").

Thus, the Supreme Court has long held that a "corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 n.13 (2014).[4] A "formal" agency is not required. *See Schutte Bagclosures Inc. v. Kwik Lok Corp.*, 48 F. Supp. 3d 675, 686-87 (S.D.N.Y. 2014) (quoting *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 420 (S.D.N.Y. 2006)). *See also Parke-Bernet Galleries v. Frankyln*, 26 N.Y.2d 13, 19 (1970) (jurisdiction arose from telephone calls between an agent bidding in New York and its principal in California).

The TAC allegations demonstrate that the Moving Defendants' affiliated U.S.-based metals traders acted for and at the behest of the Moving Defendants' participants in the Fixing. They placed and updated order flow information during the Fixing, as well as traded on NYMEX

---

[4] *See also Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 112 (1987) (O'Connor, J.) (defendant's "marketing [a] product through a distributor who has agreed to serve as the sales agent in the forum State" may amount to purposeful availment); *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 318 (1945) ("the commission of some single or occasional acts of the corporate agent in a state . . . may be deemed sufficient to render the corporation liable to suit").

to benefit the Moving Defendants' Fixing participants. *See* TAC ¶¶37-38, 44-46. Whether BASF

Metals or ICBC Standard "employed" these individuals is not dispositive—they were agents—

and in any event this would be, at most, a fact issue insusceptible of resolution on these motions

dismiss absent discovery.

The Moving Defendants' own marketing materials further confirm the interconnectivity

among their respective global trading operations. Each Moving Defendant holds out its various

related entities as agents for one another to ensure its customers a "global reach" for precious

metals trading. For example, the "BASF Precious Metals Services are global and vertically

integrated" and provides "24/7 access to world metals exchanges & key bullion centres via

trading offices in [among other places] Iselin, New Jersey." *See* TAC ¶36. BASF Precious

Metals Services also promotes its membership in the Chicago Mercantile Exchange ("CME"), of

which NYMEX is a division, and the fact that it is "a founding member of the London Platinum

and Palladium Market (LPPM)." *Id.*

ICBC Standard similarly holds itself out as offering "a 24 hour service around the globe .

. . to trade . . . precious metals via account through seamless connectivity between the systems in

Beijing, London *and New York* running around the clock." *Id.* at ¶46 (emphasis added). ICBC

Standard, like BASF, is also a NYMEX member, holding two seats on the exchange. TAC ¶45.

*See* Himes Decl., Ex. 9 ("ICBC Standard Bank owns memberships in . . . exchanges including . .

. the New York Mercantile Exchange (NYMEX)"). Accordingly, the trading of the Moving

Defendants' agents in the U.S. are those of the Moving Defendants themselves. By operation of

law, that is so whether or not the agents are affiliates of the principal, as they are here.

Contrary to the Moving Defendants' arguments, piercing the corporate veil, or

establishing an alter-ego relationship, are unnecessary. *See* BASF Metals Br. at 9-10; ICBC

Standard Br. at 8. "Jurisdiction by operation of agency law arises independent of that established through veil piercing. To illustrate, in *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318 (S.D.N.Y. 2009), the court upheld personal jurisdiction over a foreign defendant on an agency theory, while distinguishing the alter-ego ("mere department") theory as another approach.

Similarly here. Each Moving Defendant is responsible for its agent's acts as a matter of agency—not corporate—law: "the claim against the parent is premised on the view that the subsidiary had authority to act, and was in fact acting, on the parent's behalf — that is, in the *name* of the parent." *Harte v. Ocwen Fin. Corp.*, 2016 WL 1275045, at *4 (E.D.N.Y. Mar. 31, 2016) (internal quotation marks and citations omitted).

And in all events, at this pre-discovery stage, Plaintiffs' allegations that traders employed by the Moving Defendants or by their U.S.-based affiliates traded on NYMEX—and profited as a result—create a presumption that specific jurisdiction exists over BASF Metals and ICBC Standard. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996) ("the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts" and can be defeated only where the defendant "presents a compelling case that the presence of some other considerations would render jurisdiction unreasonable") (citation and internal quotation marks omitted). Indeed, neither Moving Defendant denies U.S. trading activity by its agents. But even if they had, that would only provide a basis for discovery—not for dismissal as a matter of law. *See Emerald Asset Advisors LLC v. Schaffer*, 895 F. Supp. 2d 418, 433-34 (E.D.N.Y. 2012) (out-of-state defendant was subject to jurisdiction under agency and conspiracy principles; the defendant's factual refutations were rejected because if accepted, he "would likely be absolved of liability"). *See also* Section II *below*.

