UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

IN RE PLATINUM AND PALLADIUM
ANTITRUST LITIGATION

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/29/2020

Lead Case 1:14-cv-9391-GHW

<u>MEMORANDUM OPINION</u>
<u>AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

      Platinum and palladium are precious metals. Plaintiffs in this case allege that Defendants conspired to manipulate the price of these metals by "fixing the Fix." *In re Platinum and Palladium Antitrust Litig.* ("*Platinum I*"), 1:14-CV-9391-GHW, 2017 WL 1169626, at *5 (S.D.N.Y. Mar. 28, 2017). The Fix was supposed to be a process by which Defendants determined the worldwide benchmark price of platinum and palladium according to the laws of supply and demand. But Plaintiffs allege that Defendants colluded to push the benchmark price below the price that would have prevailed in a competitive market, which allegedly caused Plaintiffs to receive lower prices for their platinum and palladium investments than they otherwise would have.

      The Court reaffirms the conclusion it reached in *Platinum I* that Plaintiffs are not efficient enforcers of the antitrust laws because Plaintiffs have not adequately alleged that they traded directly with any Defendant or that Defendants dominated the market for platinum and palladium derivatives. However, the Court has personal jurisdiction over the foreign defendants because Plaintiffs have amended their complaint to plausibly allege conduct by their co-conspirators in the United States in furtherance of the conspiracy to manipulate the Fix price. Finally, because Plaintiffs' Commodities Exchange Act ("CEA") claims are predominately foreign, those claims are impermissibly extraterritorial. Accordingly, Defendants' motion to dismiss Plaintiffs' Sherman Act claim is GRANTED, the foreign defendants' motion to dismiss for lack of personal jurisdiction is DENIED, and Defendants' motion for reconsideration is GRANTED.

# I. BACKGROUND[1]

## A. Facts[2]

Platinum and palladium are "closely related precious metals." TAC ¶ 104. "While platinum and palladium—like gold and silver—have industrial uses, all four have traditionally been traded internationally . . . [and] held primarily for their exchange value rather than industrial use." *Id.* ¶ 54 (citation omitted). The allegations in this case center on the "London Platinum and Palladium Price Fixing (the 'Fixing' or 'Fix')." *Id.* ¶ 3. The Fix was a "private conference call twice each London business day" that "set global benchmark prices for platinum and palladium." *Id.* The Fix set this benchmark by establishing the price for physical platinum and palladium; the physical platinum and palladium was housed in London or Zurich. *Id.* ¶ 59.

The London Platinum and Palladium Fixing Company Ltd. ("LPPFC") operated as the "vehicle" for the Fix from 2004 to 2014. *Id.* ¶ 3. Throughout the period between January 1, 2008 and November 30, 2014 (the "Proposed Class Period"), there were four "members" of LPPFC that participated in the Fix. *Id.* Those members are the defendants in this case: BASF Metals Limited ("BASF Metals"), Goldman Sachs International ("Goldman Sachs"), HSBC Bank USA, N.A. ("HSBC"), and ICBC Standard Bank Plc ("ICBC Standard"). *Id.*

In theory, the Fix price was determined through a bona fide Walrasian auction among Defendants. *Id.* ¶ 58. One Fixing member, known as the Chair, would announce an opening price. *Id.* ¶ 59. Then, each Defendant would announce whether they were interested in buying or selling platinum and palladium at that price. *Id.* The Chair would then adjust the Fix price until the market

---

[1] The Court has issued a prior opinion in this case that provides further background. *See Platinum I*, 2017 WL 1169626, at *2-9.

[2] These facts are drawn from the Third Consolidated Amended Class Action Complaint ("TAC"), Dkt No. 183, and are accepted as true for the purposes of the Rule 12(b)(6) motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

reached an equilibrium at which supply equaled demand for platinum and palladium at the Fix price. *Id.* ¶ 62; *see Platinum I*, 2017 WL 1169626, at *3.

Platinum and palladium trade in at least two markets. First, "[t]he market for physical platinum and palladium operates on an over-the-counter ('OTC,' *i.e.*, between private parties) basis." TAC ¶ 74; *see Platinum I*, 2017 WL 1169626, at *4-5. Second, platinum and palladium futures and options contracts trade either OTC or on an "exchange." TAC ¶ 79; *see Platinum I*, 2017 WL 1169626, at *4-5 (defining the terms "futures contract" and "options contract"). The New York Mercantile Exchange ("NYMEX") is the "leading centralized exchange for platinum and palladium futures and options worldwide." TAC ¶ 79. Plaintiffs also allege that "NYMEX Platinum and Palladium prices move virtually in tandem with Fix prices." *Id.* ¶ 82; *see id.* ¶ 94 (alleging a correlation coefficient of 1.00 for physical platinum prices to futures prices and 0.99 for physical palladium prices to futures prices).

Plaintiffs Norman Bailey, Thomas Galligher, and Larry Hollin are individuals who "sold NYMEX platinum and palladium futures contracts at artificial[ly low] prices." *Id.* ¶ 28-30. Plaintiff White Oak Fund is a "private placement fund" also alleged to have transacted in NYMEX platinum futures contracts. *Id.* ¶ 32. Collectively, this opinion refers to these plaintiffs as the "Exchange Plaintiffs." The TAC alleges that Plaintiff KPFF Investment, Inc. "sold physical platinum and palladium" at artificially low prices. *Id.* ¶ 31. This opinion refers to KPFF as the "OTC Plaintiff."

The crux of Plaintiffs' allegations giving rise to this action is that Defendants took advantage of the Fixing Calls to set the Fix Price at lower levels than competitive market forces would otherwise have dictated. *Id.* ¶ 102; *see Platinum I*, 2017 WL 1169626, at *5. Plaintiffs allege that Defendants manipulated the Fix Price in two ways. First, Plaintiffs allege that Defendants "conspired to manipulate the Opening Price announced by the Chair at the beginning of the Fixing Calls." TAC ¶ 247; *see Platinum I*, 2017 WL 1169626, at *5. Second, Plaintiffs allege that

"Defendants misrepresented actual market supply and demand in order to move the AM and PM Fix Price to the level at which it was ultimately fixed."  TAC ¶ 247; *see Platinum I*, 2017 WL 1169626, at *5.

Plaintiffs allege that Defendants employed different strategies to profit from this manipulation.  First, Plaintiffs generally allege that Defendants exploited their foreknowledge of downward swings in the platinum and palladium Fix Price to make advantageous transactions in a variety of Platinum and Palladium Investments.  TAC ¶¶ 15-16; *see Platinum I*, 2017 WL 1169626, at *8.  Relatedly, Defendants also benefited from reducing their risk in digital options and other contracts with market-based triggers, such as "stop loss" orders and "margin calls."  TAC ¶ 208; *see Platinum I*, 2017 WL 1169626, at *8.  Second, the TAC alleges that Defendants were particularly motivated to suppress the Fix Price in order to profit from large net "short" positions that they allegedly held in the platinum and palladium futures market, including NYMEX, throughout the Proposed Class Period.  TAC ¶ 174; *see Platinum I*, 2017 WL 1169626, at *8.  In addition to these methods of profiting directly from manipulating the Fix, Plaintiffs allege that the Fixing calls enabled Defendants to employ other price manipulation tactics, including "front running," "spoofing," "wash sales," "painting the screen," and "jamming."  TAC ¶¶ 10, 179 & n.4; *see Platinum I*, 2017 WL 1169626, at *6 (defining these terms).

Plaintiffs present economic data in support of their claims that there were "artificial downward spikes around the time of the Fixing" for which "there is no innocent explanation."  TAC at 49, 91 (capitalization altered).  Plaintiffs also highlight government investigations into Defendants, which they claim "corroborate" their allegations.  *Id.* at 128 (capitalization altered).

### B. Procedural History

Plaintiffs commenced this action on November 25, 2014.  Dkt No. 1.  The parties filed a joint motion to consolidate five substantively similar complaints and to appoint Labaton Sucharow

LLP and Berger & Montague, P.C. as interim co-lead counsel for the proposed class, which the Court granted. Dkt No. 32. Plaintiffs subsequently filed a consolidated amended complaint, and Defendants moved to dismiss. Dkt Nos. 45, 76, 79. Plaintiffs then filed a second consolidated amended class action complaint ("SAC"), and Defendants again moved to dismiss for failure to state a claim and for lack of personal jurisdiction over certain foreign defendants. Dkt Nos. 102, 115, 117, 119-20.

The Court granted those motions in part and denied them in part. *Platinum I*, 2017 WL 1169626, at *53. The Court held that Plaintiffs had plausibly alleged a conspiracy among Defendants to violate the Sherman Act based on Plaintiffs' allegations of Defendants' "parallel conduct" and other circumstantial evidence including that "the Fixing coincided with Defendants' alleged price manipulation[,]" that Defendants allegedly acted against their own economic self-interest, and that Defendants had a "common motive" to "profit from their foreknowledge of the Fix Price[.]" *Id.* at *10-16. The Court also concluded that Plaintiffs had Article III standing. *Id.* at *16-17. The Court then considered whether Plaintiffs had antitrust standing. *See id.* at *18-25. The Court held that Plaintiffs had adequately alleged an antitrust injury. *Id.* at *19-20.

However, the Court concluded that Plaintiffs were not "efficient enforcers" of the antitrust laws. *Id.* at *20-25. Examining all four efficient enforcer factors, the Court determined that "it is appropriate to draw a line between persons who transacted directly with Defendants and those who did not." *Id.* at *22. Because Plaintiffs did not allege that they transacted directly with Defendants, the Court held that Plaintiffs were not efficient enforcers of the antitrust laws.

The Court also concluded that Plaintiffs had plausibly alleged Commodities Exchange Act ("CEA") violations. *Id.* at *25-37. [3] The Court held that Plaintiffs' CEA claims were not

---

[3] The Court also dismissed Plaintiffs' unjust enrichment claim. *Id.* at *38. Plaintiffs have chosen not to replead this claim. *See* TAC ¶ 1.

impermissibly extraterritorial. *Id.* at *26-28. Those claims are the subject of Defendants' motion for reconsideration. In addition, the Court held that it did not have personal jurisdiction over Foreign Defendants BASF Metals, ICBC Standard, and LPPFC and denied Plaintiffs' request for jurisdictional discovery.[4] *Id.* at *39-49. Finally, the Court granted Plaintiffs leave to amend. *Id.* at *53.

### C. New Allegations in the TAC

In response to the Court's decision in *Platinum I*, Plaintiffs have added new allegations to the TAC. With respect to Plaintiffs' claim that they are "efficient enforcers" of the antitrust laws, Plaintiffs' new allegations can be grouped into four buckets. *See* TAC at 2-3. First, Plaintiffs present new allegations related to exchange trading on NYMEX. Plaintiffs allege that NYMEX is "owned and operated by CME [Chicago Mercantile Exchange] Group." *Id.* ¶ 4 n.3. The TAC alleges that "NYMEX—through its clearinghouse, CME Clearing—is the counterparty to all transactions on the exchange (*i.e.*, the buyer or seller to a NYMEX contract does not have any identified counterparty other than NYMEX)." *Id.* ¶ 80 (emphasis omitted); *see also id.* ¶ 81. Second, Plaintiffs allege that there is a close relationship between the Fix and NYMEX futures prices. *See id.* ¶¶ 5, 14, 79-103, 134, 143. Third, Plaintiffs allege that Defendants have substantial market share in both the OTC and NYMEX platinum and palladium markets. *See id.* ¶¶ 6, 38, 40, 42, 44, 64, 71, 73, 77, 191, 194, 199. Fourth, Plaintiffs allege that NYMEX is the leading centralized exchange for trading platinum and palladium derivatives. *See id.* ¶¶ 4, 79, 89.

Plaintiffs have also substantially narrowed the scope of the Class and the scope of the transactions covered by the Class definition. Plaintiffs "bring this action on behalf of themselves

---

[4] Plaintiffs have chosen not to replead their claim against LPPFC. *See* TAC ¶ 1. The Court also granted motions to dismiss filed by UBS and BASF Corporation ("BASF Corp.") for failure to state a claim. *Platinum I*, 2017 WL 1169626, at *50-52. Plaintiffs have chosen not to replead these claims. *See* TAC ¶ 1.

and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure,

seeking relief on behalf of" a class including "[a]ll persons or entities who during the period from

January 1, 2008 through November 30, 2014 . . . : (i) sold physical platinum or palladium (99.95% or

greater purity, or otherwise good delivery); (ii) sold platinum or palladium futures contracts traded

on NYMEX; (iii) sold platinum or palladium call options traded on NYMEX; or (iv) bought

platinum or palladium put options traded on NYMEX." TAC ¶ 265; *cf.* SAC ¶ 271 (including in the

proposed class those who "sold shares in platinum or palladium [exchange traded funds,]" those

who "sold over-the-counter platinum or palladium spot or forward contracts or platinum or

palladium call options[,]" and those who "bought over-the-counter platinum or palladium put

options.").

Additionally, Plaintiffs have added new allegations to the TAC with respect to BASF Metals

and ICBC Standard's alleged continuous presence in the United States and their allegedly suit-related

conduct in this country. *See* TAC ¶¶ 14, 34-38, 43-46, 64, 68, 72, 190-191, 194, 202. Plaintiffs allege

that both BASF Metals and ICBC Standard engaged in conduct directed at the NYMEX and that

information from the Fixing was disseminated to and traded on by traders in New York and New

Jersey, including on the NYMEX. *See id.* Specifically, Plaintiffs allege that United States-based

"precious metals traders" employed by a BASF Metals' affiliate "would update order information

during the Fixing and provide this updated order information to BASF [Metals'] participant in the

Fixing as the Fixing was conducted." *Id.* ¶ 38. Similarly, the TAC alleges that "New York-based

precious metals traders [employed by a United States affiliate of ICBC Standard] would update order

information during the Fixing and provide this updated order information to [ICBC Standard]'s

participant in the Fixing as the Fixing was conducted." *Id.* ¶ 44. Furthermore, the TAC alleges that

the participants in the Fixing on behalf of Defendants BASF Metals and ICBC Standard were in

"constant communication" with traders employed by United States-based affiliates.  *Id.* ¶ 38 (BASF Metals); *id.* ¶ 44 (ICBC Standard).