13

> **ii.      BASF Metals and ICBC Standard Expressly Aimed Their Conduct at the U.S., and Their Conduct Had Significant Effects in the U.S.**

Both "New York and the U.S. have an interest in protecting their residents from overseas fraud and ensuring the integrity of the commodities markets." *In re Sumitomo Copper Litig.,* 120 F. Supp. 2d 328, 343-44 (S.D.N.Y. 2000). Thus, the "effects test" serves as an independent basis for jurisdiction over ICBC Standard and BASF Metals. This test "provides for the exercise of specific personal jurisdiction over a foreign defendant based on his alleged: (1) intentional, tortious actions; (2) which were expressly aimed at the United States; (3) that causes harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the United States; and (4) [where] the injuries that are the subject of the litigation arise from or relate to the defendant's subject conduct." *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 478-79 (S.D.N.Y. 2010), *aff'd*, 714 F.3d 109 (2d Cir. 2013). *Calder v. Jones*, 465 U.S. 783, 788–89 (1984) (minimum contacts exist when the "effects" of conduct are felt in the forum state).

BASF Metals and ICBC Standard contest the second element—whether their suit-related conduct was expressly aimed at the U.S. (or New York)—and the fourth element—whether Plaintiffs' injuries arise from Defendants' conduct in the U.S. (or New York). BASF Br. at 5-9; ICBC Standard Br. at 4-10. On the fourth element, as we demonstrated above, each Moving Defendant worked closed with its U.S.-based employees or agents in furtherance of the Fixing and in trading physical and NYMEX platinum and palladium. Accordingly, we address here only the second element: targeting the U.S.

It is untenable for BASF Metals and ICBC Standard to argue that injury in the U.S. was merely foreseeable. *See* BASF Metals Br. at 7; ICBC Standard Br. at 9. Defendants' conduct was aimed directly *at* the U.S. and, specifically, New York. The TAC alleges, and the Moving

14

Defendants do not dispute, that NYMEX is the world's largest exchange for both Platinum and Palladium instruments. *See* TAC ¶89; *In re Amaranth Nat. Gas Commodities Litig.,* 269 F.R.D. 366, 372 (S.D.N.Y. 2010) (NYMEX "is the world's largest commodity exchange for the trading of futures contracts and options contracts in energy products, metals, and other commodities."). *See also* Himes Decl., Ex. 10 ("Platinum and Palladium futures and options play an integral role in the PGMs market. Listed on NYMEX, Platinum and Palladium futures have the longest history amongst all CME Group's metals products."). Nor do they dispute the near-perfect correlation between Fixing prices and physical and NYMEX platinum and palladium prices. *See* TAC ¶¶91-103. Indeed, the Fixing specifically adapted itself to the U.S. market in at least two ways: (1) the Fixing price was set in U.S. dollars, TAC ¶64; and (2) the PM Fixing was timed to "accommodate the U.S. trading day." *Id.* ¶57.

The Moving Defendants fired their shots at traders in the U.S., such as Plaintiffs and the class members, knowing full well that their manipulation would injure them in this District. Enhancing the value of their physical and NYMEX platinum and palladium positions was central to Defendants' conspiracy. TAC ¶¶14, 91, 96, 102, 145, 182-209. *See FX*, 2016 WL 1268267, at *6 (defendants' conspiracy was "expressly aimed" at U.S. where "[p]laintiffs plead[ed] collusive conduct within the United States, give examples of each [defendant's] participation in the alleged conspiracy . . . and provide undisputed averments concerning the [defendants'] extensive U.S.-based FX operations"); *Sumitomo Copper*, 120 F. Supp. 2d at 342–43 (by engaging "in a scheme

to defraud the copper market, including copper traded on New York's Comex," English defendants "expressly aimed" their manipulative conduct at New York).[5]

The authorities cited by the Moving Defendants arise from facts unlike those here. For example, in several, the plaintiffs pleaded injury to broad classes of transactions—including over-the-counter forwards, options, and swaps—many of which had no central trading venue, let alone one in the U.S. or New York.[6] By contrast, here Plaintiffs plead a narrower class of products that primarily includes NYMEX platinum and palladium instruments, for which the pre-eminent exchange is the NYMEX in New York.