The TAC asserts five claims for relief.  First, the TAC alleges that Defendants made an agreement to restrain trade in violation of section 1 of the Sherman Act, 15 U.S.C. §§ 1 *et seq*.  TAC ¶¶ 273-79.  Second, the TAC alleges a claim for manipulation in violation of the CEA, 7 U.S.C. §§ 1 *et seq*., including Commodity Futures Trading Commission ("CFTC") Rule 180.2.  TAC ¶¶ 280-84.  Third, the TAC asserts that Defendants employed a manipulative device in violation of the CEA including CTFC Rule 180.1.  *Id.* ¶¶ 285-89.  Fourth, the TAC asserts a claim for principal agent liability in violation of the CEA.  *Id.* ¶¶ 290-92.  Finally, the TAC asserts a claim for aiding and abetting liability in violation of the CEA.  *Id.* ¶¶ 293-95.

Defendants have again moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) as to all Defendants and for lack of personal jurisdiction as to the foreign defendants BASF Metals and ICBC Standard under Federal Rule of Civil Procedure 12(b)(2).  Dkt Nos. 207-11.[5]  Plaintiffs filed an opposition to both motions, Dkt Nos. 214-16, and Defendants filed their replies.  Dkt Nos. 218-21.  After those motions were fully briefed, Defendants also filed a motion for reconsideration of the Court's prior holding that Plaintiffs' CEA claims were not impermissibly extraterritorial.  Dkt Nos. 235-36.  Plaintiffs filed an additional opposition to that motion, Dkt No. 237, and Defendants filed an additional reply.  Dkt No. 238.

---

[5] Defendants also ask the Court to take a "fresh look at the lack of particularity" in Plaintiffs' allegations.  Joint Memorandum of Law in Support of Defendants' Motion To Dismiss Plaintiffs' Third Amended Complaint ("Mem."), Dkt No. 208, at 20.  Having considered this argument, the Court declines to disturb its prior rulings holding that Plaintiffs have sufficiently alleged a conspiracy among Defendants.

## II. DISCUSSION

### A. Rule 12(b)(6) Motion[6]

#### 1. Legal Standard

Under Federal Rule of Civil Procedure 8, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may nonetheless move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008)

---

[6] "Although a court should 'traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues.'" *Sullivan v. Barclays PLC*, 13-CV-2811 (PKC), 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017) (quoting *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 498 n.6 (2d Cir. 2013)). "[I]n cases such as this one with multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiffs['] cause of action, [a court] may address first the facial challenge to the underlying cause of action[.]" *Id.* (quoting *Chevron Corp. v. Naranjo*, 667 F.3d 232, 247 n.17 (2d Cir. 2012)). Accordingly, the Court considers Defendants' Rule 12(b)(6) motion first.

(per curiam).  However, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

### 2. Application

Plaintiffs have not adequately alleged that they are efficient enforcers of the antitrust laws. As discussed in *Platinum I*, "[w]hile 'it is a well-established principle that the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate standing.'" 2017 WL 1169626, at *18 (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005)) (alterations and some quotation marks omitted).  "Antitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement, the court must dismiss it as a matter of law." *Id.* (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75-76 (2d Cir. 2013)) (brackets omitted).

"To satisfy the antitrust standing requirement, 'a private antitrust plaintiff must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations,' *i.e.*, that plaintiff is 'an "efficient enforcer" of the antitrust laws." *Id.* (quoting *In re Aluminum Warehousing Antitrust Litig.* ("*Aluminum II*"), 833 F.3d 151, 157-58 (2d Cir. 2016)).  The Court concluded in *Platinum I* that Plaintiffs have adequately alleged an antitrust injury, *id.* at *19-20, and it does not disturb that conclusion here.

Thus, the question before the Court is whether Plaintiffs are "efficient enforcers of the antitrust laws." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 777-78 (2d Cir. 2016) (citation omitted). The efficient enforcer inquiry focuses on four factors: "(1) the 'directness or indirectness of the asserted injury' . . . ; (2) the 'existence of more direct victims of the alleged conspiracy'; (3) the extent to which [plaintiffs'] damages claim is 'highly speculative;' and (4) the importance of avoiding 'either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of

damages on the other.'" *Id.* at 778 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 540-44 (1983)).

"The efficient enforcer inquiry is a general balancing test in which the importance assigned to each factor 'will necessarily vary with the circumstances of particular cases.'" *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 332 (S.D.N.Y. 2018) (quoting *Gatt*, 711 F.3d at 78). The factors are meant to determine "whether the putative plaintiff is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement[.]" *Gatt*, 711 F.3d at 80 (quoting *AGC*, 459 U.S. at 542). Because the efficient enforcer inquiry presents somewhat different considerations for the OTC Plaintiff and the Exchange Plaintiff, the Court conducts the inquiry for each in turn.

### a. OTC Plaintiff

The OTC Plaintiff is not an efficient enforcer of the antitrust laws because Plaintiffs have not alleged that it transacted directly with any Defendant. The TAC alleges that the OTC Plaintiff "sold physical platinum and palladium[.]" TAC ¶ 31. Plaintiffs also allege that "[d]uring the [Proposed] Class Period," each Defendant "entered directly into platinum and palladium transactions with members of the Class." *Id.* ¶ 38 (BASF Metals); *id.* ¶ 40 (Goldman Sachs); *id.* ¶ 42 (HSBC); *id.* ¶ 44 (ICBC Standard). In addition, the TAC alleges a number of "dates on which one or more of Plaintiffs['] sales coincided with Defendants['] manipulation of the PM Platinum fixing" and makes similar allegations for the PM Palladium Fixing. *Id.*, apps. C & D (capitalization altered).[7] However, Plaintiffs do not allege that the OTC Plaintiff transacted directly with any Defendant.

Accordingly, the analysis of the four efficient enforcer factors as applied to the OTC Plaintiff focuses on whether it qualifies as an efficient enforcer, even though it did not transact

---

[7] Plaintiffs made similar allegations in the SAC, *see, e.g.*, SAC ¶ 34; apps. C & D, which the Court found to be insufficient to plausibly alleged that OTC plaintiffs were efficient enforcers. *Platinum I*, 2017 WL 1169626, at *21-25.

directly with Defendants. Plaintiffs allege that the Fix "set global benchmark prices for platinum and palladium," *id.* ¶ 3, and that Defendants conspired to rig the Fix. *See, e.g., id.* ¶ 102. Thus, Plaintiffs allege that Defendants manipulated the global benchmark price of platinum and palladium. As discussed below, the application of the efficient enforcer factors where plaintiffs allege manipulation of a benchmark is not straightforward. Ultimately, with respect to the OTC Plaintiff, the Court adheres to its decision in *Platinum I* to "dr[a]w a line between plaintiffs who transacted directly with defendants and those who did not." 2017 WL 1169626, at *22 (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VI*"), 11 MDL 2262 (NRB), 2016 WL 7378980, at *16 (S.D.N.Y. Dec. 20, 2016)) (brackets omitted). Because the TAC does not allege that the OTC Plaintiff transacted directly with any defendant, it is not an efficient enforcer.

### i. Directness of Injury

The first efficient enforcer factor is "the 'directness or indirectness of the asserted injury.'" *Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 540). This factor "requires evaluation of the 'chain of causation' linking [plaintiff's] asserted injury and the [defendants'] alleged price-fixing." *Id.* (quoting *AGC*, 459 U.S. at 540); *see also In re Commodity Exch., Inc.* ("*Gold*"), 213 F. Supp. 3d 631, 653 (S.D.N.Y. 2016) (holding that this factor "requir[es] proximate causation" between the antitrust injury alleged by plaintiff and defendants' allegedly anticompetitive conduct) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014); *DNAML PTY, Ltd. v. Apple Inc.*, 25 F.Supp.3d 422, 430 (S.D.N.Y. 2014); *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*Silver I*"), 213 F. Supp. 3d 530, 552 (S.D.N.Y. 2016)) (capitalization altered).

The first factor is problematic for Plaintiffs' argument that the OTC Plaintiff is an efficient enforcer in this case. Plaintiffs allege that the Fixing set the "globally accepted benchmark prices" for platinum and palladium. TAC ¶ 4. In similar circumstances, some courts have held that plaintiffs alleging injury via manipulation of a benchmark price satisfy the proximate causation

requirement because their allegation is that they are directly injured by defendants' manipulation of the benchmark, regardless of whether they have transacted directly with defendants. *See Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 165 (S.D.N.Y. 2018) (describing the first efficient enforcer factor as requiring plaintiffs to "demonstrate[] a sufficiently direct injury" and concluding that the plaintiffs had met that standard because they "allege[d] that they engaged in transactions for" derivatives linked to a financial benchmark "and that their returns were lower because of defendants' anticompetitive conduct"); *Gold*, 213 F. Supp. 3d at 653-54 (concluding that the plaintiffs "ha[d] demonstrated a sufficiently direct injury" in similar factual circumstances).[8] On this view, Plaintiffs have sufficiently alleged that Defendants proximately caused the OTC Plaintiff to receive lower prices than it otherwise would have when it sold its platinum and palladium.

On the other hand, where a plaintiff does not purchase directly from defendant, there are "significant intervening causative factors," which may "attenuate the causal connection between the violation and the injury." *LIBOR VI*, 2016 WL 7378980 at *15. When "[a] plaintiff and a third party" choose to "incorporate [a benchmark] into a financial transaction without any action by defendants whatsoever," the "independent decision to do so" may attenuate "the chain of causation between defendants' actions and a plaintiff's injury." *Id.* at *16.[9] Thus, although the causation

---

[8] *See also* Sharon E. Foster, *Antitrust Efficient Enforcer and the Financial Products Benchmark Manipulation Litigation* ("*Benchmark Manipulation Litigation*"), 13 Ohio St. Bus. L.J. 99, 137 (2019) (opining "that there is no intervening cause or persons between plaintiffs' damages and defendants' conduct" in benchmark manipulation cases); *cf. Gelboim*, 823 F.3d at 779 ("At first glance, here there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with [the defendants].").

[9] *See also Sullivan*, 2017 WL 685570, at *17 ("A defendant may have had no knowledge of the existence of a particular transaction, and the plaintiff may have had no dealings with the defendant, but, provided the derivative product incorporated [the benchmark] as a price term, it would fall within the scope of plaintiffs' claims."); *Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG* ("*CHF LIBOR*"), 277 F. Supp. 3d 521, 560-61 (S.D.N.Y. 2017)). *But see* Foster, *Benchmark Manipulation Litigation* at 138-39 (challenging this analysis because "it assumes, incorrectly, that plaintiffs had a choice, and the bargaining power to affect that choice, regarding what benchmark to select as part of the price equation. . . . The economic reality was that LIBOR benchmarks controlled approximately 75% of the global market for interest rate financial products during the relevant time period. Further, as a practical matter, some benchmark had to be used to estimate price. . . . Leading benchmarks, such as LIBOR, were used as a matter of course[,] not as a matter of choice.") (footnote and citations omitted).

analysis does not itself preclude Plaintiffs' argument that the OTC Plaintiff is an efficient enforcer, the problems of proving causation in this case is a significant factor in the efficient enforcer analysis.

### ii. Existence of More Direct Victims

The second efficient enforcer factor is "the 'existence of more direct victims of the alleged conspiracy[.]" *Gelboim*, 823 F.3d at 779 (quoting *AGC*, 459 U.S. at 542). Generally, "[w]hether there is a more direct victim of Defendants' alleged antitrust violation turns 'chiefly on whether the plaintiff is a consumer or a competitor.'" *Platinum I*, 2017 WL 1169626, at *23 (quoting *Gelboim*, 823 F.3d at 779). However, a plaintiff's status "is not the end of the inquiry; the efficient enforcer criteria must be established irrespective of whether the plaintiff is a consumer or a competitor." *Id.* (quoting *Gelboim*, 823 F.3d at 779). "'Inferiority' to other potential plaintiffs can be relevant, but it is not dispositive." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009). "Implicit in the inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779.

The existence of more direct victims of Defendants' alleged conspiracy does not weigh clearly in favor of or against the conclusion that Plaintiffs have sufficiently pleaded that the OTC Plaintiff is an efficient enforcer. On the one hand, those who transacted directly with Defendants may be conceived of as more direct victims of Defendants' alleged conspiracy than those who did not.

On the other hand, *Gelboim* held that this factor may have "diminished weight" in benchmark manipulation cases. 823 F.3d at 779. "In *Gelboim*, the Second Circuit recognized that 'one peculiar feature of that case was that remote victims (who acquired LIBOR-based instruments from any of thousands of non-defendant banks) would be injured to the same extent and in the same way as direct customers of the Banks.'" *Platinum I*, 2017 WL 1169626, at *23 (quoting *Gelboim*,

823 F.3d at 779) (other citations and brackets omitted).  What *Gelboim* labeled a "peculiar feature" is present in any benchmark manipulation case, and *Platinum I* concluded that it is "also present here. Those who transacted in [p]latinum and [p]alladium [i]nvestments with other market participants would be injured to the same extent and in the same way as Defendants' direct customers." *Id.* (quoting *Gelboim*, 823 F.3d at 779) (other citations omitted); *see also* Foster, *Benchmark Manipulation Litigation* at 140-41 (arguing that so long as the price a purchaser paid was tied to the relevant benchmark, it does not matter whether a plaintiff transacted directly with a defendant).  It was for this reason that *Gelboim* held that whether there were more direct victims of the alleged conspiracy should receive "diminished weight" in cases like this one.  823 F.3d at 779.  Consequently, both because *Gelboim* indicated that this factor carries diminished weight in benchmark manipulation cases and because it does not clearly cut for or against the OTC Plaintiff's efficient enforcer status, the second factor does not carry much weight in the Court's analysis.

### iii. Speculative Damages

The third efficient enforcer factor is "whether the damages would necessarily be 'highly speculative[.]'"  *Gelboim*, 823 F.3d at 780 (quoting *AGC*, 459 U.S. at 542).  "'Some degree of uncertainty stems from the nature of antitrust law' and 'the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'  At the same time, 'highly speculative damages is a sign that a given plaintiff is an inefficient engine of enforcement.'"  *CHF LIBOR*, 277 F. Supp. 3d at 563 (first quoting *Gelboim*, 823 F.3d at 780; then quoting *DDAVP*, 585 F.3d at 689; and then quoting *Gelboim*, 823 F.3d at 779).  "Damages claims may . . . be too speculative where:  (1) 'the damages claim is conclusory'; (2) 'the injury is so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions'; or (3) 'due to external market factors, there is no relationship between

the fixed price and the price that the plaintiffs ultimately paid.'" *Id.* (quoting *LIBOR VI*, 2016 WL 7378980, at *17-18).