The Moving Defendants reliance on *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219 (S.D.N.Y. 2015) ("*Aluminum I*"), is particularly inapplicable. In a more recent ruling in the same case, the Court *upheld* jurisdiction over a foreign defendant where that defendant communicated with others in the U.S. concerning aluminum deals in which the participants "contemplate that actions, events or effects would take place within multiple regions of the United States." *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 6472656, at *13 (S.D.N.Y. Oct. 23, 2015) ("*Aluminum II*").

---

[5] *See generally Atlantica Holdings, Inc. v. BTA Bank JSC*, 2015 WL 144165, at *5 (S.D.N.Y. Jan. 12, 2015) (jurisdiction upheld over a bank with no U.S. offices or business operations where securities were "denominated in United States dollars" and available for sale in New York); *Simon v. Philip Morris, Inc.*, 86 F. Supp. 2d 95, 132 (E.D.N.Y. 2000) (jurisdiction over a foreign jurisdiction upheld where "intentional and purposeful acts" were undertaken "in furtherance of the alleged conspiracy" targeting individuals in the U.S.).

[6] *See Sullivan v. Barclays PLC*, 2017 WL 685570, at *3 (S.D.N.Y. Feb. 21, 2017) (NYSE Euribor futures, CME currency futures, FX forwards, interest rate swaps, forward-rate agreements); *Laydon v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *2 (S.D.N.Y. Mar. 10, 2017) (Euroyen futures traded on the CME, and in Tokyo, Singapore, and Europe); and *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 222 (S.D.N.Y. 2015) (physical aluminum held in warehouses).

The Court's *Aluminum II* ruling also answers the Moving Defendants' reliance on *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2870 (2014). As Judge Forrest wrote: "The Court rejects [defendants'] analogy to *In re Terrorist Attacks on Sept. 11*. . . In contrast to the defendants in that case, the record here suggests that [the individual defendant here] had a far less attenuated connection to the alleged unlawful conduct as plaintiffs allege that he actually formulated the anticompetitive agreement. Furthermore, plaintiffs' evidence shows that [defendant] took direct action in furtherance of the scheme and clearly understood that his conduct would have significant effects within the United States." *Aluminum II*, 2015 WL 6472656, at *13 n.13. So too here—where the Moving Defendants comprise two of the four companies that set the Fixing twice each day, and where each traded in the U.S. in furtherance of the scheme.

ICBC Standard also cites *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016). But unlike the Defendants in our case, the *LIBOR* "defendants need not engage in any market transactions at all . . . to affect the LIBOR fix". *Id.* at *7. Instead, they submitted an opinion used to set the LIBOR benchmark. The platinum and palladium Fixing, however, was designed to be determined by actual buying and selling interest in the marketplace—a benchmark process that the Defendants corrupted. *See* TAC ¶¶56-68.

*LIBOR* is distinguishable for yet another reason. In that case, the injury to plaintiffs was unconnected to the conspiracy's purpose—the LIBOR panel banks' "projection of financial soundness." *In re LIBOR-Based Fin. Instruments Antitrust Litig. (LIBOR VI)*, 2016 WL 7378980, at *7 (S.D.N.Y. Dec. 20, 2016). As Judge Buchwald explained: "defendants' sales and trades of LIBOR-based products to plaintiffs in the United States are not within the scope of the reputation-motivated antitrust conspiracy. Likewise, trader-based allegations have no relevance

17

here." *Id.* at *9. By contrast, in our case, the link between Defendants' conspiracy to manipulate the Fixing and the injury to Plaintiffs' physical and NYMEX platinum and palladium transactions is beyond dispute. TAC ¶¶91-103 (alleging near perfect correlation between Fixing and physical and NYMEX platinum and palladium).

*Sullivan*, on which the Moving Defendants also rely, is similarly distinguishable. Underlying the *Sullivan* Court's rejection of personal jurisdiction over foreign defendants, was the failure to allege that communications "originated or [were] transmitted by the United States traders or [] involve[d] actions by any [foreign defendant's] employee in the United States." *Sullivan*, 2017 WL 685570, at *44. Here, the Moving Defendants' U.S. traders communicated with their Fixing participants in London. TAC ¶¶38, 44.