This factor also does not cut clearly in favor of or against Plaintiffs' argument that the OTC Plaintiff is an efficient enforcer. On the one hand, the OTC Plaintiff's damages claim is not conclusory; if, as Plaintiffs allege, Defendants suppressed the price of platinum and palladium, the OTC Plaintiff's theory of damages flows directly from that suppression. Moreover, Plaintiffs have alleged that the OTC Plaintiff suffered a direct injury as a result of Defendants' manipulation of the benchmark price for platinum and palladium, so the OTC Plaintiff's injury is arguably not causally attenuated from Defendants' alleged manipulation. And, although the price of platinum and palladium is undoubtedly influenced by market forces independent of Defendants' alleged manipulation, the same is true to some extent in any Sherman Act case. *Cf. Gelboim*, 823 F.3d at 780 ("Some degree of uncertainty stems from the nature of antitrust law.").

On the other hand, as in *Gelboim*, damages calculations in this case "present[] some unusual challenges." *Id.* at 781. In *Platinum I*, the Court expressed concern about Plaintiffs' ability to "untangle the impact" of Defendants' alleged conspiracy "from the impact of intervening market decisions." *LIBOR VI*, 2016 WL 7378980, at *17; *see Platinum I*, 2017 WL 1169626, at *23-25 (discussing the difficulties calculating damages would present in this case). Those concerns have not entirely abated. Accordingly, this factor also does not carry much weight in the Court's analysis of whether the OTC Plaintiff is an efficient enforcer of the antitrust laws.[10]

---

[10] The Court observes that the third efficient enforcer factor may be in tension with traditional principles of notice pleading. In most areas of law, concerns about damage calculations are deferred until after the pleading stage. *See* Foster, *Benchmark Manipulation Litigation* at 142 (opining that the concern about speculative damages "is not an efficient enforcer issue; rather, it is a problem of proof").

### iv. Duplicative Recovery & Complex Damages Apportionment

The fourth efficient enforcer factor is "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *Gelboim*, 823 F.3d at 778 (quoting *AGC*, 459 U.S. at 544). This factor "reflects a 'strong interest in keeping the scope of complex antitrust trials within judicially manageable limits.'" *LIBOR VI*, 2016 WL 7378980 (quoting *AGC*, 459 U.S. at 543) (ellipsis omitted). It is arguably the most important factor in the efficient enforcer analysis. *See* Foster, *Benchmark Rate Manipulation* at 140 ("Efficient enforcer factors focus on duplicative recovery and complex apportionment.") (citations omitted).

Like the first efficient enforcer factor, this factor does not preclude Plaintiffs' argument that the OTC Plaintiff is an efficient enforcer, but it does present significant challenges. On the one hand, if every seller of platinum and palladium collects damages from Defendants, it would not present a risk of duplicative recoveries. That is because every seller can only recover from Defendants once. *See ISDAFix*, 175 F. Supp. 3d at 61 ("[T]he damages at issue are tied to particular transactions and contracts, obviating the danger of duplicative recovery."). And, at first blush, the apportionment of damages may not seem complex. If Plaintiffs prove that Defendants manipulated the price of platinum and palladium by $X, then each seller should be able to recover $X. On this view, there is nothing more complex about damages apportionment in this case than in any price-fixing case.

Damages apportionment may not be so simple in this case, however. As noted above with respect to factor one, decisions by non-defendant buyers to incorporate the Fix into transactions over which Defendants have no control may create difficult questions of causation that bear on the damages analysis. In other words, where non-defendant parties decided to incorporate the Fix price into transactions without Defendants' knowledge, those decisions may make apportioning damages particularly complex. The complexity of damages apportionment is a significant factor in the

Court's analysis of whether plaintiffs who are not alleged to have transacted directly with Defendants are efficient enforcers in this case.[11]

### v. Conclusion

The Court concludes that plaintiffs who sold physical platinum and palladium and did not transact directly with Defendants are not efficient enforcers of the antitrust laws. As discussed above, the first and fourth factors raise serious concerns about the OTC Plaintiff's efficient enforcer status. Thus, after balancing the efficient enforcer factors with a focus on determining whether the OTC Plaintiff "is a proper party to 'perform the office of a private attorney general' and thereby 'vindicate the public interest in antitrust enforcement'" *Gatt*, 711 F.3d at 80 (quoting *AGC*, 459 U.S. at 542), the Court has concluded that plaintiffs who did not transact directly with defendants are not efficient enforcers.

This conclusion is reinforced by the possibility of disproportionate damages in benchmark manipulation cases. As noted above, benchmark manipulation cases present unique challenges for application of the efficient enforcer factors. *Gelboim* noted that one difficult issue arises with respect to so-called "umbrella" standing. "Umbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole." *Gelboim*, 823

---

[11] The allegation that there are government investigations into Defendants' manipulation of the Fix price does not carry significant weight in the Court's analysis. *Gelboim* noted that there were government investigations related to the transactions at issue in that case "ongoing in at least several countries." 823 F.3d at 780. The Second Circuit observed that "[s]ome of those government initiatives may seek damages on behalf of victims, and for apportionment among them" but did not elaborate on how this should factor into its analysis beyond stating that it was "wholly unclear on this record how issues of duplicate recovery and damage apportionment can be assessed." *Id.* Plaintiffs have made similar allegations of government investigations into Defendants' conduct in this case. TAC ¶¶ 229-40. The importance of related government investigations in similar cases is unsettled in this district. *Compare Sullivan*, 2017 WL 685570, at *20 ("[A]ctions of government regulators lessen the need for plaintiffs to function as private attorneys general and vindicators of the public interest.") *with In re For. Exch. Benchmark Rates Antitrust Litig.* ("*FOREX*"), 13 CIV. 7789 (LGS), 2016 WL 5108131, at *8 (S.D.N.Y. Sept. 20, 2016) ("Because public enforcement does not provide redress to victims of the conspiracy, the OTC Class is an efficient and necessary enforcer."). In this case, the allegations that there are government investigations into the alleged manipulation of the Fix is not a significant factor in the Court's analysis.

F.3d at 778; *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 n.4 (7th Cir. 2002) ("If . . . cartel members A and B sell to customers X and Y, and then non-cartel member firm C makes sales at or near the enhanced cartel price to customer Z, the question arises whether A and B are liable to Z for the overcharges it paid."). Here, plaintiffs who did not transact directly with defendants are "umbrella" purchasers.

Benchmark manipulation cases present particularly difficult questions regarding umbrella standing because alleged manipulators can affect prices without dominating the market. In a standard (*i.e.*, non-benchmark) manipulation case, alleged manipulators must have at least a substantial market share—if not outright market dominance—to maintain a non-competitive price. That is because a cartel must have a large enough fraction of the market to exert control over the market price. In other words, if a would-be cartel is only a tiny fraction of the market, it cannot exert market power and thus is no cartel at all. This premise has led to a "scholarly consensus" that is "skeptical" about whether it is possible for private actors to manipulate large commodity markets. *See* Andrew Verstein, *Benchmark Manipulation*, 56 B.C. L. Rev. 215, 216 (2015).[12]

Benchmark manipulation cases are different. All that a would-be cartel must do is manipulate a benchmark. Where, as here, the benchmark is calculated based on a tiny fraction of market activity, a manipulator need only manipulate that tiny fraction of market activity.[13] And "[o]nce the benchmark is hardwired into legal relationships, manipulating the proxy pays off just as much as manipulating the underlying reality." *Id.* at 217; *see also id.* ("If the manipulator has agreed to

---

[12] *See also id.* at 216-17 ("To drive up the global price of an asset—such as silver—you have to buy a truly enormous amount. But you haven't gotten rich unless you can sell at the inflated price, and whatever forces raised the price while you bought will reverse when you try to sell. In theory, the plummeting price should precisely evaporate your profits. And in the meantime, you had to pay to transport and store a quarter of the world's silver.").

[13] *See also id.* at 218 ("By their nature, benchmarks describe a market based on some small slice of it. Careful manipulators can bias that slice. It is daunting to corner the world currency market, but it is less daunting to corner the two percent of the market whose price is considered by the leading benchmark. By shrinking the domain over which the manipulator must exercise influence, benchmarks directly circumvent the principal challenges to manipulation identified by scholars.") (footnote omitted).

sell oil at the benchmark price, tampering with the benchmark has the same effect as moving the worldwide supply of oil.") (citation omitted). As noted above, because the benchmark is then widely disseminated, any party that transacted based on the benchmark can reasonably complain that their damages were caused by defendants' manipulation. But allowing parties who did not transact directly with defendants to recover also leads to the causal attenuation and complex damages apportionment noted in the Court's discussion of the first and fourth efficient enforcer factors.

Thus, benchmark manipulation cases generate the *Gelboim* court's concern that "if the [defendants] control only a small percentage of the ultimate identified market," the defendants may be liable for "damages disproportionate to wrongdoing[.]" 823 F.3d at 779 (citation omitted); *see also id.* ("Requiring the Banks to pay treble damages to every plaintiff who ended up on the wrong side of an independent LIBOR-denominated derivative swap would, if appellants' allegations were proved at trial, not only bankrupt 16 of the world's most important financial institutions, but also vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated."). As noted above, absent a benchmark, it would be difficult—if not impossible—for defendants who "control[led] only a small percentage of the ultimate identified market" to exert meaningful control over the market price. *Id.* Thus, although the concern about disproportionate damages may arise where a plaintiff alleges market manipulation by means other than the manipulation of a benchmark, it generally will not do so as forcefully as in a benchmark manipulation case—at least where, as here, the benchmark is calculated based on a small slice of market activity or information submitted by a small number of market participants. Either the would-be cartel is too small (and fails in its attempt to manipulate the market) or the cartel has substantial market share (and market-wide damages are more proportional to the harm caused by defendants). Hence, *Gelboim*'s concern about disproportionate damages is particularly relevant in benchmark manipulation cases.

There is another distinct, though conceptually overlapping, issue that results from the problems identified in the Court's discussion of the first and fourth efficient enforcer factors. This concern is that, taking the facts as alleged in the TAC as true, every non-defendant buyer received a benefit from the lower prices that prevailed in the market as a result of Defendants' illegal conduct. That is, assuming that Defendants successfully downwardly manipulated the prices of platinum and palladium, non-defendant buyers received a windfall as a result of Defendants' manipulation. But there is no mechanism for non-defendant buyers to compensate Plaintiffs for this windfall.

This is another way of characterizing *Gelboim*'s concern about disproportionate damages. Plaintiffs' damages may be disproportionate to defendants' wrongdoing because Plaintiffs' damages are not proportional to defendants' ill-gotten gains. Some (even most) of plaintiffs' damages—the difference between the lower price that allegedly prevailed because of Defendants' manipulation and the price that allegedly would have prevailed absent Defendants' manipulation—flowed to non-defendants. Although this concern applies to "umbrella" plaintiffs generally and not only in benchmark manipulation cases, it is particularly vexing where defendants control only a small percentage of the identified market, as is more likely to be the case in benchmark manipulation cases.[14]

These concerns, which flow from the problems inherent in the application of the first and fourth efficient enforcer factors in benchmark manipulation cases, reinforce the Court's conclusion that it should adhere to its decision in *Platinum I* to "dr[a]w a line between platinum and palladium

---

[14] The question is not, as one commentator has argued, whether defendants are subject to "ruinous liability" or whether particular defendants are systemically important financial institutions. Foster, *Benchmark Manipulation Litigation* at 139-40. The Court agrees that there would be a "serious rule of law problem" if the efficient enforcer inquiry turned on whether a particular defendant was "too big to fail." *Id.* at 140; *cf.* Sharon E. Foster, *Too Big to Prosecute: Collateral Consequences, Systemic Institutions and the Rule of Law*, 34 Rev. Banking & Fin. L. 655, 674-85 (2015). Rather, the problem is whether defendants—no matter their size—are subject to liability that is *disproportionate* to their allegedly ill-gotten gains. This problem arises because of the structure of benchmark manipulation litigation and, more specifically, the problems of causal attenuation and complex damages apportionment noted above.

purchasers who transacted directly with Defendants and those who did not." 2017 WL 1169626, at *22 (quoting *LIBOR VI*, 2016 WL 7378980, at *16). In addition to addressing the problems associated with the first and fourth efficient enforcer factors identified above, this approach has the further advantage of rendering Plaintiffs' recovery essentially proportional to Defendants' allegedly ill-gotten gains. For similar reasons, "a critical mass of judges within this district" addressing similar concerns in benchmark manipulation cases "have concluded that plaintiffs who are not direct purchasers are not efficient enforcers in a benchmark manipulation case." *In re London Silver Fixing, Ltd., Antitrust Litig.* ("*Silver II*"), 332 F. Supp. 3d 885, 905 (S.D.N.Y. 2018) (citing *LIBOR VI*, 2016 WL 7378980, at *16; *Sullivan*, 2017 WL 685570, at *15; *Platinum I*, 2017 WL 1169626, at *22; *CHF LIBOR*, 277 F. Supp. 3d at 558). Hence, the Court reaffirms its conclusion in *Platinum I* that the OTC Plaintiff is not an efficient enforcer because Plaintiffs have not alleged that the OTC Plaintiff transacted directly with Defendants.

### b. Exchange Plaintiffs

The Exchange Plaintiffs are not efficient enforcers of the antitrust laws because Plaintiffs have not adequately alleged that Defendants dominated the market for platinum and palladium derivatives. As an initial matter, the same concerns noted above with respect to causation and complex damages apportionment also apply to the Exchange Plaintiffs. Exchange Plaintiffs' choice to incorporate the Fix price into their platinum and palladium derivative transactions arguably attenuates the causal connection between Defendants' actions and their injury. And damage apportionment may be complex given Plaintiffs' choice to incorporate the Fix price independently of any action by Defendants. Hence, the same problems that flow from the application of the efficient enforcer factors to the OTC Plaintiff's claim also arise in the exchange context.