In sum, the Moving Defendants not only aimed their conduct at the U.S.—but indeed, NYMEX was ground zero. Trades on NYMEX were a primary means by which Plaintiffs and the class members were injured. The Moving Defendants knowingly participated in a price-fixing scheme that had the intended effect of manipulating the prices of physical and NYMEX platinum and palladium in the U.S.—and specifically in New York. *See, e.g.,* TAC ¶¶14, 91, 96, 102, 145, 182-209. These allegations meet the effects test.[7]

### iii.    Exercising Jurisdiction Comports with Due Process.

Where a defendant that has "purposefully directed its activities at the forum state" seeks nonetheless to defeat jurisdiction, "it must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Licci*, 732 F.3d at 173 (citation and

---

[7] *See also Carrier Corp v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012) (a conspiracy that directly led to higher prices in the U.S. was "expressly aimed" at the U.S.); *Vizant Techs., LLC v. Whitchurch*, 97 F. Supp. 3d 618, 629 (E.D. Pa. 2015) (conduct was "expressly aimed" where defendants knew it would harm individuals in the forum) (citation and quotes omitted).

quotes omitted). The defendant must show that "jurisdiction in this forum will make litigation so gravely difficult and inconvenient that it unfairly is at a severe disadvantage in comparison to its opponent." *Atlantica*, 2015 WL 144165, at \*5. Thus, when a defendant has sufficient contacts with the forum, considerations of reasonableness will rarely defeat jurisdiction.[8]

      *In re Term Commodities Cotton Futures Litigation* ("*Term Cotton*"), 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013), is instructive. There, the Court upheld jurisdiction over a Dutch-based defendant even though "there would be some burden" to litigating in New York. Like the Moving Defendants, the Dutch defendant was "not a fly-by-night operation that would be wholly unable to defend itself in this [cotton futures manipulation] case. To the contrary, Plaintiffs allege [the Dutch defendant] trades and markets commodities on an international level in all major world markets, implying the availability of significant international resources." *Term Cotton*, 2013 WL 9815198, at \*30. The Court also emphasized: "[t]here is no question this forum has a strong interest in providing injured parties with relief from violations of the CEA and the Sherman Act." *Id.* at \*30; *See also In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at \*12 (S.D.N.Y. June 8, 2017) (reasonableness was satisfied because modern communication and transportation mitigated any undue burden associated with litigating in the U.S.). This reasoning applies with equal force here.

      BASF Metals contends, however, that "constant and pervasive" contacts with the forum are necessary to satisfy due process. BASF Metals Br. at 4-5. However, as BASF Metal's own

---

[8] *See also Atlantica*, 2015 WL 144165, at \*5 ("The reasonableness inquiry is largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process") (citation and quotes omitted); *Simon*, 86 F. Supp. 2d at 133 ("Those cases in which jurisdiction is so unreasonable as to defeat a showing of 'minimum contacts' are rare."); *Carrier*, 673 F.3d at 451 ("an inference of reasonableness" arises when the effects test is satisfied).

authorities demonstrate, this argument is wrong. "Constant and pervasive" forum contacts matter only for *general* jurisdiction—not for *specific* jurisdiction, which applies here. *See Daimler*, 134 S. Ct. at 751; *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 131 S. Ct. 2846 2857 (2011) ("North Carolina is not a forum in which it would be permissible to subject petitioners to general jurisdiction."); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 129 (2d Cir. 2014) ("[T]he district court erred in finding that BOC is properly subject to general jurisdiction."); *Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P.*, 2014 WL 2610608, at *8 (S.D.N.Y. June 10, 2014) ("General jurisdiction over the foreign Defendants does not[] exist.").

BASF Metals also cites *In re M/V MSC Flaminia*, 107 F. Supp. 3d 313 (S.D.N.Y. 2015), a case in which BASF SE, an affiliate, was held not subject to jurisdiction. BASF Br. at 10. But there, the plaintiff sought to impute BASF Corp.'s contacts in New York to BASF SE, thus rendering BASF SE "at home" in New York and subject to general—not specific—jurisdiction. We make no comparable argument, however. BASF Metals is subject to specific jurisdiction here based on its own conduct in the U.S., performed though either its employees or its non-employee agents—and only for claims arising from that conduct.

Accordingly, the due process requirements are satisfied.