The solution to those problems that the Court has adopted with respect to the OTC Plaintiff is not readily transferrable to the exchange market, however. As explained above, parties transact

directly in the OTC market. Therefore, an OTC plaintiff's counterparty is reasonably ascertainable. But "[t]he framework of dividing plaintiffs between those who transacted with defendants and those who did not in OTC transactions 'is not readily transferable to the futures market,' because a clearinghouse such as the CME, rather than any identifiable third party, serves essentially as the counterparty." *CHF LIBOR*, 277 F. Supp 3d at 561 (quoting *LIBOR VI*, 2016 WL 7378980, at *16); *see also LIBOR VI*, 2016 WL 7378980, at *16 ("[W]here a plaintiff's counterparty is *reasonably ascertainable* and is not a defendant . . . a plaintiff is not an efficient enforcer.") (emphasis added). For plaintiffs who sold on an exchange, "there is simply no way to tailor the standing analysis to those who dealt directly with defendants." *CHF LIBOR*, 277 F. Supp. 3d at 561. In this case, the Plaintiffs have amended their complaint to allege that CME Clearing "is the counterparty to *all* transactions on the exchange (*i.e.*, the buyer or seller to a NYMEX contract does not have any identified counterparty other than NYMEX)." TAC ¶ 80. In light of the Plaintiffs' amendments, the Court is persuaded that it cannot draw a line between those who transacted directly with defendants and those who did not in the exchange context.

Because the Exchange Plaintiffs' counterparties are not reasonably ascertainable, the Court is caught on the horns of a dilemma. Defendants argue that a necessary corollary of the Exchange Plaintiffs' argument that all NYMEX sellers should be able to collect damages is that "all sellers of NYMEX futures are equally positioned to enforce the antitrust laws" and that accepting their arguments would "effectively eliminate[] the efficient enforcer requirement altogether" in this case. Mem. at 17. On the other hand, Plaintiffs argue that "to allow only those who directly contracted with Defendants to state a claim would leave wide swaths of their victims—including the *entirety* of the futures and options traders—without a remedy." Plaintiffs' Letter to Court, Dkt No. 195, at 2 n.3. Both Plaintiffs and Defendants are correct. Because the Court cannot enforce the line between those who transacted directly with Defendants and those who did not on an exchange, either *no*

seller or *every* seller will be an efficient enforcer. As Judge Stein observed with respect to exchange plaintiffs, "there is simply no way to tailor the standing analysis to those who dealt directly with defendants." *CHF LIBOR*, 277 F. Supp. 3d at 561. Therefore, it is difficult to "render[] plaintiffs' recovery essentially proportional to defendants' ill-gotten gains" and "the choice is between under-enforcement and over-enforcement[.]" *Id.*

One way to resolve this dilemma is for plaintiffs to allege that defendants dominated the relevant exchange market. Recognizing that counterparties to exchange plaintiffs are not reasonably ascertainable, judges in this district have adopted a test that "depends primarily on the extent of defendants' control of the market for the product traded on the exchange." *CHF LIBOR*, 277 F. Supp. 3d at 561 (citations omitted).

*FOREX* was the first case to adopt this standard. 2016 WL 5108131, at *10. In that case, Judge Schofield noted the *Gelboim* court's observation that "'at first glance there appears to be no difference in the injury alleged by those who dealt in LIBOR-denominated instruments, whether their transactions were conducted directly or indirectly with the Banks'" but also observed that *Gelboim* "expressed concern . . . with the possibility of damages disproportionate to wrongdoing 'if the Banks control only a small percentage of the ultimate identified market.'" *Id.* (quoting *Gelboim*, 823 F.3d at 779) (ellipsis omitted). She then concluded that this concern was inapplicable because the plaintiffs alleged that the defendants in that case "dominated the FX market with a combined market share of over 90% as significant participants in both OTC and exchange transactions." *Id.* In other words, *Gelboim*'s concern about damages disproportionate to wrongdoing applied much less forcefully on the facts of *FOREX* because where defendants had over 90% market share, they would also be responsible for over 90% of the damages. Three other judges in this district have followed Judge Schofield's lead, reasoning that "control of an exchange-based market 'may be viewed as a . . . way of ensuring that damages would not be greatly disproportionate to wrongdoing."

24

*CHF LIBOR*, 277 F.Supp.3d at 561 (quoting *LIBOR VI*, 2016 WL 7378980, at *16); *see also Silver II*, 332 F. Supp. 3d at 909.

The Court likewise adopts this test as one method by which plaintiffs can allege that an exchange plaintiff is an efficient enforcer.[15] The market domination test helps to resolve the causation and complex apportionment issues described above. Indeed, the market domination test may be thought to serve as a proxy for whether a plaintiff transacted directly with a defendant; in a market in which defendants dominate, it is far more likely that a plaintiff who bought on an exchange will have transacted directly with a defendant.

The question presented by the Exchange Plaintiffs on this motion is thus whether the Plaintiffs have adequately alleged that Defendants have dominated the platinum and palladium exchange market. The Court's inquiry consists of three steps. First, the Court must define the relevant market. Second, the Court must examine what share of that market Defendants are alleged to have controlled. Finally, the Court must determine whether Defendants controlled a sufficiently large percentage of the relevant market that they "dominated" it.

### i. Market Definition

The first step of the Court's inquiry is to define the relevant market. The "guiding precedent leaves room for debate as to how the 'market' should be defined" in cases like this one. *Gold*, 213 F. Supp. 3d at 653. Plaintiffs argue that they have alleged "a single market for platinum and palladium physical, futures and options transactions[.]" Opposition to Joint Motion to Dismiss for Failure to State a Claim ("Opp."), Dkt No. 216, at 15 n.4; *see, e.g.*, TAC ¶ 254 ("Plaintiffs were sellers in the market for Physical and NYMEX Platinum and Palladium[.]"). However, "[w]hile the Court is

---

[15] The Court does not hold that an allegation of market domination is the only method by which an exchange plaintiff can adequately plead antitrust standing in this context. For example, Defendants correctly note that the Exchange Plaintiffs have not "allege[d] that they traded *through* a clearing member affiliated with any Defendant." Mem. at 12. The Court does not take a position on whether allegations of this type plausibly plead that a plaintiff is an efficient enforcer.

bound by the factual allegations in the Complaint[],” the “definition of the relevant market is a legal conclusion, not a factual one.” *In re N. Sea Brent Crude Oil Futures Litig.* (“*Oil*”), 256 F. Supp. 3d 298, 312 (S.D.N.Y. 2017), *aff’d sub nom.*, *Prime Int’l Trading, Ltd. v. BP P.L.C.*, 784 F. App’x 4 (2d Cir. 2019). Therefore, “[t]he Court must examine the facts alleged in the [TAC] to determine what market or markets allegedly were restrained based on Plaintiffs’ theory of the case.” *Id.*

The TAC alleges harm in two different markets: The physical platinum and palladium market and the NYMEX platinum and palladium market. The markets for physical commodities and derivatives based on the price of those commodities are distinct.[16] *See Prime Int’l Trading*, 784 F. App’x at 7 (holding that the “physical market for Brent crude oil” and the market for “derivatives that were linked to, or otherwise tracked” a benchmark oil price were two separate markets); *Oil*, 256 F. Supp. 3d at 313.[17] This conclusion is consistent with other decisions in this district that have concluded that OTC and exchange plaintiffs are “victims in . . . different markets.” *Nypl v. JPMorgan*

---

[16] The TAC is inconsistent with respect to whether platinum and palladium derivatives traded on NYMEX are directly pegged to, or merely strongly correlated with, the price of physical platinum and palladium. *Compare* TAC ¶ 207 (“The Defendants were also large participants in NYMEX futures and options. These contracts, like those for physical sales of platinum and palladium, *directly incorporate or reference* the Fix price in order to determine the cash flows between the parties.”) *with id.* ¶ 91 (“The Fixing also directly impacts the price of NYMEX Platinum and Palladium. This is because exchange prices *closely track* the price of spot platinum or palladium.”) (emphases added). Therefore, the Court interprets the TAC as alleging that some NYMEX derivatives directly reference the Fix price while others do not. With respect to derivatives that directly incorporate the Fix price, the antitrust injury inquiry is straightforward because “[c]ourts in this Circuit consider manipulation of a price benchmark to constitute restraint of the market which that benchmark guides.” *Oil*, 256 F. Supp. 3d at 313 (citing *Gelboim*, 823 F.3d at 776-77; *FOREX*, 2016 WL 5108131, at *6; *Alaska Elec. Pension Fund v. Bank of Am. Corp.* (“*ISDAFix*”), 175 F. Supp. 3d 44, 59 (S.D.N.Y. 2016)). With respect to derivatives that do not directly incorporate—but closely track—the Fix price, Plaintiffs have adequately alleged that Defendants’ manipulation of the NYMEX market is “inextricably intertwined” with their manipulation of the price for physical platinum and palladium. *Aluminum II*, 833 F.3d at 161. Plaintiffs have adequately alleged that Defendants profited by trading in the NYMEX market and that the manipulation of the physical prices of platinum and palladium—*i.e.*, the prevailing price in the OTC market—was “the very means” by which Defendants profited in the NYMEX market. *Id.* at 162. Hence, the Exchange Plaintiffs have pleaded antitrust injury regardless of whether the derivatives they traded were directly linked to the Fix price. *Gold* reached a similar conclusion. 213 F. Supp. at 653 (holding that allegations that exchange plaintiffs suffered antitrust injury were “inextricably intertwined” with the Defendants’ alleged manipulation of the Fix Price for antitrust standing purposes).

[17] The *Prime International Trading* and *Oil* courts conducted their analyses of the markets in which the plaintiffs had alleged injury in the context of the antitrust injury prong of the antitrust standing analysis, rather than (as here) in the context of the efficient enforcer factors. But because the analysis of which market or markets in which the plaintiffs have alleged injury must be consistent across both prongs of the antitrust standing inquiry, both are persuasive for the Court’s analysis.

*Chase & Co.*, 15 CIV. 9300 (LGS), 2017 WL 3309759, at *6 (S.D.N.Y. Aug. 3, 2017) (citations omitted); *see also FOREX*, 2016 WL 5108131, at *11 (holding that OTC plaintiffs and exchange plaintiffs suffered injury in two different markets); *cf. CHF LIBOR*, 277 F. Supp. 3d at 562 (observing that both OTC and exchange plaintiffs could be efficient enforcers if the OTC plaintiffs pleaded that they transacted directly with the defendants and the exchange plaintiffs pleaded that the defendants dominated the market, implying that the OTC and exchange markets are distinct).[18]

Moreover, Plaintiffs allege different theories of competitive harm in the OTC and exchange markets. For example, the TAC alleges that BASF Metals was "motivated by its desire to keep prices of platinum and palladium low because both metals are used as raw materials in products

---

[18] This analysis shows why Defendants' argument that the OTC Plaintiffs are "more direct victim[s] of any alleged conspiracy to manipulate the" Fixing than are the Exchange Plaintiffs is unconvincing. Mem. at 15. Plaintiffs have sufficiently pleaded antitrust injury in two different markets, so the OTC Plaintiffs are not more direct victims than the Exchange Plaintiffs; they are victims in a different market. Other judges in this district have also rejected the argument that participants in an OTC market are more direct victims of an alleged conspiracy than participants in an exchange market. *See Nypl*, 2017 WL 3309759, at *6 ("Contrary to Defendants' argument, FX spot market participants who transacted directly at spot trading prices are not more direct victims, but rather victims in a different market.") (citations omitted); *FOREX*, 2016 WL 5108131, at *11; *cf. CHF LIBOR*, 277 F. Supp. 3d at 561-62 (noting that "[o]ne could . . . conceive of the Direct Transaction Plaintiffs as a 'more direct' victim than" an exchange plaintiff but also observing that exchange plaintiffs' claim could proceed if they plausibly alleged market domination by defendants). Consequently, this argument is unconvincing.

The Court observes a tension in both parties' arguments with respect to this issue. Plaintiffs assert that they have alleged "a single market for platinum and palladium physical, futures and options transactions[.]" Opp. at 15. This seems surprising because it supports Defendants' argument that the OTC plaintiff is a victim in the same market as the Exchange Plaintiffs. For their part, Defendants argue that Plaintiffs are "asking the Court to hold Defendants trebly liable for transactions in '*two* extraordinarily large' markets (futures and physical)[.]" Mem. at 6 (quoting *Platinum I*, 2017 WL 1169626, at *21) (emphasis added). This also seems surprising because it supports Plaintiffs' arguments that OTC plaintiffs are not efficient enforcers with respect to the NYMEX market. Hence, Plaintiffs and Defendants both appear to be arguing on the wrong side of the one-vs.-two markets question.

This odd configuration likely arises because both Plaintiffs and Defendants had incentives to argue the opposite side of this question on the antitrust injury prong of the antitrust standing analysis. It is easier for Plaintiffs to show antitrust injury if they need only show such injury in one market; thus, Plaintiffs argued that physical and NYMEX platinum and palladium were traded in one market and Defendants argued that each set of Plaintiffs must demonstrate a distinct antitrust injury. Plaintiffs now argue that "[w]hether physical and futures transactions represent one market or two markets is of no moment at this stage because the Court already ruled that Plaintiffs suffered antitrust injury." Opp. at 15 (citing *Platinum I*, 2017 WL 1169626, at *19-20). It is true that courts have generally addressed this issue on the antitrust injury prong of the antitrust standing analysis. *See, e.g., Prime Int'l Trading*, 784 F. App'x at 7. But as the above demonstrates, it is also relevant to the application of the efficient enforcer factors, including whether there are more direct victims of the alleged conspiracy under the second efficient enforcer factor. Furthermore, a definition of the relevant market is a prerequisite to the inquiry into whether defendants dominated a market.

manufactured by BASF (and its related corporate entities) . . . in addition to its motive as a proprietary trader in platinum and palladium[.]" TAC ¶ 202. This is distinct from the TAC's allegations that all Defendants profited from manipulating the Fix downward by virtue of their short positions in NYMEX platinum and palladium. *See, e.g.*, *id.* ¶ 207.