## B.    Personal Jurisdiction Exists Under the Worldwide Service of Process Provisions of the Clayton Act and the CEA

The Clayton Act and the CEA—the two federal statutes giving rise to Plaintiffs' claims—each provide an independent basis for personal jurisdiction over the Moving Defendants. The Clayton Act provides, in pertinent part, for service of process in any district where a defendant "transacts business." 15 U.S.C. § 22. The statute's twin goals—ones that the Moving Defendants seek to frustrate—are: (1) "reliev[ing] persons injured through corporate violations of the antitrust laws from the 'often insuperable obstacle' of resorting to distant forums for redress of

wrongs," and (2) preventing a foreign defendant from "retreating . . . to its headquarters [to]

defeat or delay the retribution due." *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 808

(1948).

As we previously demonstrated, BASF Metals and ICBC Standard transact business

through their employees, or through the employees of their U.S. agents, when they traded on

NYMEX and communicated with Fixing participants in London. *See* Section I.A.i., *above*.

Neither BASF Metals nor ICBC Standard deny that their own employees or those employed by

their affiliates trade NYMEX platinum and palladium. Accordingly, the Clayton Act provides a

basis for personal jurisdiction. *See Term Cotton*, 2013 WL 9815198, at *29 (personal jurisdiction

warranted where defendants had "entities in the United States to carry out various functions of its

cotton merchandising business").

The CEA §22 similarly provides for service of process "wherever the defendant may be

found." 7 U.S.C. § 25(c). Such language extends jurisdiction "to the limit permitted by . . . Due

Process." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y.

2008). As demonstrated above, jurisdiction over the Moving Defendants comports with due

process because they: (1) targeted U.S. platinum and palladium markets, thereby causing effects

in this District; and (2) are subject to conspiracy jurisdiction (discussed in Section I.C., *below*).

Since due process is satisfied, the CEA provides a statutory basis to exercise jurisdiction. *See*

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *7 (S.D.N.Y.

Nov. 18, 2014) (personal jurisdiction over an Italian defendant via the worldwide service

provision satisfied due process).

## C.    The N.Y. C.P.L.R. Also Establishes Personal Jurisdiction Over BASF Metals and ICBC Standard

A third independent statutory basis for jurisdiction is Fed. R. Civ. P. 4(k)(1). This Rule provides jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1). New York's CPLR extends personal jurisdiction to a defendant who, among other things, transacts business within the state or commits tortious acts outside the state, knowing that such acts would have consequences within the state. N.Y. C.P.L.R. 302(a)(1)-(3); *CFTC v. Wilson*, 27 F. Supp. 3d 517, 528-30 (S.D.N.Y. 2014) (long-arm jurisdiction under New York law was established because Illinois defendants' trading activities manipulated futures traded in New York); *In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 517 (S.D.N.Y. 2004) (personal jurisdiction existed over an out-of-state defendant whose out-of-state acts were conducted "with the purpose of manipulating the market for natural gas futures on the *New York* Mercantile Exchange") (emphasis in original). As shown above, these requirements are met here for the Moving Defendants.[9]

Further "'[i]t is well established that acts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction[.]'" *Sumitomo Copper*, 120 F. Supp. 2d at 338 (citation and internal quotations omitted; citing *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir. 1981)). "To establish personal jurisdiction on a conspiracy theory, [1] Plaintiffs must make a prima facie showing of conspiracy, [2] allege specific facts warranting the inference that the defendant was a member of

---

[9] Where jurisdiction is based on conduct outside the state, the defendant also must "reasonably expect" the in-state consequences and derive substantial revenue from "interstate or international commerce." N.Y. C.P.L.R. 302(a)(3)(ii). The Moving Defendants do not—and could not colorably--challenge either requirement.

the conspiracy, and [3] show that the defendant's co-conspirator committed a tort in New York." *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005), *on reconsideration*, 392 F. Supp. 2d 539, 557, 561-63 (S.D.N.Y. 2005) (upholding jurisdiction over certain foreign defendants based on alleged provision of material support to terrorists). *Accord Sumitomo Copper,* 120 F. Supp. 2d at 338-39 (upholding jurisdiction on conspiracy theory); *Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (same), *dismissed on other grounds*, 1992 WL 136849 (S.D.N.Y. 1992), *aff'd* 994 F.2d 996 (2d Cir. 1993).