These are distinct theories of anticompetitive harm, which reinforces the conclusion that Plaintiffs have alleged antitrust injury in two separate markets *See Oil*, 256 F. Supp. 3d at 312-13 (concluding that where "Plaintiffs posit that Defendants engaged in . . . anticompetitive behavior for two, potentially conflicting, reasons[,]" one of which was to drive the price of Brent crude oil "downward where related entities are both producers and refiners, so as to increase the margin, making the refining business more profitable" and the second of which was to make increased profits on "futures and derivatives products traded on NYMEX" linked to a Brent oil benchmark, the plaintiffs had alleged harm in two markets). Thus, Plaintiffs have alleged harms in both the OTC and NYMEX markets. Accordingly, the relevant market for purposes of the Court's inquiry into whether the Exchange Plaintiffs have plausibly alleged efficient enforcer status is the NYMEX market.

### ii. Defendants' Market Share

The second step of the Court's inquiry is to ascertain what share of the market Defendants allegedly controlled. Plaintiffs allege that Defendants each "h[eld] substantial market share in Physical and NYMEX Platinum and Palladium." TAC ¶ 38 (BASF Metals); *id.* ¶ 40 (Goldman Sachs); *id.* ¶ 42 (HSBC); *id.* ¶ 44 (ICBC Standard); *see also id.* ¶ 191 ("BASF[ Metals] engages in a large amount of Physical and NYMEX Platinum and Palladium trading."); *id.* ¶ 192 ("Defendant Goldman Sachs has a precious metals trading desk and engages in millions of dollars of platinum and palladium physical and derivatives trades each year."); *id.* ¶ 193 ("HSBC engages in millions of dollars of platinum and palladium physical and derivatives trades each year."); *id.* ¶ 207 ("The

Defendants were also large participants in NYMEX futures and options.").  Standing alone, these allegations might have been sufficient to allege that Defendants dominated the exchange market, requiring further factual development to resolve that question.  *Cf. LIBOR VI*, 2016 WL 7378980, at *17 (denying motion to dismiss because further factual development was necessary to determine if defendants dominated the market); *CHF LIBOR*, 277 F. Supp. 3d at 562.  However, as explained below, the Court does not decide whether the above allegations would have been sufficient to plausibly allege that Defendants dominated the market.

The TAC contains additional allegations that are relevant to the market-domination inquiry. The TAC alleges that all banks held between 20 and 50 percent of the "overall open interest" in platinum and palladium over the class period.  TAC at 113, Charts 81 & 82.  The TAC does not allege that the three Defendant Banks[19] were the only banks trading in the platinum and palladium futures market.  In fact, the TAC also alleges that UBS, which is no longer a defendant and was not a member of the Fixing, "engages in millions of dollars of platinum and palladium trades each year." *Id.* ¶ 195.  Therefore, the Defendant Banks' market share must represent some fraction of this overall open interest.  The TAC also notes that "BASF is not included in" the 20 to 50 percent figure "because it is not a bank."  *Id.* ¶ 197 n.60.  However, the TAC alleges that BASF Metals had very small holdings in the platinum and palladium derivatives market.  *Id.* at 112, Chart 79. Therefore, it is implausible that adding BASF Metals' market share to the other Defendants would have a meaningful impact on the inquiry into whether Defendants dominated the exchange market.

The TAC further alleges that "data obtained from the CFTC . . . shows that NYMEX short positions were heavily concentrated among the top 4 and top 8 traders.  Despite the presence of other traders in the market, the top 4 and top 8 traders accounted for approximately 30 to 45% and

---

[19] This opinion refers to Goldman Sachs, HSBC, and ICBC Standard collectively as the "Defendant Banks" because BASF Metals "is not a bank."  TAC ¶ 197 n.60.

45 to 65%, respectively, of platinum and palladium short positions during the Class Period." *Id.*

¶ 199; *see also id.* ¶ 114-15, charts 83 & 85.[20] Plaintiffs' theory is that Defendants "were holders of

massive short positions in NYMEX platinum and palladium futures and options" during the

Proposed Class Period. *Id.* ¶ 14. Consequently, on Plaintiffs' theory, the four Defendants would

have been among the largest NYMEX short traders. As the Court must draw all inferences in favor

of the plaintiffs on a motion to dismiss, the Court assumes that the four Defendants were the largest

NYMEX short traders in the market. But even granting that assumption, Defendants' combined

market share would have been "approximately 30[%]" of the platinum NYMEX market and

"approximately 45[%]" of the palladium NYMEX market. *Id.* ¶ 199.[21]

### iii. Market Domination

The final step in the Court's inquiry is whether Defendants controlled a sufficiently large

share of the market to "dominate" it. As noted above, *Gelboim* expressed concern that "if the

[defendants] control only a small percentage of the ultimate identified market," they may be held

liable for "damages disproportionate to wrongdoing." 823 F.3d at 779. Here, Plaintiffs have alleged

that Defendants control more than a small percentage of the relevant market. On the other hand,

*FOREX* concluded that an allegation that defendants had "a combined market share of over 90%"

was sufficient to allege market domination. 2016 WL 5108131, at *9. Plaintiffs have not alleged that

Defendants controlled 90% of the NYMEX platinum or palladium markets.

*LIBOR VI* presented a closer question. There, the plaintiffs alleged that the sixteen

defendant banks or their affiliates were "large traders" and that "large traders comprised 70 to 90

---

[20] The TAC alleges that there were approximately 40 to 100 traders with short positions on the exchange market that reported data to the CFTC during the Proposed Class Period. *See id.* at 114-15, Charts 82 & 84.

[21] Defendants point to the TAC's allegation that "'the autocatalyst and jewelry segments of the platinum market' are 'the two largest sources of demand'" as further undercutting any suggestion that Defendants dominated the platinum and palladium market. Mem. at 13-14 (quoting TAC ¶ 78). However, as noted above, the Court has concluded that the OTC market and the exchange market are distinct, and this allegation pertains to the OTC market.

percent of [the exchange] market." *LIBOR VI*, 2016 WL 7378980, at *17. However, the *LIBOR VI* court noted that the sixteen defendants were "dwarfed by the total population of over 2,900 large traders in that market during the same time period." *Id.* Pronouncing itself "skeptical that the Exchange-Based plaintiffs can ultimately show that the defendants controlled the market," the court nonetheless allowed the plaintiffs to proceed because "it remains possible that the panel banks, which included some of the world's largest financial institutions, together controlled a large percentage of the market, measured by number of trades or by dollar amount." *Id.* There was "simply not a sufficient record on the issue of market control" for Judge Buchwald to conclude as a matter of law that the plaintiffs had failed to state a claim. *Id.*

Likewise, the *CHF LIBOR* court concluded that "[i]f plaintiffs had adequately alleged an antitrust conspiracy involving all or nearly all of defendants" in that case, "the extent of defendants' control of the exchange markets for Swiss franc currency futures would require factual development and would not be a basis for dismissal." 277 F. Supp. 3d at 562. But because the plaintiffs had failed to plausibly allege a conspiracy, Judge Stein dismissed the claims brought by exchange plaintiffs. *Id.*; *see also Silver II*, 332 F. Supp. 3d at 908-09 (concluding that plaintiffs lacked antitrust standing because they had not plausibly alleged domination of the relevant exchange market by certain defendants).

The Court concludes that on the facts alleged in the TAC, Plaintiffs have not adequately pleaded that Defendants dominated the NYMEX market for platinum and palladium derivatives. Plaintiffs have alleged that Defendants' market share was at most 45% of the relevant market, and Plaintiffs' allegations suggest that Defendants' market share was likely far less than that. The Court need not and does not adopt a bright line rule for the market share that a defendant or group of defendants must control to meet the "market domination" standard. Rather, the Court holds only that Plaintiffs have not adequately pleaded market domination in the TAC.

### c. Conclusion

As in *Platinum I*, the Court concludes that Plaintiffs are not efficient enforcers of the antitrust laws and, therefore, are not the "proper party 'to perform the office of a private attorney general' and . . . 'vindicate the public interest in antitrust enforcement.'" *Gelboim*, 823 F.3d at 780 (quoting *Gatt*, 711 F.3d at 80). Accordingly, Plaintiffs' Sherman Act claim is dismissed without prejudice.

## B. Rule 12(b)(2) Motion

### 1. Legal Standard

A defendant may move to dismiss a plaintiff's claims against it for "lack of personal jurisdiction." Fed. R. Civ. P. 12(b)(2). On a motion to dismiss pursuant to Rule 12(b)(2), the "plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)); *see also Bank Brussels Lamberts v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999) ("When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." (citations omitted)). To defeat a jurisdiction-testing motion, the plaintiff's burden of proof "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). At the pleading stage—and prior to discovery—a plaintiff need only make a prima facie showing that jurisdiction exists. *Id.* at 84-85; *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013)).

If the court considers only pleadings and affidavits, the plaintiff's prima facie showing "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quotation marks omitted)). Courts may rely on materials outside the pleading in considering a motion to dismiss for lack of personal jurisdiction. *See DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)). If the parties present conflicting affidavits, however, "all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *Seetransport Wiking*, 702 F.3d at 727 (citations omitted).

### 2. Application

Plaintiffs have adequately pleaded that BASF Metals and ICBC Standard are subject to personal jurisdiction in the United States under a conspiracy theory. In its prior opinion, the Court explained at length the requirements for a federal court to exercise personal jurisdiction. *See Platinum I*, 2017 WL 1169626, at *39-44. The Court does not rehash that analysis here and provides only a summary of the law necessary for the disposition of the motions currently before the Court.

As in *Platinum I*, Plaintiffs have "disclaimed that the Foreign Defendants are subject to general personal jurisdiction." *Id.* at *43; *see* Plaintiffs' Letter to the Court, Dkt No. 196, at 1 ("Plaintiffs do not assert that Defendants are subject to general jurisdiction[.]"). Therefore, the Court will confine its analysis to specific jurisdiction. Among other requirements, "the exercise of

personal jurisdiction must comport with constitutional due process." *Platinum I*, 2017 WL 1169626,

at *39 (citing *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59-60 (2d Cir. 2012)). The

> due process analysis proceeds in two steps. First, courts evaluate the quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test. Where the claim arises out of, or relates to, the defendant's contacts with the forum—*i.e.*, specific jurisdiction is asserted—minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there. Second, once minimum contacts are established, a court considers those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quotations omitted).

There are two "independent, if conceptually overlapping, methods of demonstrating

minimum contacts." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007). "The first is

through purposeful availment,' in which 'the defendant purposefully availed itself of the privilege of

doing business in the forum and could foresee being haled into court there.'" *CHF LIBOR*, 277 F.

Supp. 3d at 589 (quoting *Licci ex rel Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir.

2013)). "The second is through 'purposeful direction,' in which 'the defendant took intentional, and

allegedly tortious, actions expressly aimed at the forum.'" *Id.* (quoting *In re Terrorist Attacks*, 714 F.3d

at 674). "The 'purposeful direction' test is also referred to as the 'effects test,' which is a 'theory of

personal jurisdiction typically invoked where . . . the conduct that forms the basis for the

controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the

forum are therefore in-forum effects harmful to the plaintiff.'" *Id.* (quoting *Licci*, 732 F.3d at 173).

"In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if

the defendant expressly aimed its conduct at the forum." *Id.* (quoting *Licci*, 732 F.3d at 173).

Plaintiffs have alleged Sherman Act and CEA claims against all Defendants in this case,

including the Foreign Defendants. *See* TAC ¶¶ 273-95; *see also Platinum I*, 2017 WL 1169626, at *43.

Both of these statutes provide for nationwide service of process. *See CHF LIBOR*, 277 F. Supp. 3d

at 589 (citing 15 U.S.C. § 22 (Sherman Act); 7 U.S.C. § 25(c) (CEA)). District courts in this circuit, and courts of appeals other than the Second Circuit, have concluded that "when a civil case arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole." *Platinum I*, 2017 WL 1169626, at *40 (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014) (collecting cases)); *see, e.g.*, *CHF LIBOR*, 277 F. Supp. 3d at 589-90 (concluding the relevant forum is the United States as a whole).[22] Therefore, the Court analyzes whether Plaintiffs have made a prima facie showing of minimum contacts with the United States with respect to BASF Metals and ICBC Standard.[23]

### a. BASF Metals

#### i. Purposeful Availment

Plaintiffs have not made a prima facie showing that BASF Metals purposefully availed itself of the privilege of doing business in the United States. The TAC alleges that BASF Metals "is a company organized and existing under the laws of the United Kingdom with its principal place of business in London, England." TAC ¶ 34. The TAC alleges that

> [i]n 2006, BASF [Metals]'s ultimate parent company, BASF Societas Europaea ('BASF SE') . . . acquired Engelhard Corporation of New Jersey. . . . As part of the acquisition of Engelhard Corporation, BASF SE also acquired Engelhard Metals Limited, which was a Fixing member[.] . . . Through its acquisition of Engelhard Metals Limited, BASF became a Fixing member[.] . . . In 2012, BASF SE changed the name of Engelhard Metals Limited to BASF Metals Limited.

*Id.* Plaintiffs also allege that BASF Corporation ("BASF Corp.") is a subsidiary of BASF SE and "is based in New Jersey (and a Delaware-registered company)." *Id.* ¶ 36. Thus, the TAC alleges that

---

[22] "[T]he Second Circuit 'has not yet decided' whether to adopt this approach[.]" *Platinum I*, 2017 WL 1169626, at *40 (quoting *Gucci*, 768 F.3d at 142 n.21).

[23] Because the Court concludes that Plaintiffs have made such a showing, it does not reach the question of whether personal jurisdiction is proper under New York law or Federal Rule of Civil Procedure 4(k)(2). *See Platinum I*, 2017 WL 1169626, at *40-41.

BASF SE is the parent corporation of both BASF Metals and BASF Corp. *See id.* ¶¶ 34-36. BASF

Metals "does not have offices, operations, or employees in New York, New Jersey, or anywhere else

in the United States." Declaration of Dr. Vasileios Vergopouls in Support of BASF Metals

Limited's Motion to Dismiss Pursuant to Fed R. Civ. P. 12(b)(2) and 12(b)(6) ("Vergopouls Decl."),

Dkt No. 209-1, ¶ 2.