On Defendants' prior motions to dismiss, the Court held that Plaintiffs had adequately pleaded Defendants' conspiracy. *Platinum*, 2017 WL 1169626, at *16. However, the Court declined to apply conspiracy jurisdiction because Plaintiffs' prior pleading failed to allege that "any Defendant—foreign or domestic—engaged in any activity related to the Fixing process or the Fixing Calls while present in New York." *Id.* at *49. The TAC remedies this insufficiency. Plaintiffs have alleged that the Moving Defendants' U.S.-based affiliates closely participated in the operation of the Fixing, including making trades and providing order flow information and updates on such information. TAC ¶¶38, 44. BASF Metals' own precious metals trader job posting admits that it has a precious metals business unit, referred to as "CCM". *See* Himes Decl. at Ex. 1. Although BASF in its brief, at 6 n.7, refers to CCM as an "organizational and marketing term", it admits that CCM—whether a "unit" or a "term"—applies to the precious metals operations across the entire, global BASF corporate family.

Equally important, Goldman and HSBC have conceded that their operations in this District subject them to this Court's jurisdiction, and their operations mirror those of the Moving

23

Defendants.[10] Under conspiracy law, Goldman's and HSBC's activities in New York are imputed to BASF Metals and ICBC Standard, thereby establishing jurisdiction on this basis as well. *See Emerald Asset*, 895 F. Supp. 2d at 432 (finding jurisdiction under conspiracy theory because defendant's agent acted for the benefit of defendant and thus agent's acts could be imputed to defendant).

The Moving Defendants further argue, based on language in *Aluminum I*, that conspiracy jurisdiction fails as a matter of law. ICBC Standard Br. at 10; BASF Metals Br. at 10. But Judge Forrest commented on conspiracy jurisdiction under Federal Rule 4(k)(2)—not as applied under the New York long arm statute. Indeed, Judge Forrester acknowledged the applicability of conspiracy jurisdiction under the CPLR 302(a)(2). *See Aluminum I*, 90 F. Supp. 3d at 226–27 (finding "the most instructive case from this District" to be *Terrorist Attacks,* 349 F. Supp. 2d at 765).

Moreover, even under Rule 4(k)(2), Judge Forrest did not reject the doctrine of conspiracy jurisdiction. Instead, the Court simply questioned the need for conspiracy jurisdiction

---

[10] *Compare* TAC ¶¶ 38, 44 *with* Goldman's and HSBC's marketing materials concerning their precious metals operations:

**Goldman:**

- "GS [Goldman Sachs] is a market maker across various precious metals, with employees trading across global locations on a continuous basis whenever markets are open for trading. . . . It should be expected that GS's sales, trading and other personnel will consult with one another including with respect to a counterparty's interests, trading behavior and expectations, mark-up, mark-down, spread, and any other relevant factors, as part of its market making activities." Himes Decl., at Ex. 11, at 2.

**HSBC:**

- "HSBC offers an unparalleled wide-aperture view of the precious metals market to . . . investors . . . . At the heart of our offering is the ability to see the entire precious metals universe at once . . . . HSBC's deep involvement at every stage of the value chain means we are key facilitators in the global flow of precious metals . . . ." Himes Decl., at Ex. 12, at 3, 6.

when other principles establish jurisdiction over foreign entities who direct foreign conduct at the forum. *See Aluminum I*, 90 F. Supp. 3d at 226-27. *Compare Aluminum II*, 2015 WL 6472656, at *12–13 (finding personal jurisdiction based on the effects of defendants' conduct in the U.S.).

The Moving Defendants' reliance on *Laydon*, 2017 WL 1113080, is equally misplaced. In *Laydon,* the plaintiffs failed to plead acts in the U.S. in furtherance of the conspiracy. *Id.* at *5-6. Here, by contrast, Plaintiffs allege that the Moving Defendants acted in the U.S. both directly and through agents employed by affiliates, as well as through co-conspirators Goldman and HSBC.[11]

Conspiracy jurisdiction is anchored in the settled common-law rule that each conspirator is the agent of its co-conspirators. Therefore, the conceded acts of Goldman and HSBC in this District establish jurisdiction over the Moving Defendants. Moreover, as discussed above, the Moving Defendants' U.S.-based affiliates also acted as agents for purposes of effectuating their conspiracy to manipulate the Fixing. *See* Section I.A.i., *above*. Accordingly, whether viewed from the lens of conspiracy or agency, Plaintiffs have pleaded sufficient facts to establish this Court's jurisdiction over the Moving Defendants. *See LaChapelle v. Torres*, 1 F. Supp. 3d 163, 169 (S.D.N.Y. 2014) ("Courts have regarded jurisdiction based on conspiracy as a subspecies of the agency rationale for jurisdiction.").