Plaintiffs' fundamental difficulty can be summarized as follows. They have alleged that

employees of BASF *Metals* manipulated the Fix as part of a conspiracy. And they have alleged that

United States-based traders employed by BASF *Corp.* executed platinum and palladium trades,

allegedly to profit from the conspiracy. However, for the Court to exercise personal jurisdiction

over Defendant BASF Metals, Plaintiffs' allegations must somehow connect BASF Metals to the

United States, such that BASF Metals can be said to have "purposefully availed itself of the privilege

of doing business in the [United States] and could foresee being haled into court there." *Licci*, 732

F.3d at 173

Plaintiffs attempt to bridge this gap by arguing that employees of BASF Metals were agents

of BASF Corp. or, perhaps, of BASF SE. *See, e.g.*, Plaintiffs' Consolidated Opposition to Motions

To Dismiss Pursuant To Fed. R. Civ. P. 12(b)(2) ("Rule 12(b)(2) Opp."), Dkt No. 215, at 10

("Regardless of whether or not these individuals were employees of BASF Metals . . . a time-

honored principle of agency law is *qui facit per alium facit per se*—he who acts through another acts

himself."). In support of this argument, Plaintiffs argue that yet a fourth BASF entity, BASF

Precious Metals Services, holds BASF out as "global and vertically integrated" and as providing

"24/7 access to world metals exchanges & key bullion centres via trading offices in among other

places Iselin, New Jersey." Rule 12(b)(2) Opp. at 12 (quoting TAC ¶ 36). In addition, the TAC

alleges "BASF Corporation has shared employees and directors with BASF Metals Limited." TAC

¶ 37.

The Second Circuit recently observed that it "ha[s] not clearly delineated the showing necessary before an agent's contacts will be imputed to its principal for purposes of personal jurisdiction under the Due Process Clause[.]" *Schwab*, 883 F.3d at 84. However, the Circuit's "caselaw concerning the New York long-arm statute is . . . instructive" because "[a]lthough the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have purposefully availed itself of the privilege of doing business in the forum." *Id.*

Thus, the Court takes guidance from *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181 (2d Cir. 1998), which applied the New York long-arm statute. The *Jazini* court held that "[t]o establish that a subsidiary is an agent of the parent, the plaintiff must show that the subsidiary 'does all the business which the parent corporation could do were it here by its own officials.'" *Id.* at 184 (quoting *Frummer v. Hilton Hotels Int'l, Inc.*, 19 N.Y.2d 533, 537 (N.Y. 1967)). Prior to *Jazini*, "the key Second Circuit case regarding the propriety of a court's exercise of personal jurisdiction over a foreign parent company based on the conduct of its subsidiary was" *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117 (2d Cir. 1984). *In re Aluminum Warehousing Antitrust Litigation* ("*Aluminum I*"), 90 F. Supp. 3d 219, 228 (S.D.N.Y. 2015). "*Beech Aircraft* established a four-factor test for evaluating whether [a court's exercise of] personal jurisdiction [over a defendant is proper] in such a scenario: (1) common ownership, (2) financial dependency, (3) the degree to which the parent interferes with the selection and assignment of executive personnel and fails to observe corporate formalities, and (4) the parent's degree of control over the marketing and operational policies of the subsidiary." *Id.* (citing *Jazini*, 148 F.3d at 184).

Plaintiffs have failed to make a prima facie showing as to any of these factors. In addition, the Supreme Court has observed that "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its

subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (quotation omitted). Plaintiffs' attempt to circumvent this well-entrenched principle via an appeal to agency law is unconvincing. *See Schwab*, 883 F.3d at 84 (finding that the requirements for personal jurisdiction were not met where a complaint impermissibly "collapses . . . two distinct Defendants—a parent and a wholly owned subsidiary—. . . into one"); *Aluminum I*, 90 F. Supp. 3d at 238 ("It is commonplace for executives to hold several roles at several affiliated companies. But so long as separate corporate formalities are maintained, the mere fact that some employees of a parent are also officers of a subsidiary does not imply that the subsidiary is an agent of the parent."); *id.* at 232 (website touting "global reach of a family of companies" insufficient where corporate formalities observed).

Plaintiffs also argue in support of their agency theory that "BASF Metals . . . advertised for precious metals trading positions in New Jersey." Rule 12(b)(2) Opp. at 9 (citing Ex. 1 to Declaration of Jay L. Himes in Support of Plaintiffs' Consolidated Opposition to Motions to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) ("Himes Decl."), Dkt No. 214). This allegation is also insufficient to establish purposeful availment. Even assuming that BASF Metals' employment of a United-States-based trader would be sufficient to make a prima facie showing of purposeful availment with the United States (which the Court does not decide), the reference to BASF Metals in the job posting was "inadvertent" and the posting "was not filled." Declaration of Rachel Crowley, Dkt No. 221; *see also id.* ("If an individual had been hired to fill the position described in the Job Posting, the individual would have been an employee of BASF Corporation, not BASF Metals Ltd."). Similarly, Plaintiffs' attempt to point to LinkedIn profiles for "individuals who traded precious metals for BASF's U.S.-based affiliates during the class period" is unavailing. Rule 12(b)(2) Opp. at 9 (citing Exs. 2-3 to Himes Decl.). These traders did not work for BASF Metals because BASF Metals "does not have . . . employees in . . . the United States." Vergopouls Decl. ¶ 2.

Hence, neither the job advertisement nor the LinkedIn profiles provide support for Plaintiffs' agency theory.

Accordingly, Plaintiffs have failed to make a prima facie showing that employees of Defendant BASF Metals were agents of BASF Corp. or BASF SE, and they have therefore failed to show that Defendant BASF Metals "purposefully availed itself of the privilege of doing business in the [United States] and could foresee being haled into court there." *Licci*, 732 F.3d at 173.

### ii. Effects Test

Plaintiffs arguments that BASF Metals should be subject to personal jurisdiction under the effects test is similarly flawed. Under the effects test, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.* at 173 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1983)). "The fact that harm in the forum is foreseeable is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." *Platinum I*, 2017 WL 1169626, at *42 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016)) (alterations and quotation marks omitted).

Plaintiffs are unable to show any conduct by BASF Metals that was expressly aimed at the United States. Again, Plaintiffs have pleaded that BASF Metals conspired to manipulate the Fix and that BASF Corp. engaged in trading to profit from that illegal conduct in the United States. But Plaintiffs have not alleged that BASF Metals took any action that was expressly aimed at the United States. Plaintiffs argue that BASF Metals' "conduct was aimed directly *at* the U.S." because the conspiracy allegedly targeted NYMEX. Rule 12(b)(2) Opp. at 15. But that characterization is inaccurate: BASF Metals' conduct allegedly targeted the Fix, which occurred in London. Although it may have been foreseeable that this conduct would cause harm in the United States, "[m]ere foreseeability" is insufficient under the effects test. *Schwab*, 883 F.3d at 87. Hence, Plaintiffs have

failed to make a prima facie showing of personal jurisdiction as to BASF Metals under the effects test.

### b. ICBC Standard

The TAC fails to make a prima facie showing of personal jurisdiction as to ICBC Standard under the purposeful availment or effects test for much the same reasons as it failed to do so with respect to BASF Metals. The TAC alleges that ICBC Standard "is a banking and financial services company organized and existing under the laws of the United Kingdom." TAC ¶ 43. Plaintiffs allege that a different corporate entity, Standard Bank Group Limited, is "licensed by the New York Department of Financial Services with" headquarters located in New York City. *Id.* The TAC further alleges that a third entity, "ICBC"—which is the "corporate majority owner" of ICBC Standard, Declaration of Karen Florencio in Support of ICBC Standard Bank Plc's Motion to Dismiss the Third Consolidated Amended Class Action Complaint ("Florencio Decl."), Dkt No. 211, ¶ 11—"is also licensed by the New York Department of Financial Services" with headquarters located in New York City. TAC ¶ 43. However, much like BASF Metals, ICBC Standard has no employees in the United States. Florencio Decl. ¶ 9. The Court construes the TAC to allege that there were New-York-based platinum and palladium traders in both the physical and derivatives markets for affiliates or subsidiaries of ICBC Standard, although the TAC is not clear on this point.

Plaintiffs raise the same agency argument with respect to employees of ICBC Standard's affiliates and subsidiaries as they do with BASF Metals, and the result is the same. Plaintiffs have not alleged sufficient reason for the Court to disregard distinctions between distinct corporate entities. The Court need not repeat its analysis here. One allegation Plaintiffs raise that is specific to ICBC Standard is that Ludmila Fabianova, a "Senior Vice President" of "Precious Metals Sales" at ICBC Standard was listed as a "'USA'-based delegate" for a conference in Rome. Rule 12(b)(2) Opp. at 10 (citing Exs. 4 & 5 to Himes Decl.). But this listing is insufficient to support the inference

that Ms. Fabianova did anything to contribute to the alleged conspiracy to manipulate the Fix price while in the United States. Accordingly, Plaintiffs have failed to make a prima facie showing of personal jurisdiction with respect to ICBC under the minimum contacts or effects test.

### c. Conspiracy Jurisdiction

Plaintiffs have plausibly alleged that BASF Metals and ICBC Standard are subject to conspiracy jurisdiction. The Second Circuit has recently clarified that to "alleg[e] a conspiracy theory of jurisdiction: the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Schwab*, 883 F.3d at 87 (citing *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013)).[24]

The Court concluded in its earlier opinion that Plaintiffs had plausibly alleged a conspiracy among Defendants. *See Platinum I*, 2017 WL 1169626, at *10-16. There is also no question that

---

[24] Because Plaintiffs argued that conspiracy jurisdiction was proper under the New York long-arm statute, the Court offers an observation about the relationship between the requirements for conspiracy jurisdiction under that statute and the standard announced in *Schwab*. In its prior opinion, the Court held that "[t]he elements of conspiracy jurisdiction [under the New York long-arm statute] are that '(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant.'" *Platinum I*, 2017 WL 1169626, at *48 (quoting *Tarsavage v. Citic Trust Co.*, 3 F. Supp. 3d 137, 147 (S.D.N.Y. 2014)). Although a defendant need not demonstrate a "formal agency relationship . . . between co-conspirators," the third prong of this test is designed to capture "the traditional indicia of an agency relationship." *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 292 n.2, 293 (S.D.N.Y. 2019). However, the Court recognizes that the requirements of conspiracy jurisdiction under New York law are unsettled. *See id.* at 292 n.2 (noting that "an out-of-state defendant can be subject to personal jurisdiction in New York even without the traditional indicia of an agency relationship when that defendant 'has knowledge of the New York acts of his co-conspirators.'" (quoting CPLR § 302 Practice Commentary C302:4 (2013) and citing *Lawati v. Montague Morgan Slade Ltd.*, 961 N.Y.S.2d 5, 8 (1st Dep't 2013)). Still, the requirements for conspiracy jurisdiction announced in *Schwab* appear to be less demanding than those established under the New York long-arm statute. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR VIII*"), 11 MDL 2262 (NRB), 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019), at *11 (observing that "any discussion of conspiracy jurisdiction must be approached with caution" because "the state[] in which . . . the FDIC bring[s its] state law claim[] [*i.e.*, New York] . . . impose[s] more stringent requirements than the ones adopted by *Schwab*"). Conspiracy jurisdiction may thus be the rare issue where "the jurisdictional analysis under the New York long-arm statute" does not "closely resemble the analysis under the Due Process Clause of the Fourteenth Amendment." *Licci*, 673 F.3d at 61 n.11 (citation omitted). As noted above, because the Court concludes that Plaintiffs have adequately alleged the prerequisites for conspiracy jurisdiction with respect to the United States as a whole, it need not decide the relationship between the due process requirements for conspiracy jurisdiction and the requirements for conspiracy jurisdiction under the New York long-arm statute.

BASF Metals and ICBC Standard participated in the conspiracy as alleged. Thus, the contested issue is whether any United-States-based co-conspirators acted "in furtherance of the conspiracy[.]" *Schwab*, 883 F.3d at 87.

*Schwab* guides the Court's analysis of conspiracy jurisdiction. The *Schwab* court considered whether the court had personal jurisdiction over three categories of defendants. Most relevant here, *Schwab* considered claims of "non-seller defendants." *Id.* at 86 (capitalization altered). The only forum-related contact in which these defendants had engaged was the sale of securities in California. *Id.* at 86-87.[25] The *Schwab* court concluded that it could not exercise personal jurisdiction because the plaintiff's "pleading does not permit an inference that certain Defendants' sales in California were in furtherance of the conspiracy." *Id.* at 87. Although the plaintiff argued that "Defendants conspired not only to manipulate LIBOR, but also to earn profits from that manipulation," the Second Circuit held that "financial self-interest is not the same as furthering a conspiracy through California-directed sales, and nowhere in Schwab's complaint are there allegations that Defendants undertook such sales as part of the alleged conspiracy." *Id.* (quotation omitted). Thus, the teaching of *Schwab* is that the mere sale of financial instruments by a co-conspirator in a forum is insufficient to confer conspiracy jurisdiction in that forum, at least on the facts presented in that case.[26]

---

[25] California was "the relevant forum for jurisdictional purposes" in *Schwab*. 883 F.3d at 82 n.4.