## II.    JURISDICTIONAL DISCOVERY—NOT DISMISSAL—IS APPROPRIATE

"'Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.'" *Dorchester*, 722

---

[11] ICBC Standard also cites *Martin v. Eide Bailly LLP*, 2016 WL 4496570 (S.D. Ind. Aug. 26, 2016), for the proposition that some courts reject conspiracy jurisdiction as inconsistent with due process. But the *Martin* court construed Indiana's state long arm statute. *Id.* at *4. New York courts, however, recognize conspiracy jurisdiction under *New York's* statute.

F.3d at 84 (quoting *Ball*, 902 F.2d at 197). *See also Leon v. Shmukler*, 992 F. Supp. 2d 179, 186 (E.D.N.Y. 2014). For the reasons set forth above, Plaintiffs have met their burden of establishing jurisdiction over each Moving Defendant. *See also Dorchester*, 722 F.3d at 84-85. Were there room for doubt, however, the Court should "'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Regenlab USA LLC v. Estar Techs. Ltd.*, 2017 WL 3601304, at *4 (S.D.N.Y. Aug. 17, 2017) (granting jurisdictional discovery and quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)). Accordingly, when a court "concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record," jurisdictional discovery, not dismissal, is a preferred course of action. *In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-md-2475, ECF No. 389, at 3 (S.D.N.Y. Mar. 17, 2016). *See also In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 205–06 (2d Cir. 2005) (where the jurisdictional inquiry was fact specific, the district court erred in denying discovery); *Mountain Tobacco*, 55 F. Supp. 3d at 314 (where the plaintiff made a "sufficient start of establishing personal jurisdiction," discovery was warranted) (citation and quotation marks omitted).

In *Brent Crude Oil,* two foreign defendants moved to dismiss for lack of personal jurisdiction, and Judge Carter directed jurisdictional discovery. Through discovery, the plaintiffs adduced additional evidence that one moving defendant, Philbro Commodities Limited, used its U.S. affiliate, Philbro Trading LLC, to trade Brent oil futures on NYMEX—the same exchange that the Moving Defendants used here to implement their manipulative scheme. The discovery established the interconnectivity between the two entities: "[w]hile the financial trades are maintained on Phibro Trading's books, the Phibro Commodities traders "are responsible for making the [trading] decisions . . . and do so with any eye towards the relevant Phibro

Commodities' trading book." *Brent Crude Oil*, 2017 WL 2535731, at *11 (citation and quotation marks omitted). Accordingly, the Court held that Philbro Commodities, the foreign defendant, "intended the effects of its alleged conduct in the North Sea to be felt in the U.S., particularly on NYMEX, where its employees executed trades." *Id.*

Comparable interconnectivity between the Moving Defendants and their U.S. traders is alleged here. Insofar as the Court may question whether the TAC's allegations establish jurisdiction, discovery should be directed. The Moving Defendants, we may safely presume, would oppose probing the facts. But the burden on these two global companies would be modest compared to the benefit of more informed judicial decision-making in a class action that will, in all events, proceed against two of the conspirators—Goldman Sachs and HSBC—neither of whom challenge jurisdiction.

## CONCLUSION

For the reasons set forth above, the Moving Defendants' motions to dismiss for lack of personal jurisdiction should be denied. Alternatively, the Court should direct jurisdictional discovery.

Dated:   August 31, 2017

**LABATON SUCHAROW LLP**

By:  /s/ *Jay L. Himes*

JAY L. HIMES
GREGORY S. ASCIOLLA
CHRISTOPHER MCDONALD
MATTHEW J. PEREZ
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
jhimes@labaton.com
gasciolla@labaton.com

**BERGER & MONTAGUE, P.C.**

By:  /s/ *Merrill G. Davidoff*

MERRILL G. DAVIDOFF
MARTIN I. TWERSKY
MICHAEL C. DELL'ANGELO
ZACHARY D. CAPLAN
1622 Locust Street
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
mdavidoff@bm.net
mtwersky@bm.net

cmcdonald@labaton.com                    mdellangelo@bm.net
mperez@labaton.com                       zcaplan@bm.net

*__Interim Co-Lead Class Counsel__*