[26] There is disagreement among district courts in this circuit over the precise holding of *Schwab*. The root of the disagreement centers on the motive of the conspiracy alleged in *Schwab*. In *Gelboim*—which involved the same conspiracy—the Second Circuit held that the allegations in that case "evince[d] a common motive to conspire" consisting of "increased profits and the projection of financial soundness[.]" 823 F.3d at 781-82 (quotation omitted). On remand, Judge Buchwald concluded that "[i]t is far from clear that *Gelboim* should be read to mean that plaintiffs have sufficiently alleged 'increased profits' as a goal independent of a conspiracy to 'project[] . . . financial soundness." *LIBOR VI*, 2016 WL 7378980, at *2 (citation omitted). Therefore, the *LIBOR VI* court concluded that United States-based trading was not within the scope of the "reputation-motivated," as opposed to a "profit-motivated," conspiracy. *Id.* at *8-9. This conclusion rested on the court's reasoning that a profit-motivated conspiracy was implausible because the *LIBOR VI* plaintiffs had alleged that the panel banks had colluded to suppress the LIBOR rate, but banks act as both borrowers and lenders. *See id.* at *2-6. *Gelboim* itself noted that "common sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR . . . It seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender" before concluding that it could not come to a firm conclusion on the question because "the record is undeveloped." 823 F.3d at 783. Judge Buchwald found the record sufficiently developed to dismiss the claims of a profit-motivated conspiracy as implausible. *LIBOR VI*, 2016 WL 7378980, at *3. Thus, Judge Buchwald concluded in

Here, however, Plaintiffs have alleged more than that co-conspirators sold platinum and palladium or platinum and palladium derivatives on an exchange. Plaintiffs allege that BASF Corp.'s "precious metals traders would update order information during the Fixing and provide this updated order information to BASF [Metals'] participant in the Fixing as the Fixing was conducted." TAC ¶ 38. Similarly, the TAC alleges that "New York-based precious metals traders [employed by a United States affiliate of ICBC Standard] would update order information during the Fixing and provide this updated order information to [ICBC Standard]'s participant in the Fixing as the Fixing was conducted." *Id.* ¶ 44.[27] Furthermore, the TAC alleges that the participants in the Fixing on behalf

---

*LIBOR VIII* that the allegation that Defendants had sold LIBOR-influenced securities in a forum was not an act "in furtherance of the conspiracy" because the sale of securities in the forum did not advance a reputation-motivated conspiracy. *See* 2019 WL 1331830, at *4 ("[T]he conspiracy to manipulate LIBOR had nothing to do with" defendants' transactions with plaintiffs, because the sale of LIBOR-based instruments motivated by defendants' 'financial self-interest' could not have furthered their conspiracy to manipulate LIBOR." (quotation omitted)). The upshot of this reasoning is that *if* plaintiffs plausibly allege a profit-motivated conspiracy, then the mere sale of securities in a forum *can* constitute an act in furtherance of the conspiracy sufficient to confer jurisdiction. *See FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16 Civ. 5263, 2018 WL 4830087, at *8 (S.D.N.Y. Oct. 4, 2018) (concluding that "where the complaint plausibly alleges a profit-motive, as here, the U.S.-based trading is properly alleged to have been a part of the conspiracy and to be related to the overseas . . . jurisdiction").

At least one court disagrees with this interpretation of *Schwab*, however. In *Dennis*, the plaintiffs argued that certain "defendants marketed and sold BBSW-Based Derivatives in the United States." 343 F. Supp. 3d at 203 (cleaned up). The plaintiffs contended that "[t]hese transactions are sufficiently related to [their] claims . . . because they are the machinery through which Defendants committed a domestic per se antitrust violation by reaching into the forum to contract for price-fixed BBSW-Based Derivatives with U.S. investors." *Id.* (cleaned up). The plaintiffs argued that "the 'reputation-based' conspiracy alleged in *Charles Schwab* should be distinguished from the 'profit-motivated' conspiracy alleged here." *Id.* at 205. However, Judge Kaplan noted that in *Schwab* "the alleged conspiracy was undertaken both because 'by understating their true borrowing costs, Defendants were able to project an image of financial stability to investors who were sensitive to risks associated with major banks following the financial crisis that began in 2007' *and* because 'suppressing LIBOR . . . had the immediate effect of lowering Defendants' interest payment obligations on financial instruments tied to LIBOR.'" *Id.* (quoting *Schwab*, 883 F.3d at 78) (emphasis in *Dennis*) (alterations omitted). "Accordingly," the *Dennis* Court held, "the conspiracy to manipulate LIBOR alleged in *Charles Schwab* was indeed motivated in part by financial incentives." *Id.* And thus, Judge Kaplan held that *Schwab* "controls here and precludes a finding of personal jurisdiction—whether through the Foreign Defendants' direct transactions in BBSW-Based Derivatives with plaintiffs or through a conspiracy theory of jurisdiction—over plaintiffs' federal claims on the basis of the Foreign Defendants' transactions in BBSW-Based Derivatives in the United States." *Id.* at 205-06. Ultimately, as described at greater length below, the Court need not reach the issue of the precise holding of *Schwab* because the Court concludes that even if it defines Plaintiffs' alleged conspiracy narrowly—*i.e.*, as a conspiracy to manipulate the Fix price—Plaintiffs have sufficiently alleged in-forum conduct in furtherance of the conspiracy.

[27] The TAC names BASF Corporation as a co-conspirator but not as a defendant. It does not name ICBC's U.S. based affiliate as a co-conspirator. However, because the complaint alleges that Defendant ICBC has "New York-based precious metals traders," TAC ¶ 44, but ICBC has "[n]o employees . . . permanently located in the United States," Florencio Decl. ¶ 9, the Court construes the TAC to allege that employees of a United-States-based affiliate of ICBC Standard employed precious metals traders.

of Defendants BASF Metals and ICBC Standard were in "constant communication" with traders employed by United-States-based affiliates. *Id.* ¶ 38 (BASF Metals); *id.* ¶ 44 (ICBC Standard).

Hence, Plaintiffs plausibly plead actions by co-conspirators in the United States in furtherance of the conspiracy to manipulate the Fix price. The TAC alleges United-States based traders for affiliates of BASF Metals and ICBC Standard provided non-public client order information directly to Fixing participants. *Id.* ¶ 38. While the TAC does not precisely allege what BASF Metals' and ICBC Standard's participants in the Fixing did with this information, it is plausible to infer that they used the information provided by United-States-based traders to decide on the price at which they ultimately wanted the Fixing to settle. Thus, the TAC plausibly alleges that United-States-based co-conspirators acted in furtherance of the conspiracy to manipulate the Fix, and the Court has personal jurisdiction over both BASF Metals and ICBC Standard.

The Court observes that the *Schwab* standard for conspiracy jurisdiction is extraordinarily broad. Indeed, under the *Schwab* standard, a court can exercise personal jurisdiction over a defendant based on the actions of a co-conspirator who is entirely unknown to that defendant.[28] *Cf. Contant*, 385 F. Supp. 3d at 292 n.2 (observing that under the New York long-arm statute, "an out-of-state defendant can be subject to conspiracy jurisdiction in New York" only if there are "traditional indicia of an agency relationship" or if the defendant "has knowledge of the New York

---

[28] Consider the following hypothetical. Imagine that, hoping to earn profits by trading abroad, Bank A conspired to manipulate the Fix price in London with Bank B. Imagine also that, entirely unbeknownst to Bank A, Bank B received information about platinum trading from a United States branch of Bank C. Under the *Schwab* standard, a United States court may have personal jurisdiction over Bank A based on the transmission of information from Bank C to Bank B— even though Bank A is not alleged to have had any control over, or even to have known about, Bank C's communication. This hypothetical must be reconciled with the Supreme Court's admonition that the "exercise of jurisdiction comports with due process only if the defendant's conduct and connection with the forum is 'such that the defendant should reasonably anticipate being haled into court there.'" *Contant*, 385 F. Supp. 3d at 292 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Judge Schofield has reasoned that the *Schwab* standard can be reconciled with the Supreme Court's case law on specific jurisdiction by noting that "in any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit." *Id.* at 293 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)) (brackets omitted). In other words, two co-conspirators—even co-conspirators who were unaware of the existence of the other—may be viewed as a single entity for purposes of conspiracy jurisdiction.

acts of his co-conspirators") (quotation omitted).  In addition, this standard may be in tension with

the Supreme Court's holding in *Walden v. Fiore* that "the relationship [between the defendant and the

litigation] must arise out of the contacts that the 'defendant *himself*' creates with the forum State."

571 U.S. 277, 284 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)); *see also id.*

(noting that the Supreme Court has "consistently rejected attempts to satisfy the defendant-focused

'minimum contacts' inquiry by demonstrating contacts between . . . third parties . . . and the forum

State") (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)).  *But see*

*Contant*, 385 F. Supp. 3d at 293 (rejecting foreign defendants' argument that "an agency relationship

between co-conspirators is necessary because personal jurisdiction cannot be based on the unilateral

activity of a third party" because "a co-conspirator is no mere third party" and "conspiracy

jurisdiction is best conceived of as an example of the well-established principle that 'a defendant's

contacts with the forum State may be intertwined with his transactions or interactions with other

parties'") (quoting *Walden*, 571 U.S. at 286 (ellipsis omitted)).

It was in part because of the concerns outlined above that the Court observed in *Platinum I*

that "[c]ourts have been increasingly reluctant to extend this theory of [conspiracy] jurisdiction

beyond the context of New York's long-arm statute."  2017 WL 1169626, at *49 (quoting *Laydon v.*

*Mizuho Bank, Ltd.*, 12 CIV. 3419 GBD, 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) and citing

*Aluminum I*, 90 F. Supp. 3d at 227 ("The rules and doctrines applicable to personal jurisdiction are

sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy

jurisdiction' doctrine."); *Tymoshenko v. Firtash*, 11-CV-2794 (KMW), 2013 WL 1234943, at *3-4

(S.D.N.Y. Mar. 27, 2013) (recognizing that conspiracy jurisdiction "has been widely criticized by

courts and scholars" and declining to consider co-conspirators' contacts for the purpose of

establishing personal jurisdiction over a foreign defendant).  However, any doubts about the

continued viability of conspiracy jurisdiction in the Second Circuit were resolved by *Schwab*.

Therefore, the TAC has plausibly alleged that BASF Metals and ICBC Standard purposefully availed themselves of doing business in the United States as required by the minimum contacts prong of the due process analysis.

Because the Court has concluded that Plaintiffs have adequately alleged that the Foreign Defendants have satisfied the first step of the personal jurisdiction analysis, it must "determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Schwab*, 883 F.3d at 82 (citation and quotation marks omitted). "The Supreme Court has set forth five factors in considering the reasonableness of the forum[:] 'A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief. It must also weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.'" *FrontPoint*, 2018 WL 4830087, at *7 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 113 (1987)). "[T]he 'primary concern' is 'the burden on the defendant.'" *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 151 n.5 (2d Cir. 2019) (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017)). "Where a defendant has purposefully directed its activities at the forum state, it may still defeat jurisdiction on due process grounds. To do so, however, it 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Licci*, 732 F.3d at 173 (quoting *Burger King*, 471 U.S. at 477).

Plaintiffs' allegations satisfy the reasonableness requirement in this case. The Foreign Defendants "are some of the world's largest financial institutions" and their affiliates "are alleged to have substantial presence in the U.S." *FrontPoint*, 2018 WL 4830087, at *9. "There is little burden in requiring them to answer the allegations that they entered into collusive transactions in the U.S." *Id.* Accordingly, the Court's exercise of personal jurisdiction over the Foreign Defendants would not be

unreasonable.  Thus, Plaintiffs have made a prima facie showing that the Court has personal jurisdiction over the Foreign Defendants, and the Foreign Defendants' motion to dismiss for lack of personal jurisdiction is denied.

### C. Motion for Reconsideration

Plaintiffs' CEA claims are predominately foreign and are thus impermissibly extraterritorial. In *Platinum I*, the Court held that Plaintiffs' CEA claims were not extraterritorial.  *See* 2017 WL 1169626, at *26-28.  Defendants move for reconsideration of that holding based on the Second Circuit's decision in *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019).  For the reasons that follow, the Court agrees that *Prime International Trading* compels the conclusion that Plaintiffs' CEA claims are impermissibly extraterritorial.

#### 1. Legal Standard

Motions for reconsideration are governed by Local Rule 6.3, which provides that the moving party shall set forth "the matters or controlling decisions which counsel believes the Court has overlooked."  "Motions for reconsideration are . . . committed to the sound discretion of the district court."  *Immigrant Def. Project v. U.S. Immigration and Customs Enf't*, No. 14-cv-6117 (JPO), 2017 WL 2126839, at *1 (S.D.N.Y. May 16, 2017) (citing cases).  "Reconsideration of a previous order by the Court is an extraordinary remedy to be employed sparingly."  *Ortega v. Mutt*, No. 14-cv-9703 (JGK), 2017 WL 1968296, at *1 (S.D.N.Y. May 11, 2017) (quoting *Anwar v. Fairfield Greenwich Ltd.*, 800 F. Supp. 2d 571, 572 (S.D.N.Y. 2011)).  As such, reconsideration should be granted only when the moving party "identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 185 (S.D.N.Y. 2016) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)) (quotation marks omitted).  Here, Defendants argue that the Second Circuit's decision in *Prime International Trading* is an intervening change of controlling law.

## 2. Application

*Prime International Trading* requires the Court reconsider its holding in *Platinum I* that Plaintiffs'
CEA claims, as alleged, are not impermissibly extraterritorial. In *Platinum I*, the Court applied the
two-step framework established by the Supreme Court in *Morrison v. National Australia Bank, Ltd.*,
561 U.S. 247 (2010), to the question of whether Plaintiffs' CEA claims are extraterritorial. Under
this framework, "[f]irst, unless Congress's intention to give a statute extraterritorial effect is 'clearly
expressed,' courts 'must presume it is primarily concerned with domestic conditions.' In other
words, 'when a statute gives no clear indication of an extraterritorial application, it has none.'
Second, if a statute applies only domestically, a court must determine which domestic conduct it
regulates." *Platinum I*, 2017 WL 1169626, at *26 (quoting *Morrison*, 561 U.S. at 265-67) (brackets
omitted).

In *Morrison*, the Supreme Court applied that two-step framework and "held that § 10(b) [of
the Exchange Act] only applies to 'transactions in securities listed on domestic exchanges and
domestic transactions in other securities. With regard to securities *not* registered on domestic
exchanges, the exclusive focus is on *domestic* purchases and sales.'" *Id.* (quoting *Morrison*, 561 U.S. at
268) (other citation and alterations omitted). "Although *Morrison* did not further define a domestic
transaction, the Second Circuit addressed that issue in *Absolute Activist* [*Value Master Fund Ltd. v.
Ficeto*, 677 F.3d 60 (2d Cir. 2012)]. There, the Second Circuit held that 'transactions involving
securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred
or title passes within the United States.'" *Platinum I*, 2017 WL 1169626, at *26 (quoting *Absolute
Activist*, 677 F.3d at 67).

The Second Circuit extended the *Absolute Activist* framework to the CEA in *Loginovskaya v.
Batratchenko*, 764 F.3d 266 (2d Cir. 2014), such that "plaintiffs asserting CEA claims must
'demonstrate that the transfer of title or the point of irrevocable liability for such an interest

occurred in the United States.'" *Platinum I*, 2017 WL 1169626, at *26 (quoting *Loginovskaya*, 764 F.3d at 274). Hence, in *Platinum I*, the Court concluded that the issue before it was whether "the transactions at issue here are 'domestic' within the meaning of *Morrison* and *Absolute Activist*." *Id.*

The Court also held that the Second Circuit's decision in *Parkcentral Global Hub, Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2014) (per curiam), was not relevant to Plaintiffs' CEA claims. In *Parkcentral*, the Circuit held that "while a domestic transaction or listing is *necessary* to state a claim under § 10(b), a finding that these transactions were domestic would not *suffice* to compel the conclusion that the plaintiffs' invocation of § 10(b) was appropriately domestic." *Id.* at 216. Rather, the *Parkcentral* court held that even if the plaintiffs in that case had alleged a domestic transaction within the meaning of *Absolute Activist*, their claims were "so predominantly foreign as to be impermissibly extraterritorial." *Id.*

In considering whether *Parkcentral*'s requirement that a plaintiff's claims not be "predominately foreign" applied to CEA claims in *Platinum I*, the Court held that

> Defendants' reliance on *Parkcentral Global Hub, Ltd. v. Porsche Automobile Holdings SE* is unavailing. In *Parkcentral*, the Second Circuit applied the *Morrison* and *Absolute Activist* tests to claims under § 10(b) against foreign defendants for securities transactions relating to securities-based swap agreements pegged to the foreign defendants' stock value. The court held that allowing the claims to proceed "would constitute an impermissibly extraterritorial application of the statute." In so holding, the court expressly stated that its "ultimate conclusion that this suit seeks impermissibly to extend § 10(b) extraterritorially *depends in some part on the particular character of the unusual security at issue.*" The court "expressed no view whether it would have reached the same result if the suit were based on different transactions." Courts in this district have declined to extend the *Parkcentral* analysis on that basis. For those reasons, the Court similarly declines to extend the *Parkcentral* holding to the transactions at issue in this action.

*Platinum I*, 2017 WL 1169626, at *27 n.13 (quoting *Parkcentral*, 763 F.3d at 201-02 and citing *In re Poseidon Concepts Sec. Litig.*, No. 13-CV-1213 (DLC), 2016 WL 3017395, at *12-13 (S.D.N.Y. May 24, 2016); *Atlantica Holdings, Inc. v. BTA Bank JSC*, No. 13-CV-5790 JMF, 2015 WL 144165, at *8 (S.D.N.Y. Jan. 12, 2015)). Because it concluded that *Parkcentral*'s holding did not apply and that the

transactions at issue were domestic, the Court held that "Plaintiffs' CEA claims d[id] not implicate an impermissible extraterritorial application of the statute." *Id.* at *28 (citation omitted).

The Court's holding in *Platinum I* that *Parkcentral* does not apply to Plaintiffs' CEA claims in this case is untenable after *Prime International Trading*. In *Prime International Trading*, the Second Circuit evaluated whether the plaintiffs' CEA claims were extraterritorial by applying *Morrison*'s two-step framework to section 22 of the CEA and two other CEA provisions. *See Prime Int'l Trading*, 937 F.3d at 104 ("Importantly, we must discern the 'focus' of each provision individually, for even if Plaintiffs satisfactorily pleaded a domestic application for one of the conduct-regulating provisions—i.e., Sections 6(c)(1) and 9(a)(2)—they must also do the same for the CEA's private right of action provision, Section 22." (citation omitted)). At the first step of the *Morrison* framework, the Second Circuit held that "since Section 22 of the CEA 'is silent as to extraterritorial reach,' suits funneled through this private right of action 'must be based on transactions occurring in the territory of the United States.'" *Prime Int'l Trading*, 937 F.3d at 102-03 (quoting *Loginovskaya*, 764 F.3d at 272). At *Morrison*'s second step, the Circuit held that "in order for Plaintiffs to state a proper domestic application of Section 22, the suit 'must be based on transactions occurring in the territory of the United States.'" *Id.* at 104 (quoting *Loginovskaya*, 764 F.3d at 272). The *Prime International Trading* court noted that "[t]o assess whether Plaintiffs pleaded permissibly domestic transactions under Section 22[,] . . . typically we would apply a test first announced in *Absolute Activist*," as the Court did with the transactions at issue in this case in *Platinum I*. *Id.* at 104-05.

Rather than apply the *Absolute Activist* test, however, the Circuit applied *Parkcentral*'s holding to the CEA—effectively overruling the Court's decision not to do so in *Platinum I*. The Circuit held that it "need not decide definitively whether Plaintiffs' transactions satisfy *Absolute Activist*, for (as discussed below) their claims are impermissibly extraterritorial even if the transactions are domestic." *Id.* at 105 (citing *Parkcentral*, 763 F.3d at 216). It then noted that the *Parkcentral* court

"assumed without deciding that the equity swaps at issue there were 'domestic transactions' under Section 10(b), but nonetheless dismissed the claims because the facts in that case rendered the suit 'predominately foreign.'" *Id.* (quoting *Parkcentral*, 763 F.3d at 216). The *Prime International Trading* court observed that "[t]he predicate to our conclusion in *Parkcentral* was the maxim that 'a domestic transaction or listing is *necessary*' but 'not alone sufficient' to state a claim under Section 10(b)." *Id.* (quoting *Parkcentral*, 763 F.3d at 215-16). The Second Circuit then held that this "rule carrie[d] over to the CEA." *Id.* In other words, "while a domestic transaction as defined by *Absolute Activist* is 'necessary' to invoke the private remedy afforded by Section 22, it is not 'sufficient.'" *Id.* at 106.

The *Prime International Trading* court explained that "[i]n order to close the gap between 'necessary' and 'sufficient,' Plaintiffs' claims must not be 'so predominately foreign as to be impermissibly extraterritorial.'" *Id.* at 106 (quoting *Parkcentral*, 763 F.3d at 216); *see also id.* at 105 ("To state a proper claim under Section 22, Plaintiffs must allege not only a domestic transaction, but also domestic—not extraterritorial—*conduct* by Defendants that is violative of a substantive provision of the CEA, such as Section 6(c)(1) or Section 9(a)(2).") (citation omitted).

On the facts presented in *Prime International Trading*, the Second Circuit concluded that the plaintiffs' CEA claims were "predominately foreign," and thus impermissibly extraterritorial, because the plaintiffs relied on an "attenuated 'ripple effects' theory whereby (1) the alleged manipulative trading activity taking place in the North Sea (2) affected Brent crude prices—a foreign commodity—which (3) affected a foreign benchmark, the Dated Brent Assessment, which (4) was then disseminated by a foreign price-reporting agency, which (5) was then allegedly used (in part) to price futures contracts traded on exchanges around the world." *Id.* at 106-07. The Circuit noted that "[n]early every link in Plaintiffs' chain of wrongdoing is entirely foreign." *Id.* at 107. Furthermore, the plaintiffs in *Prime International Trading* "ma[de] no claim that any manipulative oil trading occurred in the United States." *Id.* at 106.

*Prime International Trading* teaches that to assess whether Plaintiffs have pleaded an appropriately domestic application of the CEA, the Court must assess whether Plaintiffs' CEA claims are predominately foreign. Plaintiffs assert multiple substantive CEA violations. *See* TAC ¶¶ 281, 286, 291, 294. However, "Plaintiffs' suit must satisfy the threshold requirement of CEA § 22" ("Section 22"), which "gives Plaintiffs a private right of action" under the CEA,[29] before the Court can "reach[] the merits of their" substantive CEA claims. *Prime Int'l Trading*, 937 F.3d at 101 n.4, 104 (quotation and brackets omitted). Consequently, the Court "start[s] by assessing whether Plaintiffs have pleaded a proper domestic application of Section 22." *Id.* at 104.[30]

Plaintiffs' Section 22 claims are predominately foreign.[31] Plaintiffs allege that Defendants manipulated the Fix, which occurred in London and set the price of physical platinum located in London or Zurich. TAC ¶¶ 51-53, 59. Moreover, as the Court noted in *Platinum I*, "[t]he alleged unlawful conduct in this case is the manipulation of the Fix Price that took place during the Fixing Calls" in London, "not manipulations of particular transactions on NYMEX." *Platinum I*, 2017 WL 1169626, at *45. Because *Prime International Trading* directs that the Court should direct its focus to where the allegedly unlawful manipulation occurred, *see Prime Int'l Trading*, 937 F.3d at 106, this weighs heavily in favor of the conclusion that Plaintiffs' claims are predominately foreign. Furthermore, although Plaintiffs allege that they have suffered losses in the United States as a result of Defendants' manipulation, it has been clear since *Morrison* that an allegation that a foreign course of conduct has caused malign effects in the United States is not enough to salvage an otherwise

---

[29] *See* 7 U.S.C. § 25.

[30] Although Plaintiffs' claim for principal-agent liability under the CEA does not expressly cite Section 22, both "principal-agent liability and aiding and abetting claims under the CEA . . . are viable only where an underlying primary violation of the CEA can survive a motion to dismiss." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018) (citations omitted). Accordingly, the viability principal-agent liability claim also depends on whether Plaintiffs have pleaded an appropriately domestic application of Section 22.

[31] Because the Court concludes that Plaintiffs' Section 22 claims are predominately foreign, it does not decide whether Plaintiffs have pleaded an appropriately domestic application of other CEA provisions.

extraterritorial claim. *See Morrison*, 561 U.S. at 259 (rejecting an "effects" test for extraterritoriality); *see also Prime Int'l Trading*, 937 F.3d at 106-07. Consequently, Plaintiffs' CEA claims are so predominately foreign as to be impermissibly extraterritorial.

This conclusion is bolstered by the attenuated causal linkage between Defendants' alleged conduct and Plaintiffs' alleged injury. The crux of Plaintiffs' theory is that Defendants caused them to suffer losses by manipulating the Fix because the Fix price is a global benchmark. *See* TAC ¶ 5 ("Because of the Fixing's importance as a benchmark, as the Fix prices move, so too do the prices for physical platinum and palladium and NYMEX platinum and palladium futures and options[.]"); *id.* ¶ 91 ("Defendants seized upon the Fixing as a means to manipulate . . . NYMEX Platinum and Palladium prices because Fix prices are used as benchmarks."). The plaintiffs in *Prime International Trading* made virtually the same argument. *See Prime Int'l Trading*, 937 F.3d at 100 (noting that the plaintiffs in that case argued that there was a "'direct link' between Brent Futures settlement prices and the Dated Brent Assessment. Specifically, they contend that the 'ICE Brent Futures Contracts prices rarely deviate from the Dated Brent Assessment by more than 1% at expiration,' and that 'changes in the Dated Brent Assessment directly impact Brent Futures prices'") (brackets omitted). Yet the *Prime International Trading* court rejected those plaintiffs' claims as an "attenuated 'ripple effects' theory[.]" *Id.* at 106. There is no meaningful distinction between the theory of harm rejected in *Prime International Trading* and Plaintiffs' theory of harm in this case. Thus, this is an independent reason that the Circuit's decision in *Prime International Trading* case compels the conclusion that Plaintiffs' CEA claims are impermissibly extraterritorial.

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs first argue that the TAC alleges that "Defendants' precious metals traders in" the United States "were in 'constant communication' with Defendants' precious metals desk employees in London," who were directly involved in the twice-a-day Fixings. Opposition to Motion for Reconsideration ("MR Opp."), Dkt

No. 237, at 4 (citing TAC ¶¶ 10, 13, 26 38, 49). This is, to be sure, an allegation of domestic activity, but "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266. The allegation that United-States-based traders communicated with the Fixing participants to further the scheme to manipulate the Fix price only serves to highlight that the locus of the manipulative scheme was the Fixing itself, which was located in London. Moreover, the Fixing directly set prices in the spot markets for physical platinum and palladium, which are located in London and Zurich. *See, e.g.*, TAC ¶ 59. At bottom, the inquiry called for in *Parkcentral* and applied to the CEA in *Prime International Trading* is whether a plaintiff's claims are "predominately"—not exclusively—"foreign," and Plaintiffs' allegations regarding communications from United-States-based traders do not predominate over their allegations of foreign misconduct. *Prime Int'l Trading*, 937 F.3d at 106. Therefore, these allegations are insufficient to render Plaintiffs' claims not predominately foreign.

Plaintiffs also seek to recharacterize the allegations in the TAC to argue that United States-based trading in the physical platinum and palladium market and on the NYMEX was part of Defendants' manipulative scheme itself, not simply a means by which Defendants profited from the manipulation. *See* MR Opp. at 9 n.5. This argument is implausible. Plaintiffs' theory is that Defendants manipulated the price of platinum and palladium to profit from their short positions. *See, e.g.*, TAC ¶ 14 ("The Defendants profited because they were holders of massive short positions in NYMEX platinum and palladium futures and options."). The suggestion that Defendants (and, perhaps, their non-defendant co-conspirators) traded to further depress the price of platinum and palladium when they had—according to Plaintiffs' allegations—a tailor-made opportunity to manipulate that price via the Fixing does not make sense and is inconsistent with the allegations in the TAC. Hence, to the extent that the TAC can be read to support Plaintiffs' novel theory, the

Court rejects it as implausible. Accordingly, Defendants' motion for reconsideration is granted as to Plaintiffs' CEA claims; those claims are dismissed without prejudice.

### D. Leave to Amend

Because the Court has dismissed Plaintiffs' Sherman Act and CEA claims, there are no remaining claims in this case. However, although Plaintiffs have twice amended their complaint in response to Defendants' motions to dismiss, in this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (citation omitted); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (citation omitted). Thus, the Court will grant Plaintiffs leave to amend once again. However, Plaintiffs should not expect any additional opportunities to amend their complaint. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003) ("[W]here pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough."(citations omitted)). Any amended complaint must be filed no later than **May 1, 2020**.

Discovery in this action is stayed pursuant to the Court's April 21, 2015, order. Dkt. No. 48. Discovery in this action will remain stayed until the deadline for Defendants to answer or otherwise respond to an amended complaint. If Plaintiffs amend the TAC, and Defendants move to dismiss Plaintiffs' amended complaint, the parties may file a new motion for a stay of discovery no later than **June 1, 2020**. If Plaintiffs do not amend the TAC, or if Defendants do not file a motion to stay by the deadlines specified above, the Court will schedule a Rule 16 conference promptly thereafter.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is GRANTED, the Foreign Defendants' motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) is DENIED, and Defendants' motion for reconsideration is GRANTED. Plaintiffs are granted leave to replead their Sherman Act and CEA claims.

The Clerk of Court is directed to terminate the motions pending at Dkt Nos. 207 and 235.

SO ORDERED.

Dated: March 29, 2020
New York, New York

_____
GREGORY H. WOODS
United States District Judge